UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
ALBERT PEARSALL,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        Case No: 07-0108 (PLF)
                                          )
MICHAEL MUKASEY, Attorney General,        )
United States Department of Justice,[1]   )
                                          )
                    Defendant.            )
_____)

## DEFENDANT'S MOTION TO DISMISS OR,
## IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(1), 12(b)(6) and 56 of the Federal Rules of Civil Procedure,

Defendant, Attorney General Michael Mukasey, through counsel, respectfully moves this Court

to dismiss Plaintiff's complaint with prejudice or grant summary judgment in favor of the

Defendant for lack of subject matter jurisdiction and failure to state a claim.  In support of this

motion, Defendant respectfully refers the Court to the attached memorandum of points and

authorities.

Because this is a dispositive motion, the undersigned has not sought Plaintiff's consent

before filing it.  LCvR 7 (m).

---

[1]      Pursuant to Fed. R. Civ. P. 25(d), the current Attorney General, Michael Mukasey,
has been automatically substituted as the Defendant.

Dated: December 17, 2007            Respectfully submitted,


                                    /s/
                                    _____
                                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                                    United States Attorney


                                    /s/
                                    _____
                                    RUDOLPH CONTRERAS, D.C. BAR # 434122
                                    Assistant United States Attorney.


                                    /s/
                                    _____
                                    ANDREA McBARNETTE, D.C. Bar  # 483789
                                    Assistant United States Attorney Center Building
                                    555 Fourth Street, N.W.
                                    Washington, D.C. 20530
                                    (202) 514-7153

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ALBERT PEARSALL,                          )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )          Case No: 07-0108 (PLF)
                                          )
MICHAEL MUKASEY, Attorney General,        )
United States Department of Justice,[1]   )
                                          )
                    Defendant.            )
_____)

**DEFENDANT'S STATEMENT OF MATERIAL
FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**

        Pursuant to Local Rule 7.1(h), Defendant, Attorney General Michael Mukasey,

respectfully submits this statement of material facts as to which he contends there is no genuine

dispute.  Defendant respectfully refers the Court to the supporting documents from the

administrative stage of this case: the deposition transcripts of Albert Pearsall ("AP Dep.");

Pamela Cammarata ("PC Dep."); Matthew Scheider ("MS Dep."); Beverly Alford ("BA Dep.");

Jamie French ("JF Dep."); the declaration of Debbie S. Brown ("Brown Decl."); Agency's

Objections and Responses to Interrogatories; and the Record of Investigation ("ROI").

        1.      Plaintiff is an African American male currently employed as a GS-301-14 Senior

Policy Analyst in DOJ's Office of Community Oriented Policing Services ("COPS").  Compl. ¶¶

8, 52.  Plaintiff has worked within DOJ since approximately 1981.  Compl. ¶ 6.

        2.      While employed at DOJ's Office of Justice Programs, ("OJP") and on or about

June - July 2001, Plaintiff was interviewed regarding the EEO complaints of two other

_____

        [1]  Pursuant to Fed. R. Civ. P. 25(d), the current Attorney General, Michael Mukasey, has
been automatically substituted as the Defendant.

employees.  Compl. ¶¶ 9-10.

3.      In September 2002, Plaintiff was transferred from OJP to COPS into a GS-14

Senior Policy Analyst position.  Compl. ¶¶ 8, 15.  On or about May 25, 2004, Plaintiff first

contacted an EEO counselor and alleged that his transfer to COPS was retaliatory.  Exhibit 1,

ROI, Tab B-1.

4.      In 2003, Plaintiff applied and interviewed for the position of Supervisory

Program Audit Officer ( GS-301-15).  Compl. ¶¶ 42, 44.  The selection process for this position

took place in 2003 and Plaintiff was not selected for the position.  Compl. ¶ 44.

5.      In January 2004, COPS issued vacancy announcement COPS-04-086(DH) for a

GS-14 Supervisory Social Science Analyst ("SSSA") in the Program/Policy Support and

Evaluation Division ("PPSE").  For the SSSA position, applications were submitted to the

AVUE Digital Services ("AVUE"), which scored and ranked the applicants with the ultimate

selectee, Dr. Matthew Scheider, receiving a higher score than the Plaintiff.  Exhibit 2,

KSA/Competency Rating; Exhibit 3, Brown Decl. ¶ 2.  AVUE deemed both the selectee and the

Plaintiff as being minimally qualified for the SSSA vacancy and listed them on the

noncompetitive and merit promotion lists as being eligible candidates. Exhibit 4, ROI, Tab E-16;

Exhibit 3, Brown Decl. ¶ 2.

6.      Three candidates were interviewed for the SSSA position by a three member

panel consisting of Pamela Cammarata, Beverly Alford, and Jamie French.  Exhibit 5, ROI, Tab

D-9, at 26-27.

7.      According to the Position Description ("PD") attached to the Vacancy

Announcement, the duties of the position included, but were not limited to, responsibility for:

·    "leading support for designing, implementing, monitoring and assessing national level

2

programs to . . . implement community policing. . . .[and] perform[ing] a variety of senior level management, analytical, administrative, evaluative and other professional work in a combination of social and/or behavioral sciences contributing to the Office's mission through program and policy support and evaluation[,]" and

· "lead[ing] senior level policy analysis activities . . ., direct[ing] and oversee[ing] internal assessments and external efforts, including senior level liaison with the COPS Office Director and other organizations engaging in policy work, research or evaluation in support of the COPS Office . . . ensur[ing] policy and evaluation activities are completed efficiently and effectively . . . ."

Exhibit 6, ROI, Tab E-14.

8.      The required Knowledge, Skills, and Attributes ("KSAs") included the ability to communicate effectively in performing supervisory or leader work, the ability to supervise, and the ability to analyze organizational and operational problems and develop solutions.  Exhibit 6, ROI, Tab E-14.

9.      The requisite knowledge for the SSSA position, included, but was not limited to:

· "[p]rofessional mastery of public administration, behavioral and social sciences, including superior knowledge and skills in applying social scientific concepts and methods to studying problems of crime and criminal justice and a demonstrated ability to design and carry to completion research projects of substantial complexity[;]"

· "professional mastery of advanced research design and experimental methods[;]"

· "professional mastery of advanced qualitative and quantitative systems, behavior concepts and analysis methods[;]"

· "professional knowledge of new developments in the social and behavioral sciences as they pertain to the field of criminal justice. . . ."

Exhibit 6,  ROI, Tab E-14.

10.      Cammarata made the final selection decision.  Exhibit 7, PC Dep. 157:7-17; Exhibit 10, JF Dep. 96:2-9, 101:10-102:1, 103:14-22; Exhibit 9, BA Dep. 80:6-17.  Cammarata took into consideration the application and any attached materials, the interview, and her knowledge of each candidate's performance.  Exhibit 7, PC Dep. 194:13-195:3.

11.      As set forth in the interview questions and discussed with the panelists,

3

Cammarata sought a candidate who would be "a hands on, multitasking supervisor, who takes on work himself/herself, is very organized, efficient, meets deadlines, very independent thinker, who needs little guidance, is competent and confident, is credible in the research and evaluation field and among academics, can defend methodologies used by OIG [Office of the Inspector General], GAO [Government Accounting Office], NIJ [National Institute of Justice], etc.  Gets along well with others, is politically astute, keeps abreast of research and evaluation studies in the field, provides direction regarding future research, policy support and evaluation activities."  Exhibit 8, ROI, Tab E-17; Exhibit 7, PC Dep. 167:22-168:5; Exhibit 9, BA Dep. 40:20-25, 63:21-64:13; Exhibit 10, JF Dep. 81:17-82:8.

12.     Cammarata's focus on the research and evaluation criteria were based, in part, on her desire to address two concerns.  First, she wanted to "make a distinction between what PPSE was doing and what Training and [Technical Assistance Division] was doing" so "[she] was putting more of a focus in [filling the 2004 vacancy] on the research and the evaluation and the statistical experience and knowledge that the division holds. . . ."  Exhibit 7, PC Dep. 169:15-170:4.   "At the same time, there was concern about the COPS Office and the studies on COPS impact on crime.  And [COPS] was being criticized for [its] evaluation studies and some of the research we were doing, and [she] wanted to bring that credibility back to the division" by, in part, hiring a supervisor who had the technical knowledge, experience, and credibility in the field to implement such change.  Exhibit 7, PC Dep. 171:22-172:1.

13.     Cammarata did not consider the race or age of the candidates.  Exhibit 5, ROI, Tab D-9 at 30; Exhibit 11, D-11 at 10; Exhibit 12, D-13 at 4-5.

14.     Cammarata selected Scheider, the selectee, because she believed he was the best

4

qualified candidate and best fit the selection criteria.  Exhibit 5, ROI, Tab D-9, at 28; Exhibit 13,

E-17 (compare Summary page of Cammarata interview notes).

