**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| ALBERT A. PEARSALL, III | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No.: 07-0108 (PLF) |
| | ) |
| MICHAEL MUKASEY, Attorney General, | ) |
| United States Department of Justice, [1] | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANT- AGENCY'S MOTION TO**
**DISMISS AND/OR FOR SUMMARY JUDGMENT**

Pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil

Procedure, Plaintiff Albert Pearsall, through counsel, respectfully moves this Court to

deny Defendant's Motion to Dismiss and/or for Summary Judgment, and to rule

accordingly, in Plaintiff's favor, or in the alternative, to defer judgment, denying

Defendant's Motion to Dismiss, and deferring a ruling on the Motion For Summary

Judgment, and schedule this matter for discovery[2].  In support of this motion, Plaintiff

respectfully refers the Court to the attached memorandum of points and authorities.

_____

[1] The current Attorney General, Michael Mukasey, has been automatically substituted as
the Defendant, Fed. R. Civ. P. 25(d).

[2] The instant complaint alleges that the Plaintiff's career advancement opportunities were
methodically diminished by the Agency.  Prior to the opening of the selection process,
the white male candidate's (Scheider's) accomplishments were intentionally
systematically enhanced, embellished, bolstered and expanded to provide him with such
an advantage as to virtually pre-select him to the position for which he and Plaintiff were
to compete. By the time the selection process commenced, the Plaintiff's career had been
devalued and marginalized.  At the time the Plaintiff was transferred into the Agency's
division wherein he was a co-worker with Scheider, his competitor for the position, the
Plaintiff exercised the duties of a GS-15 and Scheider exercised those of a GS-13.  By the

1

Because this is a dispositive motion, the undersigned has not sought Defendant's

consent before filing it.  LcvR 7 (m).

Respectfully submitted,

_____
JOHN F. MERCER, ESQ.
D.C. Bar #
Attorney for the Plaintiff

---

time the Plaintiff and Scheider competed for the position, the Plaintiff's supervisory
duties had been stripped, and he was reporting to Scheider as his superior.

## I.     INTRODUCTION

As argument for dismissal of Plaintiff's complaint or grant of summary judgment in Defendant's favor, Defendant's Motion mainly focuses on the foregoing allegations:

(1) Plaintiff has failed to exhaust his administrative remedies.

(2) Plaintiff cannot demonstrate that Ms. Cammarata's proffered reasons for her selection were pretextual.

(3) Plaintiff fails to state a claim regarding combination discrimination.

(4) Plaintiff's defamation claim should be dismissed.

(5) Plaintiff's Section 1983 claim should be dismissed.

(6) Plaintiff does not state a claim of Hostile Work Environment.

In response, Plaintiff voluntarily requests that the court dismiss Counts Three, Four, and Five without prejudice, until the Plaintiff has had adequate time for discovery, and consider the following responsive motion.

First, the Court should not interpret [E.E.O.C.] regulations as demanding that a complaining party, rather than (or prior to) utilizing the amendment procedure of *section 1614.106*, "initiate a separate informal proceeding under *section 1614.105* for every subsequent matter that is "like or related to" an ongoing investigation, *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55; 2006 U.S. Dist. LEXIS 32922; 98 Fair Empl. Prac. Cas. (BNA) 332 (2006). As the matters raised by the Plaintiff were "like or related to" the investigation of discrimination and retaliation at hand, there was no need to initiate a separate informal proceeding for every single complaint.

Second, "[if] the plaintiff rebuts the employer's own explanation of its challenged acts, this eliminates the principal nondiscriminatory explanation for the employer's

actions," thereby permitting the finder-of-fact to infer discrimination. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1292-93 (D.C. Cir. 1998). Alternatively, a factfinder may infer pretext if "a reasonable employer would have found the plaintiff to be significantly better qualified for the job." *Id.* at 1288. As demonstrated below, the record shows that the Plaintiff has consistently maintained that each separate act of which he complained was connected or related to the ongoing investigation of Agency's discriminatory and retaliatory motives. This is substantiated by both the EEO Counselor's and the Investigator's Reports. Thus, the Plaintiff has set forth facts sufficient to meet his burden of overcoming summary judgment.

Further, the record shows that the Position[3] called for extensive supervisory experience. This is evidenced (not by Plaintiff's unsubstantiated opinion,[4] as the Defendant claims) by the Vacancy Announcement and related Position Description, as well as the Selectee's (Mr. Scheider's) description of the duties he actually performed while acting in the Position.

The record also demonstrates that the Plaintiff was better qualified for the Position than the Selectee. At the time of selection, the Plaintiff had twenty-three years of leadership experience, including eight years as a GS-14 supervisor of high-level federal employees, the very experience necessary to perform the core functions of the Position. In contrast, the Selectee's supervisory experience was limited to supervising an intern and two three-week stints as the Acting Supervisory Social Science Analyst, a position also once occupied by Plaintiff. (Compl).

---

[3] The Plaintiff competed for the position of GS-14 Supervisory Social Science Analyst.
[4] See Defendant's Motion, December 17, 2007, p. 29, ¶1.

Additionally, the record shows that Pamela Cammarata's[5] proffered reasons for selecting Mr. Scheider over the Plaintiff, *i.e.,* Ms. Cammarata's "observations from working with the candidates" and Mr. Scheider's "extensive experience and education in the areas of advanced research design and experimental methods" (Agency Br. 10), are based on Ms. Cammarata's self-serving statements, or "criteria subjective enough to deserve close scrutiny," *Aka v. Wash. Hosp. Ctr.*, 325 U.S. App. D.C. 255, *See, e.g., Fischbach v. District of Columbia Dep't of Corrections*, 318 U.S. App. D.C. 186, 86 F.3d 1180, 1184 (D.C. Cir. 1996); *Farber v.* [*888] *Massillon Bd. of Educ.,* 917 F.2d 1391, 1399 (6th Cir. 1990); *Lilly v. Harris-Teeter Supermarket*, 842 F.2d 1496, 1506 (4th Cir. 1988). The Defendant's shallow rebuttal is insufficient to warrant summary judgment on the issue of pretext, especially when the Plaintiff has provided evidence in the record refuting Ms. Cammarata's allegedly "legitimate"[6] substantiation for the Plaintiff's non-selection."

Finally, the record (Exhibit One Pamela Cammarata Dep.pg. 0206-0209)[7] shows that, at the time of the Plaintiff's transfer to COPS, Cammarata either had not examined the Plaintiff's GS-14 level qualifications or intentionally ignored them, and assigned the Plaintiff to clerical and administrative GS-8 level duties previously performed by the division secretary (ExhibitTwo Interrogatory of Angel Smith").

---

[5] Pamela Cammarata, at the time pertinent hereto was employed by the Agency as Assistant Director, Program Policy Support and Evaluation Division ("PPSE"), U.S. Department of Justice and supervised the Plaintiff. She was the selecting official for the position of Supervisory Social Science Analyst GS-14, for which the Plaintiff applied and competed against Scheider and others.

[6] See Defendant's Motion, December 17, 2007, p. 29, ¶1.

[7] Pamela Cammarata's Deposition of July 12, 2006.

## II.  STATEMENT OF MATERIAL FACTS OF GENUINE DISPUTE, OMISSIONS FROM DEFENDANT'S MOTION FOR DISSMISSAL AND/OR FOR SUMMARY JUDGEMENT[8]

Pursuant to Local Rule 7.1(h), the Plaintiff respectfully submits this statement of material facts omitted from the Defendant's motion, as to which there is genuine dispute, and refers the Court to the supporting documents from the administrative proceedings: Plaintiff's Official Personnel Folder (OPF); the deposition transcripts of Albert Pearsall ("AP Dep."); Pamela Cammarata ("PC Dep."); Matthew Scheider ("MS Dep."); Beverly Alford ("BA Dep."); Agency's "Objections and Responses to Interrogatories" ("AORI"); and the "Record of Investigation" ("ROI").[9]

Evidence in the record effectively refutes Ms. Cammarata's allegedly "legitimate" substantiation for Plaintiff's non-selection, and shows that prior to the selection process the Plaintiff was stripped of supervisory duties and conditions of work commensurate with his qualifications. Thus, the Plaintiff was subjected to: (1) elimination of equal opportunity for career advancement, and (2) discrimination based upon race and sex.

1.  The Plaintiff first joined the Department of Justice ("the Agency") through the "Presidential Management Intern Program" in 1981, having earned a Masters of Business Administration Degree.  ("ROI"), Tab D-1, at 3; Tab E-8.)  The program's purpose is to develop employees for senior level agency positions. (Plaintiff's Deposition, ROI).  He served as supervisor for eight years, including a

---

[8] These are facts in the record the Defendants intentionally excluded from their recitation of facts in their Motion to Dismiss and/or for Summary Judgment.  These excluded facts support the Plaintiff's contentions that the Defendant methodically eroded and destroyed Plaintiff's career advancement opportunities.

[9] The cited documents have been placed in the record by the Defendant excepting those attached to the instant pleading as exhibits.

GS-14 supervisor since 1995 in several different capacities, and several stints as

an acting GS-15 supervisor.  Prior to arriving at COPS, at the Drug Courts

Program Office, the Plaintiff supervised seven employees at grade levels ranging

from GS-11 to GS-13; and, at the Bureau of Justice Assistance, he supervised

twenty-seven individuals, including three at the GS-14 level.  (Angel Smith

Interrogatory, AP Dep. page 261:16, Performance Appraisals [APEEO 00000031

through APEEO 00000082], "Performance Appraisals dated December 22, 1999

[COPS 0206] with "Letter of Appreciation".)

2.  In September 2002, the Plaintiff was involuntarily transferred from the Office of

Justice Programs to the Community Oriented Policing Services ("COPS"),

resulting in a loss of his supervisory duties and privileges.  Compl. ¶¶ 8, 15. The

Plaintiff complained of such loss to the managers who authorized the transfer.

(ROI, Plaintiff, Tracey Henke Depositions.)  In May 2004, the Plaintiff contacted

an EEO counselor.  (Exhibit 1, ROI, Tab B-1).

3.  Since his transfer, the Plaintiff has persistently pursued opportunities for

advancement, and applied for several supervisory GS-14 and GS-15 positions,

including the GS-14 Supervisory Social Science Analyst position when it was

posted in 2004.  Despite being highly qualified for these positions, he has

repeatedly been denied advancement.  (Vacancy Announcement COPS-04-086

(DH); AP Dep., ROI)

4.  Supervisory duties and responsibilities were a critical element of the GS-14

Supervisory Social Science Analyst position, and the rating and evaluation panel

considered the Plaintiff's experience superior to Matthew Scheider.  (ROI, Tab E-

14, 7/14/06 MS Dep. 65:22-24; 70:16-23; 75:17-76:15, PC Dep. 252:12-253:7; 253:13-255:18.)

5.   The required Knowledge, Skills, and Abilities ("KSAs") for the position, which determined which applicants would be considered qualified, included "Ability to communicate effectively in performing supervisory or leader work; Ability to supervise; Ability to analyze organizational and operation problems and develop solutions; Ability to communicate orally; and Ability to communicate in writing." (ROI, Tab E-14.)