15.    The selectee had experience and an educational background in the areas of

advanced research design and experimental methods, and advanced analytical, statistical and

evaluation work including:

· holding a Ph.D. in Sociology with an emphasis in crime/deviance and social stratification;

· conducting original social science research that involves complex statistical analyses including LOGIT and OLS regression;

· having a number of peer-reviewed publications in academic journals and serving as the Assistant Editor for the journal of Deviant Behavior, a professional reviewer for Police Quarterly and Police Practice and Research, Assistant to the Editor for the official journal of the American Society of Criminology; and

· working as a Social Science Analyst in PPSE for the past five years, which entailed:

  - performing analyses that have had direct policy implications for COPS Office program and activities, such as conducting the recertification of the COPS MORE Grant program for the Attorney General to present to Congress, and developing and planning an evaluation of the COPS Office that resulted in a report to the Senate Judiciary Committee that the COPS Office had a significant effect on reducing crime; and

  - managing a number of COPS Office innovative grants and cooperative agreements.

Exhibit 13, ROI, Tab E-17, Exhibit 14, E-18; Exhibit 15, MS Dep. 26:3-7, 56:18-20, 10:22-

13:10, 14:19-15:1, 16:11-18:8, 20:5-13, 25:15-23, 38:22-40:23, 42:17-45:4.

16.    The selectee's application detailed his leadership roles at COPS, such as:

· leading the multi-divisional team for the Hot Spots program, the team that conducted the successful MORE recertification, and the team that developed an options and process memo to merge COPS Count and Progress Reports;

· leading the time-sensitive development of the PPSE Open Solicitation;

· serving as the Acting Assistant Director ("AD") and Supervisory Social Science Analyst ("SSSA") for two three-week periods;

· serving as grant manager for a large number of cooperative agreements which require supervisory skills; and

· supervising an intern;

Exhibit 14, ROI, Tab E-18.

17.    Cammarata also believed that selectee was credible in the field of academia. Exhibit 5, ROI, Tab D-9, at 28; Exhibit 13, E-17; <u>see</u> <u>also</u> Exhibit 10, JF Dep.102:7-14, 102:21-104:13; Exhibit 9, BA Dep.73:18-74:3.

18.    Moreover, Cammarata and the panelists believed that the selectee had been well prepared for the interview, bringing with him numerous examples of his substantive work. Exhibit 5, ROI, Tab D-9, at 29, Exhibit 13, E-17; Exhibit 9, BA Dep.67:6-18, 74:4-75:15.

19.    From serving as his supervisor for five years, Cammarata knew that the selectee was extremely organized, very concise, and an independent thinker who needed little guidance. He also addressed issues immediately, met deadlines, and had strong multi-tasking and leadership skills.  Exhibit 5, ROI, Tab D-9, Exhibit 13, E-17; Exhibit 7, PC Dep. 210:1-3.

20.    While Cammarata believed that Plaintiff met some of the criteria, overall she determined that Plaintiff lacked the experience and expertise in advanced research design and experimental methods, and advanced analytical, statistical and evaluation work that selectee had. Exhibit 7, PC Dep. 206:8-10; Exhibit 5, ROI, Tab D-9 at 27, 28-29; Exhibit 13, E-17. Cammarata also took into account observations about his performance she had formed from working with him.  Exhibit 5, ROI, Tab D-9, at 29, Exhibit 13, E-17; Exhibit 7, PC Dep.184:2-9. Among other things, she felt he was not organized, not brief in discussions, and was not an independent thinker or doer.  Cammarata felt he was unable to independently and proactively handle large-scale tasks and lead teams, and Cammarata questioned his ability to delegate work among his Police Integrity team.  Exhibit 5, ROI, Tab D-9, at 29-30.  Her overall concern was the detailed guidance that Plaintiff required before moving forward on complex tasks.  Exhibit 5, ROI, Tab D-9, at 30.

21.     From September 23, 2002 - April 19, 2004, Cammarata served as Plaintiff's first or second level supervisor, and therefore, had first-hand knowledge of his performance.  Exhibit 5, ROI, Tab D-9 at 2; Exhibit 7, PC Dep.184:2-9.  Examples of Plaintiff's performance include, that Cammarata and others, brought to Plaintiff's attention complaints that grantees were leaving him voice mail messages, but not getting any response.  Exhibit 16, AP Dep. 242:9-13, 242:21-23, 243:5-20; Exhibit 5, ROI, Tab D-9, at 30.  Plaintiff also failed to hold any team meetings or to have much communication with team members for the first seven months after he was assigned responsibility for serving as Police Integrity team's leader.  Exhibit 16, AP Dep. 214:11-220:25, Exhibit 17, 2/26/04 email chain between Cammarata and Pearsall.  Exhibit 5; ROI, Tab D-9, at 29-30.  Additionally, Plaintiff at times would state how overloaded he was and not complete his assigned projects, yet he continued to volunteer to take on new projects. Exhibit 5, ROI, Tab D-9 at 30.

22.     As his supervisor, Cammarata assigned Plaintiff to be in charge of significant projects, including Presidential Initiatives and the Police Integrity Team, and asked him to work on the strategic plans of the three divisions she supervised, as well as attend strategic planning and budget meetings.  Exhibit 16, AP Dep. 70:11-14, 72:8-73:10, 115:17-116:23, 117:5-118:4, 118:119:4, 176:5-20, 203:12-21, 204:5-23, 214:4-10.

23.     On or about May 25, 2004, Plaintiff contacted an EEO counselor regarding his claims of discrimination and reprisal.  Exhibit 1, ROI, Tab B-1.

Dated: December 17, 2007          Respectfully submitted,


  /s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.


  /s/
ANDREA McBARNETTE, D.C. Bar  # 483789
Assistant United States Attorney Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7153

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ALBERT PEARSALL,                          )
                                          )
                Plaintiff,                )
                                          )
        v.                                )       Case No: 07-0108 (PLF)
                                          )
MICHAEL MUKASEY, Attorney General,        )
United States Department of Justice,[1]   )
                                          )
                Defendant.                )
_____  )


## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT


        Defendant, Attorney General Michael Mukasey, through counsel, respectfully moves

this Court to dismiss Plaintiff's complaint with prejudice or grant summary judgment in favor of

the Defendant for lack of subject matter jurisdiction and failure to state a claim.  In this

employment discrimination action, Plaintiff asserts claims under Title VII of the Civil Rights

Act, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act, 29 U.S.C. § 621 et

seq.; 42 U.S.C. § 1983; and common law.  The Court should dismiss Plaintiff's claims because

he failed to exhaust his administrative remedies and failed to state actionable claims.  In the

alternative, the Court should grant summary judgment as the Plaintiff cannot demonstrate that

the Defendant's reasons for the actions at issue are a pretext for discrimination.  In support of his

dispositive motion, the Defendant respectfully refers the Court to the supporting documents from

the administrative stage of this case: the deposition transcripts of Albert Pearsall ("AP Dep.");

_____
        [1]  Pursuant to Fed. R. Civ. P. 25(d), the current Attorney General, Michael Mukasey, has
been automatically substituted as the Defendant.

Pamela Cammarata ("PC Dep."); Matthew Schneider ("MS Dep."); Beverly Alford ("BA

Dep."); Jamie French ("JF Dep."); the declaration of Debbie S. Brown ("Brown Decl.");

Agency's Objections and Responses to Interrogatories; and the Record of Investigation ("ROI").

## BACKGROUND

Plaintiff is an African American male currently employed as a GS-301-14 Senior

Policy Analyst in DOJ's Office of Community Oriented Policing Services ("COPS").  Compl. ¶¶

8, 52.  Plaintiff has worked within DOJ since approximately 1981.  Compl. ¶ 6.

While employed at DOJ's Office of Justice Programs, ("OJP") and on or about June -

July 2001, Plaintiff was interviewed regarding the EEO complaints of two other employees.

Compl. ¶¶ 9-10.  In September 2002, Plaintiff was transferred from OJP to COPS into a GS-14

Senior Policy Analyst position.  Compl. ¶¶ 8, 15.  Around 18 months after his transfer, in May

2004, Plaintiff contacted an EEO counselor alleging that his transfer to COPS was retaliatory.

Exhibit 1, ROI, Tab B-1.

In 2003, Plaintiff applied and interviewed for the position of Supervisory Program Audit

Officer ( GS-301-15).  Compl. ¶¶ 42, 44.  Plaintiff was not selected for the position.  Compl. ¶

44.

In January 2004, COPS issued vacancy announcement COPS-04-086(DH) for a

GS-14 Supervisory Social Science Analyst ("SSSA").  For the SSSA position, applications were

submitted to the AVUE Digital Services ("AVUE"), which scored and ranked the applicants

with

the ultimate selectee receiving a higher score than Plaintiff.  Exhibit 2, KSA/Competency

Rating;

Exhibit 3, Brown Decl. ¶ 2.  The selecting official, Pamela Cammarata, chose three of the

applicants for interviews. ROI, Exhibit 5, Tab D-9, at 26; Exhibit 7 PC Dep.160:8-12.