6.   The "Position Description" attached to the "Vacancy Announcement" provided a breakdown of categories of general duties including: "Exercises Supervisory and/or Managerial Authority 45%," followed by "Plans and Coordinates Group Efforts on Research Projects 40%," and "Attends/ Plans Conference Activities 15%." (*Id.*)

7.   Both the KSAs and the Position Description (including the percentages) were approved by Ms. Cammarata prior to the posting. (7/12/06 Pamela Cammarata Deposition ("PC Depo.: 177:23-178:2.").

8.   Leadership experience was obviously necessary to the job as Mr. Scheider describes a majority of his Supervisory Social Science Analyst duties as falling into the supervisory category. (7/14/06 "MS Depo." 65:22-24; 70:16-23; 75:17-76:15.) Further, Ms. Cammarata described the propensity of the duties for the Position as "supervisory" or "technical supervision." (PC Dep. 252:12-253:7; 254:13- 255:18.)

9.  There is no record of disappointment in the Plaintiff's job performance (PC Dep. 213:22-214:13-255:18).  In April 2004, Ms. Cammarata acknowledged the Plaintiff's contributions to COPS in writing "you have certainly done good quality work since you have been here…" (APEEO 00001911-1925.)

10. The Plaintiff's application for the 2004 position included over twenty-three years of leadership experience, with eight years of supervisory experience in comparable GS-14 positions, and sixteen months acting in GS-15 supervisory positions.  (ROI, Tab E-15, at 14; APEEO 00000031-82 (performance ratings for Mr. Pearsall in prior supervisory positions)).  In contrast, Mr. Scheider's ("the Selectee's") supervisory experience was limited to mentoring an intern and managing employees as Acting Supervisory Social Science Analyst.

11. The interviewing panelists agreed that the Plaintiff was clearly more qualified in the area of supervisory experience.  (PC Dep. 204:6-206:13; 6/29/06 BA Dep. 82:15-16.)  And, the members of the selection panel were unaware of negative information concerning the Plaintiff's job performance.  (BA Dep. 108:10-18.)

12. The Plaintiff's performance evaluations from his positions prior to his joining COPS demonstrate that his former supervisors found him to be an organized, independent thinker and doer.  *(See generally* APEEO 00000031-82.)  A prior supervisor found the Plaintiff "was an active participant in planning, developing, and implementing programs and projects that address extant and emerging issues and critical problems impacting criminal justice and the community at large." (APEEO 00000049.)  Another former supervisor evaluating the Plaintiff's managerial performance found that Mr. Pearsall "is rapidly developing a

reputation as a manager who gets prolific and high quality work from his
subordinates." (APEEO 00000078.)  The Plaintiff's work performance at COPS
mirrored his previous success as the Plaintiff received a monetary award for his
work on grant closeouts and file management.  (APEEO 00000086.)  And, the
Plaintiff's methods and processes for handling budget modifications to the
Integrity grants have been adopted Agency-wide, a clear indicator of how well the
Plaintiff performed his duties.  (6/28/06 AP Dep. 27.)

13. Although the Plaintiff previously had experience as a GS-14 supervisor and was
highly qualified, the Defendant held the GS-14 Supervisory Social Science
Analyst position vacant for months to allow Matthew Scheider time to become
qualified.

14. The Plaintiff's performance rating (evaluation) as a GS-14 Supervisor was "fully
successful" or better the entire ten (10) years that he served as Supervisor.
(Plaintiff, Angel Smith Depositions, ROI.)

15. The Defendant had several opportunities to restore the Plaintiff's supervisory
duties and privileges or promote the Plaintiff to a GS-15 supervisory position
(Richard Nedelkoff Interrogatory, Item 17, page 3 and 4:2).

16. Cammarata made the final selection decision.  PC Dep. 157:7-17; JF Dep. 96:2-9;
101:10-102:1; 103:14-22; BA Dep. 80:6-17.

17. Cammarata alleges, in making her decision, she considered the respective
candidate's applications, attached materials, interview, and her knowledge of each
candidate's performance.  PC Dep. 194:13-195:3.  However, her failure to
consider the respective candidate's qualifications belie her assertions.  In spite of

the fact that the Position Description provided that 45% of the Position would necessitate leadership and supervisory experience, and 40% would require research and analysis skills, Cammarata admits to have focused on other subjective criteria in making her final selection.  For example, Cammarata states that she sought a candidate who would be "a hands-on, multitasking supervisor, who takes on work himself/ herself, is very organized, efficient, meets deadlines, very independent thinker, who needs little guidance, is competent and confident…(and) is politically astute…" ROI, Tab E-17; PC Dep. 167:22-168:5; BA Dep. 40:20-25, 63:21-64:13; JF Dep. 81:17-82:8.

18. The Defendant allowed Matthew Scheider to non-competitively enhance his qualifications by acting as GS-14 Supervisory Social Science Analyst, while denying the Plaintiff an equal opportunity to demonstrate his skills, knowledge, abilities. (AP Depo. of June 28, 2006 Page 317:14, page 316:23-25 and page 317:1-2 and PC  Depo., ROI) (AP Depo. page 260-261, page 156-157, PC Depo. page 0063: 22-25, page 0064:1-25, ROI)

19. The experience gained by Matthew Scheider while he served as Acting Supervisor favorably influenced his rating and evaluation as a candidate for the permanent Position.

20. Angel Smith's Deposition contradicts Ms. Cammarata's statements that she fairly considered the Plaintiff for advancement opportunities and assignments. (Angel Smith Deposition ("AS Dep.") pages 4-5;  PC Dep. 0063: 22-25, 0064:1-25, ROI.)

21. Ms. Cammarata's purported "focus on the research and evaluation criteria" is contradicted by the listed essential elements of the position description, the weight accorded to those elements, as well as Mr. Scheider's own description of what the job entailed.

22. Moreover, Cammarata insists that she selected Scheider because she believed he was the best qualified candidate and *best fit the selection criteria* (*emphasis added*). ROI, Tab D-9, at 28: E-17 (compare Summary page of Cammarata interview notes). While the Position Description accorded 45% of the function of the Position to supervisory and leadership experience, Cammarata selected Scheider's minimal experience of supervising (PC. Dep, pg. 0208weeks of supervising an intern, accompanied by six weeks (or two three-week stints) of supervisory experience over the "Hot Spots Program" and as Acting Supervisory Social Science Analyst over the Plaintiff's twenty-three years of leadership and eight years of supervisory experience.

23. The weight accorded in the selection process to Mr. Scheider's research and analytical skills is disproportionate to the weight accorded as listed in the Position Description.

24. Tracy Henke, the Agency Official who authorized the Plaintiff's demotion/ transfer, causing the Plaintiff's loss of supervisory duties, has a public record of racial bias and manipulation and distortion of racial statistics, as supported by the following public document.[10]

---

Justice Department Demoted Official Who Fought Suppression of Racial Profiling Study <http://www.ucsusa.org/scientific_integrity/interference/racial-profiling.html> <http://www.sourcewatch.org/index.php?title=Tracy_A._Henke>

Dated: February 13, 2008                    Respectfully submitted,


                                            JOHN F. MERCER, ESQ.
                                            D.C. Bar #
                                            Attorney for the Plaintiff


**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

<http://www.thecarpetbaggerreport.com/archives/7571.html>
<http://www.washingtonpost.com/wp-
dyn/content/discussion/2006/05/26/DI2006052601169.html> .  This article noted that
Henke had caused a ruckus last year when she demanded that a Justice Department report
on racial disparities in police treatment of blacks in traffic cases be taken out of a news
release.  A respected career employee was demoted after protesting the move.

_____

ALBERT A. PEARSALL, III                           )
                                                                       )
                                Plaintiff,              )
                                                                       )
                                v.                         )          Case No.: 07-0108 (PLF)
                                                                       )
MICHAEL MUKASEY, Attorney General,  )
United States Department of Justice, [11]        )
                                                                       )
                                Defendant.            )
                                                                       )
_____)


## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION

I.      **PLAINTIFF RESPECTFULLY WITHDRAWS THE
         FOLLOWING CLAIMS:**

   i.   COUNT III, Supervisory Program Auditor Officer GS-15 Non-
        Selection;

   ii.  COUNT IV, Discrimination Based on Age;

   iii. COUNT VII, False and Intentional Business Defamation;

   iv.  Claim related to 42 U.S.C. §1983, as the agents of the Department
        of Justice are not state actors and did not act under color of state
        authority.

---

[11]      The current Attorney General, Michael Mukasey, has been automatically
substituted as the Defendant, Fed. R. Civ. P. 25(d).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

## II.   SUMMARY

The Plaintiff has been the victim of subtle and sophisticated discrimination. Originally, the Plaintiff thought the Defendant's actions were motivated because he was a complainant witness against the Agency in another employee's discrimination case. However, as more information becomes available, the Plaintiff has come to believe that was a secondary reason. The primary motive was race and sex discrimination. The Plaintiff was unable to unravel this discrimination at the time of the transfer. However, he immediately notified his bosses that the transfer was an unmerited adverse action. The Defendant responded with a reason (the reorganization) that has proven to be pretextual.

The Defendant's motion skillfully pulls excerpts from the administrative records to support their argument. The excerpts are presented by the Defendant absent of context and background. They should be disregarded; and, at minimum, they should be viewed in context and presented to the trier of fact.

For example, Defendant claims that the Plaintiff has waived his rights to a claim of compensatory damages due to a statement made during a deposition.[12] The advocacy techniques employed by the Defendant, alone suggest factual conflict warranting penetrating examination. Certainly, issues raised by factual disputes in this matter demand consideration by dispassionate fact finders.

---

[12] Assuming *arguendo*, that the Plaintiff waived his compensatory rights, the question of duress and other factors pertaining to a trial "De Novo" would nullify any such statement. Omission, by the Agency of other facts supporting the Plaintiff's claims show that these statements are "self-serving" and the Court should recognize them as such.

In the instant action, the Plaintiff alleges he was the victim of intentional removal of his supervisory duties and privileges and denial of promotion because of race and sex. The Defendant has never answered questions as to why the complainant's supervisory duties have not been restored, nor responded to its adverse impact on his career advancement.  The actions of Tracy Henke stigmatized the Plaintiff, and effectively eliminated his opportunity for future advancement, regardless of the Plaintiff's skills, knowledge, and abilities.[13]  The actions of Ms. Cammarata show the Plaintiff was never even considered for the GS-15 supervisory position.

Defendant's motion suggests that there has already been extensive discovery related to this complaint.  However, previous attempts to compel the agency to furnish information regarding the failure to promote and advance Black males or Tracey Henke's records regarding Black male employees were thwarted by successful motions to limit discovery by the Defendant in the administrative process.  The Defendant has also restricted claims and investigations around the merit promotion actions that resulted in the promotion of Mathew Schieder.

To further support our claim that race and sex discrimination were factors in failing to promote, the Plaintiff submits the following studies by the U.S. Merit Systems Protection Board showing under-representation of Black male employees in the upper grade level positions (GS-15 and above) throughout the federal government.[14]  Currently,

---

[13] The Defendant perceived the Plaintiff as "damaged goods" like 'Hester Prynne' in the novel by Nathaniel Hawthorne, *The Scarlet Letter*.