Cammarata had worked with all three interviewed candidates and had been the supervisor

for the Plaintiff and the selectee.  Exhibit 5, ROI, Tab D-9 at 2; see Exhibit 7, PC Dep. 187:20-

188:1.[2]

The three member panel which interviewed the applicants consisted of Cammarata,

Alford, and Jamie French.  ROI, Tab D-9, at 27.  Cammarata made the final selection

decision, with the panelists' input.  Exhibit 7, PC Dep.157:7-17; Exhibit 10, JF Dep.96:2-9,

101:10-102:1, 103:14-22; Exhibit 9, BA Dep.80:6-17.  It was the consensus of the panel that the

selectee was the best qualified candidate.  Exhibit 5, ROI, Tab D-9, at 28; Exhibit 13, E-17.

Cammarata took into consideration the application and any attached materials, the interview, and

her knowledge of each candidate's performance.  Exhibit 7, PC Dep.194:13-195:3.

The Position Description for the vacancy announcement listed as requisite knowledge:

professional mastery of behavioral and social sciences; advanced research design and

experimental methods; advanced qualitative and quantitative systems; and behavior concepts and

analysis methods.  Exhibit 6, ROI, Tab E-14.  In addition, Cammarata sought a candidate who

would be "a hands on, multitasking supervisor, who takes on work himself/herself, is very

organized, efficient, meets deadlines, very independent thinker, who needs little guidance, is

competent and confident, is credible in the research and evaluation field and among academics,

can defend methodologies used by OIG [Office of the Inspector General], GAO [Government

Accounting Office], NIJ [National Institute of Justice], etc.  Gets along well with others, is

politically astute, keeps abreast of research and evaluation studies in the field, provides direction

---

[2] In the past when the SSSA position had been vacant, Cammarata assigned
employees to serve as Acting SSSA on a temporary rotational basis and both Plaintiff and the
selectee served as Acting SSSA.  See Exhibit 16, AP Dep. 157:22-159:22.

regarding future research, policy support and evaluation activities." Exhibit 8, ROI, Tab E-17;

Exhibit 7, PC Dep. 167:22-168:5; Exhibit 9, BA Dep. 40:20-25, 63:21-64:13; Exhibit 10, JF

Dep. 81:17-82:8.

　　　　Cammarata's focus on the research and evaluation criteria were based, in part, on

her desire to address two concerns.  First, she wanted to "make a distinction between what PPSE

was doing and what Training and [Technical Assistance Division] was doing" so "[she] was

putting more of a focus in [filling the 2004 vacancy] on the research and the evaluation and the

statistical experience and knowledge that the division holds. . . ."  Exhibit 7, PC Dep. 169:15-

170:4.  "At the same time, there was concern about the COPS Office and the studies on COPS

impact on crime.  And [COPS] was being criticized for [its] evaluation studies and some of the

research we were doing, and [she] wanted to bring that credibility back to the division" by, in

part, hiring a supervisor who had the technical knowledge, experience, and credibility in the field

to implement such change.  Id. 171:22-172:1.

　　　　The selectee had experience and an education background in the areas of advanced

research design and experimental methods, and advanced analytical, statistical and evaluation

work including:

· holding a Ph.D. in Sociology with an emphasis in crime/deviance and social stratification;
· conducting original social science research that involves complex statistical analyses including LOGIT and OLS regression;
· having a number of peer-reviewed publications in academic journals and serving as the Assistant Editor for the journal of Deviant Behavior, a professional reviewer for Police Quarterly and Police Practice and Research, Assistant to the Editor for the official journal of the American Society of Criminology; and
· working as a Social Science Analyst in PPSE for the past five years, which entailed:
    - performing analyses that have had direct policy implications for COPS Office program and activities, such as conducting the recertification of the COPS MORE Grant program for the Attorney General to present to Congress, and developing and planning an

evaluation of the COPS Office that resulted in a report to the Senate Judiciary Committee that the COPS Office had a significant effect on reducing crime; and

- managing a number of COPS Office innovative grants and cooperative agreements.

Exhibit 13, ROI, Tab E-17, Exhibit 14, E-18; Exhibit 15, MS Dep. 26:3-7, 56:18-20, 10:22-

13:10, 14:19-15:1, 16:11-18:8, 20:5-13, 25:15-23, 38:22-40:23, 42:17-45:4.

As detailed in selectee's application, he had acted in a leadership capacity in a number of

different roles at COPS, such as:

· leading the multi-divisional team for the Hot Spots program, the team that conducted the successful MORE recertification, and the team that developed an options and process memo to merge COPS Count and Progress Reports;

· leading the time-sensitive development of the PPSE Open Solicitation;

· serving as the Acting Assistant Director ("AD") and Supervisory Social Science Analyst ("SSSA") for two three-week periods;

· serving as grant manager for a large number of cooperative agreements which require supervisory skills;

· supervising an intern;

· being nominated for the COPS MVP Award by his colleagues, in which they stated: "He has won the universal respect and appreciation of his colleagues for his intelligence, hard-work and for the no-nonsense manner in which he approaches his work;" and

- communicating effectively on numerous occasions in a leadership capacity and making presentations representing COPS, including presentations to the Office of Management and Budget, Congress, the General Accounting Office and academics.

Exhibit 14, ROI, Tab E-18.

Moreover, from serving as his supervisor for five years, Cammarata knew that the

selectee was extremely organized, very concise, and an independent thinker who needed little

guidance. He also addressed issues immediately, met deadlines, and had strong multi-tasking

and leadership skills. Exhibit 5, ROI, Tab D-9, Exhibit 13, E-17; Exhibit 7, PC Dep. 210:1-3. In

addition to the selectee's substantive knowledge and abilities, she and the panelists believed that

the selectee was extremely prepared for the interview, bringing with him numerous examples of

his substantive work.  Exhibit 5, ROI, Tab D-9, at 29, Exhibit 13, E-17; Exhibit 9, BA Dep.67:6-

18, 74:4-75:15.  Also, Cammarata and at least one of the panelists viewed favorably the fact that

Scheider had a detailed vision for leading the division.  Exhibit 13, ROI, Tab E-17; Exhibit 7, PC

Dep. 202:12-24, 260:19-262:9; Exhibit 9, BA Dep. 67:19-68:10.

From September 23, 2002 - April 19, 2004, Cammarata served as Plaintiff's first or

second level supervisor, and therefore, had first-hand knowledge of his performance.  Exhibit 5,

ROI, Tab D-9 at 2; PC Dep. 184:2-9.  While Cammarata believed that Plaintiff met some of the

criteria, overall she determined that Plaintiff lacked the experience and expertise in advanced

research design and experimental methods, and advanced analytical, statistical and evaluation

work that the selectee had.  Exhibit 7, PC Dep. 206:8-10; Exhibit 5, ROI, Tab D-9 at 27, 28-29;

Exhibit 13, E-17.  Cammarata also took into account observations about his performance she had

formed from working with him.  Exhibit 5, ROI, Tab D-9, at 29, Exhibit 13, E-17; Exhibit 7, PC

Dep.184:2-9.  Among other things, she felt he was not organized, not brief in discussions, and

was not an independent thinker or doer.  For example, in 2003, Cammarata, and others, brought

to Plaintiff's attention complaints that grantees were leaving him voice mail messages, but not

getting any response.  Exhibit 16, AP Dep. 242:9-13, 242:21-23, 243:5-20; Exhibit 5, ROI, Tab

D-9, at 30.  Plaintiff also failed to hold any team meetings or to have much communication with

team members for the first seven months after he was assigned responsibility for serving as

Police Integrity team's leader.  Exhibit 16, AP Dep. 214:11-220:25, Exhibit 17, 2/26/04 email

chain between Cammarata and Pearsall.  Exhibit 5, ROI, Tab D-9, at 29-30.  Additionally,

Plaintiff at times would state how overloaded he was and not complete his assigned projects, yet

he continued to volunteer to take on new projects.  Exhibit 5, ROI, Tab D-9 at 30.  As a result,

Cammarata felt he was unable to independently and proactively handle large-scale tasks and lead

teams, and Cammarata questioned his ability to delegate work among his Police Integrity team.

Exhibit 5, ROI, Tab D-9, at 29-30. Her overall concern was the detailed guidance that Plaintiff

required before moving forward on complex tasks. Exhibit 5, ROI, Tab D at 30.

Plaintiff testified in his deposition at the administrative stage[3] that his belief that he had

substantially more breadth and depth of experience than the selectee was based on "[his own]

record" and "[his own] background." Exhibit 16, AP Dep. 318:15-319:8. Plaintiff further

testified that he has not been in a position where he has supervised the selectee's work and does

not know the selectee's performance ratings. Exhibit 16, AP Dep. 33:22-34:4, 280:15-17. In his

opinion, however, the selectee was "very talented[,]" a "nice person" who "has worked in the

COPS Office for a number of years[,]" "a competent person[,] and a good speaker." Exhibit 16,

AP Dep. 32:22-23; 34:20-25; 35:9-14; 311:17-21.