[14] See *Fair and Equitable Treatment: A Progress Report on Minority Employment in the Federal Government*, A Report by the U.S. Merit Systems Protection Board.  See also *Causes and Cures of Under Representation*, Steve Nelson, Director, Office of Policy and Evaluations, U.S. Merit Systems Protection Board, July 30-August 3, 2007.

the appropriate congressional oversight committee is investigating Defendant's policies

and practices regarding the career advancement and under-representation of Black males.

### III.   STANDARDS OF REVIEW

#### A.  This Court Should Deny Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and/ or Failure to State a Claim.

When Congress requires the exhaustion of administrative remedies as an antecedent

to judicial review, it is "rooted, not in prudential principles, but in Congress' power to

control the jurisdiction of federal courts."  *Tanya Lewis v. Adrian Fenty, (Memorandum*

*Opinion, Dist. Ct. D.C., 07-0429 RMU, decided Jan. 24, 2008)[15] quoting*, *Avocados Plus,*

*Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004); *accord Spinelli v. Goss*, 446 F.3d 159,

162 (D.C. Cir. 2006).  Thus, before addressing the substantive issues of this case, the

court must establish its jurisdiction to adjudicate the plaintiff's claims.  As set forth

below, Plaintiff has exhausted sufficient administrative remedies to confer the requisite

subject matter jurisdiction granted by Congress.  Also, Plaintiff's claims related to

employment discrimination based upon race are sufficient to state a claim at this stage of

litigation under Title VII of the Civil Rights Act, 42 U.S.C. §2000e et seq..

##### 1.  Legal Standard to Dismiss for Lack of Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction and the law presumes that "a cause

lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511

U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283-288-89

(1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir.

---

[15] Plaintiff liberally quotes Judge Urbina's recent memorandum throughout his opposition.

2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III, as well as statutory requirement [,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).  "A claim that the court lacks jurisdiction under Article III of the Constitution may not be waived, since the jurisdiction at issue goes to the foundation of the court's power to resolve a case, and the court is obliged to address it *sua sponte*."  *Doe ex rel. Fein v. District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996).  The plaintiff bears the burden of establishing that the court has subject-matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court may dismiss a complaint for lack of subject-matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.* 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for Rule 12(b)(6) motion for failure to state a claim.  *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 8, 13 (D.D.C. 2001).  Moreover, the court is not limited to allegations contained in the complaint. *Hohri v. United States*, 782 F. 2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*,

482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. Of Scis.,* 974 F.2d 192, 197 (D.C. Cir. 1992).

### a. Legal Standard for Exhaustion of Administrative Remedies

In actions brought under Title VII, a court has authority over only those claims that are (1) contained in the plaintiff's administrative complaint or claims "like or reasonably related to" those claims in the administrative complaint and (2) claims for which the plaintiff exhausted administrative remedies. *Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C. Cir. 1995); *Caldwell v. Serv. Master Corp.*, 966 F. Supp. 33, 49 (D.D.C. 1997). It is the defendant's burden to prove by a preponderance of the evidence that the plaintiff failed to exhaust administrative remedies. *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (stating that "because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it"). Meager, conclusory allegations that the plaintiff failed to exhaust administrative remedies will not satisfy the defendant's burden. *Id.* at 12 (noting that a mere assertion of failure to exhaust administrative remedies without more is "clearly inadequate under prevailing regulations to establish a failure to exhaust administrative remedies").

Accordingly, dismissal results when a plaintiff fails to exhaust administrative remedies. *Rann v. Chao*, 346 F.3d 192, 194-195 (D.C. Cir. 2003) (affirming the trial court's dismissal of the plaintiff's ADEA claim for failure to exhaust administrative remedies); *Gillett v. King*, 931 F. Supp. 9, 12-13 (D.D.C. 1996) (dismissing the plaintiff's Title VII claim because he failed to exhaust his administrative remedies).

### 2. Standard of Review for Motion to Dismiss for Failure to State a Claim

Dismissal for failure to state a claim upon which relief can be granted is impermissible unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Owens v. Tiber Island Condominium Ass'n,* App. D.C., 373 A.2d 890 (1977); *Atkins v. Industrial Telecommunications Ass'n*, App. D.C. 660 A.2d 885 (1995). A complaint should not be dismissed because the court doubts that a plaintiff will prevail on a claim; however, dismissal for failure to state a claim may properly be granted where it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *Duncan v. Children's Nat'l Medical Ctr.*, App. D.C., 702 A.2d 207 (1997); cert. denied, 525 U.S. 912, 119 S. Ct. 257, 142 L. Ed. 2d 211 (1998).

A complaint is sufficient so long as it fairly puts the defendant on notice of the claim against [him/ her]; accordingly, liberal rules of pleading normally protect a plaintiff at the pleading stage when the complaint can be said to state a claim if all inferences are drawn in the plaintiff's favor. *Duncan v. Children's Natl'l Medical Ctr.*, App. D.C., 702 A.2d 207 (1997); cert. denied, 525 U.S. 912, 119 S. Ct. 2577, 142 L. Ed. 2d 211 (1998). For purposes of a motion to dismiss for failure to state a claim upon which relief can be granted, the complaint must be construed in the light most favorable to the plaintiff and its allegations taken as true. *McBryde v. Amoco Oil Co.*, App. D.C., 404 A.2d 200 (1979); *Cauman v. George Washington Univ.*, App. D.C., 630 A.2d 1104 (1993). A court must look to the sum of allegations made in the plaintiff's complaint and opening statement before deciding whether a proper claim is stated. *Hentz v. CBI-Fairmac Corp.*, App. D.C., 445 A.2d 1004 (1982).

### 3.   Defendant Misstates the Applicable Standards for Summary Judgment

The Defendant-Agency egregiously misstates the showing that Plaintiff must make to survive summary judgment.  Here, Plaintiff must simply show the existence of disputed issues of material fact that make decision by summary judgment inappropriate. It is only where the facts material to a cause of action are shown to be undisputed, and those facts so established indicate an unequivocal right to judgment favoring a party, that summary disposition will be permitted.  *McBryde v. Amoco Oil Co.*, App. D.C., 404 A.2d 200 (1979).

The Defendant has cited *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  In doing so, he misleadingly implies that Plaintiff not only show that the Defendant's proffered reasons for non-selection are pretextual, but also that Plaintiff prove that discrimination is the "real reason" for the standard.  For example, according to Defendant, under the theories outlined in *Fogg v. Gonzales*, 492 F.3d 447 (D.C. Cir. 2007), "plaintiff must demonstrate discrimination by a preponderance of the evidence and may rely on direct or circumstantial evidence to meet that burden," *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-102 (2003) (*cited Agency Motion p. 25*).   Defendant continues: "plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action, *St. Mary's Honor Center*, 509 U.S. at 515-518. According to Defendant, "this is a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor."

Ironically, Defendant fails to note that in *St. Mary's* the court's clarifies *when a plaintiff is entitled to judgment as a matter of law* and in that context, pronounces that the

*ultimate burden* of the plaintiff is to show discrimination. *St. Mary's* does not ascribe

this burden to a *non-movant plaintiff facing summary judgment.*(*St. Mary's*, 509 U.S. at

524 (question of discrimination is "ultimate question" in discrimination case, not subject

to the *McDonnell-Douglas* "legal rules which were devised to govern the basic

allocations of burdens and order of presentation of proof") (emphasis added, internal

quotation omitted): *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)

(concerning burden of plaintiff at trial and on motion for post-trial judgment as a matter

of law).

As grants of summary judgment are reviewed *de novo*, a party is entitled to summary

judgment only if the record, viewed in the light most favorable to the nonmoving party,

reveals that there is no genuine issue as to any material fact. *See Tao v. Freeh*, 207 U.S.

App. D.C. 185, 27 F. 3d 635, 638 (D.C. Cir. 1994). "Summary judgment will not lie

if…the evidence is such that a reasonable jury could return a verdict for the nonmoving

party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct.

2505 (1986). Accordingly, in this procedural posture, the Plaintiff is required to show

only the existence of disputed issues of material fact that make summary judgment

inappropriate.

Moreover, here the Defendant blatantly attempts to superimpose in the instant

proceeding, the administrative standard of review. The imposition of such a standard

would be clear error. This Court is required to apply the *de novo* standard. For example,

Defendant alleges that because the Plaintiff withdrew his claim for Count V, and in the

administrative proceeding underwent partial discovery, and allegedly waived

compensatory damages, this Court should dismiss both Count V and his compensatory

damage claims. The Defendant, fails to note, however, that "[i]n determining whether to grant summary judgment, the [administrative judge's] function is not to weigh the evidence and render a determination as to the truth of the matter, but only to determine whether there exists a genuine factual dispute." *Miller v. Henderson*, 2001 WL 135549, at *2 (E.E.O.C. Feb. 9, 2001) (reversing a decision below where administrative judge found no genuine factual dispute where case involved issues "best made after a hearing during which all relevant parties testify"). Clearly, these are two distinct standards of review that should not be merged into one. Further, this Court is not obligated to review the administrative decision.

The Plaintiff submits that this Court should find that the existence or non-existence of evidence of discriminatory motive is irrelevant on summary judgment where a plaintiff has shown evidence that "tends to undercut the veracity of defendant's explanation" since Defendant's actions are such that a reasonable fact-finder could infer that discrimination occurred, *see Kalinoski v. Gutierrez*, –F. Supp. 2d--, 2006 WL 1439397 at *10 (D.D.C. May 25, 2006) (denying defendant's motion for summary judgment); citing *Lathram v. Snow, 357 U.S. App. D.C. 413, 336 F.3d 1085, 1088 (D.C. Cir. 2003)*; *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) (Posner, J.) (finding where a "trier of fact…would be entitled to infer a discriminatory motive from the pretextual character of the employer's ground" that "the case could not be resolved on summary judgment").

In sum, a Defendant-employer can obtain summary judgment in one of two ways: (1) It can demonstrate that that the plaintiff's evidence fails to establish a prima facie case; or (2) it can present a legitimate, nondiscriminatory reason about which the plaintiff does

not create a valid factual dispute. *Mitchell v. Data Gen. Corporation*, 12 F.3d 1310, 1316

(4th Cir. 1003).  As documented herein, the Plaintiff has pled facts sufficient to establish a

prima facie case of discrimination.  Additionally, there are several material facts in

genuine dispute.  For those reasons, summary judgment should not be granted.  *See*

*Miller*, 2001 WL 135449 at @2.

## IV.    ARGUMENTS IN SUPPORT OF PLAINTIFF'S MOTION

### A.  This Court Should Deny Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

#### 1.  Plaintiff Has Sufficiently Exhausted His Administrative Remedies

##### a. Plaintiff is not required to raise separate Hostile Work Environment Claims in order to raise them now as long as they are sufficiently related to the claims initially raised.

Defendant contends that Counts I (Retaliatory Transfer) and VI (Hostile Work

Environment) should be dismissed since Plaintiff did not raise them separately in

his formal administrative EEO complaint. However, "[a] plaintiff need not exhaust

administrative remedies to file a retaliation claim in court."  *Jones v. Greenspan*,

402 F. Supp. 2d 294, 298 (D.D.C. 2005) (quoting *Turner v. Dist. of Columbia*, 383

F. Supp. 2d 157, 178 (D.D.C. 2005)).  "The proposition that exhaustion is

unnecessary for retaliation claims stems, in part…from fear that filing a separate

charge will result in more retaliation, and that a retaliation claim is necessarily

related to the underlying charge."  *Id*.  In the present case, the Plaintiff has alleged

that the initial transfer was a retaliatory act in response to protected activity and his

participation with the organization, Blacks in Government. Thus, it is reasonable to

believe that an investigation into the facts would have uncovered this related

underlying claim.  And, the Defendant's motion to dismiss on the ground of

insufficient exhaustion of administrative remedies in relation to Plaintiff's retaliation claim is without merit.