## STANDARD OF REVIEW

A.    *Motion to Dismiss*

In resolving Fed. R. Civ. P. 12(b)(1) and 12(b)(6) motions to dismiss, the court will treat

the complaint's factual allegations as true and draw all reasonable inferences therefrom in the

plaintiff's favor. Sullivan-Obst v. Powell, Secretary, Department of State, 300 F. Supp. 2d 85,

91 (D.D.C. 2004); Arbitraje Casa De Cambio v. United States Postal Serv., 297 F. Supp. 2d 165,

---

[3] The Plaintiff was represented at the administrative stage by the law firm of Arnold and Porter and the parties engaged in and completed extensive discovery including: 1) depositions of six individuals were taken, consuming approximately thirty-four and half hours and resulting in 1,239 pages of testimony; 2) Plaintiff served 14 requests for admissions, 29 interrogatories and 25 document requests resulting in Defendant's production of more than 1,600 pages of documents; 3) Defendant served eight requests for admissions, 26 interrogatories and 30 document requests resulting in Plaintiff's production of more than 1,900 pages of documents. At the end of this discovery the administrative law judge granted summary judgment in favor of Defendant. See PC Dep.; AP Dep.; MS Dep.; BA Dep.; JF Dep.; Agency's Objections and Responses to Interrogatories; AP Dep. 1:11-25.

168 (D.C. C. 2003) (finding that substantially the same standard of review should be used to evaluate Fed. R. Civ. P. 12(b)(1) and 12(b)(6) motions).

A complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007). To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965. While "many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." Shirk v. Garrow, 505 F. Supp.2d 169, 172 (D.D.C. 2007).

The court may consider certain additional evidence in deciding the motion. See, e.g., Marshall Cty. Health Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993); Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986); Scott v. England, 264 F. Supp. 2d 5, 7 (D.D.C. 2002) (citing Hohri); Green v. Small, No. 05-1055, 2006 WL 148740, *6, n. 4 (D.D.C. Jan. 19, 2006) (""Because documents involved in the administrative proceeding underlying this case are matters of public record, the Court's consideration of them here does not convert defendant's motion for dismissal into a motion for summary judgment.").

B.    *Summary Judgment*

In the alternative, summary judgment pursuant to Fed. R. Civ. P. 56 is proper when the pleadings, depositions, answers to interrogatories, and admissions together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must consider whether the nonmoving party failed to make a

showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Sullivan-Obst, 300 F. Supp. 2d at 90. The nonmoving party must present specific facts that would enable a reasonable jury to find in its favor; thus, by pointing to an absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. Id. Also, while the court must accept the nonmoving party's evidence as true, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. Id. Therefore, an employer can obtain summary judgment in one of two ways: It can demonstrate that the plaintiff's evidence fails to establish a prima facie case or it can present a legitimate, nondiscriminatory reason about which the plaintiff does not create a valid factual dispute. Mitchell v. Data Gen. Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, [the Rule 56] standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation." Spiegel v. Leavitt, 2005 WL 2402322, at 8 (D.D.C. Sept. 22, 2005) (citation omitted).

## ARGUMENT

### I.     Plaintiff Failed to Exhaust his Administrative Remedies

#### A.     Administrative Procedures and Exhaustion Requirements

Federal employees may file a civil action only after exhausting their administrative remedies before the concerned Federal agency. 42 U.S.C. § 2000e-16(c). Under rule-making authority delegated by Title VII, see 42 U.S.C. § 2000e-16(b), the EEOC has "established detailed procedures for the administrative resolution of discrimination complaints, including a series of time limits for seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission." Bowden v. United States, 106 F.3d 433, 437

(D.C. Cir. 1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity). The EEOC's regulations provide that "aggrieved" employees or applicants for employment who allege they have been discriminated against must first consult an agency EEO counselor before filing a complaint of discrimination and must do so within 45 days of the "matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1).

If the matter is not resolved through informal counseling, the aggrieved employee must, within 15 days, file a written complaint with the agency that allegedly discriminated against him. 29 C.F.R. § 1614.106(a)-(c). The agency must investigate the matter within 180 days or reject the complaint and issue a final dismissal. 29 C.F.R. § 1614.106(d)(2). At the conclusion of the agency's investigation, the complainant may request a hearing before an EEOC administrative judge or an immediate final decision by the agency. 29 C.F.R. § 1614.108(f).

A complainant who receives an adverse final decision from the agency may appeal that decision to the EEOC within 30 days, or may file a civil action within 90 days. 42 U.S.C. 2000e-16(c); 29 C.F.R. 1614.408; see also Wilson v. Pena, 79 F.3d 154 (D.C. Cir. 1996); Holley v. Dep't of Veterans Affairs, 165 F.3d 244, 246 (3d Cir. 1999). A complainant also may file a civil action at any time after a complaint has been pending before the agency or the EEOC for at least 180 days. 42 U.S.C. 2000e-16(c); 29 C.F.R. 1614.408.

Compliance with these procedures and time lines is mandatory. "Complainants must timely exhaust these administrative remedies before bringing their claims to court." Bowden, 106 F.3d at 437; Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative charge is a prerequisite to initiation of a Title VII action"). As the U.S. Supreme Court stated in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), "'strict

adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" 536 U.S. at 108 (*quoting* <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 825, 100 S. Ct. 2486, 2497 (1980)).

To meet the exhaustion requirements, not only must Plaintiff's civil claims be contained in his administrative complaint, but he must have exhausted his administrative remedies with respect to those claims. <u>Raines v. Department of Justice</u>, 424 F. Supp. 2d 60, 65 (D.D.C. 2006). The civil complaint is "limited to those [issues] within the scope of the administrative investigation which grows or could reasonably be expected to grow out of the administrative charge of discrimination." <u>Miller v. Smith</u>, 584 F. Supp. 149, 154 (D.D.C. 1984) (stating that claims in complaint must be "intimately related" to EEOC investigation). While the administrative complaint need not rise to the level of a formal pleading, it must describe the facts and legal theory with sufficient clarity to notify the agency of the claim. <u>Id</u>. To this end, a claim that is brought but then dropped before the agency has a chance to investigate and reconcile it, has not been administratively exhausted. <u>Miller</u>, 584 F. Supp. at 153, 155 (finding that two separate plaintiffs who had filed and withdrawn administrative complaints could not maintain civil actions).

  **B.**   <u>**Plaintiff failed to exhaust Count I, III, V and VI**</u>

The Plaintiff failed to exhaust the following claims:  (1) Count I – retaliatory hostile work environment; (2) Count III – 2003 Supervisory Program Audit Officer non-selection, (3) Count V -  retaliation for being interviewed in two EEO cases; and (4) Count VI – retaliatory hostile work environment  for participating in diversity promoting activities.  Plaintiff <u>never asserted</u> in his formal administrative EEO complaint his Counts I and VI claims.  Counts III and V claims were brought to the attention of the EEO counselor well after the 45-day period for

11

doing so.  The parts of Counts V that were timely were later withdrawn by Plaintiff at the administrative stage.  Because Plaintiff failed to exhaust his administrative remedies with respect to all of these claims, the Court should dismiss them.

### 1.    Count I was not asserted in his EEO complaint

In Count I of his Complaint, Plaintiff for the first time attempts to assert a retaliatory hostile work environment claim based on an amalgam of four claims: (1) that he was assigned an interior office space when he joined COPS in 2002[4]; (2) that he was denied approval to attend a training course in December 2003[5]; (3) that he was "denied the opportunity to telecommute on a temporary basis for medical reasons" unless he provided medical documentation;[6] and (4) that he was "not invited to important meetings, strategic planning retreats, [and] budget meetings."  See Compl. ¶¶ 26-29.

Not only did Plaintiff fail to raise these issues as a "hostile work environment" claim at the administrative level, but Plaintiff's own counsel noted that they did not amount to a "separate claim.  Exhibit 18, ROI Tab D-1, at 8.  Where a claim has not been presented or accepted for investigation at the administrative level, that claim is unexhausted.  See Silver v. Leavitt, No.05-

---

[4]    In April 2004, Plaintiff was given two opportunities to move to another office, both of which he rejected.  Exhibit 18, ROI, Tab D-1, at 71; Exhibit 5, Tab D-9 at ¶ 69; Exhibit 6, Tab D-14, at 4-5.  Plaintiff declined the first office because the furniture he had previously seen in that office had been moved elsewhere. Exhibit 19, ROI, Tab D-23; Exhibit 5, Tab D-9 at ¶ 61.  Plaintiff declined to move into a second office which was the former office of his then supervisor.  Exhibit 19, Tab D-23; Exhibit 5, Tab D-9 at ¶ 61, Exhibit 6, ROI, Tab D-14, at ¶ 5.