On the same note, Defendant's allegations that Plaintiff's Count VI (hostile work environment) is time barred and has not been sufficiently exhausted is baseless since hostile work environment is by definition an ongoing and continuous practice, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002), which is reasonably related to the initial retaliatory transfer.

Further, the language of EEO regulation supports the view that a complaining party need not [**57] initiate a separate informal proceeding for a related claim, *Kalinoski*, 435 F. Supp. 2d 55, 54 (2006).  The EEO regulation governing dismissal of claims by the agency provides:

> Prior to a request for a hearing in a case, the agency shall dismiss an entire complaint ... [t]hat fails to comply with the applicable time limits contained in *ßß 1614.105, 1614.106* and *1614.204(c)* ... or that raises a matter that has not been brought to the attention of a Counselor *and* is not like or related to a matter that has been brought to the attention of a Counselor.  *29 C.F.R. ß 1614.107(a)* (emphasis supplied).

The clear implication of this provision is that a complaint will not be dismissed solely because it raises a matter that was not first brought to the attention of a Counselor, so long as the claim is "like or related to" a matter that *was* timely brought to the attention of a Counselor, as is the case here.

The Supreme Court has provided guidance in evaluating whether specific discriminatory actions can be joined together to satisfy the exhaustion requirement.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  The Court ruled that "each incident of discrimination constitutes a separate actionable 'unlawful employment practice.'"  *Id.*  Accordingly, the Court held that "discrete discriminatory acts are not

actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* Circuits are split on how broadly the Supreme Court's holding should be construed.

As outlined in *Jones v. University of the District of Columbia*, 505 F. Supp. 2d 78 (D.D.C. 2007), the Eighth Circuit interprets the *Morgan* holding narrowly and continues to use the reasonably related test where "subsequent retaliatory acts [are] of a like kind to the retaliatory acts alleged in the EEOC charge, [and are] specified to be of an ongoing and continuous nature." *Wedow v. City of Kan. City, Mo.,* 442 F. Supp. 3d 661, 673-74 (8th Cir. 2006). Under the reasonably related test, a court may review claims that were not brought before the EEOC, even if the plaintiff has not first exhausted administrative remedies for those claims. *Id.* at 673-74 (holding that the plaintiffs' claims of gender discrimination and retaliation, occurring after the filing of the EEOC complaint, were reasonably related to the claims in their EEOC complaints because a reasonable investigation arising from the EEOC complaints would encompass present and future retaliatory acts that were alleged to be ongoing and continuous). But, the Eighth Circuit notes that, in light of *Morgan*, it has "narrowed its view of what acts are sufficiently related to be within the scope of the properly filed administrative charges." *Id.* at 673.

The Tenth Circuit, on the other hand, interprets the Supreme Court's holding broadly. Whereas, the Supreme Court's decision barred untimely, but related, incidents occurring prior to the filing of an EEOC complaint, the Tenth Circuit expanded the holding to require exhaustion of remedies for related "incidents occurring *after* the filing of [the] plaintiff's EEO complaint." *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (concluding that "*Morgan* abrogates the continuing violation doctrine as

previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with a framework where each discrete incident of discriminatory treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted").

Although the D.C. Circuit has declined to weigh in on the issue, *Weber v. Battista*, 494 F.3d 179, 183-84 (D.C. Cir. 2007), three courts in this district have. In two of the cases, the courts found that *Morgan* overruled this circuit's "reasonably related" standard and established a "discrete acts" framework for determining whether claimants have exhausted their administrative remedies. *See Romero- Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 148-50 (D.D.C. 2005) (Lamberth, J.); *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 138 (D.D.C. 2004) (Friedman, J.). In the third case, however, the court limited the holding in *Morgan* to determining the timeliness of a claim, declining to extend the discrete acts framework to the exhaustion of remedies requirement. *Hazel v. Wash. Metro. Area Transit Auth.*, 2006 WL 362693, at *8 (D.D.C. Dec. 4, 2006) (Roberts, J.). The court drew from a post-*Morgan* D.C. Circuit opinion, which held that a court could not entertain additional incidents omitted from an EEO complaint unless those incidents were within the "scope of any investigation that reasonably could have been expected to result from [the] initial charge of discrimination."[16]  *Id.*

---

[16] Note that this is the same rationale given by the Eighth Circuit in continuing "to adhere to a narrow reading of [the] exhaustion exception." *Wedow v. City of Kan. City, Mo.*, 442 F.3d 661, 674 (8th Cir. 2006) (noting that "[w]e do not require that subsequently-filed lawsuits mirror the administrative charges as long as the sweep of any subsequent judicial complaint is no broader than the scope of the EEOC investigation which could reasonably be expected to grow out of the charge filed in the EEOC complaint") (citing

(citing *Lane v. Hilbert*, 2004 WL 1071330, at *1 (D.C. Cir. May 12, 2004) (unreported)).

Taking into account the record of Plaintiff's complaints to his managers and the subsequent EEO complaints, it is reasonable that Count I (retaliation) and Count VI (hostile work environment) would have resulted from the investigation of the Plaintiff's initial EEO charges. Both charges are reasonably related to the underlying claims of retaliation and discrimination. And, the Plaintiff should not be required to amend his EEO complaint every time something occurs which might lend credence to his suspicions in order to expect that his claim would be investigated. Accordingly, this Court should deny Defendant's Motion and rule in the Plaintiff's favor since Counts I (Retaliation) and VI (Hostile Work Environment) were sufficiently administratively exhausted, and should not be barred from litigation.

### b. Title VII Cases Are Reviewed De Novo

#### 1. Defendant's Motion to Dismiss Count V should be denied.

Defendant contends that the parts of Count V that were timely were later withdrawn by Plaintiff at the administrative stage; and, for that reason, Count V should be dismissed at the trial stage. Thus, according to Defendant: (1) the Court should dismiss Count V of Plaintiff's claim as the claim was not sufficiently administratively exhausted.

#### 2. Defendant's Motion to Deny Plaintiff's compensatory damages should be denied.

---

*Duncan v. Delta Consol. Indus. Inc.*, 371 F.3d 1020, 1025 (8th Cir. 2004) (internal quotations omitted)).

Defendant also contends that since the Plaintiff, in the interest of a non-adversary proceeding, waived compensatory and punitive damages at the administrative level, that these same damages to which Mr. Pearsall is entitled, should be waived now. Plaintiff concedes that punitive damages are not available under Title VII, so that issue is not in dispute. However, according to the Defendant, the Court should also deny Plaintiff's claim to compensatory damages.

As is discussed previously herein, Title VII proceedings are reviewed *de novo*. And, Defendant's attempts to dismiss both Count V and Compensatory Damages are mistaken.

*Kalinoski* notes the administrative exhaustion requirement is designed to ensure that the agency had "notice of [plaintiff's] grievance, and a fair opportunity to provide full redress or to attempt an informal accommodation. Title VII requires no more." *Loe v. Heckler, 247 U.S. App. D.C. 292, 768 F.2d 409, 418 (D.C. Cir. 1985).* [**52]   In this case, as in *Mc Donnell- Douglas Corp. v. Green*, the Defendant had the requisite notice of this aspect of the Plaintiff's claim, Count V.   Therefore, Plaintiff's efforts at the administrative level with respect to Count V were sufficiently specific to satisfy that notice standard.

Moreover, the absence of a Commission finding of reasonable cause cannot bar suit under an appropriate section of Title VII, *McDonnell- Douglas,* 411 U.S. 792, 676 (1973).   In *McDonnell-Douglas*, the court noted that the District Judge erred in dismissing respondent's claim of racial discrimination under § 703 (a)(1). Like the Plaintiff, the Respondent in that case, satisfied the jurisdictional prerequisites to a federal action (i) by filing timely charges of employment discrimination with the Commission and (ii) by receiving and acting upon the Commission's statutory  **[***676]**  notice of the

right to sue, 42 U. S. C. §§ 2000e-5 (a) and 2000e-5 (e). The Act does not restrict a complainant's right to sue to those charges as to which the Commission has made findings of reasonable cause, and this Court should not engraft on the statute a requirement which may inhibit the review of  [**799**] claims of employment discrimination in the federal courts. The Commission itself does not consider the absence of a "reasonable cause" determination as providing employer immunity from similar charges in a federal court, 29 CFR § 1601.30, and the courts of appeal have held that, in view of the large volume of complaints before the Commission and the non-adversary character of many of its proceedings, "court actions under Title VII are de novo proceedings  [****1823**]  and . . . a Commission 'no reasonable cause' finding does not bar a lawsuit in the case." *Robinson* v. *Lorillard Corp*., 444 F.2d 791, 800 (CA4 1971); *Beverly* v. *Lone Star Lead Construction Corp*., 437 F.2d 1136 (CA5 1971); *Flowers* v. *Local 6, Laborers International Union of North America*, 431 F.2d 205 (CA7 1970); *Fekete* v. *U.S. Steel Corp*., 424 F.2d 331 (CA3 1970).

Also, there are societal as well as personal interests on both sides of this equation that the Court should consider.  The broad, overriding interest, shared by employer, employee, and the public, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions.  In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise.  *Id.*  Accordingly, as Defendant had the requisite notice of Plaintiff's claim regarding Count V, and since Title VII actions are reviewed *de novo* in the interest of justice and equal employment opportunity, Defendant's Motion to Dismiss Count V should be denied.

### c. Plaintiff's Claims Should Not Fail Because of the Time Lapse
### Between Filing of the EEO Complaint and the Retaliatory Transfer

With respect to Plaintiff's initial reassignment, Defendant argues that it is entitled to summary judgment for two principal reasons: first, that no reasonable jury could conclude that the Plaintiff suffered an adverse employment action when he was reassigned; and, second, that there is insufficient evidence from which a jury could reasonably conclude that Plaintiff's race and retaliation were reasons for the reassignment.

### 1. Plaintiff's reassignment is an actionable adverse action.

"[A] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, *reassignment with significantly different responsibilities*, or a decision causing a significant change in benefits." *Brown v. Brody, 339 U.S. App. D.C. 233, 199 F.3d 446, 456 (D.C. Cir. 1999))* (emphasis added). "[A] plaintiff who is made to undertake ... a lateral transfer" -- that is, a reassignment in which she suffers no diminution in pay or benefits -- *can* maintain a cause of action under Title VII if she has endured "materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Id. at 457.* The D.C. Circuit reiterated the *Brody* principle in *Stewart v. Ashcroft,* "[W]hile generally lateral transfers, or the denial of them, [will] not be considered adverse employment actions, there are circumstances where they [may] be." *359 U.S. App. D.C. 139, 352 F.3d 422, 427 (D.C. Cir. 2003).* And in the very recent case of *Holcomb v. Powell,* the court held that a Title VII plaintiff had suffered "materially

adverse consequences that inflict[ed] objectively tangible harm" when, following an ostensibly "lateral" reassignment, the Plaintiff spent two years doing work that was commensurate with a GS-5 position while continuing to be classified and paid at the GS-11 level. *369 U.S. App. D.C. 122, 433 F.3d 889, 902-03 (D.C. Cir. 2006)*.