[5]    Plaintiff was denied only one training request by Ms. Cammarata who denied the very same training request to two white male employees under age 40.  Exhibit 20, ROI, Tab D-10, at 1-2.

[6]    Even though the Plaintiff claimed he sought to telecommute due to medical reasons, when his supervisor requested information regarding his medical reasons, Plaintiff withdrew his request to telecommute.  See Exhibit 20, ROI, Tab D-10, at ¶ 2; Exhibit 21, Tab D-24.

0968, 2006 WL 626928, at *9 (D.D.C. Mar. 13, 2006) (holding that even though the administrative record contained some facts relating to a particular claim of discrimination, that claim had not been exhausted because it was not accepted for investigation at the administrative level). Based on Plaintiff's representations to the EEO Counselor, the claim accepted by the Equal Employment Opportunity Staff ("EEOS") for investigation (designated as Claim 4 by EEOS) was his assignment to a substandard working area at COPS - and not a hostile work environment claim. See Exhibit 22, ROI, Tab C-8.

Although Plaintiff disagreed with EEOS's determination of the claims accepted for investigation, Plaintiff did not assert a hostile work environment claim. Instead, the Plaintiff explained that his claim was that as a consequence of his involuntary transfer to COPS, his "chances of advancement" had been "significantly reduced by refusals of appropriate travel, and assignment of duties; discouragement or disallowance of participation in office life; and failure to appoint to acting positions" as well as the lack of any "satisfactory Work Performance Plan" being presented to him – all of which allegedly was "inconsistent" with COPS employees who were not the same "race, age and gender." Exhibit 23, ROI, Tab C-1; Exhibit 24, Tab C-7. Plaintiff's counsel stated that the fourth claim was not as the EEO investigator described, i.e., that he was "assigned to a substandard working area in the COPS office" Exhibit 18, ROI Tab D-1, at 8. But rather, this claim (designated as Claim 4 by EEOS) was merely part of Plaintiff's first claim challenging his 2002 transfer from OJP to COPS: "Might I add to the extent the work space issue has been carved out separately in this letter. It's our position that all of these items which Mr. Pearsall identified are encompassed and included in the first claim relating to his involuntary transfer." Exhibit 18, ROI Tab D-1 at 9-10. Despite all of Plaintiff's expounding upon his allegations, he never asserted a hostile work environment claim and therefore the Court

should dismiss Plaintiff's hostile work environment claim.  See Park v. Howard University, 71 F.3d 904, (D.C. Cir. 1996) (dismissing hostile work environment claim where Plaintiff did not make such a claim at the administrative stage).

### 2.    Count VI was not asserted in the EEO complaint

Plaintiff for the first time asserts a retaliation claim based on his alleged "participation in organizations and projects including participation in an Organization known as 'Blacks In Government' ("BIG") and activities which supported diversity in the work place as an advocate."  Compl. ¶ 57.  Plaintiff never raised with the EEOS a retaliation claim based on his alleged diversity promoting activities and such a claim was not accepted by the EEOS for investigation. Ex. 23, ROI, Tab C-1.

### 3.    Count III was untimely exhausted

In Count III of Plaintiff's Complaint, Plaintiff alleges his 2003 non-selection for the Supervisory Program Audit Officer position was discriminatory based on reprisal, gender and race.[7]  Compl. ¶¶ 41 - 46.  Plaintiff failed to contact an EEO counselor regarding this claim within  45 days of the "matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).  Even though the selection process took place in 2003, Plaintiff contacted an EEO counselor the following year on May 25, 2004 regarding his claim of discrimination.  Compl. ¶ 44; Ex. 1, ROI Tab B-1.  Thus, Plaintiff failed to timely contact an EEO counselor.

From a conversation about seniority that occurred in 2004, Plaintiff suggests that he suspected race and gender discrimination were factors in his 2003 non-selection.  Compl. ¶¶ 44 -

---

[7]    The selectee was Cynthia Bowie (an individual who Plaintiff testified is in the same protected race and age categories as he is, as well as someone who had "active EEO activity with the COPS office.").  Exhibit 25, ROI, Tab E-9.

46.  The 45-day time limit for initiating contact with an EEO counselor for job applicants who complain of discrimination in hiring begins to run when applicants learn that they were not selected for the position, rather than the date job applicants acquired evidence of discrimination. McCants v. Glickman, 180 F. Supp.2d 35, 40 (D.D.C. 2001) (finding a plaintiff's ignorance of the discriminatory motive for an adverse act plays no role "in determining the beginning of the statutory limitation period.") (citation omitted).  Because Plaintiff did not contact an EEO counselor within 45 days of learning that he was not selected for the 2003 position, he failed to timely exhaust his administrative remedy.  Therefore, the Court should dismiss this claim.

Plaintiff suggests that he wasn ot required to contact an EEO counselor until he became aware of the reasons for his non-promotion.  Courts in the D.C. Circuit have refused to grant equitable tolling on this theory because the courts have found that the plaintiffs either knew or should reasonably have known of the alleged discriminatory event at the time of their non-selection.[8]  E.g. Cones v. Shalala, 945 F. Supp. 342, 348 (D.D.C. 1996) *rev'd on other grounds,*199 F.3d 512 (D.C. Cir. 2000) ("Although the plaintiff may not have had all the facts or supporting documents that he later acquired concerning a particular selection, the plaintiff knew or reasonably should have known of the alleged discriminatory event at the time each selection was made."); Johnson v. Gonzales, 479 F Supp.2d 55, 59 (D.D.C. 2007) ("The applicable case law and regulation, however, do not allow a plaintiff to wait until he has direct proof of the

---

[8]  Moreover, equitable tolling should not be applied to this claim.  This Circuit has also held that the court's power to toll Title VII time limitations "will be exercised only in extraordinary and carefully circumscribed instances."  See Mondy v. Secretary of the Army, 845 F.2d 1051, 1057 (D.C. Cir.1988).  The D.C. Circuit has allowed equitable tolling where the plaintiff failed to contact an EEO counselor in reliance on the advice of a government official, Jarrell v. USPS, 753 F.2d 1088, 1092 (D.C. Cir. 1985); where defendant tricked plaintiff into allowing the filing deadline to pass, Washington v. WMATA, 160 F.3d 750, 752 (D.C. Cir. 1998); where the defendant engaged in affirmative misconduct, id.; or where the claimant has filed a timely pleading later found to be defective, id.  Plaintiff does not allege any of these situations.

allegedly discriminatory actions; rather, they require a plaintiff to file an EEOC charge even if he is not in possession of the 'supportive' facts necessary to prosecute a discrimination charge."); McCants, 180 F. Supp.2d at 41 (plaintiff's "own submissions to this court reveal that, at the very least, he should have suspected discrimination at the time of the interview, as he admits being told in September that there was only one other black male attorney employed by the USDA and describes one of the interviewers as "one bad apple" who belittled him for no apparent reason."). In Williams v. Munoz, 106 F. Supp.2d 40, 43 (D.D.C. 2000), the Court not only found that the plaintiff "reasonably should have suspected that there might be discriminatory reasons", but "should have investigated."  106 F. Supp.2d at 43; see also Cones, 945 F. Supp. at 348 (finding "plaintiff was aware that he was not selected or considered at the time of each decision and that a white individual was" and that the plaintiff had the wherewithal to reasonably have "know[n] enough to investigate, secure documents, and make inquiries.").

Similarly, here equitable tolling is not warranted because Plaintiff either knew or reasonably should have known of the alleged discriminatory event at the time of his non-selection.  Indeed, Plaintiff testified on January 31, 2005 that:

- When he was interviewed for the position, he was "shocked" because an "inappropriate" comment was made that "had a negative affect on his interview" and constituted discrimination. Ex. 18, ROI, Tab D-1, at 45.

- At the time of the selection, he believed that the interview panel did not fairly consider his experience, because he had qualifications that should have led to his selection.  Ex. 18, ROI, Tab D-1, at 49.

- At the time of the selection, he knew that three female employees interviewed him, which he claims created a gender bias against him.  Ex. 18, ROI, Tab D-1, at 48.

- At the time of the selection, he believed that the job assignments he had been given since he started at COPS harmed his qualifications.  Ex. 18, ROI, Tab D-1, at 48.

Consequently, Plaintiff should have had a "reasonable suspicion" that his non-selection might have been motivated by discrimination at the time of his non-selection. Despite his suspicions of discrimination, Plaintiff did not timely contact an EEO counselor within 45 days of his non-selection. Therefore, the remedy of equitable tolling is not merited.