The Plaintiff contends that his circumstances are similar to those of the Plaintiff in *Kalinoski*, where the reassignment constituted an adverse employment action for these principal reasons: (1) [he] was stripped of [his] supervisory duties and privileges, (2) [he] suffered a loss of advancement potential, (3) [he] was effectively moved down within the agency hierarchy and  [he] was assigned lower grade duties previously performed by a GS-8 level employee.  Here, the record is clear that, contemporaneous with the transfer, the Plaintiff was stripped of his supervisory duties and assigned tasks commensurate with a much lower grade. In addition, the Defendant failed to restore his duties, did not promote him to an equivalent position as merited by Plaintiff's knowledge, skills, and abilities.  Further, Defendant has never answered as to why the Plaintiff's supervisory duties have not been restored nor responded to the subsequent adverse impact on Plaintiff's career advancement.

Keeping in mind that the *prima facie* burden should not be onerous and that all reasonable factual inferences must be drawn in favor of the non-moving party, the Court should conclude that there is a genuine dispute of material fact as to whether Plaintiff suffered an adverse employment action.  Taking into consideration the strength of the Plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence, a reasonable jury could conclude that the adverse employment decision was made for a prohibited reason (i.e., either Plaintiff's

race or because he engaged in protected activity).  Even if a jury may ultimately conclude that the positions were not meaningfully different, the evidence now before the Court fails to support a finding as a matter of law that the reassignment did not entail objectively tangible harm.  Viewing the record as a whole, the Court cannot conclude that it would be unreasonable for a jury to draw such an inference here.  Thus, the Defendant cannot prevail on its motion for summary judgment on this ground.

**2. The evidence supports a reasonable inference of discrimination based on race and retaliation.**

**a. Plaintiff's evidence creates a rebuttable inference of discrimination.**

Under the *McDonnell- Douglas* framework, the Plaintiff has met his *prima facie* burden to come forward with evidence that tends to create a rebuttable inference of discrimination since a less- qualified white male (i.e., someone from outside his protected class) was placed in the Position.

In *Aka*, the D.C. Circuit said that, "[a]lthough the plaintiff cannot always avoid summary judgment by showing the employer's explanation to be false ... such a showing does have considerable evidentiary significance." *156 F.3d at 1292*. That is because, the court said,

> "when the plaintiff rebuts the employer's own explanation of its challenged acts, this eliminates the principal nondiscriminatory explanation for the employer's actions. Events have causes; if the only explanations set forth in the record have been rebutted, the jury is permitted to search for others, and may in appropriate circumstances draw an inference of discrimination. ...
>
> If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination. ... This is so because, according to ordinary [**27] evidentiary principles[,] ... a lie is evidence of consciousness of guilt. The jury can conclude that an employer who fabricates a false

explanation has something to hide; that "something" may well be discriminatory intent." *Id. at 1292-93*.

"[I]n an appropriate case, '[t]he factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination." *Aka, at 1294* (quoting *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (U.S. 1993))*.  More recently, the D.C. Circuit observed that "[u]sually, proffering 'evidence from which a jury could find that [the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury.'" *George v. Leavitt, 366 U.S. App. D.C. 11, 407 F.3d 405, 413 (D.C. Cir. 2005)*. "Although a jury may ultimately decide to credit the version of the events described by [defendant] over that offered by [plaintiff], this is not a basis upon which a court may rest in granting a motion for summary judgment." *Id.*

### b.  Timing, or Temporal Proximity Between Adverse Action and E.E.O. Complaint

Of course, Title VII does not say that retaliation must be immediate for it to be actionable.  The 300-day period for filing of an EEOC complaint starts to run when the plaintiff "has a reasonable suspicion that he has been the victim of discrimination." *Aceto v. England,* 328 F. Supp. 2d 1, 7 (D.D.C. 2004); *see also McCants v. Glickman*, 180 F. Supp. 2d 35, 40 (D.D.C. 2001); *Paredes v. Nagle*, 1982 WL 319, at *4 (D.D.C. Jan. 17, 1982); 42 U.S.C. §2000e-5(e)(1).  Here, the Plaintiff contacted the EEO Counselor after complaining of the adverse impact of the transfer on his career to his managers, and after realizing, upon their lack of response, that perhaps, the transfer was not motivated by the reasons given.  In short, given the timing issues inherent in the

personnel complaint process of the federal government, the Plaintiff acted once he reasonably suspected he had been a victim of discrimination.

But, the cases interpreting the law do hold that, if the only circumstantial evidence of retaliation is temporal proximity between the protected activity and the alleged retaliatory action, then those events must be very close in time for that evidence [**34] to be sufficient for a jury to infer a retaliatory motivation. Thus, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close.'" *Clark County School Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)*. Indeed, judges of this court have held that the passage of two months may create too wide a temporal chasm to give rise to an inference of causal connection. See *Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003)*. However, it also is true that there is no hard-and-fast rule that two or three months is too removed for an inference of causation. Moreover, as the D.C. Circuit emphasized in Holcomb, "[a]t the *prima facie* stage of a retaliation claim, a plaintiff's burden 'is not great[.]'" *433 F.3d at 903*. And, the Plaintiff should be granted discovery to gather additional evidence of retaliation. Therefore, Defendant's Motion regarding this claim should be denied.

In the present case actions by the Defendant were both surreptitious and masked by "facially neutral" employment procedures. Discrimination, like other such misdeeds, is not practiced under the scrutiny of bright lights. Hidden discussions, withheld information, secret animus may continue for months and even years before revealed. The question of when the Plaintiff should have reasonably realized he was being

discriminated against and his career was being methodically destroyed is certainly one for

a jury to determine.

### B. The Court Should Deny Defendant's Motion for Failure to State a Claim Upon Which Relief May Be Granted as Plaintiff Pleads Sufficient Facts to Establish a Prima Facie Case of Discrimination.

#### 1. Legal Standard for Rule 12(b)(6) Motion

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint.

*Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint need only set

forth a short and plain statement of the claim, giving the defendant fair notice of the

claim and the grounds upon which it rests.  *Kingman Park Civic Ass'n v. Williams*, 348

F.3d 1033, 1040 (D.C. Cir. 2003) (citing Fed. R. Civ. P. 8(a)(2) and *Conley v. Gibson*,

355 U.S. 41, 47 (1957)).  "Such simplified notice pleading is made possible by the liberal

opportunity for discovery and the other pre-trial procedures established by the Rules to

disclose more precisely the basis of both claim and defense to define more narrowly the

disputed facts and issues."  *Conley*, 355 U.S. at 47-48 (internal quotation marks omitted).

It is not necessary for the plaintiff to plead all elements of his prima facie case in the

complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or "plead law or

match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134, 136

(D.C. Cir. 2000) (internal quotation marks and citation omitted).

Yet, the plaintiff must allege a "plausible entitlement to relief," by setting forth "any

set of facts consistent with the allegations."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955,

1967, 1969 (2007) (abrogating the oft-quoted language from *Conley*, 355 U.S. at 45-56,

instructing courts not to dismiss for failure to state a claim unless it appears beyond doubt

that "no set of facts in support of his claim would entitle him to relief").  While these

facts must "possess enough heft to 'sho[w] that the pleader is entitled to relief,'" a complaint "does not need detailed factual allegations." *Id.* At 1964, 1966.  In resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable  inferences  therefrom in the plaintiff's favor.  *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292 F.3d at 242.  While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations.  *Warren v. District of Columbia*, 353 F.3d 36, 40 (D.C. Cir. 2004); *Browning*, 292 F.3d at 242.

### 2.   Plaintiff has pled legally sufficient facts to plausibly entitle him to relief for discrimination based on race.

While Defendant concedes that Plaintiff has first established a *prima facie* case of prohibited discrimination, Defendant moves for dismissal alleging that Plaintiff is unable to prove pretext in discrediting his employer's explanation.  Under the *McDonnell Douglas* framework, once the complainant has established *a prima facie* case of prohibited discrimination, the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decision. *See McDonnell Douglas,* 411 U.S. at 802.  Should the employer succeed in presenting such reasons, the burden then shifts back to the complainant, who then has an opportunity to discredit the employer's explanation. *See id.* at 804-05.  In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981), the Court held, in producing nondiscriminatory reasons for its challenged action, the employer is not

obligated to support these reasons with objective evidence sufficient to satisfy the "preponderance of the evidence" standard, *see id.* at 259-60, and that the plaintiff, at all times, retains the ultimate burden of persuasion. *See id.* at 253.  Thus, the plaintiff has "'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, that the proffered reason was not the true reason for the employment decision,' and that race [or some other discriminatory basis] was." *Id.* at 507-08 (quoting *Burdine,* 450 U.S. at 256) (citation omitted).

Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment). That is not to say that every plaintiff must always present evidence in each of these categories in order to avoid summary judgment, *Aka v. Washington Hospital Center*, 332 U.S. App. D.C. 256, * 15; 156 F.3d 1284, *;  (1998).

### a.  The Agency's Proffered Reasons for Non-Selection Are Pretextual.

In Title VII actions, where an employer has proffered nondiscriminatory reasons for the challenged employment decision, the complainant is given an opportunity to discredit the employer's explanation.  *Aka*, 156 F.3d 1284, 1288 (D.C. Cir. 1998).  The complainant can discredit the employer's explanation by demonstrating that "a

reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not" or that "the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision." *Id*. At 1294-95.  "[If] the plaintiff rebuts the employer's own explanation of its challenged acts, this eliminates the principal nondiscriminatory explanation for the employer's actions", thereby permitting the finder-of-fact to infer discrimination. *Id.* At 1292-93.  Accordingly, where the evidence in a case would permit a reasonable jury to find that the employer's explanation is pretextual, summary judgment [disposition] for the defendant should be denied.  *See Lopez v. Aramark Uniform & Career Apparel, Inc.*, 426 F. Supp. 2d 914, 944 (N.D. Iowa 2006) (denying defendant's motion for summary judgment where plaintiff met the standard for showing pretext): *Kalinoski*, 2006 WL 1439397, at *15 (same).  The *Kalinoski* court concluded: Although "a plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a *prima facie* case under McDonnell Douglas," *Stella, 284 F.3d at 146*, where a plaintiff does make such a showing, she normally will satisfy her burden of establishing an inference of discrimination based on class status. *Id.*

The final prong of the *McDonnell-Douglas* framework requires plaintiff to produce circumstantial evidence sufficient for a jury to find that the challenged action was motivated by unlawful discrimination. This may (and usually does) involve producing evidence that tends to undercut the defendant's proffered explanation for the challenged action -- that is, evidence establishing that the explanation is  pretextual.

If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination. ... This is so because, according to ordinary evidentiary principles[,] ... a lie is evidence of consciousness of guilt. The jury can conclude that an employer who fabricates a false explanation has something to hide; that "something" may well be discriminatory intent. *Id. at 1292-93*. In short, "[i]n an appropriate case, '[t]he factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination." *Id. at 1294* (quoting *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (U.S. 1993))*.