    4.    <u>Count V was voluntarily withdrawn and unexhausted</u>

In the Complaint, Plaintiff attempts to resurrect his retaliation claim relating to his 2002 transfer from OJP to COPS. Compl. ¶¶ 50-55. Not only did Plaintiff fail to timely consult an EEO counselor regarding this claim, he voluntarily withdrew this claim at the administrative stage. In response to Defendant's motion before the Administrative Judge to dismiss this claim on timeliness grounds, Plaintiff stipulated to the dismissal of that claim. <u>See</u> Exhibit 26, Complainant's Stipulated Dismissal of Claim 1, April 7, 2006. As a result, on June 15, 2006, the Administrative Judge dismissed Plaintiff's retaliatory transfer claim. <u>See</u> Exhibit 27, Order dated 6/15/2006. And Plaintiff refused to provide any discovery on the claim. <u>See</u> Exhibit 28, Complainant's Responses and Objections to Agency's Interrogatories, Response Nos. 5, 14, 19-20. Where, as in this case, a claim is brought but then dropped before the agency has a chance to investigate and reconcile it, courts have held that such a claim has not been administratively exhausted. <u>See</u>, <u>e.g.</u>, <u>Miller</u>, 584 F. Supp. at 153, 155 (finding that two separate plaintiffs who had filed and withdrawn administrative complaints could not maintain civil actions). Thus, by withdrawing his claim, Plaintiff failed to exhaust his administrative remedy and the Court should bar Plaintiff from raising this claim now.

Moreover, Plaintiff did not timely contact an EEO counselor in regards to his retaliation claim relating to his 2002 transfer from OJP to COPS. Plaintiff was transferred in September 2002 from OJP to COPS and he failed to contact the EEO Counselor until May 25, 2004 – over

17

one year and eight months later – and more than the 45 days required by the regulations. Thus, Plaintiff failed to timely contact an EEO counselor.

Furthermore, equitable tolling is not warranted because Plaintiff either knew or should reasonably have known of the alleged retaliation at the time of his 2002 transfer. McCants v. Glickman, 180 F. Supp.2d at 40-41. By Plaintiff's own admissions, he suspected that he was the subject of retaliation as far back as June 2001. Plaintiff testified that:

- Within about two weeks of providing testimony to an investigator in two EEO cases in June 2001, he was "directed to come to a meeting, and [he] found this strange because [he] had been excluded at that time from other management meetings." Ex. 18, ROI, Tab D1, p. 15.

- Because of a question posed at that meeting by a Deputy Director ("DD") of OJP'S BJA, he "felt threaten[ed] and intimidated and [] believed this meeting was being held to coerce and pressure [him] regarding his participation as a witness in the EEO matters." Se Ex. 18, ROI, Tab D1, p. 15. Several of the Plaintiff's staff came to him after this meeting to let him know that they too believed the DD's question was "intended to threaten[]" him. Ex. 18, ROI, Tab D1, p. 16.

- Within one month of providing the testimony, he had some supervisory responsibilities taken away and was involuntarily transferred within OJP. Ex. 18, ROI, Tab D1, p. 14, 17. Displeased with his transfer, Plaintiff appealed the decision to Tracy Henke.

- A year later, in July 2002, when Plaintiff met with Henke and Nedelkoff and was told he would be transferred again, Plaintiff could not understand why he was not being given a supervisory grant management position "when they appeared to be providing management assignments to individuals with considerably less experience than me." Ex. 18, ROI, Tab D1, p. 22 Suspecting other motivations, he "asked them if there was [sic] some other reason for this decision that had not been conveyed to [him]." Ex. 18, ROI, Tab D1, p. 21. The statement of Henke at this meeting was inconsistent with her actions towards others, Ex. 18, ROI, Tab D1, p. 22, and with her statements in their meeting in July 2001. Ex. 18, ROI, Tab D1, p. 23. Plaintiff stated at the meeting that his prior transfer "placed [him] at a disadvantage . . .and hurt [his] career," Ex. 18, ROI, Tab D1, p. 22 and he was "very disappointed, hurt and insulted" by management's decision to transfer him again. Ex. 18, ROI, Tab D1, p. 21.

- Around September 2002, Plaintiff learned that he would be transferred to COPS, to a position that was "the last thing" he would have expected that was not

18

"commensurate with [his] background and experience."  Ex. 18, ROI, Tab D1, p. 24, 38.

Consequently, when Plaintiff was transferred from OJP to COPS, Plaintiff should have had a "reasonable suspicion" that his transfer might have been motivated by retaliation. Notwithstanding the suspicion that was or should have been aroused by the multiple involuntary transfers, beginning within weeks of allegedly being threatened by management for EEO participation, Plaintiff failed to seek EEO counseling.  Rather, he waited 20 months, until he allegedly had supporting facts, and then initiated EEO contact.   Because of his delay, equitable tolling of Plaintiff's September 2002 transfer claim is unmerited.

## II.    Plaintiff Failed to State A Claim Regarding Combination Discrimination

In Count IV, the Plaintiff asserts that the Defendant discriminates against African American men over the age of 40.[9]  The Defendant is unaware of any statutory authority for this novel combination discrimination theory based on race, gender and age.  See also Schatzman v. County of Clermont, Ohio, No. 99-4066, 2000 WL 1562819, at *9 (6th Cir. Oct. 11, 2000) (refusing to entertain plaintiff's combination claim alleging discrimination against older women and "noting that neither the Supreme Court, nor this Circuit, recognize such a claim."); Sherman v. American Cyanamid Co., No. 98-4035, 1999 WL 701911, at *5 (6th Cir. Sep. 1, 1999) (declining to recognize a separate cause of action for "sex plus age" discrimination).  Therefore, this Court should not permit Plaintiff to pursue this combination discrimination claim.

## III.    Plaintiff's Defamation Claims Should be Dismissed

---

[9]        Plaintiff alleges in Count IV that "no African American men over 40" have been promoted to "management/supervisory positions in COPS."  Compl.  ¶ 49.  Defendant notes that since 2002 (when Plaintiff began working at COPS), Plaintiff has been the only African-American male at COPS who has applied for any of the GS-14 or GS-15 position vacancies at COPS.  Exhibit 3, Brown Decl. ¶¶ 2-3.

In Count VII, Plaintiff asserts that the Defendant engaged in false and intentional business defamation.  Compl. ¶¶ 61-66.  This tort claim appears to be based on D.C. common law.  The general rule of sovereign immunity, however, means that the federal government may not be sued unless Congress has specifically waived sovereign immunity and created a cause of action.  "The United States is immune from suit absent an express waiver of sovereign immunity."  United States v. Testan, 424 U.S. 392, 399 (1976); see also FDIC v. Meyer, 510 U.S. 471, 484-86 (1994).  The United States has not waived sovereign immunity for Plaintiff's claims under D.C. common law and Plaintiff has cited no authority for such a waiver.  Sovereign immunity means that Plaintiff's claims based directly on D.C. common law must be dismissed for lack of jurisdiction.

Moreover, the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80 ("FTCA"), is the exclusive remedy for any loss from the tortious actions of federal agencies or employees.  See 28 U.S.C. § 2679(b)(1).  The FTCA therefore pre-empts any tort actions directly based on the common law or state law, including D.C. law, against the United States, its agencies, or employees.  See Smith, 499 U.S. at 165-69; Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution, No. 74-1899, (D.C. Cir., June 28, 1976), reprinted in 566 F.2d 289 App. A-1, at 295-99; Kline v. Republic of El Salvador, 603 F. Supp. 1313, 1316 (D.D.C. 1985).

Plaintiff's complaint makes no reference to the FTCA, but even if the Plaintiff sought to bring a claim under the FTCA against the United States, the Court should dismiss the claim.  The FTCA prohibits suits arising out of libel, slander or misrepresentation as a cause of action.  The FTCA specifies certain torts for which the statute expressly does not waive the government's sovereign immunity.  See 28 U.S.C. § 2680.  Exceptions to the Federal Tort Claims Act include under 28 U.S.C. § 2680(h):

Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . .

Consequently, the FTCA excludes Plaintiff's defamation claim and the Court should dismiss such a claim.  Compl. ¶¶ 61-66.

## IV.    Plaintiff's Section 1983 Claim Should be Dismissed

In Count VII, Plaintiff asserts that the Defendant violated his 42 U.S.C. § 1983 rights by circulating and publishing false information concerning Plaintiff's suitability as an employee. Plaintiff cannot establish claims against the Defendant under 42 U.S.C. § 1983, or Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, (1971).  To the extent that the Plaintiff is attempting to hold DOJ independently liable, that entity is not a "person" as defined in § 1983, and is immune from constitutional claims for damages under Bivens, or otherwise.  See FDIC v. Meyer, 510 U.S. 471, 484-86 (1994).

In addition, the Defendant does not act under "color of state law" but rather, federal law; therefore, Plaintiff has not stated a claim under  42 U.S.C. § 1983.  Section 1983 provides that:

> "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

 42 U.S.C. § 1983.  The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the alleged wrongdoer is clothed with the authority of state law." Williams v. United States, 396 F.3d 412, 414 (D.C. Cir. 2005) *quoting* United States v. Classic, 313 U.S. 299, 326 (1941); accord Monell v. New York City Dept. of social Services, 436 U.S.