More recently, the D.C. Circuit observed that "[u]sually, proffering 'evidence from which a jury could find that [the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury.'" *George v. Leavitt, 366 U.S. App. D.C. 11, 407 F.3d 405, 413 (D.C. Cir. 2005)*. "Although a jury may ultimately decide to credit the version of the events described by [defendant] over that offered by [plaintiff], this is not a basis upon which a court may rest in granting a motion for summary judgment." Id.

### i.  The Plaintiff Was Clearly the More Qualified Candidate.

The Supreme Court noted that an alternative statement of the formulation of the requisite standard is that "the factfinder may infer pretext if 'a reasonable employer would have found the plaintiff to be significantly better qualified for the job,'" *Ash v. Tyson Foods, Inc.*, 126 S. Ct. 1195, at 1198 (2006), (quoting *Aka*, 156 F.3d at 1294).

Defendant contends that Cammarata "had legitimate, nondiscriminatory reasons for not selecting the Plaintiff for the position alleged in Count II, the 2004 Supervisory Social Science Analyst Position." (Agency p. 27)  Here, the Agency tries to maneuver around the Plaintiff's clearly superior qualifications for the Supervisory Social Science Analyst position by: contending that supervisory and managerial skills were not critical for performing the job, and selectively highlighting only those portions of the job announcement and description that support this position.  *See* Agency, p. 27.   As discussed more fully *infra*, this argument is a pretextual cover for the impermissibly discriminatory selection.  A full reading of the record, including the job announcement and description, makes clear that the core skills and experience required for the position is clearly a disputed issue of material fact.

Notably, while the Agency stresses the importance of advanced research skills for the position, the required KSAs focus on supervisory and managerial skills, and nowhere even mention "research and social analysis skills."[17] (*See* ROI, at Tab E-14).  The position description further puts the highest priority on supervisory and managerial functions.[18]  *See id.*  Moreover, as selectee has testified, the large majority of his time and focus in the supervisory position at issue after selection has been on supervising and managing employees and projects, not deploying his research and analytical skills and experience.  *See* MS Dep. 65:22-24; 70:16-23; 75:17-76:15.

---

[17]    The five required KSAs were listed as "Ability to communicate effectively in performing supervisory or leadership work, Ability to supervise, Ability to analyze organizational and operational problems and develop solutions, Ability to communicate orally, Ability to communicate in writing."  (ROI, Tab E-14.)

[18]    The position description ranked the categories of duties in the order of "Exercises Supervisory and/or Managerial Authority 45%", followed by "Plans and Coordinates Group Efforts on Research Projects 40%, and "Attends/ Plans Conference Activities 15%/"  (ROI, Tab E-14.)

Here, a reasonable employer would have found the Plaintiff to be more qualified for the job as described in the job description and as performed by the Selectee. The critical job function of the position is supervising people and projects, *see* ROI, Tab E-14; MS. Dep. 65:22-24; 70:16-23; 75:17-76:15 (admitting that the great majority of his time since selection involves supervision), areas in which the Plaintiff is very qualified, whereas the Selectee has *virtually no experience*. Where the selectee lacked meaningful experience in the critical areas of the job, and the Plaintiff has over eight years of experience, it can hardly be said that the Plaintiff's position regarding relative qualifications of the candidates is an "opinion" about "relative merits." That the Plaintiff has clearly superior supervisory qualifications is an objective statement of fact that the Agency does not effectively refute.

The disparity between the Plaintiff's qualifications and experience and those of the selectee are overwhelming, both in terms of quantity and quality, such that "a reasonable employer would have found the Plaintiff to be significantly better qualified for the job." *Aka*, 156 F.3d at 1294. The Plaintiff's application for the Supervisory Social Science Analyst position highlighted more than eight years of experience successfully supervising employees and programs within the U.S. Department of Justice, Office of Justice programs. *See* ROI, Tab E-15, at 2-9; *see also* APEEO 00000031-82. By contrast, the Selectee's supervisory experience was limited to "supervising an intern" and two three-week stints in an acting supervisory position performing unspecified duties. The Selectee's limited experience is highlighted by the contemporaneous notes of one of the interview panelists during selectee's interview, which state that Selectee "Lacks the

background experience to take on supervising responsibility at this time…" *See* ROI, Tab E-15 (Interview notes of Beverly Alford).

More importantly, the Plaintiff's prior supervisory experience included managing more individuals, holding more senior, career positions, engaging in more substantial project work involving grants administration over more significant, extended periods of time, and numbering vastly more than a single "intern." *See* ROI, Tab E-15, at 2-9; BA Dep. 82:15-16 ("…Mr. Pearsall clearly has more supervisory experience. That's not debatable."); *see also* APEEO 00000031-82. Although years of experience do not necessarily make an individual more qualified, where the experience is critical for performing the job at issue, it is indisputable that years of *relevant* experience supervising employees and grants management programs, as the Plaintiff had, do make the individual more qualified, particularly where the selectee is so lacking in such requisite experience. *See Kalinoski*, 2006 WL 1439397, at *12-13 (noting the significance of plaintiff's eight years of experience in a job at issue to the determination of whether plaintiff was an objectively superior choice in denying summary judgment to defendant employer).

C. **Defendant's Motion for Summary Judgment Should Be Denied.**

In sum, it is a clearly disputed issue of material fact what the core qualifications for the position were. There is no dispute, however, whether the Plaintiff was sufficiently more qualified in supervisory and management experience for the position than the Selectee to support an inference of pretext. Even where evidence of the difference in qualifications is "not overwhelming," at the summary judgment stage, courts have held it sufficient to support a fact-finder's determination that "objectively speaking, plaintiff was significantly better qualified for the position by virtue of her many more years of

distinguished experience" in a relevant position. *Kalinoski*, 2006 WL 1439397 at *13. Such is the case here and, for the same reasons, summary judgment should be denied.

### 1. Ms. Cammarata's Proffered Reasons for Selecting Mr. Scheider Over Mr. Pearsall are Dubious.

The Defendant proffers two reasons for Ms. Cammarata not selecting the Plaintiff for the Supervisory Social Science Analyst position.   First, Cammarata claims that she did not select Pearsall based on her "impressions" of Plaintiff that she formed as his supervisor at COPS and during his interview for the Supervisory Social Science Analyst position.  Second, Cammarata claims that she selected Scheider over Plaintiff based on the fact that Scheider had greater "experience and expertise in advanced research design and experimental methods and advanced analytical, statistical and evaluation work." (*Id.*) Both of these proffered reasons are pretextual and essentially irrelevant to the core duties and skills required of the position.

### i. A Fact-Finder could reasonably conclude that Ms. Cammarata's impressions of Plaintiff are unreasonable.

According to the Defendant, one basis for Cammarata's selection of Scheider over Plaintiff was the "impressions" that she formed of the two candidates during her time as their supervisors and during their respective interviews.  These alleged impressions do not establish that the Agency acted with a non-discriminatory intent. On summary judgment, where the selecting official is the same witness who is criticizing the complainant's performance, the court should not "give credence to…inherently self-serving statements." *Clanton v. Kirk & Blum Mfg. Co.*, 2002 U.S. Dist. LEXIS 23798; citing O'Neal v. City of New Albany, 293 F.3d 998, 1005 (7th Cir. 2002); *See also*

44

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, at 143 (to show pretext, plaintiff bears the burden of demonstrating that the employer's ostensible justification for its decision is unworthy of credence).).  If a fact-finder could conclude that Ms. Cammarata's assessments of the Plaintiff were unreasonably minimizing, then summary judgment should be denied.  *Id.*

### 1.  Ms. Cammarata's Impressions of Mr. Pearsall's Job Performance

Ms. Cammarata claims that, based on her supervision of the two men, her impression was that the Plaintiff had performance deficiencies that Mr. Scheider did not.  However, there is significant evidence that would lead a fact-finder to conclude that Cammarata's negative conclusions about the Plaintiff's performance are not reasonable.

First, Cammarata's impressions are directly contradicted by formal evaluations that the Plaintiff received from previous supervisors.  For example, the Agency claims that Cammarata's impression was that the Plaintiff  "was unable to independently and proactively handle large-scale tasks and lead team [*sic*].  In contrast, a prior supervisor found that the Plaintiff "was an active participant in planning, developing and implementing programs and projects that address extant and emerging issues and critical problems impacting criminal justice and the community at large."  (APEEO 00000049.) The Defendant also claims that Cammarata's impression was that the Plaintiff was "not brief in discussions."  However, the Plaintiff's evaluation from his time as Associate Director for Grants Administration at the Drug Courts Program Office describes him, as "routinely issu[ing] clear and concise communications that articulate policy procedure and agency decision." (APEEO 00000038.)

Second, Cammarata's purported impressions of the Plaintiff's work performance are contradicted by her own prior statements and actions. For example, in April 2004, Cammarata wrote that she believed the Plaintiff had "certainly done good quality work" during his time at COPS. (APEEO 00001911.) Prior to that, in September 2003, Cammarata approved a Special Act Award of $500.00 for the Plaintiff, rewarding him for his "dedication and hard work" in helping the Agency solicit and review grant applications and assisting with the grant coordination process. (APEEO 00000086.)

Third, Ms. Cammarata's purported impressions of the Plaintiff are contradicted by Ms. Alford's assessment of Pearsall's work. Ms. Alford, who oversaw the Plaintiff's work in closing out grants for the T&TA division, testified that she and her staff were satisfied with the help he provided to the division. (BA Dep. 27:2-16.) Alford also testified that she was not aware of any performance issues with the Plaintiff's work. (BA Dep. 108:10-18.) Indeed, Ms. Alford told Cammarata that she and her staff were satisfied with the Plaintiff's work. (BA Dep. 27:17-28:16.)

### 2. Ms. Cammarata's Impressions of Plaintiff's Interview Performance

Cammarata also claims to have based her selection decision on her impressions of the Plaintiff and the Selectee that she formed during their respective interviews. However, Ms. Cammarata's vague and subjective impressions are, in fact, evidence of pretext and do not warrant summary judgment for the Agency.

Cammarata testified that, at Plaintiff's interview, she "reacall[ed] him not seeming energetic or passionate or motivated with the interview." (PC Dep. 183:13-14.) When asked what it means to be energetic and passionate in an interview, Ms. Cammarata

testified: "It's exuding this sense of real desire to want the job…When I say passionate, it's something that comes across that he really wanted the job." (PC Dep. 184:22-185:1.) In contrast, Cammarata characterized Scheider as "energetic" and "very enthusiastic". (PC Dep. 202:20-24.) These are exactly the type of "vague[,] unsupported and subjective reasons for not selecting [a] complainant: that courts have found to be evidence of pretext, *Aka,* at 255, *See, e.g., Fischbach v. District of Columbia Dep't of Corrections*, 318 U.S. App. D.C. 186, 86 F.3d 1180, 1184 (D.C. Cir. 1996); *Farber v.* [*888] *Massillon Bd. of Educ.,* 917 F.2d 1391, 1399 (6th Cir. 1990); *Lilly v. Harris-Teeter Supermarket*, 842 F.2d 1496, 1506 (4th Cir. 1988), (finding pretext where Agency's purported basis for selection was based on the fact that selectees showed the "most hunger for the job" during interviews and that their "enthusiasm was quite good"): *see also Kalinoski*, -- F. Supp. 2d --, 2006 WL 1439397, at *13 ("'[E]xplanations that rely on heavily subjective considerations' merit closer scrutiny.") (citation omitted).