658, 695-701 (1978); <u>Polk County v. Dodson</u>, 454 U.S. 312, 317-18 (1981).  An agent of a federal agency may be subject to suit in his individual capacity under § 1983 only if he is acting pursuant to a law of the District of Columbia.  <u>See</u> <u>Settles v. United States Parole Comm'n</u>, 429 F.3d 1098, 1104 (D.C. Cir. 2005) (holding that a § 1983 claim would lie against individual members of the Parole Commission when acting pursuant to an "Act of Congress applicable exclusively to the District of Columbia").

As Plaintiff recognizes, Defendant, the U.S. Attorney General, is a federal employee of the DOJ.  Compl. ¶ 3.  Plaintiff alleges that the Defendant acted through his agents and employees in "their official capacities" and "in the course of their employments and positions of responsibility."  Compl. ¶¶ 68, 68.  Thus, Plaintiff's claims under 42 U.S.C. § 1983 must be dismissed because the Defendant did not act under "color of state law."[10]

## V.     Plaintiff does not State a Claim of Hostile Work Environment (Count I)

A work environment is considered "hostile" under Title VII only when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

---

[10]     Moreover, Title VII and the ADEA provide the exclusive remedy for Plaintiff's employment discrimination claims.  <u>See</u> <u>Prince v. Rice</u>, 453 F. Supp.2d 14, 25 (D.D.C. 2006) (granting Government's motion to dismiss federal employee's 42 U.S.C. § 1981 claim, because, among other reasons, "the Supreme Court has squarely held that Title VII 'provides the exclusive judicial remedy for claims of discrimination in federal employment.'") (quoting <u>Brown v. Gen. Servs. Admin.</u>, 425 U.S. 820, 835, 96 S.Ct. 1961 (1976)); <u>see also</u> <u>Joseph v. Potter</u>, Civil Action No. H-04-1886, 2006 WL 1581894, at *4 (S.D. Tex. Jun. 6, 2006) (dismissing §1983 claim against Government; "Title VII and the ADEA provide the exclusive remedies for race and age discrimination claims . . . .") (citations omitted).  Plaintiff's allegations demonstrate that his defamation claim is directly based on and related to the alleged discriminatory conduct: "the Agency . . . for wrongful purposes of reprisal and retaliation for his involvement in protected acts and because his being an African American male over forty engaged in publishing and proliferating defamatory libelous acts . . . ."  Compl. ¶ 61.  Thus, Title VII and the ADEA are his exclusive remedies, and his Section 1983 claim, D.C. common law claim and/or FTCA claims must be dismissed.

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) *quoting* Harris v. Forklift Sys., Inc. 510 U.S. 17, 21 (1993).  To determine whether a work environment is sufficiently "hostile" to support a Title VII claim, the Court must look at the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Harris, 510 U.S. at 23.   "[C]onduct must be *extreme* to amount to a change in the terms and conditions of employment."  Faragher v. Boca Raton, 524 U.S. 775, 788 (1998)(emphasis added).  "[O]ffhand comments[ ] and isolated incidents (unless extremely serious)" do not meet this standard.  Id.  [N]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable." Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2003).  These standards are "sufficiently demanding to ensure that Title VII does not become a general civility code."  Faragher, 524 U.S. at 788 (quoting  Oncale, 523 U.S. at 80).  Moreover, Title VII "does not prohibit all forms of workplace harassment," but only harassment based on a person's membership in a class protected by Title VII.  Stewart, 275 F.3d at 1133.

Even assuming the truthfulness of the hostile work environment allegations in the Complaint, Plaintiff's allegations fail to state a hostile work environment claim as a matter of law.  Plaintiff's list of annoyances regarding work assignments, air quality, office furniture, training, and meetings do not rise to the level of severe and pervasive.  "It is apparent from the face of the complaint that plaintiff fundamentally misunderstands the nature of the hostile work environment claim.  Title VII does not provide a cause of action for the "ordinary tribulations of the workplace," and "not everything that makes an employee unhappy is actionable" under Title VII.  Instead, a hostile work environment claim must be based on incidents comprising "one unlawful employment practice" of intimidation, insult and ridicule that pervades plaintiff's day-

to-day working life.  Plaintiff cannot satisfy this standard, for none of the acts alleged by plaintiff, whether considered alone or cumulatively, meet the demanding standards for a hostile work environment claim under Title VII."  <u>Rattigan v. Gonzales</u>, 2007 WL 1577855, at *19 (D.D.C. May 31, 2007) ("[C]obbling together a number of distinct, disparate acts will not create a hostile work environment", and that limitation is especially relevant when the "plaintiff failed to exhaust administrative remedies for many of the discrimination and retaliation claims that he now incorporates in a hostile work environment claim.").

Plaintiff's hostile work environment allegations are merely "ordinary tribulations of the workplace" that do not even appear to suggest that they were based on his race, gender, age or protected activity.  <u>Rattigan</u>, at *19.  Plaintiff complains of: his office space, air quality, and furniture; denials of telecommute and training requests; and alleged lack of invitation to attend meetings.  Compl. 23-29.  While Plaintiff's claims clearly evidence his dissatisfaction with management, they do not constitute conduct that is "sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment."  <u>Harris</u>, 510 U.S. at 22 (quotation omitted).  Therefore, Plaintiff has not stated a prima facie case for hostile work environment.

## VI.    Plaintiff's Non-selection Claim Fails (Count II)

### A.    <u>Allocation of Burdens of Production and Persuasion</u>

In <u>Fogg v. Gonzales</u>, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, *inter alia*, that the 1991 amendments to Title VII codified two alternative ways of establishing liability for intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision.  <u>Id.</u> at 451.  Under either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence[11] and may rely on direct or circumstantial evidence to meet that burden.  <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 92-102 (2003).

In the absence of direct evidence, Plaintiff may attempt to establish that he was the victim of intentional discrimination on the basis of his race by relying on circumstantial evidence analyzed using the scheme first set forth in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[12]  Under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination.  <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).  If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.

---

[11] "Preponderance of the evidence" means such evidence as, when weighed against that opposing it, has the more convincing force that something is so.  <u>Hopkins v. Price Waterhouse</u>, 737 F. Supp. 1202 (D.D.C. 1990), *aff'd* 920 F.2d 967 (D.C. Cir. 1990);  <u>Metropolitan Stevedore Company v. Rambo</u>, 521 U.S. 121, 137 n.9 (1997).  "[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose."  <u>Id.</u>

[12] Reliance on the <u>McDonnell Douglas</u> scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability.  <u>See</u> <u>Fogg v. Gonzales</u>, 492 F.3d 447, 451 n.*.

Once it is established that both parties have met their respective burdens of production (i.e., plaintiff by presenting a prima facie case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant. Hicks, 509 U.S. at 510. Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (citing 42 U.S.C. § 2000e-2(m)).

Alternatively, plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action. St. Mary's Honor Center, 509 U.S. at 515-518. This is a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor. In the single motive case Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000), Justice O'Connor recognized occasions where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Whichever standard is employed, Plaintiff fails to meet his burden of coming forward with evidence to create a triable issue. As demonstrated below, the undisputed facts illustrate that plaintiff can not establish that discrimination was a motivating factor, much less that it was the sole motivating factor in the challenged decision at issue here.

26

**B.    Defendant had legitimate, nondiscriminatory reasons for not selecting Plaintiff**

Even assuming, *arguendo*, that Plaintiff could make out a *prima facie* case of discrimination, Defendant had legitimate, nondiscriminatory reasons for not selecting the Plaintiff for the position alleged in Count II, the 2004 Supervisory Social Science Analyst Position.

The selecting official, Cammarata, determined that the selectee was the best qualified candidate based on her evaluation of the application and any attached materials, the interview, and her firsthand knowledge of each candidate's performance, as well as the candidate's past performance.  Exhibit 7, PC Dep. 194:13-195:3; see Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C. Cir. 2003) (basing selection on first hand observations of plaintiff's and selectee's performances is a non-discriminatory reason).  The Position Description for the vacancy announcement listed as requisite knowledge:  professional mastery of behavioral and social sciences; advanced research design and experimental methods; advanced qualitative and quantitative systems; and behavior concepts and analysis methods.  Exhibit 6, ROI, Tab E.

The selectee had extensive experience and education in the areas of advanced research design and experimental methods and advanced analytical, statistical and evaluation work, which was substantiated by, among other things, the work he had performed during the past five years as a Social Science Analyst, his application materials, and the supporting documentation he brought to his interview.  Exhibit 5, ROI, Tabs D-9, Exhibit 13, E-17, Exhibit 14, E-18; Exhibit 7, PC Dep. 210:1-3; Exhibit 15, MS Dep. 26:3-7, 56:18-20, 10:22-13:10, 14:19-15:1, 16:11-18:8, 20:5-13, 25:15-23, 38:22-40:23, 42:17-45:4.  Moreover, from serving as his supervisor for five years, Cammarata believed that the selectee was extremely organized, very concise, an

27

independent thinker who needed little guidance, addressed issues immediately, met deadlines, and had strong multi-tasking and leadership skills.  Exhibit 5, ROI, Tab D-9, at 28; Exhibit 13, E-17.