> **i.      Cammarata's claim that she focused on the Research and Analytic components of the Supervisory Social Science Analyst Position is contradicted by the Vacancy Announcement Position Description that she approved.**

There is no dispute that, at the time of the 2004 competition for the Supervisory Social Science Analyst position, the Plaintiff had significantly more supervisory experience and training than Scheider. There is also no dispute that the Supervisory Social Science Analyst position is supervisory. Indeed, when Scheider competed for the very same position in 2003, he was not selected based on the fact that the 2003 selectee "had greater leadership experience." (MS Dep. 126:5-7.) In order to justify her 2004 decision to select Mr. Scheider – who had less supervisory experience than Plaintiff –

Ms. Cammarata now claims that she was "putting more of a focus in '04 on the research and the evaluation and the statistical experience and knowledge" components of the Supervisory Social Science Analyst position than on the supervisory aspects.  (PC Dep. 170:2-4.)

Cammarata's claim that she was putting a greater focus on the research components of the Supervisory Social Science Analyst position is belied by the fact that the position description that she approved for the 2004 vacancy announcement states that 45% of the Social Science Analyst job entails "Exercising Supervisory and/or Managerial Authorities."  These duties include "overseeing division budget and administrative tasks"; performing administrative and human resource management functions"; "effecting disciplinary measure"; and "[r]eview[ing] and approv[ing] or disapprov[ing] leave requests" – duties that Plaintiff was more qualified to perform than Mr. Scheider. (ROI, Tab E-14.)

In contrast, only 40% of the job entails 'planning and coordinating group research projects".  (*Id.*)  However, even this component of the position entails many supervisory functions, such as overseeing "division staff…to ensure policy and evaluation activities are completed efficiently"; overseeing "external grant, cooperative agreements and reimbursable agreement processes"; and planning and coordinating "group efforts on major research projects".  *See id*.  Importantly, the position description used in the 2004 vacancy announcement for the Supervisory Social Science Analyst position is *identical* to the position description used in the 2003 vacancy announcement – the position for which Mr. Scheider competed but was not selected based on the selectee's greater supervisory experience.  Moreover, Ms. Cammarata explicitly declined to make any changes to the

2003 description when posting the vacancy announcement in 2004 – an action that directly contradicts her claim that she was changing the focus of the selection process for the Supervisory Social Science Analyst position.  (COPS 0860; PC Dep. 163:9-19.)

## D.  SUMMARY

As a threshold matter, the Defendant argued that the Plaintiff, in making his charge of discrimination, has not met the administrative time limits under EEOC 29 C.F.R. 1614.  However, it is clearly the burden of the Defendant to indentify and articulate factual circumstances which would have triggered the Plaintiff's "reasonable suspicion" that he had been the subject of discrimination. In this matter, the Plaintiff has alleged that he was the victim of and "involuntary transfer" that caused his loss of supervisory duties. The Plaintiff claims that his transfer and the resulting loss of supervisory duties resulted from discrimination based upon race and sex. It is the Defendant's burden to indentify and proffer a date certain upon which the Plaintiff would have been made aware of the aforementioned discrimination and therefore on which the Plaintiff's time to file a charge would have expired.  The Defendant has not done so.

The Plaintiff's claims of discrimination describe subtle continuous adverse actions perpetrated by the Defendant. These actions have been surreptitious rather than overt.  However the consistency of unexplained adverse circumstances visited upon the Plaintiff reveal the methodology of the Defendant.  That the Plaintiff may have been unable to unravel the misdeeds  at the time they occurred cannot be held against the Plaintiff.

Each of the actions, of which the Plaintiff has  complained including the transfer itself appear as "facially neutral employment actions" however, individually and

collectively they caused have caused the Plaintiff permanent harm and destroyed his opportunities for professional advancement. For example, when the Plaintiff was transferred he was stripped of his supervisory duties commensurate with those of a Grade 14 or 15. He was denied his supervisory privileges and relegated to performing the duties of a GS-8. Immediately before his reassignment he had been operating as an effective GS-14 with significant supervisory duties. That the Plaintiff acted responsibly and timely by notifying his superiors that the transfer was a non-merit adverse action at the time the transfer was effected. At that time he was not aware of the actual motive.  His knowledge at the time should not disqualify him from the subsequent revelation that his transfer was actually a demotion and part of a series of discriminatory acts.  When, the Plaintiff should have complained and what discriminatory act of which he been "reasonably aware" is most certainly a question for the trier of fact.

The Complaint also has alleges that the Defendant hostile actions against him were motivated by the Plaintiff's his involvement of a protective act, being a complainant's witness against the Defendant, in an earlier discrimination matter.  This discriminatory conduct may, as a discrete act, be a primary reason or a secondary reason for the discriminatory wrongs enumerated herein including factor in his involuntary transfer.  Again, the Plaintiff has had to view this episode from the context of its eventual results.  It is the Plaintiff's view that as well as being a discriminatory act, his transfer was a retaliatory act.

In Defending its reason for Plaintiff's involuntary transfer, the Defendant says it was "mandated reorganization."  The Plaintiff argues the Defendant's reason is pretextural its pretextural nature is evidenced by the Defendant's documented failure to

restore supervisory duties after implementation of the transfer. Shortly before the transfer his eventual supervisor prepared his new coworkers that the Plaintiff's presence would not be threaten their advancement." Though at the time of his transfer, the Plaintiff was immediately the employee in the unit with the most supervisory experience he was assigned the tasks of a much lower grade,   he was not provided a performance evaluation for more than a year. All of the foregoing was done in a manner such as to permanently diminish Plaintiff's   opportunities for career advancement.

   The non-merit loss of supervisory duties stigmatized the Plaintiff and effectively eliminated any opportunity for future advancement regardless of the Plaintiff' skills, knowledge, and abilities. The Defendant has labeled the Plaintiff such that he is being perceived by Plaintiff's subordinates, peers and superiors to the be labeled as damaged goods as was the famous character "Hester Prynne" in the classic Nathaniel Hawthorne novel , "The Scarlet Letter".

   The interrogatory of Angel Smith and actions of Pam Cammarata show that the Plaintiff was never given fair consideration for the GS-14 supervisory position or any other supervisory positions for which he was qualified.

   The Defendant motion suggests that there has already been extensive discovery related to this complaint. First, counsel present counsel was not involved in the earlier proceedings. Second, in that proceeding, the Defendant's motion to limit discovery filed therein (motions granted by the administrative judge) limited discovery.  The information sought by the Plaintiff through such discovery would have included information regarding the Defendant's failure to promote the Plaintiff and advancement of Black

males by the Defendants and information concerning Ms. Henke's records regarding

Black males has been

resisted by the agency.

Finally, the Defendant's motion skillfully pulls excerpts from the administrative

records to support their argument.  This technique, into its self, warrants cross-

examination and presents issues that should be determined by a jury.  Since these

statements were lifted out of context of

the question and full response, they should be disregarded. The omission of other facts

that supports the plaintiff claims shows that these statements are "self-serving" to the

Defendant and the court should recognize them as such.

Again, the primary issue in this complaint is the loss supervisory duties

responsibilities and privileges along with a failure to promote because of race and sex. As

well, the Plaintiff claims that he is also the subject of subtle and sophisticated

discrimination inclusive of retaliation, reprisal and the maintaining of hostile work

environment.

The Defendant has framed the Plaintiff's claims simply as constituting a merit

promotion controversy.  This drastically understates the nature of the case.  In reality this

is a case where the Plaintiff, due to the discriminatory actions of the Defendant was

subjected to an attack upon his right to an equal opportunity to compete for a position of

employment.

### E.  CONCLUSION

The question the Court must resolve is whether -- taking into consideration the strength of the Plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence -- a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a prohibited reason (that is, either because of plaintiff's race or because he engaged in protected activity). Even assuming *arguendo* the Plaintiff does not have a strong inferential case of race discrimination, the Court cannot conclude that the inference is so weak as to warrant summary judgment for the Defendant. Just as the Plaintiff survives summary judgment on the claim of race discrimination and retaliation in reassignment, so too, the Court should permit his discrimination case to go forward to trial with respect to the non-selections and hostile work environment claims presented.

Likewise, even if the evidence supporting a claim of retaliation in the non-selection is not compelling, a Title VII plaintiff may create an inference of retaliation solely by making out a *prima facie* case and tendering evidence that might suggest that the employer has offered false explanations for its actions. Viewing the record as a whole, the Court cannot conclude that it would be unreasonable for a jury to draw such an inference here.  The Plaintiff has produced evidence from which a jury might conclude that defendant chose a significantly less qualified individual for the position of Supervisory Social Science Analyst, and that the Defendant's proffered rationale for denying the Plaintiff the Position is pretextual.  The Plaintiff has further shown, under the circumstances, a close enough temporal proximity to his protected activity that a jury might properly infer that plaintiff was improperly transferred, constructively demoted,

and purposely denied the position in part because he had pursued a race discrimination claim and engaged in protected acts.  Accordingly, the Court should deny the Defendant's motion to dismiss and/or for summary judgment with respect to the claims of race discrimination and retaliation arising out of the Plaintiff's non-selections and failure to promote.

For the reasons set forth herein, the Plaintiff respectfully submits that Defendant-Agency's Motion to Dismiss and/or for Summary Judgment is without merit, should be denied, that this matter should be scheduled for pretrial discovery and proceedings consistent therewith.


Dated: February 13, 2008                    Respectfully submitted,


_____

John F. Mercer, Esq.
D.C. Bar # _____
Attorney for Plaintiff

City Of Washington }
{
{
{
{
{
{
District of Columbia }

## INTERROGATORY

I, Angel Smith, do solemnly swear or affirm that:

**1.  Please state your name, position title, pay plan, occupational series and grade, organizations, and organizational address (city/county/state).**

Angel Smith, Administrative Assistant, GS-303-8/4, US Department of Justice/Office of Community Oriented Policing services/Program, Policy Support, and Evaluation Division (PPSE) Division. Washington, DC.

**2.  How long have you worked for the federal government?**

6 years and 8 months

**3.  How long with the agency?**

4 years

**4.  How long in your current position?**

4 years

**5.  Who is your first line supervisor (name/position title), with dates? Who is your second line supervisor, with dates? (if different) Who were your first and/or second-line supervisors between September 2002 and April 19, 2004?**



Currently, my first and second line supervisor is Matthew Scheider. His official title is Supervisory Social Science Analyst. He also serves at the Acting Assistant Director for PPSE. From September 2002 to maybe August 2003, my fist line supervisor was Pam Cammarata, while the second lien supervisor was Ellen Scrivner. From August 2003 to maybe April 2004, my first and second lien supervisor was Nancy Leach. From the middle or end of April 2004 to present, my first and second lien supervisor is Matthew Scheider.

**6. For the record, what are your age and date of birth, race and gender?**

29 years old, August 31, 1975, African American, Female

**7. For the record, do you have any EEO activity, either as a Complainant, responsible management official, or witness?**

No.