In contrast, Plaintiff lacked the experience and expertise in advanced research design and experimental methods and advanced analytical, statistical and evaluation work that the selectee had.  Furthermore, Cammarata's impressions of Plaintiff was that he was not organized, not brief in discussions, not an independent thinker or doer, was unable to independently and proactively handle large-scale tasks and lead teams, and required detailed guidance before moving forward on complex tasks.  Exhibit 7, PC Dep. 206:8-10, 184:2-9; Exhibit 5, ROI, Tabs D-9 at 27, 28-29; Exhibit 13, E-17.  Therefore, the Defendant had legitimate nondiscriminatory reasons for not selecting the Plaintiff and the Plaintiff can not show that these articulated reasons were merely a pretext for discrimination.

### C.    <u>Plaintiff is unable to show pretext</u>

Despite being afforded ample time and opportunity for discovery at the administrative level, Plaintiff has produced no evidence that his race, age, gender, and/or prior EEO activity played any role in the selection for the Supervisory Social Science Analyst position or that the reasons articulated by the Agency are pretextual.  In evaluating a plaintiff's arguments, courts have warned that they will decline to serve "as a 'super-personnel department that reexamines an entity's business decisions.'"  <u>Holcomb</u>, 433 F.3d at 897 (citing <u>Barbour v. Browner</u>, 181 F.3d 1342, 1346 (D.C. Cir. 1999).  Mere differences between the applicants will not suffice for a showing of discrimination.  Instead, there must be a "wide and inexplicable" gulf between the applicants' qualifications in order to rebut the employer's non-discriminatory explanation.  <u>Simpson v. Leavitt</u>, 437 F. Supp. 2d 95, 101 (D.D.C. 2006) *quoting* <u>Lathram v. Snow</u>, 336 F.3d

1085, 1091 (D.C. Cir. 2003)).

Here, Plaintiff does not meet this burden as he merely asserts his opinion that he was better qualified than the selectee. Compl. ¶ 33. Conclusory and subjective opinions are held insufficient to satisfy a Plaintiff's summary judgment burden. See Vasilevsky v. Reno, 31 F. Supp.2d. 143, 150 (D.D.C. 1998) ("Plaintiff's opinion of the relative merits of her credentials as opposed to those of the selected individuals are irrelevant."); Tolson v. James, 315 F. Supp.2d 110, 116 (D.D.C. 2004) ("Plaintiff's belief that her qualifications and experience make her a more suitable candidate for the job . . . does nothing to discredit defendant's legitimate explanation for its actions. A '[p]laintiff cannot establish pretext simply based on her own subjective assessment of her own performance . . . . It is the perception of the decisionmaker which is relevant.'"). Therefore, the Plaintiff's claim that his non-selection was based on discrimination fails.

## VII.    Plaintiff's Retaliatory Transfer Claim Fails (Count V)

Plaintiff cannot establish a prima facie case for retaliatory transfer because there is no causal connection between his alleged June - July 2001 EEO activity and his September 2002 transfer.[13] Compl. ¶¶ 10, 15. Under Burlington Northern v. Santa Fe Ry. Co. v. White, 125 S.Ct. 2405, 2410-16 (2006) the test for whether a prima facie case of retaliation has been shown is: (1) that a plaintiff engaged in protected conduct, such as filing EEO charges; (2) that a reasonable employee would have found the challenged retaliatory action materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination;" and (3) that a causal connection existed between the adverse action and the protected activity. Id. Plaintiff can not establish the third of these elements (causal

---

[13] As discussed above, the Plaintiff did not exhaust his administrative remedies for this claim and it should therefore be dismissed.

connection). Causation may be established by showing that "the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985); see also Cones v. Shalala, 100 F.3d 512 (D.C. Cir. 2000) (strong timing evidence alone is sufficient to show a causal connection).

Plaintiff alleges that Defendant in September 2002 transferred him in retaliation for his June - July 2001 participation as a witness in the EEO complaint cases of other employees. Compl. ¶¶ 10, 15. This roughly 14 month lag between the protected conduct and alleged involuntary transfer suggests no causality. See Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001) (finding that a 20-month lag suggests no causality at all) (quoting with approval cases finding 4-month and 3-month lags insufficient to establish causality); Mayers v. Laborers' Health & Safety Fund, 478 F.3d 364, 369 (D.C. Cir. 2007) (finding eight to nine month gap is too long to establish the required causal connection); Wilson v. SunTrust Bank, 2004 WL 2958303 at *1 (D.C. Cir. Dec. 21, 2004) (fifteen months between filing a complaint and termination is too long to raise an inference of retaliation); Walker v. Johnson, 501 F. Supp.2d 156, 174 (D.D.C. 2007) ("This Court has held that a span of three months between the employee's EEO activity and employer's adverse action may be too long to support of presumption of causation."); Johnson v. Potter, No. Civ.A. 04-1045, 2005 WL 3273575, *4, fn 2 (D.D.C. 2005) ("Plaintiff filed his previous EEO complaint in April 2000, sixteen months prior to his rejection from the training program, and this period is simply too long to serve as evidence of causality."); Buggs v. Powell, 203 F. Supp.2d 135, 149 (D.D.C. 2003) (finding a seven month span between the filing of an EEOC complaint and an adverse employment action too long to serve as evidence of causality); Brodetski v. Duffey, 199 F.R.D. 14, 20 (D.D.C. 2001) ("courts

30

generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside a year in length").[14]  Thus, Plaintiff cannot make out a prima facie case of retaliation.

## VIII.  Plaintiff's Compensatory Damages and Punitive Damages Claims Should be Stricken

Plaintiff demands $5,000,000 in punitive damages and an additional $7,000,000 in "compensatory, punitive and other monetary damages."  Compl., p. 21.  Punitive damages are not recoverable against federal defendants under Title VII or the ADEA, and compensatory damages are not recoverable under the ADEA.  42 U.S.C. § 1981a(b)(1); see, e.g., Smith v. OPM, 778 F.2d 258 (5th Cir. 1985), cert. denied, 476 U.S. 1105 (1986); Pfeiffer v. Essex Wire Corp., 682 F.2d 684 (7th Cir.), cert. denied, 459 U.S. 1039 (1982).

Although a Title VII plaintiff normally may be entitled to compensatory damages, Plaintiff in this case has waived his right to pursue these damages during the administrative process.  Specifically, in response to the Agency's discovery requests for medical information, Plaintiff stated:  "To save himself from further personal and professional embarrassment, Complainant has determined to waive his right to seek damages for physical ailments and emotional distress related to his discrimination at COPS on the basis of his race, gender and age."  Ex. 10, Complainant's Responses and Objections To Agency's Interrogatories at 7 (Response to Interrogatory No. 6).  Accordingly, Plaintiff's demand for punitive and compensatory damages claim should be stricken.  Furthermore, because Title VII's provision permitting trial by jury is tied to the statutes's compensatory damages provision, see Landgraf v.

---

[14]    Moreover, in her sworn responses to the EEO investigator's interrogatories, the selecting official, Cammarata stated that she "was not aware, in any way, of the [Plaintiff's] prior EEO activity."  Exhibit 5, ROI, Tab D-9, at ¶ 12.

USI Film Products, 511 U.S. 244 (1994), Plaintiff's demand for a jury trial must likewise be stricken for any Title VII claims that may survive this motion.[15]

---

[15] In addition, federal employees may not demand a jury trial for claims arising under the ADEA. Lehman v. Nakshian, 453 U.S. 156 (1981). Therefore, if any ADEA claim survives this motion, Plaintiff's demand for a jury trial under ADEA should be stricken. Compl., p. 23.

## <u>CONCLUSION</u>

Based upon the foregoing, Defendant respectfully requests that Plaintiff's complaint be dismissed with prejudice or, in the alternative, summary judgment be granted in Defendant's favor.

Dated: December 17, 2007                Respectfully submitted,


 /s/ _____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


 /s/ _____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.


 /s/ _____

ANDREA McBARNETTE, D.C. Bar  # 483789
Assistant United States Attorney Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7153

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ALBERT PEARSALL,                                  )
                                                  )
                    Plaintiff,                    )
                                                  )
          v.                                      )          Case No: 07-0108 (PLF)
                                                  )
MICHAEL MUKASEY, Attorney General,                )
United States Department of Justice,[1]           )
                                                  )
                    Defendant.                    )
_____)

**ORDER**

UPON CONSIDERATION of Defendant's dispositive motion, the memorandum of

points and authorities in support thereof, any opposition thereto, any reply, and the record herein,

it is hereby ORDERED that the motion is GRANTED.


SO ORDERED, on this _____ day of _____, 2008.



_____
United States District Court Judge


_____

[1]  Pursuant to Fed. R. Civ. P. 25(d), the current Attorney General, Michael Mukasey, has been automatically substituted as the Defendant.