**8. Do you know Complainant? If so, when and in what capacity did you know him?**

Yes. He is my co-worker. I have known his since he begin working at the COPS Office.

**9. When this claim arose, were you aware of Complainant's age and date of birth, race and gender? If so, when and how did you become aware of this?**

I was aware of his race and gender simply by observing physical features. I also was aware of his age but not of his birth date. I became aware of his birthday when we engaged in a general conversation last year. He

Initials 

told me his wife was planning something for his birthday. I asked him when was his birthday and he told me August 25. I remember the date because it is a week before my birthday.

10. Complainant describes his prior EEO activity as being a witness in June to July 2001 for the EEO claims of Jeffrey Hall (EEO Complaint Number JP-01-04), and Greg Morris (EEO Complaint Number JP-01-03). Complainant states these claims were settled with the Agency in February 2003 for Mr. Hall and March 2003 for Mr. Norris. The settlement was signed by Ms. Tracey Henke, Deputy Assistant Attorney General.

11. Were you aware of Complainant's prior EEO activity?    If so, when and how did you become aware of this?

No.

12. Please respond to Complainant's first claim that that he was involuntarily transferred from OJP to COPS in September of 2002, which he alleges is due to reprisal for his EEO activity. Complainant states this involved a series of transfers. In July 2001, Tracey Henke transferred him to the Drug Courts Program Office as a supervisory grants program specialist. He was told about the transfer by Richard Ward. After six months, he was informed by Tracey Henke that the Drug Courts Program Office would be merged with the Bureau of Justice Affairs. In June 2002, he was transferred from the Drug Courts Program Office to the Bureau of Justice Affairs. On July 25,

 Initials



2002 he met with Tracey Henke, Richard Nedelkoff, Director of BJA; and Gary Silver, OJP Director of the Office of Administration to discuss the transfer. He told them he did not want the transfer. He wanted to return to a supervisory/management position in BJA. Between August and September 2002, Richard Nedelkoff informed him he would be involuntarily transferred to the COPS office.

I was not aware of the reasons of Al Pearsall's employment at the COPS Office or any other agency he worked for.

13. Complainant states he has knowledge that prior to his arrival in COPS, when Pamela Cammarata was Assistant Director for PPSE, she met with his coworkers. She collaboratively discussed the duties he would be assigned in COPS. He believes she explained to his coworkers that they need not worry and he would not be assigned to their projects or the work of the division. Please comment on the Complainant's statement.

The statement is true because I told Mr. Pearsall of the conversation Pam Cammarata had with the staff. I know this to be true because I was present at the meeting. It was discussed during a routine division staff meeting. She (Pam Cammarata) told the staff that PPSE would be getting a new staff member. His name is Al Pearsall. A few staff members said that his name sounded familiar. She told the staff to think of some duties he could perform for PPSE. She told them not to worry and that he would not be getting any of their projects and he would not effect their



promotional potential. In a following staff meeting, staff members made suggestions on what duties he could perform. One suggestion was to oversee closeouts and files. I think that suggestion came from Pam Cammarata.

**14. Complainant states that he was assigned to PPSE, a division of social science analysts as a senior policy analyst. He was assigned duties that had traditionally been assigned to the training and technical assistance division. He states he was given administrative duties. He states the duties he has been assigned are different from his social science analyst coworkers. His performance work plan is identical to the social science analyst except for two administrative elements. Complainant states that some of his duties were duties you previously performed. He states that you can comment on how these duties are valued by the office. Please comment on the Complainant's statement.**

He was given the tasks of overseeing the PPSE files. He ensures that proper documents are maintained in the files. He was also given the duty to oversee the closeout process. I was performing both of these tasks prior to his arrival. I trained Mr. Pearsall on the proper procedures to closeout grant files for PPSE. His duties are quiet different from other staff members. There was only one other Senior Policy Analyst in PPSE and that was Michael Seelman. Michael managed a number of grants, traveled to conduct site visits with his grantees, and attended conferences

they held. Mr. Peasall does not go on much travel and has not received any new grants or projects as other staff members have. He manages over 100 grants that were transferred from another division. He was given the task of monitoring them and closing them out. The closeout process and file assurance process is not valued by the staff. I see a large number of grants with documents that are not filed properly and missing documents. A meeting was held in order to get the situation in order, but other staff members did not follow the new protocol that was put in place for file management. One of Mr. Pearsall's duties is to review each file for proper documents and to ensure they are filed in the correct folder pocket. Amy Schapiro, who is a Social Science Analyst, was upset one day because she noticed a "File Assurance Form" (a form used to note the accuracy of the file) in her grant. It was recently dated and reviewed by Al Pearsall. She asked me why was Al going through her files. Can't be make better use of his time? I told her that it was a part of his PWP and he has to go through all of the files to ensure their accuracy. She said Oh I didn't know that. I would hate to have that duty.

**15. Complainant states you would have knowledge that Nancy Leach was given a grant by Pamela Cammarata to perform duties he could have performed and been assigned. Please comment on the Complainant's statement.**

This is true. After Nancy Leach was no longer employed by the Department of Justice's COPS Office, she was awarded a grant to

Initials

continue to coordinate the POP Center and its guides.  She was the program manager for this grant prior to her departure from the COPS Office.  The fact that she was going to get a grant from the COPS office was discussed prior to her departure.  However, when Cynthia Pappas, a white female, started to work for PPSE, she was made the program manager of the Nancy Leach grant and the Michael Scott grant (also associated with the POP Center and POP Guides).  Mr. Pearsall was never given the opportunity to manage none of these grants.

**16. Complainant believes that as a result, he has been systematically denied opportunities for managerial and supervisory positions within and outside of COPS.  Please comment on the Complainant's statement.**

Mr. Pearsall had told me several times that he was a manger at BJA for a division called Drug Courts.  He said he had a personal secretary and that he managed a staff of over 15 people.  He has been a supervisor for well over 10 years.  For a person of his expertise, I feel that the job he has now is beneath him and does not compliment his grade level, experience, or knowledge of the field of law enforcement and grant management.  He has told me that he has submitted resumes for various jobs, but has not received responses from employing agencies.  I told him that it may be a result of the down grade of his duties, going from having duties of a manager to having duties of an administrative assistant.

Initials 

**17. Complainant states that he has only been given opportunities to act as Assistant Director of PPSE on three occasions.   He states his lower graded GS-13 coworkers are selected to serve over him on many occasions.  He cites Rob Chapman, Amy Shapiro, Deb Cohen, Matt Lysakowski, Michael Seelman, Cynthia Pappas, Katherine McQuay as examples.  All are white and under 40 years of age.  He does not know their EEO activity.  If you have any knowledge of this, please comment on the Complainant's statement.**

I can only recall Mr. Pearsall acting in the position of Acting Assistant Director once.  Rob Chapman and Amy Schapiro are frequently assigned to the duty in the absence of the normal supervisor.  Others have served more than twice.  They have lower grade levels than Mr. Pearsall.

**18. Do you have any reason to believe that Complainant's age, race, gender or prior EEO activity was a factor in his assignments at COPS?   If so, please be concrete in your examples of why you believe this.**

I believe it is a result of his race.   I am in my late twenties and I am a female.  Other staff members are maybe three years older than me and are female.   The only factor left is race.  I too have been denied opportunities by Pam Cammarata to further my career advancement here at the COPS Office.

**19. What harm, if any, did Complainant incur by these assignments?**

 Initials

I am aware of Mr. Pearsall being under a large amount of stress. He had to take sick leave due to the stress caused by these assignments and treatment by supervisors.

**20. Did Complainant complain to you about his transfer or subsequent assignments at COPS, or to anyone else, to your knowledge?**

He has never mentioned anything about the issue of his transfer. He has voiced his opinion about his duties at the COPS Office. He has made comparisons of the duties he has verses the duties of other staff members. He stated that his treatment was not equal or fair. I have no knowledge of Mr. Pearsall discussing this with anyone else. He has not complained.

**21. Please respond to Complainant's fourth claim that he was assigned to a substandard working area in the COPS office once he was transferred there because of his gender, race, age and prior EEO activity.** He states his office is room 1072 across from the conference room ABC at 1110 Vermont Avenue. He states it is a windowless office with virtually none to very poor air circulation. The room is unhealthy. The desks are the type assigned to lower grade employees. They are not typical of the type assigned to other GS-14 senior policy analysts. **Please comment on the Complainant's statements.**

This is true. The office had no windows and the desks were not polished to a shine like the desks in offices of other employees at the same grade

level as his.   Other employees of his level had wooden bookcases with glass on the doors and other high quality furniture.

**22. To you knowledge, were there other offices to which Complainant could have been assigned?**

There were two other PPSE offices he could have been assigned to.  One was a vacant office with a window and plenty of space.  He was told that is was the office for the supervisor who would fill the Supervisory Social Science Analyst position.  Upon my arrival to the COPS Office, the office I am referring to was not occupied by a supervisor.   The person is that office later became a supervisor and then left the COPS Office.  The office was left vacant because everyone was already settled and comfortable in their old offices.   All other employees had windows in their offices.   The second office was occupied by Sandra Webb of the T&TA division.  She could have been moved to the empty office with a window that was located in the T&TA division.   No one made the effort to make this happen.

**23. Do you have ay reason to believe that Complainant's gender, race, age and prior EEO activity was a factor in his work space assignment?  If so, please be concrete in your examples of why you believe this.**

I believe his race played a part in the work space assignment.  Except for myself and Mr. Pearsall, all other employees of the PPE staff are white.

He was the only person in the division that did not have an office with a window and other adequate furniture.

**24. If this allegation has merit, what harm, if any, did Complainant incur in by being assigned this working area?**

To my knowledge, it gave him breathing problems.

**25. Did Complainant complain to you or to anyone else, to your knowledge?**

He voiced his opinion to me. I am not aware of him discussing this issue with anyone else. He has not complained.

**26. Complainant contends that Sandra Webb, Ken Howard and Karl Bickel have better office space. What would be the difference, if any, in their office space as compared to Complainant?**

Their offices had windows, polished furniture, bookcases glass door bookcases, and hardwood floors.

**27. What would be the title and grade, race, gender, age and prior EEO activity, to your knowledge, of these employees?**

They are all Senior Policy Analyst, white, two males, one female, they are over 45, all grades 14.

**28. Do you have anything to add, which is not covered above, on the claims at issue in this complaint?**

No.

I have read the foregoing statement consisting of ten (10) pages, each of which I have initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement was made of my free will without any threat, promise of immunity or

Initials

inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _7th_ day of _APRIL_, 2005.

_____
(Signature)

**PRIVACY ACT NOTICE TO INTERVIEW WITNESSES**
**(OTHER THAN COMPLAINANT)**
**FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS**

**GENERAL**

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

**AUTHORITY**

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5 United States Code, Section 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

**PURPOSES AND USES**

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Department of Justice activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

**EFFECTS OF NONDISCLOSURE**

Disclosure of the information sought is voluntary; however, failure on the part of Department of Justice employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective contractors is also voluntary, although failure to furnish the above requested information where the contract so provides, may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Witness/Investigator

Signature of Witness
(person providing statement)

Date
1/1/05

Location
Metropolitan DC

Initials