UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALBERT A. PEARSALL, III,                :
    Plaintiff,                          :
                             :
                             :
MICHAEL  MUKASEY,                        :        Case No.:  07-0108 (PLF)
Attorney General,                        :
United States Department of Justice,     :
                             :
    Defendant.                          :

**PLAINTIFF'S CONSENT MOTION FOR ENLARGEMENT OF TIME WITHIN WHICH TO FILE EXHIBIT ONE TO HIS OPPOSITION,   THE TIME FOR FILING  HAVING EXPIRED**

       Comes now the Plaintiff, Albert A. Pearsall, III, by and through counsel, John F. Mercer and moves this Court, pursuant to Rule 6(b) (1), Fed.R. Civ.P., to grant him an enlargement of time within which to file "Exhibit One" (the "Exhibit") to his opposition to the Defendant's dispositive motions filed in this action on February 13, 2008.  During electronic transmission of the opposition,  the Plaintiff experienced technical problems in attaching the Exhibit to the electronic file. The problem could not be corrected in time to include the Exhibit with the Plaintiff's opposition, thus, the time for filing expired. For the foregoing reason, the Plaintiff prays that the Court allow him to and including February 21, 2008, within which to file the Exhibit. Accordingly, the Plaintiff's Exhibit is attached hereto.  The instant motion is the Plaintiff's fourth motion for enlargement of time and the only request for an extension connected with this matter. Plaintiff has sought and received the Defendant's consent for this extension. The motion is filed in good faith and for good cause. Granting of the motion will not unfairly prejudice the Defendant.

.                          Respectfully submitted,


                  John F. Mercer,
                  Of Counsel
                  D.C. Bar # 184549
                  Tec Law Group, PLLC
                  1629 K Street, N.W.
                  Suite 300
                  Washington, D.C. 20036

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing "Plaintiff's Motion for Enlargement of Time Within Which to File Plaintiff's Exhibit One to His Opposition to Defendant's Dispositive Motions, The Time For Filing Having Expired ,"  was sent to the Defendant's Counsel, Mercedeh Momeni, Esq., Assistant U.S. Attorney 555 Fourth Street,  N.W., Washington, D.C., 20530, this 20th  day of February, 2008.

John F. Mercer

Dated: February 20th, 2008

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALBERT A. PEARSALL, III,** | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **MICHAEL  MUKASEY,** | : | **Case No.:  07-0108 (PLF)** |
| **Attorney General,** | : | |
| **United States Department of Justice,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER</u>

Upon consideration of the "Plaintiff's Consent Motion for Enlargement of Time Within Which to File Exhibit One to His Opposition, the Time for Filing Having Expired," it is hereby ordered that the motion is granted.  The Plaintiff shall have to and including February 21, 2008, within which to file his Exhibit.

_____
UNITED STATES DISTRICT JUDGE


Dated:_____, 2008

Pearsal.Camarata Deposition

⚥ 00001
```
 1        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
 2               Washington Field Office
 3    - - - - - - - - - - - - - - X
 4    ALBERT A. PEARSALL, III,        :
 5              Complainant,          :    EEOC NO. 570-2006-00115X
 6         v.                         :
 7    ALBERTO GONZALES, ATTORNEY      :
 8    GENERAL, U.S. DEPARTMENT OF     :
 9    JUSTICE,                        :
10              Agency.              :
11    - - - - - - - - - - - - - - X
12                    Washington, D.C.
13                    Wednesday, July 12, 2006
14              Deposition of PAMELA CAMMARATA, a witness
15    herein, called for examination by counsel for
16    Complainant in the above-entitled matter, pursuant to
17    notice, the witness being duly sworn by SUSAN L.
18    CIMINELLI, a Notary Public in and for the District of
19    Columbia, taken at the offices of Arnold & Porter,
20    555 12th Street, N.W., Washington, D.C., at 8:45
21    a.m., Wednesday, July 12, 2006, and the proceedings
22    being taken down by Stenotype by SUSAN L. CIMINELLI,
23    CRR, RPR, and transcribed under her direction.
24    APPEARANCES:
25
```

00002
```
 1         On behalf of the Complainant:
 2              JESSICA MEDINA, ESQ.
 3              DENIS M. DELJA, ESQ.
 4              H. HOLDEN BROOKS, ESQ.
 5              555 12th Street, N.W.
 6              Washington, D.C.  20004
 7              (202) 942-5000
 8
 9         On behalf of the Agency:
10              JENNY C. WU, ESQ.
11              Associate General Counsel
12              Legal Division
13              U.S. Department of Justice
14              Community Oriented Policing Services
15              1100 Vermont Avenue, N.W.
16              Washington, D.C.  20530
17              (202) 514-9424
18
19
20
21
22
23
24
25
```

00003
```
 1                    C O N T E N T S
 2    WITNESS                    EXAMINATION BY COUNSEL FOR
 3    PAMELA CAMMARATA              COMPLAINANT
 4         By Ms. Medina
 5
 6         Afternoon Session - Page ^
 7
 8                    E X H I B I T S
 9    CAMMARATA EXHIBIT NO.            PAGE NO.
10
```

Pearsal.Camarata Deposition

```
              11
              12
              13
              14
              15
              16
              17
              18
              19
              20
              21
              22
              23
              24
              25
00004
               1
               2                P R O C E E D I N G S
               3
               4   Whereupon,
               5                PAMELA CAMMARATA,
               6   business address at 1100 Vermont Avenue, N.W., 10th
               7   Floor, Washington, D.C., was called as a witness by
               8   counsel for Complainant, and having been duly sworn
               9   by the Notary Public, was examined and testified as
              10   follows:
              11
              12        EXAMINATION BY COUNSEL FOR COMPLAINANT
              13
              14             MS. MEDINA:  My name is Jessica Medina.
              15   I'm from Arnold & Porter and I'm here representing
              16   Albert Pearsall.  Did you want to state your name for
              17   the record.
              18             MS. WU:  I'm Jenny Wu for DOJ.
              19             MR. DELJA:  Denis Delja for Mr. Pearsall.
              20             MS. MEDINA:  I wanted to just note one
              21   thing for the record.  We are reserving the right to
              22   hold the deposition open pending any supplemental
              23   production by the government either in response to
              24   our motion to compel or for any other reason.
              25             MS. WU:  And our response is that while we
00005
               1   are going to have to wait for the judge's order as to
               2   whether she is going to extend discovery that we
               3   don't agree that you have the right to open the
               4   deposition or keep it open for any supplemental
               5   productions.
               6             MS. MEDINA:  All positions are stated.
               7             BY MS. MEDINA:
               8        Q.   Miss Cammarata, have you ever been deposed
               9   before?
              10        A.   No.
              11        Q.   I would like to go over some rules of the
              12   road for you.  Whenever I ask a question, please
              13   respond verbally as opposed to nodding your head or
              14   saying you had you or you had you.  As you'll notice
              15   we have a reporter who is transcribing every word
              16   that is said.  Unfortunately she captain really
              17   record bodily movements so we are going to try to
              18   keep everything on the record.  Please wait for me to
              19   finish my question before you start your response and
              20   I will let you try to finish your answer before I
              21   need to speak again.  At the same time, the reporter
```

Pearsal.Camarata Deposition

```
         22  can only record one of us at any one time so if we
         23  talk over each other nothing is going to get on the
         24  record.  If you don't understand a question, please
         25  let me know and I will try and rephrase it for you.
00006
          1  If you need a break please let us know.  This is not
          2  a marathon.  It may feel like one but if you need to
          3  use the rest room, need to take a break, need some
          4  coffee, anything like that, just let me know and we
          5  can stop.  Do you understand these instructions?
          6       A.    Yes.
          7       Q.    In preparing for your deposition today,
          8  have you spoken with any attorneys for the agency and
          9  I'm not interested in hearing about anything that you
         10  or any of the attorneys actually said.  I'm just
         11  interested to know whether you actually spoke with
         12  them?
         13       A.    I spoke with Jenny Wu.
         14       Q.    Did you speak with anyone else?
         15       A.    No.
         16       Q.    How many times did you speak with Jenny
         17  Wu?
         18       A.    For what purpose.
         19       Q.    To prepare for the deposition?
         20       A.    Twice.
         21       Q.    Do you recall when?
         22       A.    Yesterday.
         23       Q.    How long did you meet yesterday?
         24       A.    For the day.  Probably about five hours.
         25       Q.    And you, what other time did you meet with
00007
          1  Jenny?
          2       A.    Probably about two weeks ago.
          3       Q.    And how long did you meet with her for
          4  that time?
          5       A.    Maybe an hour.
          6       Q.    And I assume, have you spoken with Jenny
          7  for other reasons in relation to this case other than
          8  preparing for the deposition?
          9       A.    Just in gathering information for my
         10  interrogatory.
         11       Q.    And when was that?
         12       A.    I guess ever since, every time you all
         13  asked for information.
         14       MS. WU:  Pam, don't disclose the substance
         15  of what we talk about okay.
         16       BY MS. MEDINA:
         17       Q.    Do you recall approximately when you
         18  started meeting with Jenny or speaking to Jenny
         19  regarding the case?
         20       A.    No.
         21       Q.    Was it over a year, more than a year ago?
         22       A.    It was whenever this claim became started.
         23  Actually it wasn't started.  When it -- I guess it
         24  was about a year ago.
         25       Q.    Did you meet with Jenny before the claim
00008
          1  was actually filed?
          2       A.    No.  No.
          3       Q.    So after April 2004, would that be
          4  accurate?
          5       A.    I don't know.
          6       Q.    Was it -- do you know if it was three
```

Page 3

Pearsal.Camarata Deposition

7    years ago?
8         A.    No.   It was after the claim was filed just
9    to gather information.
10            MS. WU:   Don't testify about the substance
11   of our conversations.
12            BY MS. MEDINA:
13        Q.    Time periods, time lengths, after the
14   claim was filed, do you recall about how long after?
15   The season?  Do you know the season?
16        A.    No.
17        Q.    Do you recall about how many times you
18   have spoken with her regarding the case?  If you can
19   estimate?
20        A.    I don't know.  Maybe three or four.  Four
21   or five.
22        Q.    Is that in addition to preparing for the
23   deposition or does that include preparing for the
24   deposition?
25        A.    I guess it depends on how you define that.

00009

1         Q.    Total meetings with Jenny?
2         A.    Would be about five.
3         Q.    About five.  And then in addition to the
4    meetings, you mentioned emails?
5             MS. WU:   Objection.  Mischaracterizes her
6    testimony.
7             THE WITNESS:   No.  I said gathering
8    information for my own affidavit or interrogatory,
9    whatever you call it.
10            BY MS. MEDINA:
11        Q.    Were the five meetings that you talked
12   about was in person?  Those were in person meetings?
13        A.    Yes.
14        Q.    Did you have any other types of meetings?
15        A.    No.
16        Q.    Did you speak with her on the phone?
17            MS. WU:   Objection to the form of the
18   question.  You can answer.
19            THE WITNESS:   Not that I recall.
20            BY MS. MEDINA:
21        Q.    So the only time that you spoke with Jenny
22   was in person at those five meetings?
23        A.    Yes.
24        Q.    After the claim was filed?
25        A.    Correct.

00010

1         Q.    Did you review any transcripts of any of
2    the depositions in this case?
3         A.    No.
4         Q.    Were you present at any of the depositions
5    in this case?
6         A.    Yes.
7         Q.    Which ones were you present at?
8         A.    Al Pearsall and Angel Smith.
9         Q.    Any others?
10        A.    No.
11        Q.    Did you review Beverly Alford's deposition
12   at all?
13        A.    No.
14        Q.    Did you speak with Miss Alford about her
15   deposition?
16        A.    No.
17        Q.    Did you review Jamie French's deposition?

Page 4

Pearsal.Camarata Deposition

```
18      A.      No.
19      Q.      Did you speak with Miss French about her
20 deposition?
21      A.      No.
22      Q.      Did you take any notes at Mr. Pearsall's
23 deposition?
24      A.      Yes.
25      Q.      Do you have those notes by any chance with
00011
 1 you?
 2      A.      No.  I didn't bring anything with me.
 3      Q.      Have you spoken with anyone at COPS
 4 regarding any of the deposition taken in this case?
 5      A.      No.
 6      Q.      Did you review any documents in
 7 preparation for the deposition, I'm sorry, for your
 8 deposition today?
 9      A.      Just my own interrogatory.
10      Q.      Any other documents?
11      A.      So many notes.  Documents for the
12 supervisory social science analyst position.  They
13 were my own notes.
14      Q.      Did you review any other documents in
15 preparation for your deposition?
16      A.      No.  Not that I recall.
17      Q.      Did you review Mr. Pearsall's personnel
18 file?
19      A.      No.
20      Q.      Did you review any email communications?
21      A.      No.
22      Q.      You mentioned that you reviewed notes in
23 preparation for your deposition today?
24      A.      My interview notes for the supervisor
25 social science analyst position.
00012
 1      Q.      Those were the only documents you reviewed
 2 for the social supervisory analyst position?
 3      A.      Correct.
 4      Q.      I'd like to enter an exhibit.
 5              (Cammarata Exhibit No. 1 was
 6              marked for identification.)
 7              BY MS. MEDINA:
 8      Q.      Miss Cammarata, take a moment to look at
 9 Exhibit 1 and let me know if you recognize the
10 document.
11      A.      Okay.
12      Q.      Do you recognize the document?
13      A.      Yes.
14      Q.      What is it?
15      A.      Response from the COPS office on some of
16 these issues.
17      Q.      Is that the response to complainant's
18 interrogatories?  Would that be correct?
19      A.      Sure.  Yes.
20      Q.      And did you help answer any of these
21 interrogatories?
22      A.      Those that pertain to me, yes.
23      Q.      Which ones in particular did you help
24 answer?  If you could go through just name off the
25 numbers that you helped answer?
00013
 1      A.      Okay.  Number five.  Number six.  Seven.
 2 No.  I'm sorry.  Eight.  Nine.  12.  13.
```

Page 5

Pearsal.Camarata Deposition

```
 3          MS. WU:  For the questions that regard the
 4 claims that are dismissed, do you need her to talk
 5 about those also?
 6          MS. MEDINA:  Only if she helped answer
 7 them on this document.
 8          MS. WU:  I think most of them we don't
 9 really answer them.  We just object to them because
10 of the dismissal of the claim.
11          MS. MEDINA:  I understand, Jenny.  As long
12 as you don't testify today.  As long as Pam can just
13 note which ones she helped with.
14          MS. WU:  Okay.  Yes.  I'm not testifying.
15 I'm just trying to help this process along.
16          THE WITNESS:  I think that's T.
17          BY MS. MEDINA:
18     Q.     Okay.  And did you review any of the
19 interrogatories prior to their being filed with the
20 court?
21          MS. WU:  Object to the form of the
22 question.
23          THE WITNESS:  Yes.  I reviewed them.
24          BY MS. MEDINA:
25     Q.     You reviewed them?
```

00014

```
 1     A.     Yes.
 2     Q.     Did you see a draft of these?
 3     A.     I believe so.
 4     Q.     Did you, do you recall making any
 5 revisions to them?
 6     A.     I can't recall.
 7     Q.     We'll be coming back to this document
 8 later in the deposition but I just wanted to get that
 9 out of the way because it can take a while.
10 Miss Cammarata, I'd like to take a little bit of time
11 just to find out a little bit more about you.  Can
12 you state your full name for the record?
13     A.     Pamela Jane Cammarata.
14     Q.     And can you spell your last name?
15     A.     C-A-M-M-A-R-A-T-A.
16     Q.     And can you spell your first name for the
17 record?
18     A.     P-A-M-E-L-A.
19     Q.     Great.  And what's your date of birth?
20     A.     8-7-61.
21     Q.     So how hold are you today?
22     A.     44.
23     Q.     Are you married, Miss Cammarata?
24     A.     Yes.
25     Q.     Do you have any children?
```

00015

```
 1     A.     No.
 2     Q.     Have you ever been convicted of a felony?
 3     A.     No.
 4     Q.     Have you ever been involved in any EEO
 5 activity?
 6     A.     No.
 7     Q.     Have you ever been a witness in any EEO
 8 complaint?
 9     A.     No.
10     Q.     Have you ever been a participant in the
11 EEO process other than what you're serving in for
12 this complaint?
13     A.     No.
```

Page 6

Pearsal.Camarata Deposition

14      Q.      Have you ever been involved in any lawsuit
15 of any kind?
16      A.      No.
17      Q.      You've never had a traffic violation,
18 anything like that?
19      A.      Traffic citation, a ticket?
20      Q.      No.  Not a citation.  Have you ever been
21 in court before?
22      A.      I guess for a traffic ticket.  Yes.
23      Q.      Anything else?
24      A.      The other thing is have I been in court,
25 when I worked at the Anne Arundel County state's

00016

1 attorney office.  I was a juvenile restitution
2 officer.
3      Q.      What is that?
4      A.      It goes way back.  I was working with
5 youth and how they would have to pay back restitution
6 for youth, for delinquency.
7      Q.      So you were there as an officer of the
8 court?
9      A.      Yes.  I guess so.  I don't know what the
10 official term is but yes.  I was there on behalf of
11 the state's attorney's office.
12      Q.      Have you ever been a party in any lawsuit
13 or criminal proceeding?
14      A.      No.
15      Q.      Have you ever been a witness in any
16 lawsuit or criminal proceeding?
17      A.      No.
18      Q.      I'd like to talk a little bit about your
19 professional background.  Could you tell me, could
20 you just give me an idea about your education?
21      A.      I have a Bachelor's Degree in criminology
22 and a Masters of Science in criminal justice with a
23 major in police administration.
24      Q.      Can you describe for me what kind of
25 courses you take for your Masters of Science in

00017

1 criminal justice?
2      A.      Research methods, statistics, just
3 criminal justice classes when, law enforcement,
4 parole, probation, corrections.
5      Q.      Are those also the classes that apply to
6 your major in police administration?
7      A.      For the most part.
8      Q.      And do you have any other higher level
9 education other than your masters?
10      A.      No.
11      Q.      Have you taken any other graduate courses?
12      A.      No.
13      Q.      Now we are going to go through your work
14 history and if it's easier, you can start with today
15 and move backwards or if you prefer, you can start
16 from beginning the time and move forward?
17      A.      I'll start from beginning.  I don't
18 remember exact dates but right, soon after college, I
19 worked for the Anne Arundel County state's attorneys
20 office.  As I mentioned before as a youth or juvenile
21 restitution officer.
22      Q.      About how old were you when you graduated
23 from college?
24      A.      I graduated in '83.

Page 7

Pearsal.Camarata Deposition

00018
25      Q.      In '83.  That's fine.  If you can give me
1   the year, that's even better.
2       A.      And that's though with my Bachelors
3   degree.  That was my undergraduate.  I started
4   working, as I said when I graduated from there, I
5   started working for the state's attorney's office.  I
6   was there for just a couple of years.  I would say
7   maybe two and then I went to the Anne Arundel County
8   Police Department.
9       Q.      What did you do at the police department?
10      A.      I was a management analyst.  I worked for
11  the, well, a couple different things I guess.  I held
12  three or four different positions all as a civilian.
13      Q.      How long were you at the Anne Arundel
14  Police Department?
15      A.      About seven years.  And at that time, too,
16  is when I got my Masters degree, during that time
17  period.
18      Q.      At the same time you were working with the
19  police department you studied for your masters?
20      A.      Uh-huh.  And for my Masters degree, I also
21  did a thesis on police response to domestic violence.
22      Q.      How long did it take to you complete your
23  thesis?
24      A.      Two years.
25      Q.      So you were at the Anne Arundel Police

00019
1   Department for about seven years.  Where did you go
2   next?
3       A.      To Department of Justice.  That was in I
4   think it was in 1990 or '91.  And that was with the
5   office of justice programs.  Specifically the office
6   of juvenile justice and delinquency prevention.
7   There I served as a research, like a research analyst
8   and I was in their research division and I worked on
9   research and statistics on missing and abducted
10  children and child abduction.
11      Q.      What was your grade at DOJ as a research
12  analyst?  If you recall?
13      A.      I want to say a 123, a GS-13.  I came in
14  as a 13.
15      Q.      You came in as a 13.  And how long were
16  you at OJP?
17      A.      Only about a year and a half.  And then I
18  moved over to the COPS office in '94, which is when
19  the COPS office first started.
20      Q.      Were you involved in the founding of the
21  COPS office?
22      A.      Yes.
23      Q.      What role --
24      A.      And I was asked to go from the office of
25  juvenile justice and delinquency prevention, I was

00020
1   asked to go from there to help with the beginning
2   stages of the COPS office.
3       Q.      And what was your position at COPS when
4   you started in 1994?
5       A.      You know we really didn't have positions.
6   It was a brand new office.  No HR system in place.
7   No database in place.  It was probably a year and a
8   half before we really actually had an HR person and
9   then developed positions.

Page 8

Pearsal.Camarata Deposition
```
10        Q.    Did you -- what grade were you at when you
11  came --
12        A.    13.  I just came over as a 13.  We did
13  when I first started the COPS office started in their
14  research division, we had like a little research unit
15  and I started there.  Then I moved into our grants
16  division and became a supervisor.
17        Q.    When you started at COPS, how many
18  divisions were there?  You mentioned the research
19  division, the grant division.  Were there any other
20  divisions?
21        A.    Well, we had some legal attorneys.  We had
22  some IT folks but we didn't officially have divisions
23  but there is probably three or four or five different
24  functions.
25        Q.    And you were under the research function
```
00021
```
 1  of the COPS office?
 2        A.    Correct.
 3        Q.    Who was your supervisor?
 4        A.    Dave Hayeslip.
 5        Q.    Can you spell that for me?
 6        A.    I think it's H-A-Y-E-S-L-I-P.
 7        Q.    Did he have a position at COPS?  We are
 8  not sure what your position was but did Mr. Hayeslip
 9  --
10        A.    Well, he was my supervisor.
11        Q.    How many people did Mr. Hayeslip
12  supervise?
13        A.    I'd probably say four or five of us.
14        Q.    Did he supervise people across divisions
15  or was he just supervising people in the research
16  division?
17        A.    I think at that time just mostly the
18  research folks.
19        Q.    Do you know what Mr. Hayeslip's grade was?
20        A.    I don't know.
21        Q.    Do you know if he was above a 13?
22        A.    I would guess.  Yes.
23        Q.    Do you know if he was well above a 13?
24        MS. WU:  Objection to the form of the
25  question.
```
00022
```
 1        THE WITNESS:  No, I don't.
 2        BY MS. MEDINA:
 3        Q.    And how long did you serve as the
 4  research, in an undefind position at COPS?
 5        A.    Probably two years.  And then like I said
 6  we began getting some structure in place and I was
 7  asked to move over to the grants division and become
 8  a supervisor there.
 9        Q.    And when was that?
10        A.    I don't know for sure but let's see, I
11  started there in '94, I'd say my guess is around '97.
12  And I served as then it was a regional supervisor in
13  the grants administration division.
14        Q.    I want to take one step back.  When you
15  first came over to COPS, what exactly were you doing
16  in the research division?  What were your duties?
17        A.    I'm thinking.  Researching on policing
18  issues, community policing issues.  Mostly, though,
19  kind of providing direction and structure to the COPS
20  office and our programs, you know, our very first
```
Page 9

Pearsal.Camarata Deposition

21    grant programs.
22        Q.    You didn't have a named position.  Can you
23    analogize it to a position that's in COPS now?  Is
24    there anything in COPS right now like what you used
25    to do in 1994.

00023

1         A.    No.  And the reason I say that is in 1994,
2     again, we didn't have a structure.  We were all doing
3     a little bit of everything so I was serving as doing
4     some research.  I was also serving as a grant
5     manager.  That part is, I can relate to how COPS
6     office is today but like I said, it was everybody, it
7     was only about, I'm only talking seven people and
8     then it grew to 20 and then 40 so we kind of did a
9     little bit of everything but I did serve as a program
10    manager.
11        Q.    Is a program manager different than a
12    grant manager?
13        A.    I'm sorry.  Grant manager.
14        Q.    And you said at one point you moved to the
15    grants division as a supervisor?
16        A.    Correct.
17        Q.    Were you regional supervisor, is that
18    correct?
19        A.    I super vied a region.  I did that for a
20    couple of years and then I was asked to move to
21    another region that was struggling and be the
22    supervisor for that region.
23        Q.    Which region did you first supervise?
24        A.    I don't know.
25        Q.    But you know you moved to a different

00024

1     region?
2         A.    I moved to a different region and a
3     different floor.
4         Q.    So you had a different office?
5         A.    Different office.  And that served as a
6     supervisor over different staff doing the same
7     similar functions.
8         Q.    Let's go back to your first position as a
9     grants division supervisor.  How many people did you
10    supervise?
11        A.    I would say it was about seven and then up
12    to about 12.
13        Q.    Do you recall what your grade was when you
14    were a grants division supervisor?
15        A.    Still a 13.
16        Q.    And what were the grades of the employees
17    you were supervising?
18        A.    I guess four or five would have been the
19    lowest, GS 4 or 5 up to a 12, GS-12.
20        Q.    And then you testified that you moved to a
21    different region?
22        A.    Uh-huh.
23        Q.    Can you describe --
24        A.    Same structure.  Exact same duties.  Just
25    to a different region.

00025

1         Q.    Were you supervising the same number of
2     people?
3         A.    Yes.  I would assume.
4         Q.    Over the same range of grades?
5         A.    Yes.
                        Page 10

Pearsal.Camarata Deposition
6      Q.     And how long were you supervising this
7   different region?
8      A.     I'm not sure.  Maybe two years.  There I
9   believe I -- then we had, by then we had our program
10  policy support and evaluation division.
11     Q.     When did the program policy support and
12  evaluation division, and if you don't mind I will
13  refer to it as PPSE from this point forward.  When
14  did that division start in COPS?
15     A.     It just evolved.  You know, I could say
16  from day up with because it was the research division
17  that just evolved into this division.  And in fact
18  Dave Hayeslip was still at this time the head of that
19  division.
20     Q.     Was Mr. Hayeslip supervising you the
21  entire time before then ?
22     A.     No.
23     Q.     Who was your supervisor when were you at
24  the grant division?
25     A.     Craig Uchida.

00026
1      Q.     Can you spell that.
2      A.     U-C-H-I-D-A.
3      Q.     And did you know Mr. Uchida's grade by any
4   chance?
5      A.     I don't know for sure.
6      Q.     And when you went to the different region,
7   who was your supervisor?
8      A.     Still Mr. Uchida.  He oversaw four
9   regions.
10     Q.     And then you moved to PPSE?
11     A.     At that point then I competed for -- I'm
12  missing something here.  I have to think because I
13  competed for the head of that division.
14     Q.     The head of PPSE?
15     A.     Yes.  Yes.  Which is a 15 so I've missed a
16  14 somewhere.  I'll have to go back and think but
17  I've missed a GS-14 level somewhere in our
18  discussion.
19     Q.     So somewhere between you working for the
20  grants division for the different problematic region
21  when Mr. Uchida moved you, somewhere in between that
22  and your competing for the head of PPSE, there was a
23  position you were missing.  If you think of it we'll
24  come back to it.  But there should be a GS-14
25  position?

00027
1      A.     Right.  And it may have been those
2   supervisor positions.
3      Q.     In the grant division?
4      A.     Uh-huh, but I would need to --
5      Q.     One thing I forgot to mention in the
6   instructions, if you think of anything to supplement
7   anything that you've said today or you need to
8   correct yourself, feel free to just chime in.
9             So when did you compete -- I'm sorry?
10     A.     When I competed for the assistant
11  director, for PPSE, actually, Dave Hayeslip had left.
12  In that interim.  So the person who hired me for the
13  assistant director position was Gil Kerlikowske.
14  You're going to want me to spell it.
15  K-E-R-L-I-K-O-W-S-K-E.
16     Q.     Now, was he the selecting official for
                        Page 11

Pearsal.Camarata Deposition

17    that competition?
18    A.    Yes.
19    Q.    Indiana was also your supervisor?
20    A.    Yes.
21    Q.    And what was his position?
22    A.    He was the deputy director.
23    Q.    Was he a deputy director of COPS?
24    A.    At the COPS office but I don't -- we have
25    changed a lot of different restructuring.

00028

1    Q.    So he would have been a deputy director --
2    A.    At the COPS office.
3    Q.    Of a specific division?
4    A.    Of several divisions.
5    Q.    Do you know which divisions he would have
6    been the again the director for, other than PPSE?
7    A.    I think he had the monitoring division.
8    Q.    Any others?
9    A.    I can't remember.
10    Q.    Do you know he approximately you competed
11    for the assistant director of PPSE?
12    A.    No.  I could look back at my resume and
13    tell you but I don't recall offhand.
14    Q.    So it was after 1999.  If it comes back to
15    you then just let me know.  And what position are you
16    sitting in now?
17    A.    I am currently the deputy director of what
18    we call program support.
19    Q.    Did I miss a position between the
20    assistant director of PPSE?
21    A.    Yes.  From -- in November of--September,
22    I'm sorry, September of '02, I moved to the deputy
23    director position.
24    Q.    Of program support?
25    A.    Yes.

00029

1    Q.    And what were you just prior to the deputy
2    director of program support?  What was your position?
3    A.    The assistant director.
4    Q.    So we don't have any more holes?
5    A.    Correct.
6    Q.    And what are your duties as deputy
7    director of program support?
8    A.    Today?  I oversee three different
9    divisions.  PPSE, training and technical assistance
10    and publishing.
11    Q.    How many deputy directors are there at
12    COPS right now?
13    A.    Three.
14    Q.    How many divisions are there at COPS right
15    now?
16    A.    I believe 10.
17    Q.    So you have, do all the directors have
18    about an equal share of COPS?
19    A.    Yes.
20    Q.    And who is your supervisor now?
21    A.    The director of the COPS office Carl Peed.
22    Q.    And you mentioned that Mr. Kerlikowske was
23    your supervisor while you were assistant director for
24    PPSE.  Did your supervisors ever change while you
25    were there?

00030

1    A.    Yes.  At some point Alice Scrivner was

Page 12

Pearsal.Camarata Deposition

2  also my boss while I was assistant director.
3      Q.     Can you spell that?
4      A.     S-C-R-I-V-N-E-R.
5      Q.     Did anyone else serve as your supervisor
6  when you were assistant director at PPSE?
7      A.     No.
8      Q.     Do you recall the approximate dates that
9  Mr. Kerlikowske served as your supervisor?
10      A.     No.
11      Q.     Can you split up your time there in terms
12  of time spent under Kerlikowske versus time spent
13  under Scrivner?
14      A.     I can't.
15      Q.     Did one have the majority time?
16      A.     I don't know.  There is a lot of movement
17  at the COPS office as you can see?
18      Q.     And we didn't have a date range for when
19  you competed for the assistant director position for
20  PPSE.  Do you know approximately how long you served
21  in that position?
22      A.     No.  I could look at my resume and tell
23  you but I don't know offhand.
24      Q.     Let's talk a little bit about when were
25  you assistant director for PPSE.  How many people did

00031

1  you supervise?
2      A.     Well that ranges of course but I would say
3  on average seven, seven or eight.
4      Q.     What would the range be?  What was the low
5  end of the range?
6      MS. WU:  Object to the form of the
7  question.
8      THE WITNESS:  I don't know.  I'm just
9  saying on average or seven or eight people over the
10  course of time.
11      BY MS. MEDINA:
12      Q.     Sometimes there were more, sometimes less
13  than seven?
14      A.     Probably.
15      Q.     And can you describe for me your duties
16  while you were assistant director of PPSE?
17      A.     To provide direction to the division.  To
18  give to advance community policing, operationalize
19  community policing, providing resources to the
20  kneeled for community policing.  Conducting research
21  and evaluation on policing issues and strategies.
22      Q.     Any other duties?
23      A.     No.  Not that I can think of.
24      Q.     When you say conducting research and
25  evaluations, were you actually conducting the

00032

1  research yourself?
2      A.     Not myself directly, but providing grant
3  funding to contract, or grantees to conduct research.
4  We were also partnering with the other DOJ component,
5  the National Institute of Justice.  That's like the
6  research arm of the Justice Department, and we were
7  working with them on several research studies and
8  evaluations of our own grant programs.
9      Q.     When you say working with them, what does
10  that mean?
11      A.     We would give them funding to conduct some
12  research.  We -- I guess that's T we would give them
Page 13

Pearsal.Camarata Deposition

13  grant funding and they would conduct some research as
14  well.   So you didn't conduct any of the research
15  along with national institute of just I.   Only that
16  it was a partnership with them but they would man am
17  the grant, the entity to do some research.   But we
18  had a partnership there.   We gave them the money.
19  They then had a contractor do the work.
20       Q.    So your primary goal was to get money?
21       A.    No.
22       Q.    What was it?
23       A.    Primary role would be to partner with them
24  in conducting the research.
25       Q.    Does that means that COPS is conducting

00033

1   the studies?
2        A.    No.   We are overseeing it, providing
3   guidance, direction.   Discussing methodology.
4        Q.    And can you describe a little bit more to
5   me what it is to provide direction to a division?
6   You had described that as one of your duties as the
7   assistant director?
8        A.    General management and oversight of their
9   daily activities and all of their projects.   We all
10  had several research projects or programs that we
11  were managing and my job is to provide oversight and
12  make sure they are managing their projects correctly,
13  making sure that deliverables are on target.
14       Q.    And I'm sorry.   I don't want to
15  mischaracterize your testimony.   One of the duet his
16  to do with advancing community policing.   Can you
17  describe to me what that is?
18       A.    Specifically providing resources to the
19  field so that our grantees who are law enforcement
20  agencies understand how to implement community
21  policing strategies.   It's helping move police
22  departments from a traditional style of policing to a
23  much more proactive problem solving strategy.
24       Q.    And what exactly is the COPS role in that?
25  I mean, do you go to the local precincts and give

00034

1   presentations on how to get out of the old school
2   system?
3        A.    This division more so would be developing
4   resources to give to the field.   Publications --
5        Q.    When you say resources?
6        A.    Newsletters, fact sheet.
7        Q.    Any other types of resources?
8        A.    Now it's different.   Now we did CDs with
9   technology.
10       Q.    Are those CDs and publication CDs of fact
11  sheets?
12       A.    Uh-huh.
13       Q.    Okay.   So providing resources to the field
14  comes under community policing generally?
15       A.    Yes.
16       Q.    Any other duties as assistant director of
17  PPSE?
18       A.    The division also did go onsite I guess to
19  do presentations and attend conferences.   That's one
20  way in help them advance our community policing
21  strategies.
22       Q.    And what would be involved in the
23  presentations?

Page 14

Pearsal.Camarata Deposition

24      A.      Providing definitions for community
25  policing, what it means to operationalize community

00035

1   policing, how to move your department from a
2   traditional to a more proactive approach.  So that it
3   would be presentations before small groups, as well
4   as large groups, large conferences.
5       Q.      As assistant director of MPSE, did you
6   oversee the onsite presentations or did you actually
7   give the presentations?
8       A.      Both.
9       Q.      Has it come back to you at all what your
10  GS-14 position was while you were at COPS?
11      A.      No.  I think it was the supervisor
12  positions.
13      Q.      Can you analogize it to a position that is
14  in COPS now?
15      A.      No.
16      Q.      Supervisor position?
17      A.      Well, a supervisor over the grants
18  division I believe is a 14 now.
19      Q.      And when you were the GS-14 it was in the
20  grants position, your supervisor division?
21      A.      I believe so.
22      Q.      Do you recall approximately how many
23  people you were supervising at that time?
24      A.      When?
25      Q.      When were you a supervisor in the grants

00036

1   division before you became assistant director of
2   PPSE?
3       A.      I think I answered that, the two reasons
4   --
5       Q.      Is that the GS-14 position that you're
6   talking about?
7       A.      The two supervisor.  I was a regional
8   supervisor.
9       Q.      I'm sorry.  I thought we were trying to
10  fill a hole between when were you a supervisor in the
11  grants division then you went to a different region.
12      A.      Those were both regional supervisors.  I
13  believe those were the 14.
14      Q.      I had in my notes that those were 13
15  positions?
16      A.      I think that was where I missed the 14.
17      Q.      Okay.  So you believe that that was the
18  position directly before your assistant director of
19  PPSE?
20      A.      Yes.
21      Q.      So being a regional supervisor?
22      A.      Yes.
23      Q.      And as a region supervisor, what a-- you
24  testified that you supervised GS-12s.  What position
25  did they hold in the grant position?

00037

1       A.      I believe a grant advisor is a role that
2   they play.
3       Q.      Did you supervise any analysts when you
4   were regional supervisor?
5       A.      I believe so.
6       Q.      Do you know approximately --
7       A.      Like a policy analyst.  I think I had a
8   policy analyst in each of the regions.
Page 15

Pearsal.Camarata Deposition

9    Q.    Do you know the grade for the policy
10   analyst?
11   A.    No.
12   Q.    But it would have opinion below a 14?
13   A.    Yes.
14   Q.    Could it have been a 14?
15   A.    I don't know.
16   Q.    So other than grant advisors and policy
17   analysts, what other types of position did you
18   supervise when you were regional supervisor?
19   A.    We had the lower levels of-GS 4s and 5s
20   for grant technicians.
21   Q.    And you mentioned that you supervised two
22   separate regions.  Were you regional supervisor in
23   one region and you moved to a different region.  Were
24   your responsibilities similar?
25   A.    Yes.

00038

1    Q.    So let's talk about what your
2    responsibility were as a regional supervisor?
3    A.    Region supervisor was I served a region
4    within the country.  Country was broken into four
5    regions and there are grant advisors that are
6    responsible for all of the grants, thousands of grant
7    for each state so each grant advisor had a stator two
8    assigned them and they were responsible for the
9    grants in that state.  I oversaw everything within a
10   region.
11   Q.    When you sigh oversaw, what did you
12   oversee?
13   A.    What do you mean?
14   Q.    Can you describe to me how you oversaw
15   grants management?
16   A.    Made sure that my folks were aware of all
17   of the grant programs since there are grant programs.
18   Since they are serving as grant advisors, making sure
19   they were provided good customer service to all their
20   grantees and were being responsive to their grantees.
21   As I said they have the subject matter expertise to
22   provide answers so their employees.  And to develop
23   other programs as well.
24   Q.    Within grant programs?
25   A.    Grant programs to --

00039

1    Q.    Grant programs to employees?
2    A.    Yes.
3    Q.    Did you have any other duties other than
4    overseeing the grants management?
5    A.    Like I said serving as a senior level
6    person within the grant division and help being an
7    assistant with developing some of the grant programs.
8    We would be getting new grant programs each year.
9    Q.    What were your responsibilities of a
10   senior level person within the grant administration?
11   A.    Working with Craig Uchida and other
12   supervisors, so, to be an advisor to him as a whole.
13   Q.    Did you meet with supervisors from other
14   divisions?
15   A.    No.
16   Q.    So there wane any cross divisional
17   meetings?
18   A.    I'm sure there were.  I'm actually
19   speaking for on a regular basis.  On a regular basis

Pearsal.Camarata Deposition
```
20  supervisors for the grant division would be, but yes,
21  we will a lot of crossover.
22      Q.      Can you describe the cross over?
23      A.      Grant division?
24      Q.      Yes.
25      A.      Working with the legal division on legal
00040
 1  requirements of grant programs, that legal programs
 2  of our grantees.  Working with the research division
 3  in helping develop new programs.  At some point
 4  throughout this time we developed a monitoring
 5  division so we were working, you know, it would be
 6  working with monitoring on monitoring of grantees.
 7      Q.      Any other crossover --
 8      A.      It could be.  I can't recall.
 9      Q.      And when you would work with the legal
10  division, who would you work with?  I don't need
11  names.  I would prefer positions if you could.
12      A.      Just legal advisors.
13      Q.      Was the legal division set up similarly to
14  the grants administration division in terms of having
15  --
16      A.      At that point.
17      Q.      Supervisors or --
18      A.      At that point I don't think so.
19      Q.      So you would work, you could work with
20  anyone in the legal division?
21      A.      Correct.
22      Q.      What about in terms of working with the
23  research division?
24      A.      Same thing.  Anybody in there.
25      Q.      Anyone ranging from a GS-4 to a GS-14?
00041
 1      A.      Well, in the PPSE division, the GS levels
 2  were much higher.  I don't even think there was
 3  administrative assistant then so the GS levels would
 4  range from is 11 to 13.
 5      Q.      But you would work with anyone in the
 6  research division while you were in the grant
 7  administration division?
 8      A.      At that time, yes.
 9      Q.      Were there supervisors in PPSE at that
10  time?
11      A.      I don't believe so.
12      Q.      I'm sorry, you do believe so or you don't?
13      A.      I do not believe so.
14      Q.      And who would you work with in the
15  monitoring division?
16      A.      We were just developing the monitoring
17  division I believe at the time so I'm not sure if we
18  actually had a division or we were, it was more of a
19  transition.  Some of the folks within the grants
20  division were starting to monitor but at some point
21  we broke out into a new division because we have
22  monitoring specialists at some point.
23      Q.      I want to clarify the first position you
24  held within the PPSE division was as assistant
25  director for the PPSE division?
00042
 1      A.      That division started out as the research
 2  division which was the division I came into to begin
 3  with.
 4      Q.      But it was not labelled the PPSE division?
```
Page 17

Pearsal.Camarata Deposition

```
 5        A.     It was labelled research and development
 6  division.
 7        Q.     I don't want to mischaracterize your
 8  testimony but to sum up you came into COPS in the
 9  research division.  You moved to the grants
10  administration division and then you returned to
11  PPSE, which had evolved from the research division?
12        A.     Correct.
13        Q.     I'd like to ask a few questions about the
14  composition of the work force at COPS since you've
15  been there, since you've been there, since the
16  beginning.  How many African-American employees above
17  a grade 14 have you worked with at COPS?
18        A.     Above a 14 since the beginning?  We had a
19  lot of people in and out.  The turnover in the early
20  years was huge.  -- if it's easier to name names you
21  can name names.
22        MS. WU:  You actually for privacy act
23  purposes you can't name names.  You can identify them
24  by code somehow, maybe by title if you know or
25  division.
```

00043

```
 1        THE WITNESS:  Well, you said GS-14.  I
 2  only, I can only think of one that's current right
 3  now.
 4        BY MS. MEDINA:
 5        Q.     What position are they?
 6        A.     External affairs.
 7        Q.     What division is that in?
 8        A.     I'm sorry.  That's the division.  External
 9  affairs.
10        Q.     And what is their current grade?
11        A.     I believe a 14.
12        Q.     And that's the only African-American
13  employee?
14        A.     No.  No.  I'm thinking of another one.
15  Actually the deputy director at COPS at one point,
16  Ben Tucker.
17        MS. WU:  Don't name names.  Can we
18  actually strike the name and just for Privacy Act
19  purposes.  It's really not supposed to be identifying
20  people unless they are involved directly in the case
21  by name.
22        THE WITNESS:  There is one person that's
23  the deputy director.
24        MS. WU:  As much information that can you
25  to Jessica.  Without the name.
```

00044

```
 1        MS. MEDINA:  You can give title and year.
 2  If there have been several people that have served in
 3  the deputy director position it's going to be hard
 4  for us to identify who is who, especially when we
 5  have to read off of a record.
 6        THE WITNESS:  Right.  So it was a deputy
 7  director and it goes back to when I was in the grants
 8  division, as far as a time frame goes.
 9        Q.     So that would be between 1997 and 2002,
10  there was a deputy director in which division?
11        A.     Well he wasn't -- he wasn't deputy
12  director.
13        Q.     And what grade was he at?
14        A.     I believe it was above a GS-15.
15        Q.     Were there any other African-American
```

Page 18

Pearsal.Camarata Deposition

16    employees at a grade 14 or above at COPS since you've
17    been there?
18         A.    I can't recall any right now.
19         Q.    Have you ever supervised any
20    African-American employees that were a grade 14 or
21    above?
22         A.    Just the complainant in this case.
23         Q.    Have you promoted any African-American
24    employees to grade 14 or above?
25         A.    I don't believe I have ever had the

00045

1    opportunity to do that.
2         Q.    How many -- I'm sorry.  Let me rephrase
3    the question.  How many opportunities to promote
4    anyone to a grade 14 or above have you had?
5         A.    Say that again.
6         Q.    How many opportunities have you had to
7    employ anyone of any race at COPS to a grade 14 or
8    above?  Have you served on selection panels?
9         A.    I'm thinking.  I have to think.  14 or
10    above.
11         Q.    Or above?
12         A.    Probably about five.
13         Q.    That's since you've been at COPS?
14         A.    Yes.
15         Q.    And none of those five, I guess I'm
16    confused by the fact that you didn't have an
17    opportunity to promote any African-American employees
18    to a grade 14 or above?
19         A.    I thought you said now.  I did not have, I
20    can't recall an opportunity with an African male over
21    14.  I have promoted African females to a 15.
22         Q.    But the question was African-American
23    employees so if you want I can go back to the
24    questions because I'm not sure you were answering
25    them in terms of African-American males or females.

00046

1    Let's start again?
2         A.    Okay.
3         Q.    Thankfully I have an outline.  Talking
4    about the composition of work force in COPS since
5    you've been there in 1994.  How many African-American
6    employees, male or female do you recall being at a
7    grade 14 or above?
8         A.    Two of them as assistant directors.  One
9    of the assistant directors is the audit division.
10    One of the assistant directors is in the monitoring
11    division.
12         Q.    Any other African-American employees at
13    grade 14 or above since you've been at COPS?
14         A.    I can't think.  I can't recall any more.
15         Q.    I think you testified these were both
16    female?
17         A.    Correct.
18         Q.    Were you involved in the promotion of
19    these African-American females to their grade 14 or
20    above position?
21         A.    Yes.  And I'd like to go back and say
22    there are three African-American females.  I promoted
23    two.
24         Q.    What was the third position?
25         A.    Assistant director of the training and

00047

Page 19

Pearsal.Camarata Deposition
1   technical assistance division.
2        Q.    Who were the other positions?
3        A.    The assistant director in the monitoring
4   division and the assistant director in the audit
5   division.
6        Q.    Do you recall approximately when those
7   women came into the position, their positions?
8              MS. WU:  Don't use names again.
9              THE WITNESS:  Did I do that?
10             MS. WU:  No.  But before you start
11  testifying about questions Jessica asked.
12             THE WITNESS:  It must have been late '03
13  or early '04.
14             BY MS. MEDINA:
15       Q.    For which position?
16       A.    Both.  They were both pretty close
17  together.
18       Q.    How many selection panels have you been on
19  for selection of a position at grade 14 or above at
20  COPS for the duration of the time you've been there?
21       A.    14 or above?  I would have to say four.
22       Q.    Would I be correct to say that two of
23  those four were for the assistant auditor director
24  position you just mentioned and assistant auditor
25  position?

00048

1        A.    Yes.
2        Q.    What were the other two?
3        A.    For the social science analyst position in
4   PPSE.
5        Q.    Was there more than one selection for the
6   supervisory social science analyst position in PPSE?
7        A.    Yes.  It was advertised twice.
8        Q.    What years was it advertised?
9        A.    It was advertised in January of '03 and
10  again in, I think around January of '04.  That's
11  approximate.
12       Q.    Other than the four selection panels you
13  just mentioned, were there any other selection panels
14  at which you were involved that were for a position
15  at grade 14 or above?
16       A.    Not that I recall.
17       Q.    Let's go back over, going back to
18  African-American employees at a grade 14 or above.
19  How many have you ever supervised?  This is male or
20  female.
21       A.    I don't know.  I'd have to count.
22       Q.    Okay.  Well, we said there were three
23  African-American employees at a grade 14 or above
24  since you've been at COPS.  How many of them have you
25  supervised?

00049

1              MS. WU:  Objection to the characterization
2   of the testimony.
3              THE WITNESS:  I'm sorry.  Can you ask your
4   question again.
5              BY MS. MEDINA:
6        Q.    Let me back up one.  How many
7   African-American employees have been at COPS since at
8   grade 14 or above since you've been there in 1994?
9        A.    There should be four.
10       Q.    Four?
11       A.    Yes.

Page 20

Pearsal.Camarata Deposition

```
12       Q.      So --
13       A.      Above the 14, it's the three ADs and the
14  one in external affairs that I can think of.
15       Q.      And this is at grade 14 or above?
16       A.      Yes.
17       Q.      So of those four, how many have you
18  supervised?
19       A.      Three.
20       Q.      Which three?
21       A.      The AD in monitoring.  The AD in audit.
22  And the AD in training and technical assistance.
23       Q.      What is the time period for when you
24  supervised these people?
25       A.      Since I have been a deputy director which
```

00050

```
1   would have been September of '02.  Actually, that's
2   when I became deputy director but at some point then
3   I actually selected them for promotion.
4        Q.      If I have to go over my own timeline.  So
5   you started supervising the assistant director of the
6   audit division that was an African-American female in
7   2003.
8        A.      Whenever I promoted here into that
9   position.
10       Q.      And for the monitoring division, your
11  supervision of that person would have started in late
12  '03 or early 2004?
13       A.      When I promoted her into that position.
14       Q.      And when did your supervision of the
15  African-American employee sitting in the training and
16  technical assistance division begin?
17       A.      That would have been when I became deputy
18  director which would have been September of '02.
19       Q.      And do you supervise the African-American
20  employee in the external affairs division?
21       A.      No.
22       Q.      And it's a male I believe you testified
23  earlier?
24       A.      Yes.
25       Q.      And he is over a GS-14?
```

00051

```
1        A.      I believe he is a 14.
2        Q.      Okay.  But you do not supervise him?
3        A.      Do not.
4        Q.      Have you supervised any other
5   African-American employees at a grade 14 or above
6   other than the four you just mentioned?
7        A.      Mr. Pearsall.
8        Q.      You can name him -- you can use his name.
9        A.      I just did.  Sorry.
10       Q.      You can use his name.
11       A.      So I have to add him to the list.
12       Q.      Okay.  And I'll reiterate if my questions
13  are unclear, just let me know and I will either
14  backtrack or try and rephrase it because I know it
15  can be confusing with the dates.  So you supervised
16  four African-American employees, male or female at a
17  grade 14 or above since you've been at COPS?
18       A.      Yes.
19       Q.      And you started supervising Mr. Pearsall
20  at what time?
21       A.      When he first came to the COPS office
22  which was in September of '02.
```

Page 21

Pearsal.Camarata Deposition

23      Q.      How long have you been in the deputy
24  director position when you started supervising
25  Mr. Pearsall?

00052

1       A.      When Mr. Pearsall came to the COPS office,
2   I was the assistant director of PPSE.  I was not yet
3   the deputy director.  That was only about a week
4   though and then I was promoted to, not promoted,
5   transferred over to deputy director.
6       Q.      So had you been serving as assistant
7   director for PPSE for one week and then you were --
8       A.      No.
9       Q.      Promoted?
10      A.      From when Al came on board.
11      Q.      Okay.  I apologize.  My timeline seems to
12  be out of whack here.  When did you come into the
13  assistant director for PPSE position?
14      A.      I don't know.
15      Q.      That's the timeline.  Do you know
16  approximately how long you had been serving in it
17  before you became deputy director?
18      A.      No.
19      Q.      Was it over a year?
20      A.      Yes.
21      Q.      Was it over two years?
22      A.      I don't know.
23      Q.      So now let's get specific with
24  African-American males at COPS.  And we are talking
25  about those that are at a grade 14 or above.  How

00053

1   many do you supervise?
2       A.      One.
3       Q.      How many have you ever supervised?
4       A.      I believe only one.
5       Q.      And have you ever promoted any
6   African-American males to a grade 14 or above?
7       A.      I don't know if I've ever had the
8   opportunity to do that.
9       Q.      Is that a no?
10      A.      Yes.
11      Q.      That's a no?
12      A.      Yes.
13      Q.      And when you say you don't know if you've
14  ever had the opportunity to promote an
15  African-American male to a grade 14 or above, can you
16  describe to me what that's based on?
17      A.      I don't know if we have ever had them from
18  my perspective eligible or that they have applied for
19  positions for which I was hiring.
20      Q.      You have never had an opportunity to
21  promote an African-American male to a position of a
22  grade 14 or above?
23      A.      I don't believe so.
24      Q.      Did you have an opportunity in 2006?
25      A.      With the current complaint.

00054

1       Q.      Yes.  This is included?
2       A.      I'm sorry.  Yes.  Yes.
3       Q.      I just want to make sure that the record
4   is clear.  So how many African-American males have
5   you had an opportunity to promote to a grade 14 or
6   above?
7       A.      Actually, I want to go back.  I did not

Page 22

Pearsal.Camarata Deposition
```
 8   have an opportunity to promote Mr. Pearsall to
 9   anything above a 14.  So I did not see that as a
10   promotion.
11        Q.    And what time period are you talking
12   about?
13        A.    During my time at the COPS office.
14        Q.    Any time at the COPS office?
15        A.    Yes.
16        Q.    How -- have you had an opportunity to
17   promote any African-American males to a grade 13 or
18   above?
19        A.    To a grade 13?
20        Q.    Yes?
21        A.    Yes.
22        Q.    When?
23        A.    I can't give you dates but I -- we did
24   promote them to a 13.
25        Q.    Can you describe the circumstances?
```
00055
```
 1        A.    A gentleman in the monitoring division to
 2   a policy analyst.
 3        Q.    He was promoted to policy analyst?
 4        A.    Yes.  GS-13.
 5        Q.    What was his previous position?
 6        A.    I don't remember the title.  I don't know.
 7        Q.    Were you the selecting official?
 8        A.    I was the approving official.
 9        Q.    Do you know if this was recently?
10        A.    It was, would have been, I'm going to
11   guess two and a half years ago.  Two, two and a half
12   years.
13        Q.    Would that be around 2003, sometime
14   between 2003, 2004?
15        A.    Yes.
16        Q.    So this was when you were deputy director?
17        A.    Yes.
18        Q.    Any other opportunities that you had to
19   promote African-American males to a grade 13 or
20   above?
21        A.    I don't believe so.
22        Q.    Have you had any opportunities to reassign
23   African-American males to a grade 14 or above while
24   you've been at COPS?
25        A.    Well, I was involved with receiving
```
00056
```
 1   Mr. Pearsall.
 2        Q.    What do you mean by receiving
 3   Mr. Pearsall?
 4        A.    When he, when he first came to the COPS
 5   office I was really really really excited to get him.
 6   And he transferred over from office of justice
 7   programs.
 8        Q.    So you, you're counting his transfer from
 9   office of justice programs to COPS as a reassignment
10   to a grade 14 or above?  Is that correct?
11        A.    I think you said -- I thought you said
12   transfer.
13        Q.    I said reassignment?
14        A.    I guess.
15        Q.    I just want to make sure I understand what
16   you're saying and what you're counting as
17   reassignment.  Did you have any other opportunities
18   to reassign any African-American males to any
```
Page 23

Pearsal.Camarata Deposition

```
       19  positions of grade 14 or above while you've been at
       20  COPS?
       21      A.    No.
       22      Q.    Did you ever have an opportunity to
       23  reassign Mr. Pearsall to a grade 14 position after he
       24  had been transferred to COPS?
       25      A.    No.
00057
        1      Q.    Did you ever have an opportunity to
        2  promote Mr. Pearsall to a grade 14 or above while he
        3  was at COPS?
        4      A.    He was a 14 when he came to the COPS
        5  office.  So there was -- I would not be -- no
        6  promotion.
        7      Q.    Right.  That was when he came into COPS.
        8  But since he has been at COPS, have there been any
        9  opportunities to reassign him to any positions at a
       10  grade 14 or above?
       11      A.    No.
       12      Q.    Have there been any opportunities to
       13  promote him to any positions at a grade 14?
       14      A.    I posted for a vacancy for a GS-14
       15  supervisory social science analyst.
       16      Q.    Would you consider that an opportunity to
       17  reassign or promote Mr. Pearsall to a position at a
       18  grade 14 or above?
       19      A.    Well I don't see it as a promotion.
       20      Q.    What do you see it as?
       21      A.    A 14 to a 14.
       22      Q.    How do you characterize that?
       23      A.    What do you mean?
       24      Q.    You don't characterize that as a
       25  reassignment?
00058
        1      A.    I don't characterize that as a promotion
        2  because it's going from a GS-14 to a GS-14 so that's
        3  what I meant when I said I haven't had the
        4  opportunity to promote him.  To me a promotion is a
        5  higher GS level so I haven't had the opportunity to
        6  promote hill.  I haven't had the opportunity to
        7  reassign because I posted for the vacancy
        8  announcement which people competed for.
        9      Q.    Is there any term that you use for when
       10  somebody was at a GS-14 and applies for a posted
       11  vacancy at the same level?  Or did I have to say that
       12  phrase as we are going through the deposition?
       13      A.    He had the opportunity to compete for that
       14  position.
       15      Q.    Okay.
       16      A.    So select -- have I had the opportunity to
       17  select it for a different position?  Yes.
       18      Q.    So my next question is going to be have
       19  you had the opportunity to select any
       20  African-American male employees involving a position
       21  at grade 14 or above?
       22      A.    Yes.
       23      Q.    How many?
       24      A.    One.
       25      Q.    Just one.  Okay.  And how many
00059
        1  opportunities to select any employees to positions at
        2  GS-14 or above have you been involved in?
        3      A.    Any employees GS-14 and above?
```

Page 24

Pearsal.Camarata Deposition

4      Q.      An opportunity to select as you've
5  described it today?
6      A.      I believe I answered that before.  I think
7  it was four.
8      Q.      Okay.  Now we are going to go one level
9  deeper.  We are talking about African-American males
10  over 40 years.  How many have you known at COPS at a
11  grade 14 or above?
12     A.      African-American males over 40 years old
13  at a 14 or above?  I don't know people's age but one
14  would be the deputy director that I mentioned in the
15  early days of COPS.
16     Q.      Is the -- the man in the external affairs
17  division?
18     A.      I don't know.
19     Q.      Okay.
20     A.      And then Mr. Pearsall.
21     Q.      So Mr. Pearsall is the only
22  African-American male over 40 years of age at a GS-14
23  or above that you've ever supervised?
24     A.      I believe so.  Yes.
25     Q.      Because you didn't supervise the deputy

00060

1  director?
2      A.      No.  I just thought of somebody else.
3      Q.      Somebody elsewhere?
4      A.      GS-14 African-American male over 40, I supervised
5  in the audit division.
6      Q.      When?
7      A.      He retired last year so from the time I
8  became deputy director which was September of '02 to
9  somewhere in '05.
10     Q.      What was his position?
11     A.      I've drawn a complete blank.  Audit, he
12  worked within the audit division.  A management
13  analyst.
14     Q.      Do you know what his grade was?
15     A.      I believe -- I believe it was a 14.  And I
16  supervised him.
17     Q.      Did you have an opportunity to promote
18  this person at any time while you were at COPS?
19     A.      No.
20     Q.      Did you have any opportunities to move
21  this gentleman from a GS-14 to another GS-14 while he
22  was at COPS?
23     A.      No.  No.  But I did put him in an active
24  rotation before I hired the assistant director.
25     Q.      Can you explain to me what that means?

00061

1      A.      There was a vacancy of the head of the
2  audit division.  When I became deputy director, I put
3  this black male over 40 rotating with a white male as
4  rotating to be the assistant direct store in the
5  audit division.  They took turns rotating, I think it
6  was like a week at a time or a certain time period
7  rotating as the assistant director.
8      Q.      How long did it rotation cycle run for?
9      A.      Until I hired the assistant director in
10  there and I can't remember the time frame we talked
11  about.
12     Q.      That was in 2003?
13     A.      I believe.
14     Q.      Okay.  Okay.  Did this gentleman compete

Page 25

Pearsal.Camarata Deposition

15  for the assistant director of audit division?
16       A.     No.
17       Q.     If you're interested in taking a break,
18  this is a good subject break.  If you're not, I can
19  keep going.
20       A.     I can take a break.  Quick one.
21       (Recess.)
22            (Cammarata Exhibit Nos. 2-3 were
23            marked for identification.)
24       BY MS. MEDINA:
25       Q.     Ms. Cammarata, you've been handed Exhibit

00062

1   2 and 3.  Can you take a look at those documents and
2   let me know if you recognize them?
3        A.     Yes.  I do.
4        Q.     What are they?
5        A.     One is my interrogatory and one is the
6   supplemental affidavit.
7        Q.     Turning to page 37 of the interrogatory
8   that's Exhibit 2.
9        A.     Okay.
10       Q.     Is that your signature at the bottom?
11       A.     Yes.
12       Q.     And what does that signature signify?
13       A.     That I have read the foregoing statement
14  and it's true and complete to the best of my
15  knowledge.
16       Q.     And is that true?
17       A.     Yes.
18       Q.     And if you want you can take a moment to
19  review the document and just let me know if that's
20  still true today.
21       A.     It's still true today.
22       Q.     Great.  And turning to Exhibit 3, can you
23  turn to page 9 of the exhibit.
24       A.     Yes.
25       Q.     Is that your signature?

00063

1        A.     Yes.
2        Q.     And what does the signature signify?
3        A.     Same -- I have read it.  It's true and
4   it's complete to the best of my knowledge.  And
5   that's still true.
6        Q.     Great.  We'll be turning to Exhibit 2 and
7   Exhibit 3 later in the deposition as well.  I want to
8   turn to Mr. Pearsall's arrival at COPS.  When
9   approximately did Mr. Pearsall go to COPS?
10       A.     I believe he started at the COPS office on
11  September 23rd of '03.
12       Q.     Of 2003?
13       A.     I mean 2.  2002.
14       Q.     Were there any vacancies in the COPS
15  office in September of 2002?
16       MS. WU:  Objection.  Foundation.
17       BY MS. MEDINA:
18       Q.     Did there ever come a time when there was
19  a vacancy in COPS?
20       A.     I had one in PPSE.
21       Q.     You had a vacancy in PPSE was that in
22  2002?
23       A.     Yes.
24       Q.     Was that in September of 2002?
25       A.     Yes.

Page 26

Pearsal.Camarata Deposition

00064
```
 1        Q.      What was the vacancy?  What position was
 2  it for?
 3        A.      Supervisory social science analyst.
 4        Q.      How long had that position been vacant by
 5  September 2002?
 6        A.      We were in a hiring freeze and I believe
 7  that it was vacant from the time that the previous
 8  supervisor departed or resigned from the COPS office
 9  and that was in April of '02.  So it was a position
10  again with the hiring freeze it was just that.
11        Q.      How long was the hiring freeze?
12        A.      I don't remember.
13        Q.      Was it still in effect in September of
14  2002?
15        A.      Well, at some point I was able to post it.
16  Which was January of '03 for the first time.  So I
17  don't know when the hiring freeze ended but I know
18  when I was able to post.
19        Q.      Were there any other vacancies in COPS
20  other than the vacancy in PPSE?
21        A.      I don't know.
22        Q.      What grade was the supervisory social
23  science analyst position?
24        A.      GS-14.
25        Q.      And what were the duties associated with
```

00065
```
 1  the position?
 2              MS. WU:  Objection to the form.
 3              THE WITNESS:  Duties of the supervisory
 4  social science analyst position would be to oversee
 5  the activities of the division, conduct research,
 6  analytical, analyses.  I'm sorry.  My mind is going
 7  all over the place.
 8              Do presentations.  I know we've covered
 9  this before.  That's why I'm hesitating because we
10  have kind of gone over it before.
11              BY MS. MEDINA:
12        Q.      We've gone over it when?
13        A.      Earlier with the supervisory social
14  science analyst position.
15        Q.      We may be going over it again actually
16  later in the deposition so we can leave the duties
17  for later.  Why don't we leave that for later in the
18  deposition.  I'm really interested in finding out
19  about what the environment in COPS was like when
20  Mr. Pearsall came over in 2002.  So this was the only
21  vacancy was the one in PPSE, and that's the only
22  vacancy you were aware of?
23        A.      That I'm aware of.
24        Q.      Tell me a little bit about why
25  Mr. Pearsall came over to COPS if you can.
```

00066
```
 1              MS. WU:  Objection.  Lack of foundation.
 2              THE WITNESS:  I was notified by the
 3  director of the COPS office Carl Peed and Tim Quinn.
 4  They had previously met with Mr. Pearsall.  They
 5  looked at his resume and given his resume looked at
 6  his background and his experience and called me and I
 7  said he looks, based on his background and his
 8  experience, to be a great fit for my division.  I
 9  looked at the resume and totally agreed and jumped on
10  it and said I would be very, very interested in
```
Page 27

Pearsal.Camarata Deposition
11  talking to this person.
12      Q.    Now when you said your division, which
13  division are you speaking of?
14      A.    PPSE.
15      Q.    Why did you think Mr. Pearsall would be a
16  great fit for PPSE?
17      A.    Because he had the background and the
18  knowledge that I was looking for in my division.
19  Specifically, one, he had experience in OJP.  He had
20  experience with grant management, grant
21  administration.  He had experience with closeouts.
22  These were all the issues that for me as the head of
23  that division, I have weaknesses in these areas.
24      Q.    You had weaknesses in all the areas that
25  you just mentioned?

00067

1       A.    Closeouts, file management, file systems
2   and processes.
3       Q.    What were your weaknesses in these areas?
4   Let's start with closeouts.  What were your
5   weaknesses in closeouts?
6       A.    We were just starting closeouts and we had
7   no process in place.  I didn't have a process in
8   place.  The organization as a whole closeouts was
9   becoming a huge issue because of the backlog and
10  since day one, I had not closed out.  We had not
11  closed out any grants in the PPSE.  So we had a
12  backlog and we had no system, no process in place.  I
13  knew as the head of the division you know that we
14  could get slammed on an audit and I just needed
15  somebody to come in here and help me develop a
16  process and start working on that.
17      Q.    Was there anyone in PPSE at that time that
18  would have been able to help you close out the files?
19      A.    No.
20      Q.    There was no one with any experience?
21      A.    No.
22      Q.    In closing out files?
23      A.    No.  No.  No.
24      Q.    Have you had any experience closing out
25  files?

00068

1       A.    No.  And also, given my time when I had
2   spent over at OJP, which is where Al came from, I was
3   aware that OJP had a very extensive process put in
4   place as far as the whole grant administration, grant
5   management of a file from beginning to closeout.
6       Q.    Were you involved at all in the closeout
7   process at OJP while you were there?
8       A.    No.  No.
9       Q.    So what exactly was it about
10  Mr. Pearsall's experience that made you think that he
11  would be useful in helping you with closeouts?
12      A.    Well, on his resume to begin with, he
13  talked about closing out a whole backlog of grants at
14  OJP.  I believe like he chaired a committee on
15  closeouts.  And then when he came and talked to me,
16  we discussed it and I was very excited.
17      Q.    So you also mentioned that you were
18  interested in Mr. Pearsall's grant management
19  experience?
20      A.    Grant and file management experience.
21      Q.    Is that the same thing?  Is that a
Page 28

Pearsal.Camarata Deposition

```
22   different -- I'm confused by that?
23        A.   Well, a grant file meaning --
24        Q.   Okay.  Grant files versus files generally?
25        A.   Correct.
```

00069

```
 1        Q.   Is that the distinction you're making?
 2        A.   Correct.
 3        Q.   What experience did Mr. Pearsall have with
 4   grant file management were you interested in?
 5        A.   I don't remember specifically how it said
 6   it on his resume but given the experience and all of
 7   the plays he had been in OJP, he had at some point
 8   talked about the red book process which I was
 9   familiar with because I had worked over at OJP and he
10   talked about just the different places he had been in
11   the office of justice programs.  That was on his
12   resume but when he and I talked, he said you know he
13   is very knowledgeable with file managements, how they
14   should be organized, what's officially in a file,
15   following OMB regulations, etc.  In our discussions
16   he was very knowledgeable of regulations on file
17   management.
18        Q.   So grant file management, you had made a
19   distinction between grant file management and file
20   management generally?
21        A.   I mean grant file management.
22        Q.   Okay.  Was there anything else about
23   Mr. Pearsall's experience with grant file management
24   that you were interested in?
25        A.   Just you know, I guess in general like I
```

00070

```
 1   said he was very familiar with the regulations and
 2   policies on how files should be maintained.  And that
 3   was an inherent weakness in my division at the time.
 4        Q.   Why do you say that?
 5        A.   Our files were in, were not in good
 6   condition.  My social science analysts were not
 7   keeping the files the way that, didn't follow any
 8   system or any process and again as the head of the
 9   division, it was extremely important to me that I get
10   a system in place.  It's another huge audit finding
11   that we did.
12        Q.   You had also mentioned file management as
13   something you were interested if for Mr. Pearsall, is
14   that separate from grant file management?
15        A.   No.
16        Q.   So just to reiterate, the things you were
17   interested in in terms of Mr. Pearsall were his
18   experience at OJP, his experience with grant file
19   management, and his experience with closeouts.  Was
20   there anything else?
21        A.   Well, I was also -- what he and I talked
22   about him serving as a program manager.  We talked
23   about him taking, helping me with some of the GPRA,
24   the Government Performance and Results Act,
25   activities.
```

00071

```
 1        Q.   That would have fallen under his
 2   experience as a program manager?
 3        A.   Yes.  And then just more in general if
 4   there were any systems or policies that I needed to
 5   have in place, he had that background.
 6        Q.   Was there an audit division in COPS at the
```

Page 29

Pearsal.Camarata Deposition

```
 7   time?
 8        A.     There is an audit division but they don't
 9   do internal audits.  They audit our grantees.  We do
10   not have an internal audit function.
11        Q.     You'll have to forgive me.  I'm not a COPS
12   expert so you'll be answering a lot of questions
13   about that, how everything is working.  Was there
14   anything else about Mr. Pearsall's experience that
15   you were interested in other than his experience at
16   OJP, his grant management, his grant file management
17   experience and his strength with closeouts and his
18   experience as a program manager?
19        A.     No.
20        Q.     Did you -- going back to his experience at
21   OJP, what specifically were you interested in in
22   terms of that?
23        A.     Closeouts and his knowledge of file
24   management procedures.
25        Q.     Anything else?
```

00072

```
 1        A.     No.
 2        Q.     So tell me, tell me again how you thought
 3   Mr. Pearsall would help your division?
 4        A.     I needed -- I was weak in those two areas.
 5   Again as the head of the division, it's my
 6   responsibility to make sure that I have a system in
 7   place, that those files are managed and maintained
 8   properly, that I'm following the regulations and that
 9   I close them out properly.
10        Q.     Did you see any supervisory opportunities
11   for Mr. Pearsall within COPS?
12        A.     No.  No.
13        Q.     Were you interested at all in his
14   experience as a supervisor?
15        A.     No.  And he and I never talked about that
16   when we first met.
17        Q.     You didn't talk about his experience as a
18   supervisor?
19        A.     No.
20        Q.     Mr. Pearsall didn't mention his experience
21   as a supervisor when he met with you to talk about
22   his coming over to COPS?
23        A.     Not that I recall.
24        Q.     Did there come a time when you had a
25   meeting with staff prior to Mr. Pearsall's arrival?
```

00073

```
 1        A.     Yes.
 2        Q.     When was that?
 3        A.     I was meeting with the staff every week.
 4   We have a weekly division meeting.
 5        Q.     Which members of the staff by division or
 6   position?
 7        A.     That attend weekly meetings?  It's
 8   everybody.  All the supervisory -- I'm sorry.  All
 9   the social science analysts.  Everyone in the
10   division and including the administrative assistant.
11        Q.     And these are just people in PPSE?
12        A.     Yes.
13        Q.     How many meetings with the staff did you
14   have where you discuss Mr. Pearsall's coming to COPS?
15        A.     I only recall one.
16        Q.     Did you describe that meeting?
17        A.     It was after I talked with Al.  We had a
```

Page 30

Pearsal.Camarata Deposition

18  discussion on, I'm sorry, this is my discussion with
19  Al, talked about what he would be doing.  I called
20  them up or he called me -- at that point I met with
21  my division at the division meeting and said to them
22  I'm very excited that we were getting a new person, a
23  new body, a new person in the division and I talked
24  about Al's strengths that I had already discussed
25  with him as far as closeouts and file management.  I

00074

1  believe I also stated he would be helping with some
2  of the GPRA.
3        Q.      Did you discuss anything else at the
4  meeting regarding Mr. Pearsall?
5        A.      The issue that I had been discussing with
6  the staff that that supervisory social science
7  analyst was open.  They knew that.  They knew the
8  position was open.  It's a 14.  Several of the
9  members are 13.  Actually one is a 14.  That position
10  was open.  It was available.  They knew at some point
11  I was going to be posting for a supervisory social
12  science analyst 14 and their concern was are you
13  still going to post that position.  And I said yes, I
14  am still posting that position.  When Al came over, I
15  wouldn't have to give up that slot.  The fear, the
16  concern for me is when somebody comes over to your
17  division, does that mean they take the slot away and
18  then you no longer have a slot.  And I said I have a
19  slot.
20        Q.      Could you have put Mr. Pearsall into that
21  slot?
22        A.      No.
23        Q.      Why?
24        A.      I will post for my positions.  And give
25  everyone an opportunity to apply.

00075

1        Q.      Is that something in your discretion?
2        A.      Is it my -- I believe.  I mean --
3        Q.      Do you know if there are any regulations
4  governing whether you have to post a position or
5  whether you can assign --
6        A.      I don't know the HR regulations.  I know
7  that I would post for that position and let people
8  apply.
9        Q.      But you don't know if any specific
10  government regulations govern whether you would have
11  been able to assign Mr. Pearsall?
12        A.      No.  I do not know.
13        Q.      Who expressed concern at the meeting?
14        A.      I don't know.
15        Q.      Do you recall what positions those people
16  held that expressed concern?
17        A.      No.
18        Q.      Do you recall whether everyone in the
19  meeting expressed concern?
20        A.      I don't know.  I mean, I don't know if
21  people had the concern or weren't saying something
22  because somebody did.
23        Q.      Can you describe to me --
24        A.      It wasn't a big discussion.  It either
25  someone said what about the supervisory vacancy,

00076

1  supervisory social science analyst vacancy and I said
2  that position will still be posted.  I don't have to
Page 31

Pearsal.Camarata Deposition

```
 3    give a slot away.  That position will still be
 4    posted.  I can't speak for anybody else in the room.
 5         Q.    I'm just trying to get who said what and
 6    what they said?
 7         A.    I don't know.
 8         Q.    One person raised a concern and you
 9    responded to that concern?
10         A.    I believe so.
11         Q.    Do you recall if anyone else raised a
12    concern at that time?
13         A.    No.
14         Q.    Was there anything further with the
15    conversation on this issue during the meeting?
16         A.    Not that I recall.
17         Q.    So you don't know whether you could have
18    assigned Mr. Pearsall to that position under any DOJ
19    regulations?  You're not aware?
20         A.    I never pursued that.  No.
21         Q.    Who would know?
22         A.    I don't know.
23         Q.    If you wanted to pursue it, who would you
24    ask?
25         A.    Our HR person.
```

00077

```
 1         Q.    Who is your HR person?
 2         A.    Debbie Brown.  I don't know if she was HR
 3    then.  She is our current HR person.
 4         Q.    Would she know whether if there were a
 5    regulation that governed whether Mr. Pearsall could
 6    have been assigned to that position?
 7         A.    I can't speak for her.
 8         Q.    Is it her responsibility to know as the HR
 9    person?
10         A.    I don't know.  I don't know what her
11    duties are.
12         Q.    Who would know what her duties are?
13         A.    She would.
14         Q.    Anyone else?  Who is her supervisor?
15         A.    Diane Hughes.
16         Q.    What's Diane Hughes' position?
17         A.    Assistant director of administration.
18         Q.    Was she the assistant director of
19    administration at the time Mr. Pearsall came over to
20    COPS?
21         A.    I don't know.
22         Q.    Could you know approximately when she came
23    into the position?
24         A.    She -- no.  I mean, I don't.
25         Q.    Do you know if it's within the last year?
```

00078

```
 1         A.    It has not been within -- it's been longer
 2    than a year.
 3         Q.    Has it been longer than five years?
 4         A.    I don't know.  I don't think so.
 5         Q.    Other than the conversation you had with
 6    Mr. Pearsall after receiving his resume, did you have
 7    any other conversations with him prior to his coming
 8    to COPS?
 9         A.    We had one meeting in person.  And one
10    meeting on the phone.
11         Q.    And the meeting in person is the meeting
12    we have already discussed today ?
13         A.    Yes.
```

Page 32

Pearsal.Camarata Deposition

14      Q.      Can you tell me about your meeting on the
15 phone?
16      A.      Well, I don't -- either he called me or I
17 called him to see if he was interested in getting, in
18 the job since we had discussed everything and he said
19 yes, he was very interested.   And I was very excited.
20      Q.      Did you discuss anything else on the
21 phone?
22      A.      Not that I recall.
23      Q.      Did you go back over what the duties would
24 be for his position?
25      A.      I don't think -- I don't recall.   It was

00079

1 clear in my mind when we talked in person that he was
2 clear on what he was doing.
3      Q.      Did you take any notes at your meeting
4 with him when you met in person in terms of what you,
5 what would have happened at the meeting?
6      A.      Not as the result of the discussion.   No.
7      Q.      Did you take any notes as a result of
8 anything else?
9      A.      Well, I had a little sticky that had
10 closeouts file management on it that I went over with
11 him.
12      Q.      That was all that was on the sticky?
13      A.      Yes.   And I think I may have had GPRA.
14 But that's what I was using to talk to him.
15      Q.      So had you written that list before you
16 met with Mr. Pearsall?
17      A.      Yes.   Yes.   Yes.
18      Q.      Do you still have the sticky?
19      A.      I don't think so.   No.
20      Q.      And you didn't write up any notes at the
21 meeting after you had the meeting with Mr. Pearsall?
22      A.      No.   No.
23      Q.      Did you take any notes of your meeting on
24 the phone with him?
25      A.      No.

00080

1      Q.      Do you know --
2      A.      I can't recall.   I should say not that I
3 recall.
4      Q.      Do you know approximately when you talked
5 to him on the phone after meeting with him in person?
6      A.      No.   No.   But I -- no.
7      Q.      Was it a week later?  Two weeks later?
8      A.      I don't -- I think it was very soon after
9 because I was very excited to have Al.
10      Q.      Did you have any discussions with the
11 staff other than the one meeting, the one weekly
12 meeting where you discussed Mr. Pearsall's arrival?
13      A.      Not that I recall.
14      Q.      You didn't have any other meetings with
15 any other COPS staff members discussing
16 Mr. Pearsall's arrival prior to his coming to COPS?
17      A.      Say that again.
18      Q.      Prior to Mr. Pearsall actually arriving at
19 COPS, other than the weekly meeting that we have
20 already discussed, did you have any other meetings
21 with staff where you discussed Mr. Pearsall?
22      A.      No.   Not meetings with staff.
23      Q.      Did you have any meetings with anyone
24 else?

Page 33

Pearsal.Camarata Deposition

```
    25        A.      I got back with director Peed and Tim
00081
     1  Quinn to let them both know that I had met with Al
     2  and they were right.  His background and experience
     3  did fit what I was looking for in the division and
     4  that I was definitely going to pursue having him come
     5  to my division.
     6        Q.      I'm sorry.  I'd like to back track for a
     7  moment.  Director Peed and Tim Quinn had sent you
     8  Al's resume, is that correct?
     9        A.      They handed it to me.
    10        Q.      Did they, did they say why they thought
    11  that he would be a good fit?
    12        A.      No.  They just said look at his resume
    13  based on his background and experience would be a
    14  good fit for PPSE.
    15        Q.      Were they aware of your weaknesses in PPSE
    16  at that time?
    17        A.      Yes.
    18        Q.      Did they highlight for you that they
    19  thought Mr. Pearsall would be able to help you with
    20  your weaknesses?
    21        A.      I don't recall.
    22        Q.      You just recall them handing you the
    23  resume and saying he would be something along the
    24  lines of he would be a good fit for PPSE?
    25        A.      Based on his background and experience,
00082
     1  yes.  He would fit PPSE.
     2        Q.      Did you have any meetings with anyone else
     3  at COPS prior to the arrival of Mr. Pearsall where
     4  you described Mr. Pearsall coming?
     5        A.      I did actually talk to Beverly Alford in
     6  our training and assistance technical division and
     7  expressed to her my excitement.  She was my
     8  counterpart and she was having difficulty with
     9  closeouts.  She had hired some people.  I just knew
    10  she was having difficulty there and I said I have got
    11  the answer.  I said I was very pleased that Al was
    12  coming.  I said he can help us both provide the
    13  guidance and the oversight on our closeouts.
    14        Q.      When did you meet with Beverly Alford to
    15  discuss Al coming?
    16        A.      I don't recall.  But at some point, at
    17  some point when I saw his resume or talked with him.
    18        Q.      After -- was your meeting with Beverly
    19  after you had spoken with Mr. Pearsall?
    20        A.      I don't know.  I don't know.
    21        Q.      Other than Mr. Pearsall's providing
    22  guidance and oversight of closeouts, did you discuss
    23  anything else about Miss Alford about Mr. Pearsall's
    24  coming?
    25        A.      I believe the file management system as
00083
     1  well.
     2        Q.      Anything else?
     3        A.      No.
     4        Q.      Did you send Miss Alford Mr. Pearsall's
     5  resume?
     6        A.      I don't believe so.
     7        Q.      Did you send anyone Mr. Pearsall's resume?
     8        A.      No.
     9        Q.      Did you have any other conversations with
```

Page 34

Pearsal.Camarata Deposition

10 anyone else at COPS prior to Mr. Pearsall's arrival,
11 his coming to COPS?
12      A.      No.   Not that I recall.
13      Q.      Did you take any notes from your
14 conversation with Miss Alford regarding Mr. Pearsall
15 coming to COPS?
16      A.      No.
17      Q.      And did you take any notes of your meeting
18 with director Peed and Tim Quinn when they gave you
19 Mr. Pearsall's resume?
20      A.      No.
21      Q.      What position did Mr. Pearsall come into
22 at COPS?
23      A.      He came over as a policy analyst, senior
24 policy analyst.
25      Q.      And can you describe the position of the

00084

1 senior policy analyst?
2      A.      I developed that with him and we jointly
3 put in language about closing out the grants,
4 knowledge of grant management system, knowledge of
5 file management system.  We added GPRA
6 responsibilities.  We added serving as the senior
7 program manager because he certainly would also be
8 taking on projects and programs.  And some policy
9 analysis language.
10      Q.      Did you discuss his taking on programs at
11 your meeting with him prior to his coming to COPS?
12      A.      I don't know.
13      Q.      Do you recall whether you mentioned his
14 duties as a senior program manager with any of your
15 conversations with anyone at COPS prior to his
16 arrival?
17      A.      Say that again.
18      Q.      You, did you mention to anyone at COPS,
19 either staff or your supervisors that Mr. Pearsall
20 would be coming over and one of his duties would be
21 to be a senior program manager?
22      A.      I may have mentioned that to the staff in
23 that meeting that he would be taking on projects.
24      Q.      Did you mention that during your meeting
25 with Beverly Alford?

00085

1      A.      I don't recall.
2      Q.      So Mr. Pearsall wasn't only going to be
3 responsible for file closeouts and grant file
4 management?
5      A.      Correct.  He was going to be responsible
6 for program management and GPRA and policy analysis
7 work.
8      Q.      And I'm sorry.  Did you discuss these
9 aspects of his job with him in person when you met?
10      A.      I know that we touched on file management
11 closeouts.  I know we touched on GPRA.  I don't know
12 if we talked about program management.
13      Q.      Was there -- I'm sorry?
14      A.      That's okay.  Go ahead.
15      Q.      Was there anything in his resume that made
16 you think that he had, he would be useful in terms of
17 a senior program manager?
18      A.      I don't know.
19      Q.      Well, you had mentioned that there were
20 several things in his resume that interested you in
                        Page 35

Pearsal.Camarata Deposition

21 terms of file closeouts?
22        A.      Yes.  Right.  Those were the two that
23 really stand out for me.
24        Q.      So you don't recall whether there was
25 anything in particular that made you think

00086

1 Mr. Pearsall would be a beneficial senior program
2 manager?
3        A.      I do not recall that.
4        Q.      Are there other senior policy analysts at
5 the COPS office?
6              MS. WU:  Object to the form.  Can you
7 answer the question.
8              THE WITNESS:  I believe so.
9              BY MS. MEDINA:
10       Q.      Do you supervise any of them?
11       A.      I do now.  I did not then.  My role as
12 deputy director, I have a second level.
13       Q.      What did the other senior policy analysts
14 that you supervise now, can you describe their
15 general duties?
16       A.      Well, I can only speak to those that are
17 in my area.
18       Q.      The ones that you supervise?
19       A.      There may be other senior policy analysts
20 elsewhere.  The ones that I provide second level
21 supervision to, there are, they are in the training
22 and technical assistance division.  And they oversee
23 training grants.  They oversee our regional community
24 policing institues which provide training to the
25 field.

00087

1        Q.      Do they have any other duties?
2        A.      Their main function is to manage grants,
3 manage cooperative agreements, manage training that's
4 being delivered.
5        Q.      Any other duties?
6        A.      Those are their main duties.
7        Q.      Have you worked with any senior policy
8 analysts when you were, in 2002?  Did you have the
9 opportunity to work with any other senior policy
10 analysts at COPS?
11       A.      No.  Not that I recall.
12       Q.      So any knowledge that you have of senior
13 policy analysts would only be from your position now?
14 Is that correct?
15       A.      Well, within -- I did, at that time, I
16 certainly knew, worked closely with the training and
17 technical assistance division, so I guess you could
18 say yes, I worked with -- I worked with them -- I
19 worked with them.
20       Q.      So you did work with the senior policy
21 analysts in the training and technical --
22       A.      I guess it depends on how you define work
23 with them.
24       Q.      How would you define work with them?
25       A.      I'm aware that they are there.  I don't

00088

1 think we had any joint projects.
2        Q.      Were you aware of what their duties were?
3        A.      From observation, yes.
4        Q.      What -- and this was in 2002?
5        A.      Right.

Page 36

Pearsal.Camarata Deposition

6   Q.   Are these the same duties that you listed
7 earlier?
8   A.   Yes.  Yes.
9   Q.   Were there any senior policy analysts in
10 PPSE prior to Mr. Pearsall?
11       MS. WU:  Object to form.  You can answer
12 the question.
13       THE WITNESS:  I don't know.  I don't
14 believe so.
15       BY MS. MEDINA:
16   Q.   He was the first senior policy analyst in
17 PPSE?
18   A.   I believe so.
19   Q.   Other than the senior policy analyst in
20 the training and technical assistance division, are
21 there senior policy analysts in any of the other
22 divisions at COPS?
23   A.   I don't know.
24   Q.   Do you know who decides the duties of the
25 senior policy analyst in the training and technical

00089

1 assistance division?
2   A.   Who currently decides the duties would be
3 their assistant director.
4   Q.   Would that have been different in 2002?
5       MS. WU:  Objection.
6       THE WITNESS:  No.
7       BY MS. MEDINA:
8   Q.   The assistant director is responsible for
9 developing the duties of the senior policy analyst?
10   A.   Correct.
11   Q.   And were you involved at all in the
12 process of developing the duties of the senior policy
13 analyst in the training and technical assistance
14 division?
15   A.   No.
16   Q.   Do the assistant directors of the
17 different divisions ever confer on the duties of
18 their analysts either social science analysts or
19 senior policy analysts?
20       MS. WU:  Objection to the form.
21       THE WITNESS:  I don't know.
22       BY MS. MEDINA:
23   Q.   Well, you've been an assistant director
24 at, of PPSE, isn't that correct?
25   A.   Correct.

00090

1   Q.   Did you ever confer with any of the other
2 assistant directors in terms of developing position
3 descriptions for people you supervise?
4   A.   No.
5   Q.   Would it be fair to say that each
6 assistant director unilaterally decides the position
7 description for the people they supervise?
8   A.   Well, they would work with HR.
9   Q.   Do they work with anyone else?
10   A.   Not that I know of.
11   Q.   Do you confer with anyone in COPS on the
12 duties of social science analysts?
13   A.   No.
14   Q.   Just HR.  I'm sorry you had mentioned --
15   A.   You mean when it's originally developed.
16 I worked with HR when I originally developed them but
Page 37

Pearsal.Camarata Deposition

17    other than that, no.
18         Q.    So other than when, I'm sorry, I don't
19    want to mischaracterize your testimony.  When you
20    originally develop a position description, you work
21    along with HR?
22         A.    Correct.
23         Q.    And is the process different if you are
24    changing a position description?
25         A.    No.  I would work with HR if I was

00091

1     changing it.
2          Q.    Would you work with anyone else during the
3     original development of a position description other
4     than HR?
5          A.    No.
6          Q.    Would you work with anyone else during if
7     you were going to change a position description other
8     than HR?
9          A.    No.
10         Q.    Are there any regulations governing the
11    development of position descriptions?
12         A.    I don't know.
13         Q.    Did you ever refer to any regulations when
14    you were developing any position descriptions?
15         A.    I would rely on HR for that.
16         Q.    And you mentioned that you do not confer
17    with anyone at COPS when you develop the position
18    description for social science analyst.  Is it any
19    different for senior policy analysts?
20         A.    No.
21         Q.    Let's take a quick break.
22              (Recess.)
23                   (Cammarata Exhibit No. 4 was
24              marked for identification.)
25              BY MS. MEDINA:

00092

1          Q.    We have just entered Exhibit 4 into the
2     record.  I just want to note for the record that
3     there is a notation at the bottom right-hand corner
4     of Exhibit 4 which was not on the original that was
5     produced in this case.  Ms. Cammarata, do you
6     recognize this document?
7          A.    Yes.
8          Q.    What is it?
9          A.    Meeting notes from September 17th of the
10    PPSE division.
11         Q.    Are these, we discussed earlier that you
12    had a meeting with staff where you discussed
13    Mr. Pearsall's arrival and someone had raised a hand,
14    raised a concern and you had responded regarding the
15    supervisory social analyst position.  Is this, are
16    these notes from that meeting?
17         A.    I would assume.
18         Q.    What are you basing that on?
19         A.    Well, this would, it was one meeting I had
20    with the division to tell them that AI would be here,
21    AI was coming.
22         Q.    Do you recall whether there may have been
23    two meetings, one in which the staff raised concern
24    and one in which you gave a formal update?
25         A.    I don't recall.

00093

1          Q.    Had you, I guess I'm a little confused by
                        Page 38

Pearsal.Camarata Deposition
2  the language, update on Al Pearsall.  Had you told
3  the staff about Al Pearsall previously prior to this
4  September 17th meeting?
5       A.    I don't recall.
6       Q.    Is it possible that there were, there was
7  more than one meeting where you discussed
8  Mr. Pearsall's arrival at COPS?
9       A.    I don't recall.  Appear the reason I say
10 that is I developed the agenda for the meeting.  I do
11 the heading.  So I could have very well put for me
12 update on Al and then Angel takes those headings and
13 puts in what she recalls.
14      Q.    So you do the actual headings that are in
15 bold with the numbers, is that correct?
16      A.    I believe so.
17      Q.    And Angel, you said --
18      A.    Well, she takes notes.
19      Q.    She takes notes of the meeting.  Are her
20 notes reflected on this document?
21      A.    These are her notes.
22      Q.    So you give her the number?
23      A.    The agenda.  I give her the agenda.
24 That's the agenda.
25      Q.    Which part of the meeting is attributable

00094

1  to Angel?
2       A.    The substance under the headings.  Then
3  again she could have added a heading if something new
4  came up during the meeting.  I developed the agenda.
5  She -- we have a discussion.  She summarizes the
6  notes and there could have been new items.
7       Q.    Do you have an independent recollection of
8  this meeting as we sit here today of the September
9  17th, 2002 meeting?
10      A.    Do I have a what.
11      Q.    Do you have an independent recollection of
12 it?  Do you remember it without looking at the paper?
13      A.    Yes.
14      Q.    And is this the meeting that we were
15 discussing earlier.
16      A.    I recall having a meeting with the
17 division as I previously stated.
18      Q.    Do you recall whether these notes
19 represent the notes from that meeting?
20      A.    I believe so.
21      Q.    Can you read what's, the notes written
22 under number two update on Al Pearsall in
23 parenthesis, Pam?
24      A.    He will be a senior policy analyst.  He
25 will take Amy's or Dylan's old office.  He will

00095

1  handle systems and processes, he will oversee
2  closeouts, grant management, CMS maintenance, CMS
3  queries, file management, CMS entry, mail out of
4  award packets, GPRA activities, and some grant
5  programs.
6       Q.    Do you recall what the response was
7  regarding your update on Al Pearsall?
8            MS. WU:  Objection to form.  You can
9  answer the question.
10           THE WITNESS:  What the response was by
11 whom?
12           BY MS. MEDINA:
                    Page 39

Pearsal.Camarata Deposition

13    Q.    By anyone in the meeting?

14    A.    Just what I alluded to.  I was excited
15 about AI coming on board.  I expressed my enthusiasm
16 to this group that we were actually getting a new
17 person who could help the division out.

18    Q.    I'm sorry.  Go ahead?

19    A.    I'm done.

20    Q.    Did there ever come a time where staff
21 expressed a concern that Mr. Pearsall may be taking
22 some of their duties away?

23    A.    Not that I recall.  The only concern I
24 recall is what we discussed earlier.

25    Q.    Is it possible that some staff members may

00096

1 have expressed a concern that Mr. Pearsall would be
2 taking over their work?

3    MS. WU:  Objection to form.  You can
4 answer.

5    THE WITNESS:  I don't recall.

6    BY MS. MEDINA:

7    Q.    So the one concern that you do remember
8 the staff raising was that Mr. Materials pay be
9 slotted into the supervisory social science analyst
10 position?

11    A.    No.

12    MS. WU:  Objection.

13    THE WITNESS:  That's not how I stated it.
14 The concern was that the position of supervisor as
15 social science analyst, that slot would be removed so
16 that AI had a seat.

17    Q.    Can you explain to me what AI's, if you
18 didn't have a position open for Mr. Pearsall is, that
19 what you're saying?

20    A.    I have only a certain number of spots in
21 the division.  They were all filled but based on my
22 recollection they were filled but one slot.  If I
23 have a new person coming in, that slot may have to go
24 with this person, the slot, just a number which would
25 mean this vacancy would no longer exist.  That was

00097

1 the concern.  That I would no longer be able to post
2 and have a position of supervisory social science
3 analyst.

4    Q.    So were you given an extra slot for
5 Mr. Pearsall?

6    A.    I guess.  Yes.

7    Q.    Who -- was your budget increased when
8 Mr. Pearsall arrived?

9    A.    I don't know what you mean.

10    Q.    I'm a little confused?

11    A.    I got a new slot I guess.  Technically I
12 would have had a new slot because it didn't take the
13 slot I had.

14    Q.    So when Mr. Pearsall came over he did not
15 absorb any vacancies in COPS?

16    A.    In my division.

17    Q.    In your division.  Did he absorb a vacancy
18 somewhere else in COPS?

19    A.    I don't know.  I don't know if they took a
20 slot from somewhere else.  I have no idea.

21    Q.    What exactly do you mean by slot?  Does
22 that refer to money.  I'm confused as to what that
23 refers to?

Page 40

Pearsal.Camarata Deposition

24      A.      An FTE position, a full-time equivalent
25  position.  Every division has an allotted amount of

00098

1   FTEs.  I only have a certain amount.  So to make way
2   for somebody to come in, I would have to get that
3   slot from somewhere within the office.  I got the
4   slot.  Al didn't take away a slot that I had.
5       Q.      Was that a benefit?
6       A.      I certainly did see Al as a benefit.  I
7   saw Al as a benefit.
8       Q.      No.  I'm saying the point that Al did not
9   take a slot away from your division, was that seen as
10  a benefit?
11              MS. WU:  Object to the form.
12              THE WITNESS:  By who.
13              BY MS. MEDINA:
14      Q.      By who?
15      A.      I still got to post my supervisor social
16  science analyst position so yes.  I got Al and I also
17  had the opportunity to post for a supervisory social
18  science analyst position.
19      Q.      So would you have had the operating of
20  having two more full time employees in your division,
21  as opposed to just one with Mr. Pearsall coming over,
22  is that correct?
23      A.      Not necessarily.  Only thing is I got
24  additional slot and I got ability to post?
25      Q.      So if you filled the vacant slot with

00099

1   someone other than Mr. Pearsall you would have had an
2   extra employee in your division than you had prior to
3   Mr. Pearsall arriving?
4       A.      Not necessarily.  If someone internal to
5   the division applied.
6       Q.      Okay.  Can you, you said that you did see
7   it as beneficial, did you testify that it was a
8   benefit that Mr. Pearsall did not have to take the
9   spot?
10      A.      For the supervisory social scientists
11  position.
12      Q.      Why was it a benefit?
13      A.      Because I still have the opportunity to
14  post for the position.  I didn't lose the opportunity
15  to post for that position?
16      Q.      Did anyone else see you as a benefit?
17      A.      I don't know.
18      Q.      Was anyone else concerned with the fact
19  that Mr. Pearsall was not objecting to the vacancy?
20              MS. WU:  Objection to form.
21              BY MS. MEDINA:
22      A.      As I stated earlier I would lose the
23  opportunity to post, I would lose the slot.  That was
24  the concern.
25              MS. WU:  Objection to the form.

00100

1               BY MS. MEDINA:
2       Q.      Can you describe to me was there an
3   agreement between -- I guess I'm trying to understand
4   how a decision was made that Mr. Pearsall would not
5   take a slot in PPSE?  That you would not have to put
6   him in a slot?
7       A.      I don't recall.
8       Q.      Who would have been in a position to make

Page 41

Pearsal.Camarata Deposition

```
 9  that decision?
10      A.    I guess our executive management team.
11      Q.    Who on the executive management team in
12  2002?
13      A.    Actually, I wasn't even part of that then.
14  I don't know.  I don't know.  I assume director Peed.
15      Q.    Did director Peed discuss with you that
16  Mr. Pearsall would not have to go into the
17  supervisory social science analyst position slot?
18      A.    I don't recall.  I don't recall.
19      Q.    So you don't recall how you knew that he
20  wouldn't have to go in that slot?
21      A.    Right.  What I recall is that I didn't
22  lose the slot.
23      Q.    Do you recall somebody telling you you
24  wouldn't lose the slot?
25      A.    I don't.  I don't.
```

00101

```
 1      Q.    So you don't know if this was part of your
 2  conversations with Mr. Quinn or Mr. Peed when you
 3  were discussing Mr. Pearsall coming over from OJP?
 4      A.    Yes.  I don't recall that.
 5      Q.    Let's go back to your conversation with
 6  Mr. Quinn and director Peed.  You didn't talk about
 7  the slot.  You don't remember talking about the open
 8  slot.  What exactly do you remember talking about?
 9          MS. WU:   Objection.  This has been asked
10  and answered.  You can continue talking if you want
11  to.
12          THE WITNESS:  I was going to say we have
13  covered it.
14      BY MS. MEDINA:
15      Q.    We have -- just give it to me again if you
16  can.
17          MS. WU:   Same objection.
18          THE WITNESS:  They gave me his resume,
19  they had a discussion with Al.  They met with Al and
20  they had his resume.  After discussions with Al and
21  his resume that they thought it would be based on his
22  background and experience he would be fit for PPSE.
23      Q.    And did you testify that Mr. Quinn and
24  director Peed knew about the weaknesses in PPSE when
25  they were looking at Al's resume?
```

00102

```
 1      A.    I had talked about in senior management
 2  meetings, the whole office was talking about
 3  closeouts being an issue.  It was an organization or
 4  a COPS wide initiative.  So yes.  They are aware that
 5  I was -- I needed help in those areas.
 6      Q.    What, what things did you talk about in
 7  the senior management meetings when talking about
 8  closeouts issues?
 9      A.    Just COPS wide that we need to develop a
10  closeout policy and process.  We were starting to
11  develop process in developing a manual, working on
12  the backlog.
13      Q.    Who was working on the backlog at that
14  time?
15      A.    I don't know.
16      Q.    Was anyone working on the backlog?
17      A.    I don't know specifically.  I'm talking
18  about in senior level managers which are the
19  assistant directors.  We are developing, I mean, it
```

Page 42

Pearsal.Camarata Deposition
20  was on organizational wide priority.
21        Q.      You were just, in these management
22  meetings you were just talking about the black log?
23        A.      In general.
24        Q.      Did you come up with any ideas of how to
25  deal with the backlog?

00103

1        A.      I -- the lead on the closeouts at that
2   time fell to our grants administration division.
3   However, myself as the AD of a separate division from
4   the grants administration division knew that it was
5   really important for me to get my act together in my
6   division from closeouts.
7         Q.      Who specifically was handling it in the
8   grants administration division?
9         A.      I don't recall at that time.
10        Q.      Do you recall the position of the person
11  who was handling it?
12        A.      No.
13        Q.      Was it the assistant director?
14        A.      Well he was overseeing it.
15        Q.      He was overseeing the closeouts?
16        A.      Well, he is, he is over the grants
17  administration division, he provides oversight just
18  based on his position, but I cannot recall who is
19  actually leading the closeout effort in his division
20  at that time.
21        Q.      How would you have characterized the
22  closeout effort at that time?
23        A.      Just beginning.
24        Q.      Was there an instruction, I guess I'm
25  trying to figure out how the, it was just beginning,

00104

1   who started it?
2         A.      I don't know.
3         Q.      Was it a decision by senior management?
4         A.      I don't know.
5         Q.      Were you involved at all in the decision?
6         A.      No.
7         Q.      How did you know that the closeouts fell
8   to the grants administration division?
9         A.      Because the majority of the grants are in
10  the grants administration division.
11        Q.      Was there a communication from the grants
12  administration division saying we are handling
13  closeouts now?
14        A.      As I said we were discussing it in senior
15  management meetings.  It was a COPS wide priority to
16  address closeouts.  The grants administration
17  division had the lead on this.  But I have grants in
18  my division that I knew needed to be addressed and
19  were not being addressed.  They had -- they were
20  putting together a team of people to work on this
21  process to develop a manual.  I didn't have that.
22        Q.      Was the manual just going to be applicable
23  to the grants administration division?
24        A.      At that time it was.  But that's why I
25  needed, the manual took a while to develop.  At the

00105

1   same time I'm trying to address the closeouts in my
2   division.
3         Q.      Do you know how the grants administration
4   division was handling closeouts prior to the issuance
Page 43

Pearsal.Camarata Deposition

 5   of the manual?
 6        A.     No.
 7        Q.     You weren't aware of any of their efforts
 8   in terms of dealing with the backlog of closeouts?
 9        A.     Yes.  I was aware that they were
10   addressing them.  I don't know how but yes, they were
11   addressing closeouts.
12        Q.     So were there people in grants
13   administration division that were addressing
14   closeouts?
15        A.     Yes.  They had a team.
16        Q.     They had a team of people?
17        A.     Yes.
18        Q.     Do you know who was on the team?
19        A.     I can't recall.
20        Q.     Do you know how many people were on the
21   team?
22        A.     No.
23        Q.     Did you hear about the team, how did you
24   know about the team?
25        A.     Because we discussed it at senior

00106

 1   management meetings that there was a team of people
 2   who the deputy director in grants administration
 3   division was putting together to address closeouts.
 4   It was a huge priority for us.
 5        Q.     And was this team put together to address
 6   closeouts throughout COPS?
 7        A.     It primarily focused on the grants
 8   division.  I did ask Angel, administrative assistant
 9   to sit in on those.  That didn't help me address my
10   problem.
11        Q.     You asked Angel to sit in on --
12        A.     In on those meetings.
13        Q.     On the team meetings?
14        A.     Yes.
15        Q.     Did she report back to you on the progress
16   of the team?
17        A.     Did she report back to me?  I assume.
18   Yes.
19        Q.     Do you recall anything that she said about
20   what the team was doing?
21        A.     What I recall is I needed someone of a
22   higher level to help get me through this closeout
23   process.  Angel is an administrative assistant who
24   was not able to close out or grants to the level that
25   I wanted to have done.  That's what I recall.

00107

 1        Q.     But you don't know who was serving on the
 2   team in the grants administration division?
 3        A.     I can't recall.
 4        Q.     So in addition, in addition to sending
 5   Angel to the meetings, you also had her handling the
 6   closeouts?
 7        A.     No.
 8        Q.     I'm sorry.  I misunderstood what you said.
 9        A.     I had her attend the meetings and get us
10   started on closeouts.  I had weaknesses with my
11   closeouts and weaknesses with Angel's level working
12   on closeouts.
13        Q.     Did you ever meet with anyone on the
14   grants administration team regarding closeouts?
15        A.     I don't recall.

Pearsal.Camarata Deposition

16    Q.    Do you think it would have been a good
17  idea for you to meet with people on the grants
18  administration team regarding closeouts if you have
19  such a weakness in your own division?
20    A.    As the assistant director, it would have
21  deferred to me.  However, at the same time, that's
22  exactly why I was so excited to get out.  A GS-14,
23  someone with the experience that could come in and
24  help me do it.
25    Q.    But prior to Al's arrival, what had you

00108

1   been doing as assistant director of your division
2   when there was a team of people in the grants
3   administration division doing exactly what you had a
4   weakness in your own division?
5    MS. WU:  Objection to the extent it's been
6   asked and answered.
7    THE WITNESS:  They weren't -- this is
8   evolving.  This is not like the team got together
9   today and tomorrow they had a process that I could
10  apply.  This was an evolving process, closeouts were
11  brand new to the COPS office as a whole.  The people
12  who were put together in the grants administration
13  division were new to it too.  So we are talking about
14  time frame.  While they are struggling, I'm
15  struggling.  And I knew that's again why I was so
16  happy to get out to help me with this because I
17  needed someone who could provide oversight.  If Al
18  didn't did it, I would have.  I would have.  It's my
19  responsibility to make sure that those grants get
20  closed out properly.
21    BY MS. MEDINA:
22    Q.    Had you been doing that for the time prior
23  to Mr. Pearsall's arrival?
24    MS. WU:  Objection.
25    THE WITNESS:  That's why I had a weakness.

00109

1   No.  I was start to go work with Angel on it.
2    BY MS. MEDINA:
3    Q.    When you spoke with director Peed and
4   Mr. Quinn about Al coming over, did they mention any
5   other, any other opportunities that Mr. Pearsall
6   could have been used for other than the position in
7   your division?
8    A.    No.  And I jumped on it in a heartbeat.
9    Q.    Did you discuss with them whether anyone
10  else was considering taking Mr. Pearsall?
11    A.    No.
12    Q.    Do you know whether anyone else either in
13  COPS or outside was considering Mr. Pearsall's resume
14  at the same time you were?
15    A.    No.
16    Q.    So you don't know if director Peed and
17  Mr. Quinn called other people in the COPS division to
18  see whether they would be interested in working with
19  Mr. Pearsall?
20    A.    I'm not aware of that.
21    Q.    Did you talk to anyone else in COPS to see
22  if anyone else would have been interested in Mr.
23  Pearsall?
24    A.    No.  I wasn't interested in sharing.  I
25  mean I wanted him.

00110

Page 45

Pearsal.Camarata Deposition
1      Q.      But you did talk to Beverly Alford?
2      A.      Right.  But he was still, I wanted him in
3   my division.
4      Q.      Had you ever thought about hiring someone
5   else to handle the closeouts prior to getting the
6   call from director Peed and Mr. Quinn regarding
7   Mr. Pearsall?
8      A.      No.
9      Q.      That thought never crossed your mind?
10     A.      It was timing.  It was just timing.  At
11  the same time I was experiencing these weaknesses was
12  the exact same time when the opportunity to have Al
13  came on board.
14     Q.      So you hadn't come up with any other plan
15  in terms of dealing with the closeouts?
16     A.      At that point, no.
17     Q.      Hypothetically speaking, what would you
18  have done if director Peed and Mr. Quinn had not sent
19  you Al's resume in terms of closeouts?
20          MS. WU:  Objection.  Calls for
21  hypothetical.  Speculation.
22          THE WITNESS:  I don't know.
23          BY MS. MEDINA:
24     Q.      You don't know what you would have done.
25  You're an assistant director and you don't know what

00111
1   you would have done?
2      A.      I don't know what I would have done.  The
3   responsibility falls to me ultimately as the head of
4   the division.  That responsibility falls to me.
5      Q.      Would you have considered hiring somebody
6   to ham this for you?
7      A.      I didn't have a position.
8          MS. WU:  Objection.
9          THE WITNESS:  I did not have a slot or
10  position to hire anyone except for the supervisory
11  social science analyst.
12          BY MS. MEDINA:
13     Q.      So who in your division would have
14  performed these duties if you didn't have an open
15  position?
16     A.      I don't know.
17          MS. WU:  Objection.  Calls for
18  speculation.
19          BY MS. MEDINA:
20     Q.      Would you have had the supervisory social
21  science analyst handle the closeouts?
22          MS. WU:  Same objection.
23          THE WITNESS:  I don't know what I would
24  have done and I didn't have to think of that because
25  as I said as I'm struggling with these things, I had

00112
1   the opportunity to bring Al on board.  The
2   opportunity to bring Al on board happened.
3          BY MS. MEDINA:
4      Q.      When you were reviewing Mr. Pearsall's
5   resume, did you ever think that he could have been
6   overqualified for the position for which you hired
7   him?
8      A.      No.
9      Q.      Why not?
10     A.      Why?  Because I looked -- I needed a
11  senior level person with senior level experience in
Page 46

Pearsal.Camarata Deposition

12  these areas that I've discussed.  He was the person
13  that could provide the proper oversight and the
14  proper guidance to what I needed to have done.
15      Q.      Did you notice on his resume anything
16  other than his experience with file closeouts and
17  file management?
18      A.      I couldn't have honed in on those things.
19      Q.      Do you recall how long his resume is?
20      A.      No.
21      Q.      Or was at the time in 2002?
22      A.      No.
23      Q.      Did you read the whole thing?
24      A.      I'm sure I did.
25      Q.      And you didn't see any other experience

00113
1   that would have been useful at COPS other than his
2   experience?
3       A.      That was the priority.  That's what stands
4   out to me.  That's what I was struggling with and
5   what stood out to me was as I said before the
6   experience on those two issues.
7       Q.      So his experience with OJP with the
8   closeouts is one of the things that stood out to you
9   on his resume.  You testified to that already.
10      A.      Yes.
11      Q.      When you worked at OJP, do you know who
12  handled the closeouts there?
13      A.      No.
14      Q.      Do you have any idea?
15      A.      OJP is made up of five different agencies
16  or bureaus.  I was in one.  Al was in a different one
17  so I don't know if each individual bureau did
18  closeouts.  I don't know if they did closeouts for
19  the whole office of justice programs.  I don't know.
20      Q.      But you had mentioned that you were
21  impressed by OJP's system of closeouts?
22      A.      Whole file -- grant management system from
23  beginning to end.
24      Q.      What was your experience with the grant
25  management system at OJP?

00114
1       A.      That they have a formal process in place.
2   They have systems.  They have processes.  They have
3   what you call red books and you go through a process.
4       Q.      Is that from personal experience?
5       A.      Yes.  For me being there.
6       Q.      What --
7       A.      But I never closed out a file.
8       Q.      Did you ever have a file?
9       A.      I was only there a year and a half.
10      Q.      Did you ever have a file?
11      A.      I managed programs.
12      Q.      Who handled the file management of the
13  programs you managed?
14      A.      I managed my file and my programs.
15      Q.      Was there anyone that you would have
16  directed a question if you had a question as to how
17  you should be managing your file while you were at
18  OJP?
19      A.      OJP had a set procedure in place for
20  managing their files.  I was there in '92.  We are
21  now talking 2002.  I -- I had enough knowledge to
22  know that we weren't managing our files properly,
                    Page 47

Pearsal.Camarata Deposition
```
      23   that OJP had a system and process in place and I
      24   didn't and I needed one.
      25       Q.    So when you were at OJP the only
00115
       1   experience had you with the file management system
       2   was in the manuals that you followed?
       3       MS. WU:  Objection.  Mischaracterizes her
       4   testimony.
       5       THE WITNESS:  No.  I have program files
       6   and there were certain ways the files had to be laid
       7   out.  That was it.  And then I managed my program.
       8       Q.    Who told you how to lay it out?
       9       A.    I don't remember.
      10       Q.    Was it a person or were you following
      11   instructions of a book or something?
      12       A.    No.  It must have been a person.
      13       Q.    But you don't know who that person was?
      14       A.    No.
      15       Q.    And you don't know what their grade level
      16   was?
      17       A.    No.  No.
      18       Q.    Shortly, shortly after Mr. Pearsall's
      19   arrival at COPS, did there come a time where there
      20   was a COPS retreat?
      21       A.    I don't know.  I don't --
      22       Q.    Do you recall a retreat that both you and
      23   director Peed and members of the COPS staff may have
      24   attended near the time Mr. Pearsall arrived?
      25       A.    I don't recall.  Where was the retreat?
00116
       1       Q.    I can't testify today.
       2       A.    I don't recall.
       3       Q.    We are just going off of what you
       4   remember.  Was -- have there ever been retreats with
       5   COPS staff after the time that Mr. Pearsall arrived?
       6       A.    We have had a couple of retreats.  I can't
       7   -- I don't recall dates but we have retreats to
       8   manage or to develop our strategic plan.
       9       Q.    Is, has diversity ever been discussed at
      10   any of these retreats?
      11       A.    In what way?
      12       Q.    In any way.  Diversity in terms of racial
      13   diversity?
      14       A.    Attending the retreat or -- I don't recall
      15   any discussion on that.
      16       Q.    There has never been any discussion of
      17   diversity at any of the COPS retreats?
      18       MS. WU:  Objection to form.
      19       THE WITNESS:  I don't recall.
      20       BY MS. MEDINA:
      21       Q.    Has anyone ever raised a concern at any of
      22   these retreats regarding diversity?
      23       MS. WU:  Objection to form.
      24       THE WITNESS:  I don't recall that
      25   discussion at retreats.
00117
       1       BY MS. MEDINA:
       2       Q.    We are going to go back to discussing your
       3   development of position descriptions.  When you say
       4   you mentioned that the only other people you confer
       5   with are HR.  What exactly is the relationship
       6   between you and HR in terms of position description
       7   development?
```
Page 48

Pearsal.Camarata Deposition

8    A.    In general?
9    Q.    Yes.
10   A.    They would give me a template for the
11  position and then I would develop from that template
12  the duties and responsibilities of that position.
13  And in Al's case, Al helped me develop the position
14  description so it's Al and HR.
15   Q.    Were you given a template when you were
16  designing Mr. Pearsall's description?
17   A.    I believe so.
18   Q.    Do you recall the duties that were
19  described on the template?
20   A.    I don't.
21   Q.    Were all, were the closeout duties
22  described on the template?
23   A.    I don't recall.  I don't recall that.
24   Q.    Do you recall any of the duties that were
25  described on the template that you got from HR?

00118
1    A.    No.  No.  What I recall is developing it
2   based on my discusses Al and having him review it.
3    Q.    But you started with a template?
4    A.    I believe so.
5    Q.    So you talked with Al and you developed
6   his position description from the template that you
7   got from HR so you did start with something?
8    A.    Yes.
9    Q.    But you don't have a recollection today of
10  what was in that template?
11   A.    No.
12   Q.    Do you know what position the template
13  described?
14   A.    No.
15        MS. MEDINA:  I need to make a note for the
16  record if the template that HR provided has not been
17  produced already, then we would like that and I'll
18  give the list at the end of the deposition of
19  everything we are requesting but I don't believe that
20  we got any template.
21        MS. WU:  If it's responsive to any
22  document requests and if we haven't in fact produced
23  documents you're requesting then we would be happy to
24  produce documents to you.
25             (Cammarata Exhibit No. 5 was

00119
1             marked for identification.)
2        BY MS. MEDINA:
3    Q.    Do you recognize that document,
4   Ms. Cammarata?  Ms. Cammarata, may I just see the
5   first page of that exhibit.  I want to make sure I
6   have that.  Do you recognize the document?
7    A.    Yes.
8    Q.    What is it?
9    A.    Well, it appears to be the position
10  description that I wrote with Al for senior policy
11  analyst.  What's throwing me off is this cover page
12  dated back in '96.
13   Q.    It will probably be cleaner, let me
14  separate the exhibit between the cover page and this.
15  This is the order it was produced to us but it's
16  difficult to tell.
17   A.    This doesn't go with that.
18   Q.    Is in a your testimony that they don't go

Page 49

Pearsal.Camarata Deposition

19  together?  Do you have knowledge that they don't go
20  together ?
21       A.     Logically they couldn't go together
22  because this is back in '96 under Ellen Scrivner and
23  Ben Tucker.  That's what I -- I believe I developed
24  that.  That's what I developed.  In 2002.
25       Q.     Okay.  Can I get another exhibit sticker

00120

1   for the second part.  Is that Exhibit 5?
2        A.     Five.
3               (Cammarata Exhibit No. 5 was
4               marked for identification.)
5        BY MS. MEDINA:
6        Q.     So let's just start with Exhibit 5.  Can
7   you describe to me what Exhibit 5 is?
8        A.     Exhibit 5 appears to be the cover page of
9   a position description for senior policy analyst.
10       Q.     And can you explain to me in the first
11  section under position description under category 11
12  there are three categories possible supervisory,
13  managerial and neither.  Which one is marked on this
14  position description?
15       A.     Managerial.
16       Q.     Were you familiar with this cover sheet
17  when you were developing Mr. Pearsall's position
18  description?
19       A.     No.
20       Q.     Would HR have been familiar with it?
21       A.     I believe so.
22       Q.     And you testified that you worked with HR
23  when developing a position description, is that true?
24       A.     Correct.
25       Q.     Would this have been, would Exhibit Number

00121

1   5 have been accompanying the senior policy analyst
2   position descriptions, is that how you usually see
3   these documents?
4        A.     I'm sorry.  Can you say that again.
5        Q.     Have you ever seen another document like
6   Exhibit Number 5?  Either for another senior policy
7   analyst or for any other type of position
8   description?
9        A.     No.
10       Q.     You've never seen a cover sheet like this?
11       A.     I don't know what you mean when you say
12  like this.  I know that there is a cover sheet but
13  not like this one.
14       Q.     What's different about the cover sheet
15  that you've seen?
16       A.     Well, I haven't seen this one that says
17  senior policy analyst for program policy support and
18  evaluation division.
19       Q.     When you were, the program policy support
20  and evaluation division is the division that you were
21  heading while Mr. Pearsall came in, is that correct?
22       A.     Correct.  Correct.
23       Q.     And you had never seen this cover sheet in
24  relation to the senior policy analyst position?
25       A.     No.

00122

1        Q.     Did you request any documents from HR
2   prior to developing his position description?
3        A.     No.

Page 50

Pearsal.Camarata Deposition

4      Q.      You had mentioned that they sent you a
5  template.  Do you recall whether a cover sheet was
6  attached to the template?
7      A.      I don't believe a cover sheet was
8  attached.
9      Q.      Did they send it to you in an email?
10     A.      I don't recall.
11     Q.      I understand that you haven't seen this
12 particular position description cover sheet before.
13 Have you seen these types of cover sheets or other
14 position descriptions?
15     A.      Yes.
16     Q.      In what circumstances?
17     A.      I'm just -- in general circumstance that
18 I've seen them attached to position descriptions
19 before.
20     Q.      Do you know what this cover sheet is used
21 for?
22     A.      No.
23     Q.      Who would know what this cover sheet is
24 used for?
25     A.      HR.

00123

1      Q.      Are you responsible for filling out any
2  information on this cover sheet?
3      A.      No.
4      Q.      Do you know who is responsible for filling
5  out the information on this cover sheet?
6      A.      I would assume HR.
7      Q.      Maybe you can get into a little more about
8  your relationship with HR when you're developing the
9  position description because obviously you testified
10 that you don't recognize this cover sheet.  This is
11 something that HR develops and do you have any input
12 into the cover sheet whatsoever?
13     A.      No.  No.
14     Q.      So what --
15     A.      My input is on the development of the
16 position description.
17     Q.      And that would be something akin to
18 Exhibit 6?
19     A.      Correct.
20     Q.      Do you have input into any other, I guess
21 my first question would be is there anything missing
22 from the position description in terms of what a
23 normal position description looks like other than
24 Exhibit 5 and Exhibit 6?
25     A.      I don't know.  I only was involved in this

00124

1  part.
2      Q.      In Exhibit 6?
3      A.      Correct.  Sorry.
4      Q.      Who would know whether we were missing any
5  parts of the position description?
6      A.      HR.
7      Q.      What, what is your relationship with HR in
8  terms of developing the part of the position
9  description that you developed and that's Exhibit 6?
10     A.      My relationship with them would be one
11 side developed it in the specific case, worked with
12 Al, come up with a final draft, I would submit the
13 final draft to HR.
14     Q.      Does HR have, you submit a draft?

Page 51

Pearsal.Camarata Deposition

15    A.    A final draft.  Or no, a draft.  I mean
16 they obviously have the authority to make some
17 changes.
18    Q.    What exactly is their authority?
19    A.    I don't know what their exact authority
20 is.  I can tell you what happened in my case.
21    Q.    I'm speaking generally.  We can, we'll be
22 talking about the specific circumstance of developing
23 Mr. Pearsall's description but when you're developing
24 something with HR, they send you a template.  You
25 create a draft and then you send them the draft?  Is

00125

1 that -- does that --
2    A.    And they before made suggestions.  Edits.
3    Q.    Are there any parameters as to what HR can
4 edit?
5    A.    I don't know.  I looked to them as
6 guidance.
7    Q.    Do you have to take all of HR's guidance?
8    A.    I don't know.
9    Q.    Who would know?
10    A.    HR.
11    Q.    So would you consider HR, would their
12 comments trump anything that you had to say in the
13 position description?
14    A.    I would assume.
15    Q.    What are you basing that on?
16    A.    That that's their, they have the knowledge
17 and experience in this area.
18    Q.    Don't you have the knowledge and
19 experience to know what your employees are doing?
20    A.    From the substance.  Yes.  I don't know
21 what you mean.
22    Q.    What do you mean by substance?
23    A.    Well, I know what I, what I want in the
24 position description.  I know what I want a person to
25 do so I can draft what I want this person to be

00126

1 responsible for and I give it to HR.
2    Q.    And then does HR have a final say in what
3 goes into the position description?
4    A.    I assume they do.  I never had to
5 challenge them to know.  That's why I'm basing mine
6 on experience.  I have looked to them for guidance.
7 They have made edits before and I have accepted them.
8 I have never challenged them in any way.
9    Q.    Has anyone ever challenged HR on position
10 descriptions that you know of?
11    A.    I don't know.  I'm only speaking from my
12 experience but I look to them for the guidance and
13 authority.
14    Q.    Do you know if there is a process in terms
15 of challenging HR on position descriptions?
16    A.    No.  I don't know.
17    Q.    Turning back to Exhibit 5, do you have any
18 familiarity with any of the terms on the document?
19    A.    Yes.
20    Q.    Do you, I mean I'm specifically looking
21 under the first section of position description and
22 the classification of the position as managerial.  Do
23 you understand what that means when the box is
24 checked managerial?
25    A.    I have never paid attention to that
Page 52

Pearsal.Camarata Deposition

00127
```
 1   before.
 2        Q.    Do you know what it means?
 3        A.    Other than it's managerial, I don't know
 4   what that means to operationalize it.
 5        Q.    Do you know if, what the difference, if
 6   there is a difference between supervisory,
 7   managerial, and neither?
 8        A.    I only know the difference between neither
 9   and supervisory.
10        Q.    Do you know the difference between
11   supervisory and managerial?
12        A.    No.
13        Q.    Do you know who would know the difference?
14        A.    HR.
15        Q.    And just to clarify, do you know how these
16   cover sheets are used by HR?
17        A.    No.
18        Q.    Do you know how anyone in the cost
19   department uses these cover sheets?
20        A.    No.  I mean the only thing that would
21   stand out for me would be if it was marked
22   supervisory as an official supervisory position.
23   That's all I know.
24        Q.    And how do you know that?
25        A.    Because based on my experience someone
```

00128
```
 1   having an official supervisory position is different
 2   than a nonsupervisory position.
 3        Q.    And nonsupervisory isn't an option on here
 4   and so I'm trying to understand?
 5        A.    That's why I said I would know the
 6   difference between neither or supervisory.
 7        Q.    Have you encountered any of these cover
 8   sheets with any of your other employees?
 9        A.    I'm sorry.  What.
10        Q.    Have you encountered any of these cover
11   sheets with any of your COPS staff?
12        A.    What do you mean?
13        Q.    I mean have you ever seen them before with
14   any of your social science analysts, senior policy
15   analyst, administrative assistants?
16        A.    Yes.  I've seen the forms before.
17        Q.    How do you use the forms?
18        A.    I don't.  I use the position description.
19        Q.    Do you ever refer back to these forms for
20   any reason?
21        A.    No.  I use this position description.
22        Q.    You mentioned that you've never challenged
23   anything with HR and I guess one of the, do you know,
24   do you know if Mr. Pearsall had a cover sheet like
25   this filled out when he came to COPS in 2002?
```

00129
```
 1        A.    When he -- when he came there, did he have
 2   one?  You mean to bring with him?
 3        Q.    No.  I mean do you know if HR developed a
 4   sheet like this with Mr. Pearsall's name on it and
 5   his position?
 6        A.    I don't know.
 7        Q.    So do you know if, I mean, this cover
 8   sheet appears to apply to a senior policy analyst in
 9   the program policy support and evaluation division.
10   Do you know if there are any other cover sheets like
```
Page 53

Pearsal.Camarata Deposition
```
11  this that would apply to that position?
12       A.    Not -- no.
13       Q.    So would it be fair to say that this cover
14  sheet was the cover sheet that was in effect for
15  Mr. Pearsall's position when he came over to COPS?
16       A.    I don't know.
17       Q.    Who would know?
18       A.    HR.
19       Q.    Would you have access to this cover sheet?
20       A.    If I asked HR.
21       Q.    Did you ever request any information on
22  Mr. Pearsall's position, I'm sorry not Mr. Pearsall's
23  position, the position of senior policy analyst when
24  Mr. Pearsall was coming over?
25       A.    Just from this standpoint.  We are
```
00130
```
1   developing, developing the position description.
2        Q.    All right.
3                    (Cammarata Exhibit No. 7 was
4                    marked for identification.)
5        BY MS. MEDINA:
6        Q.    If you can look at Exhibit 7 and let me
7   know if you recognize the document.
8        A.    Okay.
9        Q.    Are you familiar with what appears to be
10  this email chain?
11       A.    Yes.
12       Q.    Can you describe to me generally what's
13  going on?
14       A.    Discussion of the development of the
15  position description in PWP for Al Pearsall.
16       Q.    Now, I'm just interested in concentrating
17  on the interaction between you and HR because we had
18  been discussing what your relationship is with HR.
19  What happened, what was HR's involvement with
20  Mr. Pearsall's position description?
21       A.    Reviewing it as I sent it over and noting
22  that the position itself wasn't appear official
23  supervisory position and therefore we should remove
24  the term supervising and provide some other language.
25       Q.    Did you, did you agree with HR's comments?
```
00131
```
1        A.    Once she raised them with me.  It's true,
2   he was not an official supervisory position.  Yes.  I
3   agreed.
4        Q.    Did, when Mr. Pearsall had raised the
5   issue of adding the terms of supervising, did that
6   raise any concerns when he initially raised it?
7        A.    When he first raised it with me.  No.
8        Q.    Have you drafted other position
9   descriptions for other employees that included the
10  terms supervising?
11       A.    Not that I recall unless it was a
12  supervisor position.
13       Q.    Did you expect Mr. Pearsall to be
14  supervising?
15       A.    No.
16       Q.    But you didn't, that didn't raise any
17  concerns for to you have that term in his position
18  description?
19       A.    I didn't have an in on that.  He would be
20  provide -- he was, you know, you call it supervising
21  staff of leading a team of both, some folks in PPSE
```
Page 54

Pearsal.Camarata Deposition

22 and some folks in training and TA, so when Al first
23 put that in there supervising them I thought okay.  I
24 just didn't hone in on that until HR said it's not
25 really an official supervisory position is he really

00132

1 supervising them meaning is he doing their
2 performance appraisals.  No.  He is not their
3 official supervisor.  I would remain the official
4 supervisor of the people he was working with and
5 Beverly would remain the supervisor of the people he
6 was dealing with.
7         Q.     You said that you had never used the term
8 supervising in any other position descriptions other
9 than for your supervisory?
10        A.     I don't recall.  I don't recall.
11        Q.     Did you, was there any further
12 communication with HR following these emails in 2002
13 regarding Mr. Pearsall's position description?
14        A.     I don't recall.
15        Q.     Do you recall whether the terms
16 supervising was actually deleted from Mr. Pearsall's
17 position description?
18        A.     I believe it was.
19        Q.     Do you recall when it was deleted?
20        A.     No.  Before we finalized it.
21        Q.     And when was it finalized?
22        A.     I don't remember.
23        Q.     Can you give me an estimation?
24        A.     No.  No.  Because we went back and forth
25 and back and forth and then from the PD we then

00133

1 developed the PWP.  I do not recall when that
2 position description was finalized.
3         Q.     And what does it mean exactly to be
4 finalized?
5         A.     To me I guess accepted by all parties and
6 that's what we are working off of.
7         Q.     Is there any official process in which a
8 position description becomes finalized?
9         A.     Well, because of Al's concerns, I mean,
10 this one I would say was finalized once HR looked at
11 it then they sent it over to main justice to our
12 justice management division to take a look at it.
13 They then September it back and certified at the
14 GS-14 level.  That to me is final.
15        Q.     So when it gets approved by the justice
16 management division, that would be finalized?
17        A.     In this case.  In this particular case,
18 that's how I would define final.
19        Q.     Is it different in other cases?
20        A.     I've never experienced this before where
21 it had -- what HR does with it, if they send it to
22 justice management division, I'm not aware.
23        Q.     But you were made aware in this case?
24        A.     Yes.  Yes.  Because Al was raising
25 concerns with me that it was not at the GS-14 level.

00134

1         Q.     Well, let's go through Mr. Pearsall's
2 position description.  And you can, turning back to
3 Exhibit number six, can you identify the document?
4         A.     I believe it to be the position
5 description that Al and I came up with.
6         Q.     Do you know if this was the final version

Page 55

Pearsal.Camarata Deposition
```
 7  of the position description?
 8      A.    Not -- no.  I don't.  And because the word
 9  supervising is in there, I assume it's not.
10      Q.    So this would not be the one that was
11  finalized by JMD?
12      A.    I don't know.
13      Q.    Do you have any idea of where in the draft
14  process this exhibit is?
15      A.    No.
16      Q.    Why don't you take a minute, take a moment
17  to review it and let's see whether, if it properly
18  captures what Mr. Pearsall's position description was
19  as you had agreed to it with him in 2002.
20      A.    I'm sorry.  Say that again.
21      Q.    I want to you take a moment to review
22  Exhibit 6 and tell me if after you've reviewed it you
23  have a better idea of where it was in the draft
24  process in terms of whether this is what you had
25  agreed to with Mr. Pearsall in 2002 or whether this
```
00135
```
 1  was a later draft or whether this was the one that
 2  was finalized by JMD.
 3      A.    I don't know.  It's got the word
 4  supervising in there.  It has the JPRA in there that
 5  we both agreed to.  It has the word senior program
 6  manager in there that Al requested and I agreed.  It
 7  certainly has the closeout information, the bio
 8  management, so, but because of the words supervising
 9  in there, I, like I say, can't tell you if it's the
10  final one.
11      Q.    I'm sorry, do you know whether the final
12  draft deleted the word supervising?
13      A.    It was supposed to.
14      Q.    Did you have to, did you have to approve
15  the final draft of his position description?  Some
16  way?
17      A.    Yes.
18      Q.    Did you have to review it again to approve
19  it?  I guess I'm just a little confused as to the,
20  just the process of how we get to a final draft on
21  here.
22      A.    I just can't recall exactly how many
23  times, this cover -- I just don't know if this is the
24  final one and if supervising slipped in there
25  somehow, I just don't know if this is the final one.
```
00136
```
 1      Q.    Well let's just unfortunately it's very
 2  difficult for us to tell where the final draft is as
 3  well.  So maybe we can go through this position
 4  description.  You can tell me if there are things
 5  that you disagree with in terms of what you finally
 6  agreed with Mr. Pearsall and we can go from there?
 7      A.    Okay.  Are you waiting for me.
 8      Q.    I wanted to give you an opportunity to see
 9  if you think there is anything that should have come
10  out or should have been included in the final
11  position description that you agreed to with
12  Mr. Pearsall.
13      A.    Based on my recollection, the supervising
14  seems to be the only thing that would cause me to
15  question whether this was the final one or not.
16      Q.    So disregarding the term supervising, is
17  it fair to say that this is a reflection of the
```
Page 56

Pearsal.Camarata Deposition

18  position description as you and Mr. Pearsall agreed
19  to it in 2002?
20          MS. WU:  Objection to the form.
21          THE WITNESS:  I would have to look at my,
22  what I have back in the office to see.  You know.
23  But what I would say is it hits on the closeouts.  It
24  hits on the file management.  It hits on the GPRA and
25  adds the word senior in front of program manager.

00137

1      Q.      So let's go through, I just want to take
2  you through the different responsibilities that are
3  laid out in his position description just so I
4  understand what exactly was going on?
5          MS. WU:  I'm going to object to these line
6  of questions because you just made a statement that
7  isn't reflected in the record.
8          BY MS. MEDINA:
9      Q.      Let's just go through this document.  You
10  can tell me if you agree that what's stated in the
11  document is what you discussed with Mr. Pearsall
12  regarding what his duties would be as the senior
13  policy analyst in PPSE.  In the position description
14  are, which section of the position description should
15  one look to in order to do, to figure out what the
16  employee's duties are?
17      A.      The summary and the major duties and
18  responsibilities.
19      Q.      So on this draft of the position
20  description, what duties are listed?
21      A.      Performing a variety of analytical
22  administrative programmatic and other professional
23  work.
24      Q.      Let's start with that.  Did you discuss
25  that duty with Mr. Pearsall?

00138

1      A.      At what time?
2      Q.      At any time?
3      A.      Not -- I'm not -- I don't think we
4  discussed it in this context.
5      Q.      In what context?
6      A.      The way it's written here.
7      Q.      When you read -- I'm sorry, are you
8  reading from the first paragraph under major duties
9  and responsibilities?
10      A.      Correct.  I mean --
11      Q.      Can you perhaps, how would you
12  characterize what's written there?
13      A.      Some program management.
14      Q.      So that first paragraph is trying to
15  describe Mr. Pearsall's program management duties?
16      A.      I would say it leans more towards program
17  management.
18      Q.      Does it discuss any of his other duties?
19      A.      Analytical.  Professional is very general.
20  But analytical, and then the programmatic.
21      Q.      Did you discuss Mr. Pearsall's program
22  management duties with him when you met with him in
23  2002?
24      A.      I don't recall.  I mean at some point I
25  gave him some programs to manage so --

00139

1      Q.      Did you discuss that he would be managing
2  programs and program management would be one of his
Page 57

Pearsal.Camarata Deposition

3   duties?
4       A.    I don't recall.  I do not recall.
5       Q.    Is that something that, when you go over
6   duties with a new employee, do you usually discuss
7   all of their duties with them?
8       A.    I thought you meant when I first met with
9   Al.  When I first met with Al, I don't recall if we
10  did program management at that initial meeting.
11      Q.    But you do recall --
12      A.    Subsequent to that at some point I
13  assigned him programs and that's part of his duties
14  and responsibilities.
15      Q.    Did you assign him programs prior to
16  explaining to him that he would have program
17  management duties?
18      A.    Or at the same time.  I don't recall.
19      Q.    Did you discuss, did you discuss this
20  particular part of the position description with him
21  when you were developing the position description?
22      A.    I don't recall.
23      Q.    Would it have been your typical practice
24  to discuss all of the duties of the position
25  description with an employee when you were developing

00140

1   your position description?
2       A.    Yes.  But I wouldn't necessarily word it
3   exactly like this.  I would be talking in
4   generalities, for instance, the closeouts and the
5   file management.  GPRA and program management.
6       Q.    But you don't recall discussing program
7   management with Mr. Pearsall when you met with him?
8       A.    That initial time.  Correct.
9       Q.    But you do recall discussing it with him
10  at some point?
11      A.    Yes.
12      Q.    And you're just not sure whether it was
13  around the time that you assigned the actual
14  programs?
15      A.    Right.
16      Q.    So moving on to the second paragraph under
17  major duties and responsibilities, can you review
18  that and tell me to which duty it's speaking?
19      A.    Directs the design and development of
20  program policy and technical assistance processes and
21  programs pertinent to the COPS office.
22      MS. WU:  I'm just going to have my
23  standing objection.  You can respond.
24      THE WITNESS:  What I believe that this
25  should allude to is Al developing some policies and

00141

1   procedures in systems in place within the division.
2       BY MS. MEDINA:
3       Q.    What did that mean?
4       A.    Putting systems in place, making sure we
5   are doing those things that we should be doing.  It's
6   somewhat tied to the file management process, but I,
7   I mean, I can give examples.  In the grandfather's
8   cooperative agreement was a lot of different tasks.
9   For instance, progress reports.  Every one of our
10  files had a different process for having a grantee
11  submit progress reports.
12      I needed Al to come up with a system so I
13  had one system in place for items such as a progress
                    Page 58

Pearsal.Camarata Deposition

14    report so they were piled in up with system so I'm
15    looking at this as developing a policy to put in
16    place for our files.
17         Q.    The second paragraph refers to
18    Mr. Pearsall's file management duties.
19         A.    Well, it's a little bit different.  It's
20    developing, for me it's developing systems and
21    processes and putting them in place.
22         Q.    Did you discuss with him what specific
23    systems and processes he should be developing and
24    putting in place?
25         A.    I asked him based on his knowledge could

00142

1    he go through the files and look at the requirements
2    of the cooperative agreement and see where, you know,
3    I needed systems.  And I believe we did discuss
4    progress reports.
5         Q.    Did you discuss any other procedures or
6    policies that he did not --
7         A.    I don't recall.
8         Q.    And when did you, when did you discuss
9    this with him?
10         A.    I don't recall.
11         Q.    Do you recall whether it was near the time
12    that he arrived at COPS?
13         A.    I would believe so.
14         Q.    Does the second paragraph of the position
15    description under major duty and responsibilities
16    refer to any other duties of Mr. Pearsall?
17         A.    Not that I recall.
18         Q.    And moving down to the third paragraph.
19    What, what duties does that paragraph refer to?
20         A.    The grant closeout process for both PPSE
21    and training and TA and the file management process.
22         Q.    And what guidance did you provide to
23    Mr. Pearsall as to how he was supposed to perform
24    these duties?
25         A.    The guidance I provided him with was that

00143

1    this was really important to me and important to the
2    COPS office and I need to have him develop the
3    process for both, develop it and manage the process
4    for both.
5         Q.    So he would be managing and developing the
6    process for the file closeouts?
7         A.    Say that again.
8         Q.    You said that he would be developing the
9    process and managing the process for the file
10    closeouts?
11         A.    Correct.
12         Q.    Does that third paragraph speak to
13    anything else in Mr. Pearsall's duties?
14         A.    And the file management process.
15         Q.    Did you give Mr. Pearsall any other
16    guidance in terms of how he should develop these
17    processes and manage the grant closeouts and file
18    management process?
19         A.    I was, I was relying on his knowledge to
20    help guide the process.  Or guide the development.
21         Q.    Do you recall when you had the discussions
22    with him where you told him where you gave him the
23    guidance on how he would be overseeing the grant
24    closeout process and the file management process?
Page 59

Pearsal.Camarata Deposition

00144
25      A.      Well, we talked about it at the initial

1  meeting and then at subsequent meetings.
2      Q.      How many subsequent meetings did you have
3  where you gave him guidance?
4      A.      I have no idea.  I have no idea.
5      Q.      Do you have any notes from any of those
6  meetings?
7      A.      I don't know.  I don't recall.
8      Q.      Do you recall approximately how many times
9  you discussed, you provided guidance to him in terms
10 of the file management and grant closeout duties?
11     A.      Not how many times but I know that, I know
12 that I went over it with him in the beginning, told
13 him what my expectations were, and then over the
14 course of time had, wasn't seeing results.  We have
15 talked about it several times throughout the process.
16     Q.      What did you initially, what did you tell
17 Mr. Pearsall about your expectations?
18     A.      I don't recall exactly but my expectations
19 are that we would have a process in place and we
20 would be closing out grants properly.  In an official
21 manner that we would have a system for where these
22 closeouts files are filed regarding the file
23 management process, I laid out the problems which are
24 I didn't have a process in place and I have no
25 consistency in the division as far as progress

00145
1  reports, etc.  I asked him to look through the files
2  to review the cooperative agreement and see what,
3  what, based on his knowledge, what systems and
4  processes I should have in place.
5      Q.      Did you tell him anything else about your
6  expectation?
7      A.      I don't recall.
8      Q.      Was there any documentation of these
9  conversations that you had with Mr. Pearsall?
10 Regarding your expectation?
11     A.      Regarding my expectations?  I -- well, we
12 have discussed, I mean the performance work plan
13 eventually at some point had these elements in the
14 performance work plan and we talked about them.
15     Q.      Other than your conversations about the
16 performance work plan, do you recall whether there is
17 any documentation of you telling Mr. Pearsall what
18 you expect of him in terms of these duties?
19     A.      No.
20     Q.      Moving down to the fourth paragraph under
21 major duties and responsibilities, what is that
22 referring to?
23     A.      The government, actually it should say
24 government performance and results for PPSE.
25     Q.      And what is that?

00146
1      A.      In the early days, we were collecting data
2  for the government performance results act like it's
3  measuring performance in the division.
4      Q.      What kind of performance?
5      A.      Well back then, I can't remember back
6  then.  I think it was like the number of grants we
7  made.  The number of awards, grant awards I should
8  say that we made.  We were trying to develop some new
9  measures that could more accurately measure our
Page 60

Pearsal.Camarata Deposition

10  performance.
11      Q.      What guidance did you give Mr. Pearsall in
12  terms of what he needed to do related to the
13  government performance results performance act?
14      A.      I don't recall.
15      Q.      Do you recall whether you gave him any
16  guidance?
17      A.      No.  I don't recall.  This -- I don't
18  recall.
19      Q.      And do you recall if there is any
20  documentation of any guidance that you gave him
21  regarding his duties in relation to the government
22  performance results performance act?
23      A.      I don't know.
24      Q.      Moving down to the fifth paragraph under
25  major duties and responsibilities, what is that

00147

1   referring to?
2       A.      Preparing and reviewing complex reports,
3   position papers, program materials for policy
4   decisions.  It's -- what is if referring to,
5   developing some complex reports based on looking at
6   data within the COPS office, well CMS queries at the
7   COPS office.  I should say both internal and
8   external.
9       Q.      And what part of, what part of
10  Mr. Pearsall's duties does that fall into?
11      A.      It could -- any of them.  Any of them.
12  For instance, to do closeouts, you really have to use
13  your CMS query then use some analytical abilities and
14  dig into our databases.  And develop a query that
15  would then tell you you know that would feed into the
16  closeout process who is eligible for the closeout,
17  which grantees are eligible for the closeout, where
18  in the process they are.  That kind of thing.
19      Q.      Do you recall any guidance that you gave
20  Mr. Pearsall in relation to the types of analytical
21  queries that he should do or anything in relation to
22  these complex reports that are referenced in the
23  position description?
24      A.      I do recall talking to him about needing
25  his knowledge and experience, needing him to develop

00148

1   the knowledge and experience with the CMS which is
2   COPS management system as our database.  That houses
3   all of our grant data.  I do remember mentioning to
4   him that he should become familiar with CMS and being
5   able to run queries because that would be the
6   foundation of things I would need him to do.
7       Q.      Do you recall when you discussed the CMS
8   duties?
9       A.      No.
10      Q.      Do you recall whether it was close to the
11  time when Mr. Pearsall arrived?
12      A.      I don't recall.
13      Q.      Moving down to the sixth paragraph under
14  the major duties and responsibilities, can you tell
15  me what that's referring to?
16      A.      I believe this is related to in the days
17  when AI was coming over, we were developing,
18  enhancing CMS.  There was a working group, a cross
19  division working group when enhancing our CMS
20  database because it wasn't reflective of the needs of

Page 61

Pearsal.Camarata Deposition

21  divisions.  It definitely was not reflective of
22  PPSE's needs.  I wanted Al to help get involved with
23  that so that again with the CMS database if he knew
24  it inside and out, could help us develop the database
25  from a policy systems process standpoint to get the

00149

1   database to reflect our needs.
2       Q.     What guidance did you provide him in terms
3   of redeveloping the CMS?
4       A.     I needed him to be on that working group
5   that was meeting and that the database did not
6   reflect the needs of the PPSE division.  And I was
7   not looking for Al to be an IT expert but from a
8   policy standpoint, understanding the CMS database
9   what the needs are of the division and making
10  recommendations.
11      Q.     Do you recall when you had the
12  conversations with Mr. Pearsall regarding CMS?
13      A.     No.
14      Q.     Do you know if it was close to his arrival
15  at COPS?
16      A.     I believe so.
17      Q.     Do you recall how many times you may have
18  talked to him about his duties and being in his
19  working group?
20      A.     No.
21      Q.     The last paragraph on the first page of
22  Exhibit 6, can you take a look at that and tell me to
23  which duties this applies?
24      A.     As a program manager.  Managing his
25  individual projects.  And serving, specifically Al

00150

1   would be serving as a lead on the integrity team.
2       Q.     And we'll be talking about the integrity
3   team separately.  In terms of his general project
4   management duties, what guidance did you give him
5   when he came in 2002?
6       A.     I don't recall.
7       Q.     Do you recall talking about his program
8   management duties?  When he came to COPS?
9       A.     I don't recall.
10      Q.     Do you recall when you first assigned him
11  some programs to manage?
12      A.     No.
13      Q.     Moving on to the second page.  The first
14  full paragraph, can you tell me what that, what
15  duties that refers to?
16      A.     That he serve as a COPS representative on
17  any cross division or cross agency initiatives, as
18  well as attending conferences and participating in
19  conferences and presenting at conferences or summits,
20  etc.
21      Q.     Did you discuss this duty with him when he
22  arrived at COPS?
23      A.     I don't recall.
24      Q.     Do you recall whether you gave him any
25  guidance on how he should be attending conferences or

00151

1   cross agency meetings?
2       A.     I don't recall.
3       Q.     Moving down to the second paragraph on the
4   second page of Exhibit 6, what duties does that
5   paragraph refer to?

Page 62

Pearsal.Camarata Deposition

6      A.      Just that you become, you develop the
7   knowledge and the expertise in this, in an area and
8   people can come to you for technical assistance for
9   questions.  It was just a general duty.
10     Q.      Did you discuss this at all with
11  Mr. Pearsall?
12     A.      When you say discuss this, I mean, Al and
13  I talked about the position description as it is.  He
14  reviewed it.  I reviewed it.  He had just a comment
15  on the supervisory thing so I mean, yes, he has
16  reviewed it and I have reviewed it, we have discussed
17  it at some point, all of this, whatever the PD is,
18  the appropriate PD, we discussed.
19     Q.      When did you discuss it?  Did you actually
20  sit down with Mr. Pearsall and something similar to
21  this position description and go through everything
22  with him?
23     A.      I believe so but I don't recall when.
24     Q.      Do you know approximately when in this
25  whole process you would have done that?

00152

1      A.      No.
2      Q.      Do you have a documentation of that
3   meeting?
4      A.      No.  Not that I recall.
5      Q.      The last paragraph under the major duties
6   and responsibilities, what duties are those referring
7   to?
8      A.      Just any other professional activities,
9   any special projects.
10     Q.      Were there any special projects that were
11  specifically in mind for Mr. Pearsall when he came
12  over to COPS?
13     A.      No.  It's just a general statement.
14     Q.      This is a break in subject matter if you
15  guys would be interested in taking like lunch now
16  otherwise we could go for another half-hour or an
17  hour.  Whatever.
18             MS. WU:  Do you want to take a lunch
19  break.  Yes.  We will do that.
20
21             (Whereupon, at 12:30 p.m., the deposition
22  in the above-entitled matter was recessed, to
23  reconvene at 1:30 p.m., this same day.)
24
25

00153

1   AFTERNOON SESSION
2                                  (1:40 p.m.)
3   Whereupon,
4             PAMELA CAMMARATA,
5   the witness on the stand at the time of recess,
6   having been previously duly sworn, was further
7   examined and testified as follows:
8   EXAMINATION BY COUNSEL FOR COMPLAINANT (RESUMED)
9
10            BY MS. MEDINA:  Miss Cammarata, you
11  earlier mentioned that the supervisory social science
12  analyst position was open for competition in 2004.
13  Do you recall testifying to that.
14     A.      Yes.  I'm just confirming the dates.
15  2004.  Okay.  Yes.
16     Q.      Okay.  Were you the selecting official for
                        Page 63

Pearsal.Camarata Deposition

17  that competition?
18       A.     Yes.
19       Q.     Can you tell me a little bit about, I'm
20  sorry, did you select the panel of interviewers for
21  that position?
22       A.     Yes.
23       Q.     And who did you select to be on the panel?
24       A.     Beverly Alford, assistant director of our
25  training and technical assistance division and Jamie

00154

1  French, supervisor in the grants administration
2  division.
3       Q.     And why did you choose Ms. Alford and
4  Ms. French to be on your panel?
5       A.     I chose Ms. Alford because the two
6  divisions worked closely together.  That's PPSE and
7  the training and technical assistance division.  And
8  she is a black female so I wanted some diversity on
9  the panel.  And she is a higher GS level.
10       Q.     What is Miss Alford's?
11       A.     GS 15.
12       Q.     Any other reasons for choosing Miss Alford
13  to sit on the panel?
14       A.     No.
15       Q.     When you said that divisions work closely
16  together, does that mean that Miss Alford works with
17  the supervisory social science?
18       A.     ?  My opinion she is aware of what the
19  supervisory social science analyst does.
20       Q.     And she would be aware of their duties?
21       A.     Yes.
22       Q.     Would she have professional interactions
23  with them?
24       A.     Yes.
25       Q.     Would she work on projects with them?

00155

1       A.     Work on projects?  What do you mean by
2  that?
3       Q.     Any cross divisional projects.
4       A.     I'm trying to think of an example.  Yes.
5  There are some cross division projects.
6       Q.     So she would be in a position to know what
7  the supervisory social science analyst does on a
8  day-to-day basis?
9       A.     Yes.  She should be.
10       Q.     And did you and I'm sorry Ms. French, why
11  did you choose Ms. French to be on the panel?
12       A.     She was a GS-14 and she worked in the
13  grant administration division and it's a division
14  that has some interaction with PPSE.
15       Q.     You say Miss French was a supervisor in
16  the grants administration position.  Did you know her
17  specific position at the time?
18       A.     That is her, I mean it's a supervisor, I
19  guess she is supervisor of a region, I don't know
20  which region.
21       Q.     Any other reasons that you chose
22  Miss French to sit on the panel?
23       A.     No.  I don't recall.
24       Q.     Did you discuss with Ms. Alford and
25  Ms. French the reasons why had you chosen them to sit

00156

1  on the panel?

Page 64

Pearsal.Camarata Deposition

2       A.      I don't recall.
3       Q.      Just to get, let me back track just a
4   moment, how many selection panels have you been the
5   selecting official for?
6       A.      I know of four.  I'm aware of four.
7       Q.      And what are the duties of a selecting
8   official?
9       A.      Make the final selection.
10      Q.      Anything else?
11      A.      Get input from the panel.  Let me even
12  back up.  Participate actually in the interviews, get
13  input from the panel, make the final selection.
14      Q.      What does it mean to get input from the
15  panel?
16      A.      Get, input meaning get their feedback on
17  candidates.
18      Q.      Is there a specific system that you have
19  in place in terms of getting input from panel
20  members?
21      A.      No.
22      Q.      Is it, do you have a typical practice that
23  you've gone through this at least four times?
24      A.      Each time it's different.
25      Q.      Are there any regulations that you're

00157

1   aware of that govern the duties of a selecting
2   official?
3       A.      I'm not aware.
4       Q.      Are you aware of any regulations that
5   govern the selection process at all?
6       A.      Selection process?  No.  Not that I'm
7   aware of.
8       Q.      So other than making the final selection
9   getting input from the panel as you described and
10  participating in the meetings themselves, are there
11  any other duties of the selecting official?
12      A.      Can you say that again?
13      Q.      Other than making the final selection
14  getting input from the panel as you've described and
15  participating in the interviews, were there any other
16  duties as the selecting official?
17      A.      As the selecting official, I don't
18  believe.
19      Q.      Can you describe the selection process
20  generally?
21          MS. WU:  Objection to form.  You can
22  answer.
23          THE WITNESS:  The selection in this
24  process, in this situation.
25          BY MS. MEDINA:

00158

1       Q.      No.  How the selection process works for
2   the times you were involved.
3       A.      I can speak to the selection process here.
4   Each time I can speak to each one individually.  It's
5   not -- there is no typical process.
6       Q.      There is no typical selection process
7   that's followed?
8       A.      No.
9       Q.      Each selection process is totally
10  different?
11      A.      Let me speak to this one.  In this process
12  it selected the panel members, used the position
                    Page 65

Pearsal.Camarata Deposition
13  description, developed the vacancy announcement,
14  developed the KSAs, developed the skill set for which
15  I was looking, and developed the questions.  The
16  questions asked during the interview.
17       Q.    The process you've just described, is that
18  a different process than you've used for your other
19  selections?
20       A.    No.
21       Q.    So each time you've been involved as a
22  selecting official --
23       A.    I have followed that.  Yes.
24       Q.    Who selected which applicants would be
25  interviewed for the supervisory social science

00159

1  analyst position?
2       A.    I did.
3       Q.    And what did you base that on?
4       A.    I based that on selecting for interview
5  those who were COPS staff and in this case the other
6  two candidates didn't, didn't meet my skill set so I
7  did not choose to interview them.
8       Q.    How many total applicants did you have for
9  the position?
10       A.    Five.
11       Q.    And you selected three for interviewing?
12       A.    Yes.
13       Q.    I'm sorry.  Going back to the selection
14  process that you go through when you are developing
15  the vacancy announcement and the KSAs, is there any,
16  does anyone review that development?
17       A.    When I develop, there is an AVUE system,
18  an electronic system, AVUE that spits out some
19  generic KSAs for that vacancy announcement.
20       Q.    Do you know what the AVUE system uses as
21  criteria to spit out KSAs?
22       A.    No.  I don't.
23       Q.    And what happens after it spits out the
24  KSAs?
25       A.    I don't remember specifically in this

00160

1  situation, but then I would select of the KSAs the
2  ones that I want to use.
3       Q.    Do you have an opportunity to revise the
4  KSAs?
5       A.    Yo.
6       Q.    Have you ever revised KSAs as a selecting
7  official?
8       A.    I'm not sure.  I did not revise them in
9  this one.
10       Q.    Does anyone in HR review the KSAs that
11  have been selected?
12       A.    They review the vacancy announcement which
13  has the KSAs in it.
14       Q.    At what point in the process does HR
15  review the vacancy announcement?
16       A.    Before it becomes final.
17       Q.    Can you describe the process for
18  developing a vacancy announcement?
19       MS. WU:  Object to the form.  You can
20  answer the question.
21       THE WITNESS:  I take the position
22  description, I draft the vacancy announcement based
23  on the position description.
Page 66

Pearsal.Camarata Deposition

```
24           BY MS. MEDINA:
25      Q.      And at that point do you send it to HR?

 1      A.      I believe so.
 2      Q.      Do you remember receiving any responses
 3 from HR in terms of the vacancy announcement that you
 4 had sent them?
 5      A.      I don't recall.
 6      Q.      Have you ever had a challenge by HR to any
 7 of your vacancy announcements?
 8      A.      Not that I recall.
 9      Q.      Do you ever recall any concerns that HR
10 had with any of your vacancy announcements?
11      A.      I don't recall.
12      Q.      Let's go back to, you had mentioned there
13 were five original applicants and you selected three
14 for interviewing.  Why did you select those three?
15      A.      They were COPS staff.  I just selected all
16 of the internal COPS staff.
17      Q.      And the other two applicants were not COPS
18 staff?
19      A.      Correct.
20      Q.      And that was the only criteria you used to
21 --
22      A.      I used criteria to nonselect the other
23 two.  One, they were not -- I mean the main thing was
24 one of them was, as I recall, more focused on
25 probation and parole.  The other one was focused --
```

```
 1 didn't have enough for me of a combination of the
 2 skillset for which I was looking.
 3      Q.      What was it about the other applicant that
 4 they didn't have that was in the skillset?
 5      A.      As I recall, they had very little bit of
 6 community policing and very little bit of supervision
 7 so it was a combination of just a very little bit of
 8 each of those.
 9      Q.      When we had talked about the vacancies
10 earlier today, you had mentioned that you had
11 competed the supervisory social science analyst
12 position both in 2003 and then again in 2004.  Do you
13 know whether the KSAs changed between 2003 and 2004
14 for those positions?
15      A.      I believe they did not change.
16      Q.      Do you know whether the position
17 description, I'm sorry, the vacancy, there was any
18 difference in the vacancy announcements?
19      A.      I believe there was no difference.
20      Q.      So when you were going through the process
21 in 2004, were there any steps that you didn't have to
22 do because the vacancy announcement was identical to
23 the last competition and the KSAs were identical to
24 the last competition?
25      A.      I would review it just to make sure, but
```

```
 1 you are correct.  If it was the same one from '03, it
 2 would have just been posted.
 3      Q.      So the, so you would want to correct your
 4 testimony as to what the process was for 2004?  Can
 5 you, can you explain to me what your actual process
 6 was for 2004?
 7      A.      I still would have taken the position
 8 description, reviewed the vacancy announcement,
```

Page 67

Pearsal.Camarata Deposition
```
 9  reviewed the KSAs, and then asked HR to post it.
10      Q.      Do you recall receiving any feedback from
11  HR as to the 2004 vacancy announcement or KSAs?
12      A.      No.
13      Q.      When you were reviewing the five applicant
14  files, did you take any notes?
15      A.      No.
16      Q.      Between the time that you had, well, maybe
17  we can go into the -- let me just start over.  After
18  reviewing the five applicant files and nonselecting
19  the two non-COPS staff members, what was the next
20  step in your process?
21      A.      I don't -- I can't recall for sure but I
22  would have selected the panel members.  I believe I
23  selected the panel members, sent them copies of
24  their, of the candidate's applications, and then
25  began scheduling interviews.
```
00164
```
 1      Q.      So you selected the panel after you had
 2  chosen who the interviewees would be?
 3      A.      I'm not sure.
 4      Q.      Do you recall whether you knew who the
 5  interviewees would be when you were emailing people
 6  to be on the panel, or I'm sorry, selecting your
 7  panel?
 8      A.      I don't recall.
 9      Q.      Did you review the interviewees applicant
10  files again prior to their interviews?
11      A.      I don't recall.
12      Q.      You had originally reviewed them before to
13  determine whether someone was qualified for an
14  interview.  Do you remember whether you reviewed it
15  again prior to the interview?
16      A.      No.  I don't recall.
17      Q.      Would you recall whether you had made any
18  notes about any second review you had done of the
19  applicant files?
20      A.      I would have reviewed them again after the
21  interview.  Before making my selection.
22      Q.      So once you had chosen the selection panel
23  and prior to the interviews themselves, did the
24  selection panel members meet?
25      A.      Yes.
```
00165
```
 1      Q.      How many times did you meet?
 2      A.      I recall once.
 3      Q.      Do you recall when approximately you met?
 4      A.      No.
 5      Q.      Do you recall approximately when after the
 6  vacancy announcement went out?
 7      A.      Well it would have been before we
 8  scheduled the interviews.
 9      Q.      Do you recall approximately how long it
10  was between the time that you met with the panel
11  members and you started interviewing people?
12      A.      I do not recall.
13      Q.      Who, who was at these meetings?
14      A.      The two other panel members and myself.
15  And I can only recall one meeting.
16      Q.      And this meeting, can you estimate, I mean
17  was it days before the interview started, months
18  before the interview started?
19      A.      I can't recall.  It would have been right
```
Page 68

Pearsal.Camarata Deposition
20  before the interviews.
21      Q.      What do you mean by right before?
22      A.      I don't know.  Before.  I mean before the
23  interviews we met.
24      Q.      Is it a month?  Do you know if a month had
25  passed?  Was it the same day that the interviews

00166

1  started?
2      A.      I don't know.  I don't recall.
3      Q.      Do you know if it was the same day the
4  interview started?
5      A.      I don't recall.
6      Q.      So who was at the one meeting?
7      A.      Beverly Alford, Jamie French, and myself.
8      Q.      Anyone else?
9      A.      No.
10      Q.      And what did you discuss at the meeting?
11      A.      What I was looking for in the position.
12  We went over the questions that I had developed and
13  who would ask what question.
14      Q.      When had you developed the questions?
15      A.      After I had the KSAs.
16      Q.      Did you develop them prior to receiving
17  the applicant files?
18      A.      Yes.  I believe so.
19      Q.      Did you discuss anything else at the
20  meeting with Miss Alford and Miss French?
21      A.      Not that I recall.
22      Q.      And what exactly did you tell Miss Alford
23  and Miss French you were looking for in the position?
24      A.      I referred to the last page or the summary
25  page of the questions and I have it summarized there

00167

1  as overall, a person who is an independent thinker,
2  doer, organized, well respected in the field, person
3  who can get things done, independently motivated, is
4  -- I mean can stand up to GAO and OIG, has research
5  and evaluation experience.
6      Q.      Did you have, did you have the same
7  questions in your for 2003?
8      A.      I don't recall.
9      Q.      Do you recall whether there were questions
10  for the 2003 panel?
11      A.      Yes.  There were questions.
12      MS. WU:    Jessica, I'm going to let her
13  testify to a certain extent to 2003 selection
14  decision, however, we have made objections to the
15  amount of discovery that you do get with regard to
16  that selection and so her testimony is going to be
17  permitted to a certain extent but if you get really
18  extensive into them I'm going to instruct her not to
19  answer.
20      MS. MEDINA:    Depending on whether I agree
21  or not with whether it's too extensive, we can cross
22  that bridge when we come to it.
23      MS. WU:    Right.
24      BY MS. MEDINA:
25      Q.      The summary at the page at the end of your

00168

1  questions, did you have a similar summary page at the
2  end of your questions in 2003?
3      A.      I don't recall.
4      Q.      Do you recall what you were looking for in
Page 69

Pearsal.Camarata Deposition

5  supervisory social science analyst in 2003?
6      A.    A person who was motivated.  Independent
7  doer.  Independent thinker.  Has research background.
8  Knows COPS grants or are experienced with COPS
9  grants.  Familiar with COPS programs.
10     Q.    Anything else?
11     A.    I'm sorry.  Anything else on what?
12     Q.    On the 2003 summary of what you were
13  looking for?
14     A.    Right now that's the best I can recall.
15     Q.    And was there, was there anything
16  different in 2004 from what you listed in 2003?
17     A.    The only thing that, I mean -- yes.  There
18  is a difference.  The difference is where the
19  division was going at the time.  In -- I, during this
20  time, had a concern that the two divisions training
21  and TA and PPSE were becoming too much alike.  And
22  that the distinction between the two divisions was
23  becoming not so clear.
24           As we were evolving, as the COPS is always
25  evolving, I wanted to make a distinction between what

00169

1  PPSE was doing and what training and TA was doing.
2  So I was putting more of a focus in '04 on the
3  research and the evaluation and the statistical
4  experience and knowledge that that division holds as
5  separate from the training and technical assistance
6  division.
7      Q.    What made you concerned with the fact that
8  PPSE and TNTA were becoming more alike?
9      A.    Prior to myself becoming deputy director,
10  the deputy director before me, there were projects
11  that were assigned to training and TA that should
12  have been, that weren't training related, that should
13  have been PPSE.  There were several of those.
14     Q.    I'm sorry.  Was this a concern of the
15  deputy director or did the deputy director assign
16  projects?
17     A.    Its was not a concern of that deputy
18  director at the time, my predecessor.  She assigned
19  projects to training and technical assistance that
20  were not training and technical assistance.  The
21  types of projects were becoming as there was no real
22  division between the two divisions.  The concern was
23  on my end.
24     Q.    So you were the one with the concern?
25     A.    Right.  As I became deputy director, I

00170

1  wanted to make the distinction between the two
2  divisions.
3      Q.    Did anyone else at COPS raise this concern
4  with you?
5      A.    I don't recall.
6      Q.    Did you raise the concern with anyone
7  else?
8      A.    I don't recall.  It's, you know as the
9  deputy director, the two divisions are under me.
10  It's within my authority to make those kinds of
11  decisions.
12     Q.    Did you discuss it with your supervisor at
13  the time that this was a concern of yours?
14     A.    I don't recall.
15     Q.    Would you discuss the vision or I mean
                        Page 70

Pearsal.Camarata Deposition

16  would you discuss what was going on in your two
17  divisions with your supervisor?
18      A.    With my -- no.  No.  I had the authority
19  of both of those divisions and I'm not going out of
20  scope.  It's just making sure that they were, there
21  was more of a distinction between the two divisions.
22  At the same time, there was concern about the COPS
23  office and the studies on COPS impact on crime.  And
24  we were being criticized for our evaluation studies
25  and some of the research we were doing, and I wanted

00171

1   to bring that credibility back to the division.
2       Q.    Did you discuss this concern with anyone
3   at COPS?
4       A.    I don't recall.
5       Q.    Do you recall whether anyone else
6   expressed this concern at this time period?
7       A.    I don't recall.
8       Q.    So going back to the discussion you had
9   with Miss Alford and Miss French, you said the
10  summary page of questions was what you wanted to
11  concentrate on?
12      A.    No.  I didn't say that.  We went over all
13  of the questions.  We determined who was asking a
14  question.  I summarized for them the kind of person I
15  was working for.  This was prior to the interviews.
16      Q.    Did you summarize for them at all what
17  important skills you thought were necessary?
18      A.    Those are embedded in the questions and at
19  the summary.
20      Q.    And what skills are, do you consider
21  embedded in the summary in the questions?
22      A.    Advanced knowledge or mastery knowledge of
23  statistical analytical evaluative work.  Knowledge of
24  research or advanced knowledge of research and
25  methods, methodology.  And in addition to everything

00172

1   I've already said before.
2       Q.    Can you explain why there was no change in
3   the vacancy announcement and the KSAs between 2003
4   and 2004 if you had a change in your focus?
5       A.    It doesn't -- the KSAs are five KSAs and
6   they are knowledge skills and abilities that were
7   required for the position regardless.
8       Q.    Did you express your change in focus
9   during the time period when you published the vacancy
10  announcement?
11      A.    I don't know what you mean.
12      Q.    I mean from a candidate's perspective, how
13  would they have known what your focus was?
14      MS. WU:  Object to the form of the
15  question.  You can answer.
16      THE WITNESS:  Can you repeat that.
17      BY MS. MEDINA:
18      Q.    How would a candidate applying for the
19  supervisory social science analyst position in 2004
20  have known what your focus was for this position?
21      MS. WU:  Objection to the form.
22      THE WITNESS:  It, as you said, it didn't
23  affect the vacancy announcement or the KSAs.
24      BY MS. MEDINA:
25      Q.    Did anyone in HR know what your focus was

00173

Page 71

Pearsal.Camarata Deposition
```
 1  for this position?
 2      A.      When I say the focus, it's embedded in the
 3  questions that I was asking and it's no different
 4  than the vacancy announcement.  When I say that I was
 5  looking for someone with advanced analytical skills,
 6  evaluative research, that's in the vacancy
 7  announcement.  I'm not saying anything different than
 8  what's in the vacancy announcement.
 9      Q.      How do you reconcile that with the fact
10  that the same vacancy announcement was used in 2003
11  and 2004?
12      A.      There can be qualifications that I'm
13  putting a focus on more than others but the KSAs and
14  the vacancy announcement and the position description
15  is no different.
16      Q.      Does anyone review your discretion of your
17  focus on the KSAs and in the vacancy announcement?
18      A.      No.  I don't know what you mean.
19      Q.      I'd like to enter an exhibit.
20              (Cammarata Exhibit No. 8 was
21              marked for identification.)
22  BY MS. MEDINA:
23      Q.      Can you take a look at Exhibit 8 and let
24  me know if you recognize the document?
25      A.      Okay.
```
00174
```
 1      Q.      Do you recognize the document?
 2      A.      It appears to be a vacancy announcement
 3  for the supervisory social science analyst.
 4      Q.      And is the entire document the entire
 5  vacancy announcement?
 6      A.      This is actually the position description.
 7  This is not a vacancy announcement.
 8      Q.      Would the position announcement be
 9  circulated?
10      A.      To who.
11      Q.      To any candidates or anyone who is
12  interested in viewing it?
13      A.      I don't know.  I know they get the vacancy
14  announcement.  It may apply to that.
15      Q.      But this position description is what you
16  used to draft the vacancy announcement.  Is that
17  fair?
18      A.      Yes.
19      Q.      Did your, did the panel members see the
20  position description as well.  Did you send that to
21  them in addition to the vacancy announcement?
22      A.      I don't recall.
23      Q.      You don't recall what you sent the panel
24  members?
25      A.      I recall sending them the vacancy
```
00175
```
 1  announcement, the KSAs and the applications.
 2      Q.      Would they have had access to the position
 3  description?
 4      A.      First I just want to go back.  The vacancy
 5  announcement which I'd like a little bit more time to
 6  take a look at is attached here with a position
 7  description and then a lot of emails.  I'd like to
 8  review all of this.  It's more than just a position
 9  description.
10      Q.      Okay.
11      A.      Okay.
```
Page 72

Pearsal.Camarata Deposition

12    Q.    Ms. Cammarata, you have competed for
13 positions before, correct?
14    A.    Yes.
15    Q.    Do you recall whether position
16 descriptions were included along with vacancy
17 announcements?
18    A.    I don't recall and I haven't applied for
19 anything with the AVUE system.  I don't know how AVUE
20 works.
21    Q.    Do you know whether you had access to
22 position descriptions when you were applying for
23 positions?
24    A.    I don't recall.
25    Q.    Do you ever recall reviewing the position

00176

1 description prior to applying for it?
2    A.    No.
3    Q.    But we have established that when you were
4 drafting the vacancy announcement, you based that on
5 the position description?
6    A.    Correct.  Yes.
7    Q.    So turning to the position description
8 itself, which I think you have indicated as separate
9 from the vacancy announcement.  The position
10 description starts on the fourth page of the exhibit.
11 And it completes, correct me if I'm wrong, and is
12 titled supervisory social science analyst GS 0101-14?
13    A.    Correct.
14    Q.    Can you explain the, the meaning of the
15 percentages next to the bolded headers?
16    A.    I don't -- I'm not involved in those
17 percentages.  I believe that's done by AVUE.  Based
18 on the position.
19    Q.    This document is done by AVUE?  So this
20 document would be available through the AVUE system?
21    A.    I believe so.  I don't know.  I do not
22 know.
23    Q.    Were you involved at all in developing
24 this position description?
25    A.    Yes.

00177

1    Q.    Did you approve the position description?
2    A.    Yes.
3    Q.    So do you recall whether the percentages
4 were there when you approved it?
5    A.    I believe so.
6    Q.    So when you were reviewing this position
7 description, what did these percentages mean to you?
8    A.    That the job is, can be managerial.
9 Effort on research or focus on research and on
10 presentations and conference activities.
11    Q.    It probably will be clearer if we read
12 into the record what we are talking about.  Can you
13 read the three bolded headers along with the
14 percentages that follow.
15    A.    Sure.  Exercises supervisory and/or
16 managerial authorities 45 percent.  Plans and
17 coordinates group efforts on research projects, 40
18 percent.  And attends plans conference activities, 50
19 percent.
20    Q.    And so you approved this position
21 description as drafted?
22    A.    Yes.

Page 73

Pearsal.Camarata Deposition

23    Q.      And is that the position description that
24  was in effect for the supervisory social science
25  analyst position?

00178

1     A.      Yes.
2     Q.      And can you explain to me just, did these
3   percentages, what did they mean to you when you
4   approved it? You obviously read the document.  Did
5   you think there was something wrong when you reviewed
6   the document?
7     A.      No.
8     Q.      Did you think the percentages were
9   mischaracterizing the position at all?
10    A.      No.
11    Q.      So would you agree that according to these
12  percentages, supervisory and managerial authorities
13  are the plurality of this position?
14    A.      What do you mean the plurality.
15    Q.      Meaning it's the, it has the largest
16  percentage of the -- we really don't have majority
17  here because we don't have 50 percent?
18    A.      No.  I wouldn't say that.  I would say
19  it's a part of the position description as is
20  research projects and conference and presentations.
21    Q.      Are you saying that 40 percent is not --
22    A.      Well 40 and 15.  I'm looking at the other
23  two, the remaining.  The research project is 40 and
24  the conference activity is 15.
25    Q.      I guess I'm confused as to the, how you're

00179

1   getting your numbers.  Is 45 bigger than 40?
2     A.      Yes.
3     Q.      So is it fair to say that as this position
4   description is drafted and as you approved it, the
5   supervisory part of the position accounts for a
6   larger percentage of the duties than the planning and
7   coordinating group efforts on research projects?
8     A.      Yes.  But there is a third component.
9     Q.      Yes.  But that doesn't change the fact
10  that supervisory is a larger percentage than planning
11  and coordinating group efforts on research?
12           MS. WU:   Objection to the extent you're
13  becoming argumentative with the witness.
14           BY MS. MEDINA:
15    Q.      You can answer?
16    A.      45 is larger than 40.
17    Q.      Okay.  And did you approve it that way?
18    A.      Yes.  Yes, I did.
19    Q.      Going back to your meeting, your one
20  meeting with Ms. Alford and Ms. French prior to the
21  interviews, had they received the applicant packages
22  by that time?
23    A.      I don't recall specifically.  I don't know
24  if I gave them right there at the meeting or if I
25  gave it to them prior to.

00180

1     Q.      Do you recall discussing any of the
2   candidates or their applications with Ms. Alford and
3   Ms. French prior to the interviews?
4     A.      I do not recall that.
5     Q.      Have you done, have you done any initial
6   rating or summary of the candidate's application
7   package prior to interviewing?

Page 74

Pearsall.Camarata Deposition

 8    A.    No.
 9    Q.    Were you aware of whether Ms. Alford or
10  Ms. French had done any summaries or analysis of the
11  applicant's packages prior to the interviews?
12    A.    I'm not aware.
13    Q.    Did you have any discussions with the
14  applicants prior to the interviews?
15    A.    I don't recall.
16    Q.    Was there any purpose to the first meeting
17  other than your discussion with Ms. Alford and
18  Ms. French about the questions that would be asked?
19         MS. WU:   Objection to the extent it
20  mischaracterizes testimony.
21         THE WITNESS:  I've stated the purpose of
22  that meeting.
23         BY MS. MEDINA:
24    Q.    Okay.  Other than, other than coming up
25  with the questions or I'm sorry, you gave Ms. Alford

00181

 1  and Ms. French the questions that you had drafted at
 2  that first meeting, is that correct?
 3    A.    Yes.
 4    Q.    Was there any other purpose for the
 5  meeting?
 6         MS. WU:  Objection.  Asked and answered.
 7         THE WITNESS:  Yes.  I've already answered
 8  that.
 9         BY MS. MEDINA:
10    Q.    Could you remind me what your answer was?
11         MS. WU:  Same objection.
12         THE WITNESS:  The purpose -- what I did at
13  that meeting was go over the questions and go over
14  the skillsets that I was looking for and we discussed
15  who would be asking each question.
16         BY MS. MEDINA:
17    Q.    Did you have any input from anyone else
18  when you were coming up with the questions?
19    A.    No.  Not that I recall.
20    Q.    Did you receive any feedback from
21  Ms. Alford or Ms. French regarding the questions?
22    A.    No.  Not that I recall.
23    Q.    Was there any change in the questions from
24  the time that you gave them to Ms. Alford and
25  Ms. French at that meeting and the time that you

00182

 1  actually had the interviews.
 2    A.    Not that I recall.
 3    Q.    I'd like to talk specifically about
 4  Mr. Pearsall's interview for the position.  Can you
 5  go through a bit about what was said during the
 6  interview?
 7    A.    Well, we asked the same questions as we
 8  did the other candidates.  I start off the interview
 9  by saying can you tell me a little bit about yourself
10  and your qualifications for this position.  I
11  remember Al answering the questions.  I recall him
12  handing out a one-page handout at the interview.
13         I recall him not seeming energetic or
14  passionate or motivated with the interview.  He
15  talked about his supervisory style.  He answered the
16  questions.
17    Q.    Prior to his interview, did you go back
18  and review his applicant file again?

Page 75

Pearsal.Camarata Deposition
```
19        A.      I don't recall.
20        Q.      Do you recall having -- you had already
21   reviewed his applicant file once to select him for
22   the interview?
23        A.      Correct.
24        Q.      Do you recall having any impresses about
25   Mr. Pearsall prior to the interview?
```
00183
```
 1        A.      Based on the application, no.
 2        Q.      Did you have any impressions based on
 3   anything else prior to the interview?
 4        A.      I have impressions based on my one-on-one
 5   working with him and my observations of his
 6   performance.
 7        Q.      And what were those impressions?
 8        A.      I was beginning to have problems with Al's
 9   performance.
10        Q.      You mentioned that he did not seem
11   energetic and motivated during the interview.  What
12   does that mean?
13        MS. WU:  Objection.  You can answer the
14   question.
15        MS. MEDINA:  What is the basis for your
16   objection.
17        MS. WU:  You mischaracterized.  She didn't
18   say motivated.  She said energetic and passionate.
19        BY MS. MEDINA:
20        Q.      What does it mean to be energetic and
21   passionate during an interview?
22        A.      It's exuding this sense of real desire to
23   want the job.  To take it a step beyond what you want
24   in the job.  An energy level.  When I say passionate,
25   it's something that just comes across as that he
```
00184
```
 1   really wanted the job.
 2        Q.      Did -- okay.  You mentioned that you had
 3   impresses of Mr. Pearsall prior to the interview from
 4   your own one-on-one experiences with him.  Did you
 5   share those impressions with any of the panel
 6   members?
 7        A.      I don't recall.  Definitely not prior to.
 8   It would have only come into play at the very end
 9   when I was making my selection.
10        Q.      So you may have shared them with the other
11   panel members after the interviews?
12        A.      After all of the interviews when we
13   discussed it.  All the interviews.
14        Q.      Did Mr. Pearsall ever say that he wanted
15   the job during the interview?
16        A.      I don't recall.
17        Q.      Does the fact that he applied for the job
18   indicate to you that he is interested in the job?
19        A.      Yes.
20        Q.      So would that translate into he has a
21   desire for the job?
22        A.      No.
23        Q.      Have you ever applied for a job for which
24   you didn't have a desire for the job?
25        A.      I haven't.
```
00185
```
 1        Q.      Is it normally your experience that people
 2   who apply for jobs are not interested in the job?
 3        MS. WU:  Objection.
```
Page 76

Pearsal.Camarata Deposition
```
 4           THE WITNESS:  I can't speak for them.
 5           BY MS. MEDINA:
 6     Q.    Who was selected for the position?
 7     A.    Matthew Scheider.
 8     Q.    And who made that decision?
 9     A.    I did.
10     Q.    Did the selection panel meet to discuss
11 the selection?
12     A.    The interview panel met.  The interview
13 panel, myself and the two others met at the end of
14 all interviews to discuss the selection.
15     Q.    How many times did you meet to discuss the
16 selection?
17     A.    I recall once.
18     Q.    How soon after the interviews did you
19 meet?
20     A.    Soon after, but I can't recall exact time
21 or date.
22     Q.    Do you remember if it was the same day?
23     A.    I don't recall.
24     Q.    Do you remember if it was within the same
25 week?
```
00186
```
 1     A.    I don't recall.
 2     Q.    Could it have been a month later?
 3     A.    I don't believe it was a month later.
 4     Q.    Are you basing that on, what are you
 5 basing that on?
 6     A.    I just didn't think it was a month later.
 7     Q.    So --
 8     A.    I don't recall when it was, how soon after
 9 the interviews that we met.
10     Q.    Less than a month?
11     A.    I don't recall.
12     Q.    But not a month?
13     A.    I don't believe so.
14     Q.    And what were your impressions of all of
15 the candidates prior to the interview process because
16 you had already reviewed all their application
17 packets?
18     A.    Can you be more specific.
19     Q.    I'm just looking for a general impression,
20 general impressions of the can't dates.  Did you have
21 a reaction to receiving their application packet?
22     A.    No.  I worked with all three candidates, I
23 work with in the program policy support and
24 evaluation division.  My impressions would be based
25 on my work with them in the division.
```
00187
```
 1     Q.    Did you have an idea of whether somebody
 2 would be a good fit for this position based on your
 3 work with them?
 4     A.    Not prior to.  Not prior to the interviews
 5 and final selection.
 6     Q.    How -- okay.  Did you share your
 7 impressions about any of the candidates with panel
 8 members prior to the interviews?
 9     A.    Not prior to the interviews.
10     Q.    How much did the application packets
11 affect your impressions of the candidates?
12     A.    Say that again.
13     Q.    You mentioned that you had worked with
14 each of the candidates at COPS.  I'm asking you how
```
Page 77

Pearsal.Camarata Deposition

15 much the application packets affected your
16 impressions of the candidate?
17    A.    I -- at the end of all of the interviews,
18 I went back and looked at the applications.  The
19 applications would have affected my impressions based
20 on how they answered the KSAs and what documentation
21 they attached to their application.  And if their
22 application was complete.
23    Q.    What is a complete application?
24    A.    In my, for me, a complete application is
25 responding to the KSAs.  And in this case attaching

00188

1 the performance appraisal.
2    Q.    Are there regulations guiding what a
3 complete application is?
4    A.    I don't know.
5    Q.    Did all the applicants you interviewed
6 have complete applications?
7    A.    No.
8    Q.    Did you do any follow up with any of the
9 applicants so that they could complete any incomplete
10 applications?
11    A.    No.  I still moved forward with the
12 interview process.
13    Q.    Did you have any contact with any of the
14 candidates prior to the application process?
15    MS. WU:   Object to the form.
16    THE WITNESS:   What do you mean by contact?
17 I mean they are all in the division that I
18 supervised.
19    BY MS. MEDINA:
20    Q.    Did you talk to any of them about the
21 application process?
22    A.    No.
23    Q.    Did you discuss your views of what a
24 complete application are with any of the candidates?
25    A.    No.  It's in the vacancy announcement.

00189

1    Q.    I'm sorry.  The definition of a complete
2 application is in the vacancy announcement?
3    A.    No.  I'm saying what's in the vacancy,
4 what's required in the vacancy announcement, each
5 person who applies sees what's required in the
6 vacancy announcement.
7    Q.    And does what's required from the vacancy
8 announcement comport with your idea of what a
9 complete application is?
10    A.    A complete application for me is
11 responding to the vacancy announcement.
12    Q.    Do you know if the vacancy announcement
13 requires that performance evaluations be attached to
14 the application?
15    A.    It does.
16    Q.    And do you know what the process is for
17 any candidates who don't have performance
18 evaluations?
19    A.    No.  I believe the process is move
20 forward, have the interviews, make my decision.
21    Q.    Have you ever confirmed what the process
22 is in terms of incomplete applications with anyone?
23    A.    No.
24    Q.    After the interviews, you said you met
25 with the panel members once to discuss the

Page 78

Pearsal.Camarata Deposition

00190
1    applicants.
2    A.    Yes.
3    Q.    Can you tell me about that meeting?
4    A.    Yes.  I -- it again was just with Beverly
5  Alford, Jamie French and myself.  I, since I was the
6  selecting official, I kind of backed off.  I wanted
7  to hear from my panel members what their thoughts
8  were.
9         So a discussion -- I recall it being
10  pretty short in time frame.  A very short discussion,
11  but I --
12    Q.    Do you recall approximately how long it
13  was?  An hour?
14    A.    I would say less than, I would say less
15  than an hour.  My recollection is it was about 30
16  minutes.
17    Q.    I'm sorry.  I interrupted you.
18    A.    I let Ms. French and Ms. Alford give their
19  opinions.
20    Q.    And what were their opinions?
21    A.    My recollection is that Miss French
22  believed that candidates were all qualified.  But
23  that Matthew was the more qualified given that
24  supervisory experience wasn't as important or as
25  weighted given the higher GS level in PPSE.

00191
1         I recall Mrs. Alford saying Al is, could
2  do the job, but he wasn't as articulate or as
3  passionate as Matthew.  I recall someone saying
4  Matthew was much more prepared for the interview.
5  Matthew brought a lot of documentation to the
6  interview for his work.
7    Q.    I'm sorry.  Did someone say that?
8    A.    Yes.  And someone said that he was more
9  prepared given that he had a vision for the division.
10    Q.    Do you recall who said that Matthew
11  brought documentation?
12    A.    No.
13    Q.    Was it you?
14    A.    I don't recall.  I first let them have
15  this discussion and what their thoughts were.  And
16  then we all agreed and talked.
17    Q.    So all the comments that you just
18  mentioned should be attributed to either Ms. Alford
19  or Ms. French?
20    A.    My recollection, yes.
21    Q.    And did you make any comments during the
22  meeting?
23    A.    I recall nodding my head.  I recall
24  agreeing with them.  You know, I took some notes.
25    Q.    You took some notes of the meeting between

00192
1  the interview panel members?
2    A.    Yes.
3    Q.    And do you remember, do you recall what,
4  whether those notes had a title of any sort?
5    A.    No.
6    Q.    Was it on a legal pad?
7    A.    No.  Just a separate piece of paper.  And
8  they showed, I just, I guess reiterated some of
9  Jamie's comments, some of Beverly's comments and we,
10  I had evaluation and research and we somewhat rank

Pearsal.Camarata Deposition

11  ordered the three candidates.
12      Q.     And what was the evaluation supposed to
13  signify?  I'm sorry.  What does that mean?
14      A.     Research -- actually I'm sorry it was
15  research.  It was research and supervisory.
16      Q.     And that was on your separate set of
17  notes?
18      A.     Yes.
19      Q.     Did the panelists share their meeting
20  notes at all?  Did you see Ms. Alford's notes or
21  Ms. French's notes?
22          MS. WU:  Objection.  Lack of foundation
23  but you can answer the question.  Wit wits I don't
24  recall seeing their notes.  I trawl being a verbal
25  conversation.

00193

1           BY MS. MEDINA:
2       Q.     Other than the notes that you took?
3       A.     Correct.
4       Q.     Did anyone else at the meeting take any
5   notes of the interview calendars?
6       A.     I don't recall.
7       Q.     Other than agreeing with the comments, do
8   you recall whether you said anything else at this
9   meeting?
10      A.     I don't recall.
11      Q.     You mentioned earlier that you had shared
12  your impressions of the candidates with the panel
13  members, not before the interview but afterwards.
14  Did you share those impressions at this meeting?
15      A.     I don't know what context.  Since I was
16  the electing official I take into consideration, what
17  I don't recall is if I went over every single detail
18  with them.  As the selecting official, I do not, just
19  focus on the interview.  I have the liberty of taking
20  into consideration the application, the materials
21  attached, the interview, my firsthand knowledge of
22  performance, as well as past performance.
23          So I know in my mind what I would be
24  reviewing to make my decision.  But I can't recall if
25  I said that to them.

00194

1       Q.     Do you recall whether you shared your
2   impressions of the candidates with the panel members
3   at any time?
4       A.     I know -- I do recall walking out of that
5   room believing there was consensus, that Matthew
6   Scheider was the best qualified candidate for that
7   job.
8       Q.     That's not really answering the question.
9   The question is did you share your impressions of the
10  candidates with the other interview panel members?
11  Do you understand the question?
12      A.     Yes.  I'm sorry.  I'm thinking.  I don't
13  recall.
14      Q.     You don't recall whether you mentioned --
15      A.     Because here's the thing.  I'm the
16  selecting official.  So I get to take those things
17  into consideration so I don't know if I actually
18  shared that with them or if in my mind I knew I was
19  going to be taking my own stuff in my own mind anyway
20  to make the decision.
21      Q.     How -- okay.  How, how much do you weigh

Page 80

Pearsal.Camarata Deposition

22  the views of the panel members in these selections?
23      A.    I value their input.
24      Q.    And what -- do you remember, you don't
25  remember whether you shared your impressions with

00195

1   Ms. Alford or Ms. French at the meeting.  Do you
2   remember their having any reactions to anything you
3   said at the meeting?
4       A.    No.  I recall the meeting being short.  I
5   recall comments that Jamie made that I noted.  I
6   recall comments that Beverly made that I noted.
7             And I recall walking out of there believes
8   there was consensus.
9       Q.    Did all three of you agree on a candidate
10  when you walked out?
11      A.    It was my belief.  Yes.
12      Q.    Was that belief shared by the other two
13  interview panelists?
14      A.    I can only speak for myself.  I believed
15  there was consensus that Matthew Scheider was the
16  best qualified candidate for the job.
17      Q.    Did you say --
18      A.    When I walked out of there.
19      Q.    Did you say that at the meeting?
20      A.    No.  That was my impression when I walked
21  out of that meeting.
22      Q.    Did anyone say in the meeting Matthew
23  Scheider is the best qualified candidate for this
24  position?
25      A.    I believe so.  I believe we had consensus

00196

1   on that.
2       Q.    Who is they?
3       A.    I don't recall.  I assume everyone did.
4   There was a discussion that took place.  I've alluded
5   to what Jamie French said, what Beverly said, the
6   cons census coming out of there that Matthew was the
7   best qualified.  Now, like I said with me, I was
8   taking into consideration everything.
9       Q.    So was it clear to you that Ms. Alford had
10  expressed a preference for Matthew for this position?
11      A.    Yes.
12      Q.    And how was that made clear to you?
13      A.    Based on what I stated.  Based on what she
14  said, what Amy said, when I ranked them.  We came to
15  a consensus my opinion, when I walked out of there
16  there was consensus that Matthew Scheider was the
17  best qualified but again I'm the selecting person.
18  I'm taking more into consideration in my mind for the
19  selection.
20      Q.    Did you take those things into
21  consideration in your mind during this meeting with
22  the other panel members?
23      A.    That's what I don't recall.
24      Q.    Did the panel discuss the importance of
25  supervisory experience or supervision versus

00197

1   research?
2       A.    Yes.
3       Q.    And when did you discuss that?
4       A.    In this discussion, this meeting.  As I
5   mentioned, Jamie French was the one who said research
6   wouldn't be not as important given the high level of
Page 81

Pearsal.Camarata Deposition
```
 7  individuals in PPSE and they are very independent and
 8  need very little supervision.
 9       Q.     Did Ms. Alford have an opinion on whether
10  supervision was, what the relationship between
11  supervision and research for this position?
12       A.     I believe she agreed.
13       Q.     She agreed with what?
14       A.     With Jamie's comment, that the supervision
15  was not as important.
16       Q.     Did you state an opinion at that meeting?
17       A.     I, I don't recall.  I agree with it.
18       Q.     If this is the case then why was the
19  position description drafted with 45 percent being
20  attributed to supervision and 40 percent being
21  attributed to planning and coordinating research?
22       MS. WU:  Objection to the form.  Question.
23  You can answer.
24       THE WITNESS:  If you look at the position
25  description, the position description is not, all 45
```
00198
```
 1  percent is not supervision the way I, we are looking
 2  at it as an HR function.  In this position
 3  description when it says exercises supervisory in our
 4  managerial authority it's also talking about
 5  performing analytical evaluative professional work.
 6  It's having the technical supervision.
 7       BY MS. MEDINA:
 8       Q.     I'm sorry.  Can you point to where you are
 9  in the document or indicate by paragraph.  The first
10  sentence of the paragraph would help.
11       A.     In the first paragraph.  So what I'm
12  saying is this.  When we say your question about
13  supervisory will go such a high value, depends on how
14  you define supervisory.  Supervisory here is not just
15  defined as HR kind of supervisory, so in paragraph
16  one it's talking about the incumbent performance of a
17  right of evaluative and other professional work.  In
18  paragraph two, we are talking about providing your
19  insight and direction on division activities and
20  paragraph three the technical supervision that's
21  necessary for accomplishing the goals of the
22  division.
23       Q.     And in terms of the, in terms of the
24  planning and coordinating group efforts on the
25  research projects, what exactly is planning and
```
00199
```
 1  coordinating referring to?
 2       A.     Coordinating your division's projects,
 3  your staff, all of the staff in your division,
 4  coordinating their projects.
 5       Q.     Could that be considered a supervisory
 6  function?
 7       A.     I guess it depends on how you define
 8  supervisory.
 9       Q.     In terms of overseeing projects?
10       A.     What's the question?
11       Q.     Could planning and coordinating group
12  efforts on research projects, does that header
13  include supervisory aspects as well?
14       A.     As the supervisory social science analyst,
15  you're leading all of the work of your division, so
16  you're leading, I mean you're in a supervisory social
17  science position.  You are responsible for all of
```
Page 82

Pearsal.Camarata Deposition

18  your employees, all the work they did, the nature of
19  the work they do.
20      Q.    So you're supervising everyone in your
21  division?
22      A.    Yes.
23      Q.    And can you -- how can you characterize
24  that as anything other than supervisory?  I guess I'm
25  --

00200

1       A.    Because there is a technical expertise.
2   In my opinion, there is a technical expertise and
3   there is a supervisory role.  When we say that the
4   division itself didn't need so much a supervisor in
5   that division meaning the division itself is very
6   independent high level people that don't need a lot
7   of HR supervision.  They are not people with
8   personnel issues.
9       Q.    What is HR supervision?
10      A.    Just that, that they don't need a lot of,
11  there are not a lot of issues or complaints or
12  personnel issues, employee issues.
13      Q.    Are those the only functions of a
14  supervisor, to deal with the employee issues?
15      A.    No.
16      Q.    I guess I'm confused as to why supervision
17  is being cabined ^ sic in terms of HR duties?
18      A.    Well, I'm telling you from, how the panel
19  looked at it.  I can only talk but how the panel
20  looked at it, the panel looked at supervisory
21  responsibility being not as important because the
22  division, it's comprised of high level individual,
23  folks who are individually motivated, that don't need
24  a lot of guidance.  They don't need a lot of
25  oversight.

00201

1       Q.    I want to touchback on the consensus issue
2   of the panel.  Was it ever recorded that the panel
3   members agreed that Matthew Scheider was the best
4   qualified for the position?
5       A.    No.
6       Q.    That was your thought in your head.  I'm
7   sorry?
8       A.    From the meeting it was my belief there
9   was consensus on who was the best qualified.
10      Q.    You had earlier mentioned that expressing
11  a passion in the interview was one of the reasons why
12  Mr., one of the things that Mr. Pearsall did not do.
13  Did the other candidate exhibit passion during the
14  interview?
15      A.    In my definition, my observation, yes.
16      Q.    How?
17      A.    Mr. Scheider came to the table very
18  energetic.  Had all of his projects, justification
19  for all of the work, for some of the work that he has
20  done in the division that related to this position.
21  He had a plan.  He had a vision for the division and
22  very enthusiastic.
23      Q.    How about the other candidate other than
24  Mr. Pearsall and Mr. Scheider?
25          MS. WU:  Don't refer to her name.  Can you

00202

1   refer to her as applicant three.  Is that okay.
2          BY MS. MEDINA:
                    Page 83

Pearsal.Camarata Deposition
```
 3      Q.      Yes.   Applicant three?
 4      A.      What about her?
 5      Q.      Did she show energy and passion during the
 6 interview?
 7      A.      Not as much.
 8      Q.      Not as much --
 9      A.      As Mr. Scheider.
10      Q.      And what you basing that on?
11      A.      My observation.
12      Q.      What was it about her that you observed
13 that you thought was not displaying passionately?
14      A.      Just the same things that I said with
15 Mr. Scheider that weren't there with her.  She
16 didn't' come to the interview with a lot of
17 documents.  She didn't come into the interview with a
18 vision for the division, just those things you can
19 take kind of one step further.
20      Q.      Was passion one of the qualification
21 requirements for this position?
22      A.      No.
23      Q.      Would it be possible for a qualified
24 candidate to not exhibit what you describe as passion
25 and still be qualified?
```
00203
```
 1      A.      Yes.   The reason I raise it is because I
 2 mentioned it's in my notes based on the discussion I
 3 had with the panel.
 4      Q.      How would you compare Mr. Pearsall's and
 5 Mr. Scheider's prior supervisory experience?
 6      A.      My recollection or my opinion of their
 7 supervisory experience is that Mr. Pearsall has more
 8 supervisory experience.  That's based on his resume.
 9 And application.  His experience was over office of
10 justice programs.  Matthew Scheider doesn't have as
11 much supervisory experience.
12      Q.      When you say he doesn't have as much, can
13 you quantify?
14      A.      I mean I can give you specific projects
15 that would qualify as that.  It's -- he had like
16 three projects that were like team leader work.
17 That's the extent of his experience.  Supervisory
18 experience.
19      Q.      And do you know the extent of
20 Mr. Pearsall's supervisory experience?
21      A.      Just based on his resume and application.
22 But I don't know the years.
23      Q.      Do you know if it was years of experience?
24      A.      I recall it being more than Matthew
25 Scheider, but I don't know the specifics.
```
00204
```
 1      Q.      Can you give ranges?  Was it Mr. Pearsall
 2 appeared to have maybe a month more experience than
 3 Mr. Scheider?
 4      A.      I don't recall.
 5      Q.      You don't recall that from when you were
 6 reviewing their applicant packages?
 7      A.      I'm sure I did then and I don't now.
 8      Q.      Do you recall whether there was a, there
 9 was a difference.  You do recall the difference?
10      A.      There was a difference.
11      Q.      Okay.  Do you recall whether it appeared
12 as though Mr. Pearsall had extensive supervisory
13 experience?
```
Page 84

Pearsal.Camarata Deposition

14    A.    It depends on how you define extensive.
15 But I don't remember how many years of experience,
16 supervisory experience he had.
17    Q.    Do you recall having an impression of how
18 much supervisory experience a person had when you
19 reviewed his application?
20    A.    I believe it was more than Matthew Snyder
21 and the other candidate.
22    Q.    You had mentioned that the candidates were
23 rated on your notes of the meeting, the candidates
24 were rated under supervision and research.  Do you
25 recall the order for Mr. Pearsall and Mr. Scheider

00205

1 for those two elements?
2    A.    Yes.
3    Q.    Can you tell me how they came in order?
4    A.    Under supervisory or supervision, it was
5 Mr. Pearsall, Mr. Scheider, and the third candidate.
6    Q.    And what about under research?
7    A.    Mr. Scheider, Mr. Pearsall and the third
8 can and date.
9    Q.    And did the panel, the other two panel
10 members agree with that assessment?
11    A.    It was my belief they did.
12    Q.    But you, what you wrote down in your
13 notes, those were your thoughts of how they should be
14 ranked?
15    A.    No.  Those were what I, based on the
16 discussion we had.
17    Q.    Did the other panel members review your
18 notes?
19    A.    No.
20    Q.    Did you ever show them to them?
21    A.    No.  I mean, I wasn't hiding them.
22    Q.    Did you ever, did you ever express concern
23 for any of the panel's preferences?
24    A.    I don't know what you mean.
25    Q.    Well, did anything that any of the panel

00206

1 members had said during that meeting, did any of that
2 cause you any concern?
3    A.    I don't recall.
4    Q.    Did you expressly confirm what the panel's
5 preferences were?  Did you ask them to make sure that
6 you were correct in your assessment of what they
7 thought?
8    A.    No.  No.
9    Q.    So you don't actually have any objective
10 criteria?
11    A.    This is based on my recollection of that
12 meeting at that time.
13    Q.    Did you ever confirm, I'm sorry, why
14 didn't you ever confirm with a the panel what your
15 assessment of their recommendation was?
16    A.    I didn't think I needed to confirm with
17 them.  We were sitting there having a discussion.
18 I'm writing it down.  I believe I have a consensus.
19 I'm the selecting official.  So -- I didn't see a
20 need to say is this accurate.  I assumed it was
21 accurate.
22    Q.    Did you think Mr. Scheider had adequate
23 supervisory experience to be qualified for the
24 position?

Page 85

Pearsal.Camarata Deposition
25      A.      Yes.
00207
1       Q.      What did you base that on?
2       A.      Well, he made the list.  I only received
3  those applications, applicants that were eligible.
4  So he made the list.  So he obviously qualified for a
5  new position.
6       Q.      Did you have any independent thoughts
7  about whether his supervisory experience was enough
8  to qualify him for the supervisory social science
9  analyst position?
10      A.      He qualified through the process, but I
11 have my own independent thoughts based on my
12 observation of his work.
13      Q.      Based on supervisory work?
14      A.      Team leader work.
15      Q.      Did any of the other panel members share
16 with you whether they thought Mr. Scheider had
17 adequate supervisory experience to fill the position?
18      A.      My -- I recall us agreeing that Al had
19 more supervisory experience than Matthew.
20      Q.      Did you ever discuss whether anyone was
21 concerned that Matthew might not have experience to
22 qualify for this position?
23      A.      The only thing that related to that is
24 that Jamie said the division doesn't need as much
25 supervision given the nature of the staff.
00208
1       Q.      Was Mr. Scheider's submission of prior
2  performance appraisals a factor in why he was
3  selected?
4       A.      Say that again?
5       Q.      Was Mr. Scheider's submission of prior
6  performance appraisals a factor in why he was
7  selected?
8       A.      It is significant because he followed the
9  procedures in the vacancy announcement.  The nature
10 of his performance appraisals, I already knew.
11      Q.      Do you recall how many performance
12 appraisals Mr. Scheider submitted?
13      A.      No.
14      Q.      How many -- you said you knew what was in
15 the performance appraisals.  Do you recall how many
16 performance appraisals, I'm sorry, did you drop them?
17      A.      I was his first line supervisor.  I
18 prepared, I mean I'm the one who gave him his
19 performance evaluation.
20      Q.      How many performance evaluations did you
21 do for Mr. Scheider prior to the selection panel?
22      A.      I don't know.  I'd have to, since he came
23 to the office.
24      Q.      How long had he been working with you as
25 his first line supervisor?
00209
1       A.      I believe five years.
2       Q.      With there any request to Mr. Pearsall to
3  provide his performance appraisals?
4       A.      I don't recall.
5       Q.      You don't recall whether there was a
6  request?
7       A.      I don't -- correct.  I don't recall that I
8  asked him for them.
9       Q.      Do you recall whether anyone asked him for
Page 86

Pearsal.Camarata Deposition

10    them?
11         A.     I don't believe so.
12         Q.     In your other experiences on a selection
13    panel when an applicant did not submit -- did you
14    have ever have any experience where he had not
15    submitted his performance appraisal?
16         A.     I don't recall.
17         Q.     Is it customary to notify a candidate that
18    they are missing something in their applicant file?
19         A.     I don't know what you mean.
20         Q.     I mean if an applicant is missing
21    something in their applicant file, would it be a
22    normal practice of yours to let them know that it's
23    something missing?
24         A.     It mays into my selection.
25         Q.     Would you give them an opportunity to

00210

1    complete their applicant file if you noticed there
2    was something missing?
3         A.     If I thought I needed it.
4         Q.     I'm sorry.  If you thought you needed it,
5    you would tell them they should complete it?
6         A.     In this case I don't recall asking
7    Mr. Pearsall for his performance appraisal.
8         Q.     Did the lack of performance appraisal
9    disadvantage Mr. Pearsall in the selection process?
10         A.     It played a role in my selection.
11         Q.     How did it play a role?
12         A.     Just the request on the vacancy
13    announcement wasn't followed.  But by this time, I
14    have had, now had a year, year and a half experience,
15    direct experience with Mr. Pearsall and his
16    performance.
17         Q.     Did anyone on the interview panel mention
18    that Mr. Pierce had not included any performance
19    appraisals?
20         A.     I don't know.  I don't recall.
21         Q.     Did you discuss the fact that Mr. Pearsall
22    did not have any performance appraisals in your
23    meeting with Ms. Alford and Ms. French following the
24    interviews?
25         A.     I don't recall.

00211

1         Q.     You said the lack of Mr. Pearsall's,
2    Mr. Pearsall not having his performance appraisal in
3    the application packet played a role in your
4    selection process?
5         A.     Yes.
6         Q.     Would you say that it would have helped if
7    he had had the performance appraisals in his
8    application packet?
9         A.     I don't know.
10         Q.     You testified earlier that if an applicant
11    had an incomplete file, and you thought they were
12    missing something that they needed, you would have
13    let them know?
14         A.     Well, that's why I'm saying in this case,
15    I had now been working with Mr. Pearsall over a
16    period of time that I could one-on-one observe his
17    performance and observe his performance.  I already
18    had over a year and a half time frame of his
19    performance.
20         Q.     Did you observe Mr. Pearsall in a
                        Page 87

Pearsal.Camarata Deposition

21 supervisory role?
22      A.      No.
23      Q.      So would it have helped to have the
24 performance appraisals from when he was serving in a
25 supervisory role?

00212

1       A.      Actually I go back.  No.  Because I did
2 have experience with Al not as a supervisor, but
3 serving as a team leader.
4       Q.      Is there a difference between serving as a
5 team leader and between serving as a supervisor?
6       A.      I can define them as very similar for me,
7 and I had experience with him as a team leader.
8       Q.      So you don't think it would have been
9 helpful so have his performance appraisals for when
10 he had been in a supervisory role to help make a
11 decision about whether he would have been qualified?
12      A.      No.
13      Q.      Did you ever mention to the other
14 panelists that the -- I'm sorry.  How long were you
15 Mr. Pearsall's direct line supervisor at COPS?
16      A.      I have to go back but it was from the time
17 he came to COPS until Nancy Leach was selected and
18 then from the time Nancy Leach left until Matthew
19 Scheider was selected.
20      Q.      Would the responsibility ever have fallen
21 on you to do a performance appraisal for
22 Mr. Pearsall?
23      A.      It would depend on where it fell within
24 the time frame.  We do performance appraisals at a
25 certain time every year, so when it came time for

00213

1 performance appraisals, depending on who was his
2 supervisor.  The issue we have here is we didn't have
3 a performance appraisal for a long time.
4       Q.      Even the time where you were not
5 Mr. Pearsall's first line supervisor, you were his
6 second line supervisor, is that true?
7       A.      Correct.
8       Q.      And you would have reviewed any
9 performance appraisal that any of his first line
10 supervisors would have drafted?
11      A.      Correct.
12      Q.      So the ultimate responsibility would have
13 fallen on you to make sure that Mr. Pearsall had a
14 performance appraisal?
15      A.      Correct.
16      Q.      Did you mention to any of the other
17 panelists at this selection panel that Mr. Pearsall
18 did not have a performance appraisal from Companies?
19      A.      I don't recall.
20      Q.      Would you have given the panel a reason
21 why Mr. Pearsall does note have a performance
22 appraisal to attach to his application?
23      A.      I don't recall.
24      Q.      Do you think that would have been
25 something important to mention to the other panel

00214

1 members seeing as how were you his first line or
2 second line supervisor for the entire time he was at
3 COPS prior to the selection panel?
4               MS. WU:  Objection to the form.
5               THE WITNESS:  Say that again.

Page 88

Pearsal.Camarata Deposition

6          BY MS. MEDINA:
7          Q.     Don't you think it would have been
8    important to mention to the panel members that for
9    the entire tomb that Mr. Pearsall was at COPS you
10   were his first line supervisor or his second line
11   supervisor and you had not completed an a performance
12   appraisal for him?
13         MS. WU:  Objection to the form.
14         THE WITNESS:  Yes.  Mr. Pierce wouldn't
15   approve anything for us to even evaluate any time him
16   with.  I -- again --
17         BY MS. MEDINA:
18         Q.     Was Mr. Pearsall ever asked to provide
19   performance appraisals from any positions outside of
20   COPS?
21         A.     That's what I would have thought he would
22   have attached.  I only knew the issues were trying to
23   get him on a performance work plan.  At COPS I was
24   directly involved with working with him on that.  I
25   knew the issues.  What I was expecting him to attach

00215

1    would have been performance appraisal from his other
2    place, his last one.
3          Q.     Do you think that would have been helpful
4    to his application packet?
5          A.     Would it have been helpful?  It would have
6    played a role but like I said, but not the only role
7    bus there is a whole lot of things that I take into
8    consideration making my selection and by this time
9    now I've had firsthand observation of his
10   performance.  As a team leader, project manager.
11         Q.     If it would have played a role during the
12   selection process, why didn't you mention it to me?
13         A.     I have no idea.  I don't know what what's
14   on did.  I don't know if it would have played a role.
15         Q.     Did you contact any of Mr. Pearsall's
16   former supervisors after this selection panel review?
17         A.     No.
18         Q.     Were you interested in finding out
19   anything more of Mr. Pearsall's former experience as
20   a supervisor?
21         A.     No.
22         Q.     Didn't you contact his references?
23         A.     Because I had my own observations.  At
24   this point Al had been with us for about a year and a
25   half.  A year and a half is a who year I could

00216

1    evaluate him on a written performance appraisal.  We
2    never got there because of issues that Al was never
3    happy with anything so I have my own observations for
4    a year and a half on his performance.
5          Q.     We are going to switch gears a little bit
6    and I'm going to ask you some questions about acting
7    positions.  What is the protocol for filling acting
8    positions?
9          MS. WU:  Objection as to form.
10         THE WITNESS:  What position?
11         BY MS. MEDINA:
12         Q.     Do you know if there is a general protocol
13   for filling acting positions at COPS?
14         A.     I only know what I have done.
15         Q.     Do you know if there are any specific
16   requirements or guidelines that COPS employees need

Page 89

Pearsal.Camarata Deposition

17  to follow when filling acting positions?
18       MS. WU:   Objection.
19       THE WITNESS:  I don't know.
20       BY MS. MEDINA:
21       Q.   Would it be your responsibility to know as
22  someone who fills acting positions whether there are
23  regulations governing?
24       A.   It depends on how you're defining acting
25  and in what capacity.

00217

1        Q.   What are the different ways that you could
2   define acting?
3        A.   As I mentioned to you before, when one of
4   the assistant director positions was vacant, I
5   rotated people into the acting position.
6        Q.   Did you consult regulations or guidelines
7   on how to fill an acting position prior to filling an
8   acting position?
9        A.   No.
10       Q.   Have you ever consulted any guidelines on
11  how to fill an acting position?
12       A.   Well, HR is at the table at our senior
13  management meetings and when I -- they know what my
14  plans are and you know, they know what I'm doing.
15       Q.   So you tell HR what your protocol will be
16  for filling an acting position?
17       A.   Whether I tell them or I mention it in a
18  senior management meeting, they are there.
19       Q.   Do you get any --
20       A.   There is no reason for me to think what
21  I'm doing is wrong.
22       Q.   How would you know that if you don't know
23  what regulations govern filling acting positions?
24       A.   Because no one has told me different.
25       Q.   Have you asked anyone?

00218

1        A.   No.  But they know what I'm doing.
2        Q.   How do they know what you're doing?
3        MS. WU:   Asked and answered.  Objection.
4        BY MS. MEDINA:
5        Q.   Do you get confirmation from them that
6   what you're doing is okay?
7        A.   I believe so.
8        Q.   How do you get confirmation from them?
9        A.   Either verbally or an email or in
10  meetings.  When I state what my intention is.
11       Q.   Do you know if other managers follow this
12  same procedure in terms of checking in with HR?
13       A.   I do not know.
14       Q.   What protections are in place to ensure
15  that discrimination is not a part of filling acting
16  positions?
17       A.   Can you repeat that.
18       Q.   What protections are in place to ensure
19  that discrimination is not a part of filling acting
20  positions?
21       A.   Well, I would assume with HR being aware
22  of what I'm doing.  Myself as a supervisor and a
23  manager.  I certainly attended a lot of supervisory
24  classes.  And I've attended every, we have mandated
25  E. O and ethics courses every year I attend.

00219

1        Q.   Is your checking with HR, is that a formal
Page 90

Pearsal.Camarata Deposition

2 process at all in terms of filling the acting
3 position?
4        A.     No.
5        Q.     Is there anything to stop you from not
6 checking with HR when you're filling an act position?
7        A.     Say that again.
8        Q.     Could there ever be a time when HR is not
9 aware of the protocol you're using to fill an acting
10 position?
11       A.     I don't believe so.  They are involved in
12 all of our senior manager meetings.
13       Q.     And ary time you are about to fill an
14 exacting position --
15       A.     That issue is generally raised but like I
16 say in the example I gave you when the assistant
17 director is vacant and there are two 14s in there and
18 I'm rotating them, I have no reason to believe that
19 by giving them equal opportunity in the rotation that
20 that's a problem.
21       Q.     Have you ever supervised any other
22 employees who were responsible for filling acting
23 positions?  Do you understand the question?
24       A.     Say it again.
25       Q.     Have any of your subordinates ever filled

00220

1 acting positions?
2        A.     In the situation I just gave you an
3 example, they were my subordinates.
4        Q.     No.  I'm sorry.  For example, you are the
5 deputy director right now.  If had you someone
6 serving under you who was the assistant director and
7 they were in a position to fill their own position if
8 they were out or needed to be away from the office
9 for a time, have you ever had that situation where
10 you are supervising someone who is filling an acting
11 position?
12       A.     Whenever, whenever the ADs who report
13 directly to me are out on leave, they select someone
14 to serve in their place for that day or vacation.
15       Q.     What is the protocol for selecting someone
16 to serve?
17       A.     It depends on each division.  Some
18 divisions have 14 senior level people who is defined
19 as kind of a deputy position.  Those people for
20 instance in the audit division, put a 14 in, serving
21 as acting because he has a deputy role and is a 14
22 and higher level.
23       Q.     And is it different in other divisions?
24       A.     In the training and technical assistance
25 division.  There is a deputy position there.  And

00221

1 Ms. Alford puts her deputy in charge when she is
2 gone.
3        Q.     Is it different in PPS.
4        A.     In PPSE it depends on what level you're
5 talking about.  The supervisory social science
6 analyst, as you've noted here on the position
7 description stuff, says that that person will serve
8 as the AD in the absence of the AD.  When the
9 supervisor is gone, they rotated them, rotated the
10 positions.
11       Q.     Who rotated?
12       A.     Whoever was serving in the supervisory
Page 91

Pearsal.Camarata Deposition

13  position.
14      Q.      Were you monitoring the rotation at all?
15      A.      You mean -- how do you mean monitoring it.
16      Q.      I mean when you were assistant director,
17  was there anyone serving in the supervisory analyst
18  position that would rotate other people to act in her
19  position?
20      A.      When the supervisory social science
21  analyst person is not there, they would rotate people
22  in that position to sort of act it.
23      Q.      The supervisory social science analyst
24  would rotate people for whenever he or she was on
25  leave?

00222

1       A.      Yes.
2       Q.      Did you monitor the rotation?
3       A.      I don't know what you mean by monitor the
4   rotation.
5       Q.      Were you aware of the rotation?
6       A.      I'm aware that when they go away, they
7   send an email that I'm going away and so and so will
8   be acting in my place.
9       Q.      Was that always the process that was
10  followed by the supervisory social science analysts
11  in?
12              MS. WU:  Object to the form.  You may
13  answer.
14              THE WITNESS:  They rotated it?  What do
15  you mean?
16              BY MS. MEDINA:
17      Q.      No.  They offered the position to everyone
18  in the department who was qualified.
19      A.      They didn't -- no.  It wasn't open to
20  everyone in the department that's qualified.
21      Q.      Who would it be open to?
22      A.      The people within the division.
23      Q.      Which division?
24      A.      Within PPSE, the supervisory social
25  science analyst position.

00223

1       Q.      Which PPSE would it be open to?
2               MS. WU:  Objection to the form.
3               THE WITNESS:  You're talking about within
4   the supervisory social science analyst within PPSE,
5   when the supervisor is not there, he or she selects
6   somebody in the division and every one can be Bart of
7   that rotation except for our administrative
8   assistant.  So it's open to, what are the different
9   grades in PPSE.
10      A.      Right now I believe everyone could be a
11  123 or might be a 12.  I'm sorry.  13-14.  There may
12  be a 12.
13      Q.      So it's open to 12s open to 14s open to
14  13s?
15      A.      Yes.  Yes.  But it's my understanding most
16  recently that Matthew changed that and now is only
17  rotating amongst Al Pearsall and Katherine McQuay the
18  two 14s, and they should stick with that?
19      Q.      Did anyone express any concern that the
20  acting position was being rotated amongst 12s, 13s
21  and 14s?
22      A.      I don't know.
23      Q.      Do you have any concerns with the fact
Page 92

Pearsal.Camarata Deposition
24     that a GS-14 position was rotated amongst GS -12s,
25     13s and 14s?

00224

1          A.     In an acting?  And for supervisory social
2     science analyst, no.
3          Q.     You don't have any concerns with that?
4          A.     No.
5          Q.     Would a GS-12 be qualified to serve?
6          A.     I don't know if there is a 126789
7     definitely 123s and 14s.
8          Q.     And you already testified you don't know
9     if there are any regulations governing acting
10    positions and the filling of acting positions?
11         A.     Correct.
12         Q.     This is a good time to take a break.
13                (Recess.)
14                     (Cammarata Exhibit No. 9 was
15                marked for identification.)
16                BY MS. MEDINA:
17         Q.     Take a look at Exhibit Number 9 for me,
18    Ms. Cammarata and let me know if you recognize the
19    document.
20         A.     Okay.  I'm ready.
21         Q.     Do you recognize the document?
22         A.     Yes.
23         Q.     What is it?
24         A.     An email exchange with Debbie Brown, our
25    human resources personnel, and me.

00225

1          Q.     What are you discussing?
2          A.     The posting of the PPSE supervisory social
3     science analyst position.
4          Q.     And on the first email in the chain, can
5     you read the second paragraph?
6          A.     EMT.  That one?
7          Q.     Yes.
8          A.     EMT, I decided to post the supervisor
9     position instead of the AD position.  Thanks for the
10    options and the flexibility.
11         Q.     When did you make the decision to post the
12    supervisor position?
13         A.     It must have been at this time.
14         Q.     I'm sorry.  Which supervisor position is
15    this email referring to?
16         A.     The supervisory social science analyst
17    position in PPSE.
18         Q.     And what's the date on the email?
19         A.     January 11th.
20         Q.     How long had the supervisory social
21    science analyst position been vacant before you
22    decided to post?
23         A.     Let me get my -- let me get my time frame.
24    Can you ask that again?
25         Q.     Sure.  How long had the supervisory social

00226

1     science analyst position been vacant before you
2     decided to post the position?
3          A.     I don't know.  I'd have to go back and
4     look at dates.
5          Q.     Do you remember when the last person was
6     in the position?
7          A.     I believe that this was posted soon after
8     the person who previously held the position vacated.
                          Page 93

Pearsal.Camarata Deposition
9     Q.     Do you know approximately how soon after?
10   Was it less than a year?
11         A.     I believe so.
12         Q.     Do you know approximately what year the
13   last supervisory social science analyst position had
14   held that position?
15         A.     Well, that would have -- I believe it was
16   in December or January, December of '03 or January of
17   '04 when that position became vacant.
18         Q.     And was, I'm sorry, how -- were you
19   sitting in the assistant director position when
20   someone else was sitting in the supervisory social
21   science analyst position?
22         A.     No.
23         Q.     When were you sitting in the assistant
24   director position?
25         A.     I was sitting in the assistant director

00227

1    position up until I became deputy director which is
2    September of '02.
3          Q.     Did anyone fill the assistant director
4    position after you became deputy director?
5          A.     No.
6          Q.     How long did the assistant director
7    position remain vacant?
8          A.     From September of '02 until about a month
9    ago.
10         Q.     And we are in July of 2006 so the position
11   remained open between September of 2002 to June of
12   2006?
13         A.     Yes.
14         Q.     Are there, do you know if there are any
15   regulations governing how long a position may remain
16   vacant?
17         A.     No.
18         Q.     And what, what factors did you consider
19   when you decided not to post the assistant director
20   position in 2004?
21         A.     I only had one position allotted me.
22         Q.     I'm sorry.  Can you explain?
23         A.     I only had one position allotted to me.
24   We have at this, over the last year and a half, our
25   budget, what we call our M&A budget, our management

00228

1    and administration, it's our operating budget, has
2    been reduced.  So we have not been able, over the
3    course of several years to back fill positions
4    automatically.  We don't have enough funding to back
5    fill every vacant position in the COPS office.
6          Q.     What is back filling?
7          A.     When someone leaves, you hire someone.
8          Q.     Okay.
9          A.     Because our M&A budget has been cut over
10   the years, we have had to pull back the authority for
11   the ADs to back fill positions and in our executive
12   management meetings, the EMT is our executive
13   management team, we sit and decide what positions are
14   most critical to the office that we can fund given
15   our budget because we can't do all of the vacant
16   ones.
17         Q.     So when deciding whether to fill a
18   position, is that a decision EMT makes?
19         A.     At this time, yes.
                      Page 94

Pearsal.Camarata Deposition
20      Q.      So in 2004, EMT made the decision of
21  whether to not post the assistant director position?
22      A.      No.    EMT would come to the table and
23  discuss what our critical positions were in the
24  office at the time.  In this particular case, there,
25  we had, we said that there needs to be some kind of a

00229

1  supervisor in PPSE.    That was critical so I got one
2  slot.  I had two vacancies, supervisor and the AD.
3                  And so I had only one slot.  We did not
4  have enough budget to do both.
5      Q.      Did you discuss the choice between filling
6  the supervisory social science analyst position and
7  filling the assistant director position with anyone?
8      A.      No.
9      Q.      You didn't discuss that decision with
10  anyone?
11      A.      I made the decision myself and then
12  notified EMT what my decision was.
13      Q.      In the email you say thanks for the
14  options and the flexibility.  Had you discussed the
15  option of offering the assistant director position
16  with EMT?
17      A.      Just had I had two vacancies, an AD
18  position which they are aware of and a supervisor
19  position both vacant.  What we discussed was I needed
20  some type of supervision.  It was up to me to decide
21  which one.
22      Q.      You were the only one who made the
23  decision between which position would be offered?
24      A.      Correct.
25      Q.      Did you discuss the different, did you

00230

1  discuss your reasons for why you chose to offer the
2  supervisor position with anyone?
3      A.      I don't recall.
4      Q.      Would it have been typical for you to
5  discuss these types of things with EMT?
6      A.      I don't know how you define typical.  In
7  this case they gave me the option or the flexibility
8  to decide which one.  I then made that decision.
9      Q.      Did anyone show any reservations regarding
10  not posting the assistant director position?
11      A.      We didn't discuss it.
12      Q.      Was there any further response to this
13  email directed to EMT in regards to your decision to
14  post the supervisory social science analyst position
15  as opposed to the assistant director position?
16      A.      I don't recall.
17      Q.      Did you give EMT any reasons for why you
18  did not want to post the assistant director position
19  in 2004?
20      A.      I don't recall.
21      Q.      Why did you decide to post the supervisor
22  position in 2004?
23      A.      Because I only had one slot.  And the
24  supervisory position had been filled previously and
25  so I continued the momentum there, and the

00231

1  supervisory social science analyst, again just
2  because there had been precedent and that's where I
3  had been hiring everyone before for that position.  I
4  had made out with the AD position vacant because I
Page 95

Pearsal.Camarata Deposition

5   was somewhat serving in that role as well, even
6   though I was deputy director, I was able to do some
7   of the functions of the assistant director so to be
8   consistent, I just kept with the pattern.
9       Q.    Well, you had mentioned earlier that the
10  supervisory social science analyst serves as the
11  assistant director in an acting capacity when there
12  is no assistant director assigned to the position, is
13  that correct?
14      A.    Correct.
15      Q.    So when you say you were serving as
16  assistant director --
17      A.    Because I still could do some of those
18  duties as the assistant director.
19      Q.    The deputy director?
20      A.    As the deputy director.  Let me back up.
21      Q.    Okay?
22      A.    When the supervisory social science
23  analyst serves as an acting assistant director, they
24  don't necessarily take on every responsibility of the
25  assistant director because they have their full-time

00232

1   job as the supervisor.  Full time.  To take on the
2   acting AD what that means is they are my point of
3   contact.  And they still run the division.  So they
4   do not take on the full duties O R. Of an assistant
5   director and a supervisory social science analyst.
6       Q.    When someone is serving in the acting
7   assistant director position, are other people in the
8   division aware that they are serving in that
9   capacity?
10      A.    Serving as an acting?
11      Q.    Yes?
12      A.    Yes.
13      Q.    Are they held responsible for all the
14  duties of the assistant director when they are
15  serving in the acting capacity?
16      A.    Who?
17      Q.    The person who is serving as the acting
18  assistant director.  Are they held responsible for
19  the duties of the assistant director?
20      A.    They are not rated as an assistant
21  director.  They are rated on the duties of the
22  supervisory social science analyst and they are rated
23  on, that they at least served in that capacity
24  whenever needed.  But they are not rated on the
25  performance elements of an assistant director.

00233

1       Q.    Are they paid the rate of the assistant
2   director?
3       A.    No.
4       Q.    Did you express your, I'm sorry, going
5   back over the reasons that you decided not to post
6   the assistant director position, you had mentioned
7   the, that the SS, I'm sorry, you only had one slot,
8   that was one reason you gave.  And the supervisory
9   social science analyst position had been filled
10  previously and so you were continuing with the
11  momentum.  Were there any other reasons why you
12  decided not to fill --
13      A.    Yes.  What I stated is that I could still
14  perform some of the duties of the assistant director
15  as I had been doing since September of '02.

Page 96

Pearsal.Camarata Deposition

16    Q.    Did you convey any of these reasons why
17 you decided not to post the acting assistant director
18 to anyone at COPS?
19    A.    I do not believe so.
20    Q.    So no one at COPS knew your reason for not
21 posting the decision?
22    A.    I don't believe so.
23    Q.    I'm sorry.  Not posting the position.
24    A.    I believe I made the decision and went
25 with it.

00234

1    Q.    So who had served as the acting assistant
2 director from 2004 to 2006?
3    A.    Excuse me.  Let me think.  Who served as
4 an acting assistant director from when?
5    Q.    From 2004 to 2006, from the time you
6 filled the supervisory social science analyst
7 position?
8    A.    Not from this time but from the time the
9 position was filled.
10    Q.    Yes?
11    A.    From the time the position was filled, the
12 supervisory social science analyst position
13 description has that person defaulting to serve as an
14 acting assistant director.  But again, they are not
15 rated on a position description or a PWP of an AD and
16 I still retain the duties of an AD as well.
17    Q.    But whoever was in the position of
18 supervisory social science analyst from 2004 to 2006
19 would have served in that, in the acting assistant
20 director position for the entire time?
21    A.    Correct.
22    Q.    And if you had posted the assistant
23 director position in 2004, who in COPS would have
24 been qualified to compete?
25    MS. WU:  Objection.  This whole line of

00235

1 questioning is getting way beyond what the claims at
2 issue are in this case.  And I'm not going to let her
3 answer that question.  You know if you want to go to
4 the judge on further discovery on your new claims
5 that your client may potentially have you can do that
6 when that process is in place but right now what's at
7 issue is the 2004 supervisory social science analyst
8 vacancy and your client's nonselection for that.
9    MS. MEDINA:  I'm not going to have a
10 conversation with you on the merits of whether this
11 is relevant or not and so if she wants to step
12 outside I'm happy to tell you exactly why it's
13 relevant to this current claim so --
14    THE WITNESS:  Should I step out.
15    MS. MEDINA:  Yes.
16    (The witness exits the room.)
17    MS. MEDINA:  The fact that the 2004
18 supervisory social science analyst position was
19 offered and that the person who gets selected for
20 that automatically goes into the acting assistant
21 director position with no competition and it does not
22 get rotated is an automatic reason why Mr. Pearsall
23 could have been discriminated against in being chosen
24 for the supervisory social science analyst position.
25    MS. WU:  I'm sorry Jessica.  State that

00236

Page 97

Pearsal.Camarata Deposition

1  one more time.  Because he wasn't chosen for the
2  supervisory social science analyst position and that
3  person automatically goes into the acting director
4  position, that is the reason why he could have been
5  discriminated in the AD position?
6           MS. MEDINA:  Yes.  It's part of a pretext
7  of why Miss Cammarata chose not to select
8  Mr. Pearsall in the supervisory social science
9  analyst position because he automatically would have
10 been acting as the assistant director.
11          MS. WU:  But that's not what at issue.
12 What's at issue is the GS-14 position.  If you want
13 to show that there is a pretext regarding the reasons
14 why she gave for not selecting from the GS-14, sure.
15 We can talk about that.  She has been talking about
16 that like the reasons why but I still don't
17 understand your rationale.
18          MS. MEDINA:  We are also trying to show
19 that Ms. Cammarata was interested in not having
20 Mr. Pearsall move up through the ranks.  This is part
21 of the claim and the fact that the GS-14 position
22 automatically goes into a GS-15 position, that's
23 attached to the GS-14 position and the fact that the
24 person who got the GS-14 position possibly could not
25 have been able to compete for the GS-15 position if

00237

1  it was offered in 2004 is a reason why Miss Cammarata
2  did not offer the assistant director position.
3  Because it would have been harder for her to
4  discriminate against Mr. Pearsall if he is competing
5  against people who are unqualified for the GS-15
6  position as opposed to offering a position that's at
7  GS-14 level where there is a lot more people in COPS
8  who are closer to being qualified as Mr. Pearsall.
9           MS. WU:  I still don't think these are
10 claims that were investigated or ones that were
11 accepted by EEOS but subject to my objections I'll
12 let you go on a little further and if there are areas
13 that you start hitting where I'm not going to let her
14 answer, I'll instruct her to do that but thank you.
15 I appreciate your explaining that.
16          MS. MEDINA:  It's your witness.  Do you
17 want to go get her?
18          MS. WU:  Sure.
19          BY MS. MEDINA:
20      Q.   So going back to, is there a question on
21 the record for before the witness stepped out.
22          THE REPORTER:  Question :  And if you had
23 posted the assistant director position in 2004, who
24 in COPS would have been qualified to compete?
25          MS. WU:  I reaffirm my objection that's

00238

1  already on the record and also I object to the form
2  because it calls for speculation.
3           THE WITNESS:  I don't know who would be
4  eligible.
5           BY MS. MEDINA:
6      Q.   Well, you have experience with everyone
7  who works in COPS, isn't that true?
8      A.   No.
9           MS. WU:  Objection.
10          BY MS. MEDINA:
11      Q.   Who in -- do you know if anyone in the
                         Page 98

Pearsal.Camarata Deposition

12   PPSE division would have been qualified to compete
13   for the assistant director position in 2004?
14            MS. WU:  Objection.
15            THE WITNESS:  Would they have been what?
16            BY MS. MEDINA:
17       Q.   Qualified to compete?
18       A.   I don't know how you define qualified.  I
19   mean who qualifies for the position is done at
20   justice management division.
21       Q.   Don't you as a selecting official make a
22   decision about whether someone is a qualified
23   candidate?
24       A.   No.
25       Q.   You don't look up the qualifications of

00239

1    the candidates?
2        A.   I make a selection based on the candidate
3    list that's provided to me by the justice management
4    division or our personnel.
5        Q.   Are you familiar with the, with the
6    position description for the assistant director?
7            MS. WU:  Objection to form.
8            THE WITNESS:  Yes.
9            BY MS. MEDINA:
10       Q.   Can you think of people in the PPSE
11   division that would have been able to fulfill that
12   position description?
13           MS. WU:  Objection.
14           THE WITNESS:  Again, I cannot speak for
15   others and their qualifications for that position.
16           BY MS. MEDINA:
17       Q.   Okay.  Knowing that the supervisory social
18   science analyst position has an automatic feature
19   that the person will serve in the assistant director
20   position if that position is vacant, what weight did
21   you give to that fact in your selection of the
22   supervisory social science analyst position?
23       A.   Can you repeat that.
24       Q.   Correct me if I'm wrong, but the person
25   who serves in the supervisory social science analyst

00240

1    position automatically serves as the acting assistant
2    director if there is no assistant director filling
3    the position at the time, is that correct?
4        A.   Correct.
5        Q.   And in 2004, when you competed the
6    position for supervisory social science analyst, was
7    there anyone in the assistant director position?
8        A.   No.
9        Q.   So at the time that the supervisory social
10   science analyst position was competed, you knew that
11   that person would automatically become the acting
12   assistant director, is that correct?
13       A.   They would serve in that capacity.
14       Q.   And now --
15       A.   Of acting AD.
16       Q.   Now I'm asking you what weight did you
17   give knowing that whoever you chose to be the
18   supervisory social science analyst would serve as the
19   acting assistant director?
20       A.   None.
21       Q.   You gave it no weight?
22       A.   No.  Because as I said, the person that's

Page 99

Pearsal.Camarata Deposition
```
        23  in the supervisory social science analyst position
        24  basically serves as my point of contact regardless.
        25  I am still doing the responsibilities of the AD.
00241
         1  When I select for the supervisory social science
         2  analyst, that does not come into play for anything
         3  with assistant director.
         4       Q.    Does the person who serves as acting
         5  assistant director perform any supervisory duties?
         6            MS. WU:  Objection to form.
         7            THE WITNESS:  Say that again.
         8       BY MS. MEDINA:
         9       Q.    Does the person who serves as the acting
        10  assistant director perform any supervisory duties?
        11            MS. WU:  Same objection.
        12            THE WITNESS:  The person in the
        13  supervisory social science analyst position performs
        14  the duties of the supervisory social science analyst.
        15  There are no other supervisory duties in acting as an
        16  AD.
        17            BY MS. MEDINA:
        18       Q.    There are no supervisory duties in acting
        19  as an AD?
        20       A.    There are no additional duties than they
        21  would have as a supervisor.
        22       Q.    So what exactly does the person who acts
        23  in the assistant director position do?
        24       A.    If you have both positions, if you have
        25  both positions filled, supervisory social science
00242
         1  analyst position serves as a supervisory social
         2  science analyst.  The assistant director does some of
         3  the things that I'm doing as deputy director because
         4  I'm taking over those duties.
         5            They do things such as carefully reviewing
         6  all of our publications from the division and making
         7  sure reading through them word for word and making
         8  sure the message is clear, it's written for the right
         9  audience.  It's written, well, for the right target
        10  audience.  They provide direction for the whole
        11  division, the direction of where this division should
        12  be going.  They are thinking big picture, big scope,
        13  here's where the division needs to be going.
        14            BY MS. MEDINA:
        15       Q.    Anything else?
        16       A.    And then the assistant person serving here
        17  provides guidance, is responsible for everybody in
        18  the division.
        19       Q.    The person serving in the --
        20       A.    I'm sorry.  Assistant director is the head
        21  of the division.  Ultimately the person responsible
        22  for the division.
        23       Q.    Does the person who serves as the acting
        24  assistant director handle any HR type supervisory
        25  duties?
00243
         1       A.    Not any different than they would as --
         2  you know, it depends on if the two positions are
         3  filled so can you ask your question again.
         4       Q.    Sure.  Does the person who serves as the
         5  acting assistant director perform any HR related
         6  supervisory duties?
         7       A.    They perform their duties as the
```
Page 100

Pearsal.Camarata Deposition
8    supervisor social science analyst position.  You'd
9    have to give me a specific but as the supervisory
10   social analyst they are handling HR.  I guess if they
11   are complex they would come to me.
12       Q.    You had mentioned earlier that the
13   supervisory social science analyst does not have HR
14   supervisory component which was --
15          MS. WU:  Objection to the extent it
16   mischaracterizes her testimony.
17          THE WITNESS:  I didn't testify to that.
18          BY MS. MEDINA:
19       Q.    What extent of HR supervisory duties are
20   included in the supervisory social science analyst?
21       A.    In this case, the extent of the HR
22   supervisory responsibilities are limited because the
23   staff themselves are a higher level, GS level
24   independent individuals who don't require a lot of HR
25   supervision.

00244

1        Q.    Would that situation change for the acting
2    assistant director?  Are there any additional HR type
3    supervisory duties that the acting assistant director
4    needs to take care of?
5        A.    If there is an assistant director, they
6    would be the selecting, there are some additional HR
7    functions.  If there is an assistant director, they
8    would be serving as the selecting official for some
9    of the staff.  They are serving as the second line
10   supervisor, whereas I'm serving as a deputy director
11   as the second line supervisor.
12       Q.    And do they -- would an acting assistant
13   director fill those roles?
14       A.    No.  An acting would serve as the
15   supervisor and I would still then maintain the second
16   line supervisor authority so to answer your question,
17   if the supervisor -- if there is no assistant
18   director, the supervisor is serving as the acting.
19   They do not serve as first and second level line
20   supervisor.  They still serve as first.  I'm the
21   deputy director.  I serve as second.  If there was an
22   assistant director, they would serve as second.
23       Q.    So what additional duties does the
24   supervisory social science analyst have when they are
25   acting as assistant director?

00245

1        A.    Serving as my point person because if
2    there was an assistant director, there would be a
3    person in between us.
4        Q.    Who do you mean by point person?
5        A.    As my go-to person for the division.
6        Q.    Go to for what?
7        A.    Anything in the division.  The supervisory
8    social science analyst position is now by default
9    without an assistant director the head of that
10   division, the most senior in that division.  They are
11   the person who would work directly with me on issues.
12   Now I forget your question.
13       Q.    There wasn't a question pending.  But we
14   are still trying to figure out exactly what the, what
15   the supervisory social science analyst does when they
16   are acting as the assistant director and being a
17   point of contact I guess I'm a little confused, are
18   they just answering the phone when you called telling
Page 101

Pearsal.Camarata Deposition
19  you what's going on in their division?  How is that
20  different from what they do when they are a
21  supervisory social science analyst?
22       A.    If they were, if they were supervisory
23  social scientists they would be reporting to the
24  assistant director.  I have meetings with all of my
25  assistant directors weekly meetings with my assistant

00246

1  directors.  So the difference is without the
2  assistant director, this person becomes my go-to
3  person within the division, this person attends
4  weekly meetings with me to keep me abreast of what's
5  going on in the division and for me to go to them for
6  whatever requests I have of the person and the staff.
7       Q.    Would you give someone who is acting as
8  the assistant director responsibility over the entire
9  division?
10       A.    They are the most, the supervisory social
11  science analyst is the most senior position in the
12  division.  Except for the assistant director.
13       Q.    And would you characterize that as
14  different than a supervisory social science analyst
15  that is serving under the assistant director?
16       A.    I don't know what you mean.
17       Q.    The supervisory social science analyst who
18  is serving under an assistant director, would they be
19  responsible for the entire division?
20       A.    They are responsible for all the staff but
21  when you have an assistant director, then it's the
22  assistant director who would have ultimate authority
23  or ultimate responsibility for the division.
24       Q.    So even the supervisory social science
25  analyst is responsible for all the staff?

00247

1       A.    From a supervisory social -- stand point.
2  Yes.
3       Q.    What changed in 2006 that made you decide
4  to post the assistant director position?
5       MS. WU:  Objection.  I'm not going to let
6  her answer these questions.  You're instructed not to
7  answer.
8       MS. MEDINA:  Okay.
9       BY MS. MEDINA:
10       Q.    Prior to the 2004 selection, who was
11  serving in the supervisory social science analyst
12  position?
13       A.    For what time frame?
14       Q.    Directly prior.  Before the vacancy
15  obviously.
16       A.    From what time frame?
17       Q.    I guess it would be about 2003 you said
18  that the vacancy started in 2003 so who had served in
19  2003 and prior?
20       MS. WU:  Do you know what, let's use
21  either initials or some kind of other code just to be
22  safe.
23       THE WITNESS:  Well it would have -- I
24  think I can do that without the specifics.  From '03
25  to '04, right?

00248

1       BY MS. MEDINA:
2       Q.    Well, you posted the position in January
3  '04?
Page 102

Pearsal.Camarata Deposition

4      A.     But it wasn't filled until April.
5      Q.     Right.
6      A.     So it's vacant up until April.
7      Q.     Okay.
8      A.     So from '03 to April of '04, right?  The
9  staff -- all of the staff rotated into the position
10  except for the administrative assistant.
11      Q.     And who was serving prior to December '03?
12      A.     You mean at December of '03 and before?
13      Q.     Yes?
14      A.     For a short time frame, there was another
15  supervisory social science analyst in that position.
16      Q.     It was a filled position?
17      A.     Yes.
18      Q.     Okay.  Can you describe that person's
19  duties?
20      A.     It's the same duties as the supervisory
21  social science analyst.
22      Q.     The same duties as today?  Are those the
23  duties that are described in the position description
24  that we went over for the vacancy announcement?
25      A.     I believe so.

00249

1      Q.     We went through a few position
2  descriptions today.
3      A.     I know.  I know.
4      Q.     I just wanted to make sure that we are all
5  on the same page.  How many people did this
6  supervisory social science analyst supervise?
7      A.     I mean it's at different times.  Hiring
8  people.  People leaving, but I believe, I have to go
9  back to earlier.  I think I said average of seven to
10  eight people in the division?
11      Q.     And how much interaction did you have with
12  the supervisory social science analyst?
13      A.     Because there was no, because the
14  assistant director position was vacant, I would have
15  weekly meetings so that person attends my weekly
16  meetings.  And it would be whoever serves in that
17  role.  As I mentioned to you, they rotated so whoever
18  was serving as the acting supervisory social science
19  analyst at that time was the one with whom I would be
20  meeting.
21      Q.     I'm going to specifically ask about the
22  person who served in the supervisory social science
23  analyst position from prior to December 2003.  If
24  it's easier for to you use something like initials,
25  if Jenny is all right with it, then you can use the

00250

1  initials of the person just so we know who we are
2  talking about.  Do you know who served as the
3  supervisory social science analyst prior to December?
4      A.     Yes, I do.
5      Q.     Who was that?
6      A.     Can I say her name.  Initials.
7              MS. WU:  Just refer to it by initials.
8              THE WITNESS:  NL.
9              BY MS. MEDINA:
10      Q.     How many people did NL supervise?
11      A.     About seven to eight.
12      Q.     And how much interaction did you have with
13  NL?
14      A.     Weekly meetings.  And she attended senior
Page 103

Pearsal.Camarata Deposition

15  management meetings.  And then any other time I had a
16  need of that division.
17      Q.    And how much of her time was spent
18  supervising?
19          MS. WU:  Object to the form of the
20  question.  You can answer.
21          THE WITNESS:  You'd have to ask her.
22          BY MS. MEDINA:
23      Q.    Well, you met with her on a weekly basis.
24  Did you have an idea what she was doing during the
25  week?

00251

1      A.    It also depends how you define
2  supervision.
3      Q.    Did you have an idea of what her
4  day-to-day activities were?
5      A.    Yes.
6      Q.    What was she doing on a day-to-day basis?
7      A.    Overseeing the staff's projects, programs,
8  leading the division in their activities, developing
9  research and evaluation projects and overseeing the
10  projects.  Any special projects within the division.
11  Developing publications.  Managing the entire
12  publication process and overseeing all of the grants
13  and cooperative agreements within the division.
14      Q.    Of the, of the duties that you just
15  described which ones of those would you characterize
16  as supervisory?
17      A.    I characterize as supervisory, I should
18  say there are additional duties meaning approving
19  leave, approving training requests, suggesting
20  training for employees, career development.  That's
21  what I define, those are the ones I define as
22  supervisory.
23      Q.    So you don't define overseeing staff
24  projects as supervisory work?
25      A.    I define that more of a technical

00252

1  expertise.  Technical supervision.
2      Q.    So it's a specific type of supervision?
3  And what about leading the division?  Would that be a
4  supervisory duty?
5      A.    I look at that more as a manager,
6  manager's responsibility in leading the division.
7      Q.    So there is a different between managing
8  and supervising?
9      A.    Which is why if have you an assistant
10  director, I look at the assistant director as the
11  manager of the division and the one leading the
12  division and not worried about the day-to-day
13  responsibilities of the division.
14      Q.    Does the acting assistant director
15  responsible for managing the division?
16      A.    I -- in my definition, no.  They are full
17  time job.  They have no time to leading the division
18  is how I characterize it as leading the division and
19  thinking big picture and those kind of things.  There
20  is no time for that person to do that.  That's why
21  you need both positions.
22      Q.    Even the person in the supervisory social
23  science analyst position is responsible for leading
24  the division.
25      A.    They basically have day-to-day
Page 104

Pearsal.Camarata Deposition

00253
```
 1   responsibility for the staff and their projects.
 2        Q.    Would you characterize day-to-day
 3   responsibility for the staff and their projects as
 4   supervisory?
 5        A.    As I said before, my definition for
 6   supervision is, are those HR responsibilities.
 7        Q.    And developing the publications, what
 8   would you characterize that as, is that supervisory?
 9        A.    Developing publications is actually at the
10   staff level, but reviewing them and, not reviewing
11   them but making sure they are on track and stuff is a
12   responsibility of the supervisory social science
13   analyst.
14        Q.    And would you describe that as supervisory
15   or nonsupervisory?
16        A.    I would define it as a technical
17   supervision.
18        Q.    Is developing the publications different
19   from managing the publications?  You had mentioned
20   that?
21        A.    Developing the publications is at the
22   staff level.  Managing the process of making sure
23   they are delivered on time, the timeline ultimately
24   would fall to the supervisory social science analyst
25   if there is no assistant director.
```

00254
```
 1        Q.    And would you characterize managing the
 2   publications or managing the process for the
 3   publications as supervisory?
 4        A.    I would define it as technical
 5   supervision, having technical expertise.
 6        Q.    And the other duty you had mentioned was
 7   developing research and overseeing research projects.
 8        A.    Technical.
 9        Q.    Is that what had you mentioned?
10        A.    Right.
11        Q.    And you would define that as technical
12   supervision.  Did NL conduct high level research when
13   she was a supervisory social science analyst?
14        MS. WU:  Object to the form.  You can
15   answer the question.
16        THE WITNESS:  Can you repeat that?  I
17   don't know what you mean by how you define high
18   level.
19        BY MS. MEDINA:
20        Q.    Did NL perform advanced analytical
21   statistical and/or evaluation work while she was
22   serving in the supervisory social science analyst
23   position?
24        A.    I don't recall.  I'd have to go back.
25        Q.    So none of her projects stand out as
```

00255
```
 1   analytical, statistical or evaluation work?
 2        A.    It's the time frame for me that I'm not
 3   clear on.  There were, there were those projects
 4   taking place in the division.  The time frame I'm not
 5   clear on.
 6        Q.    Are you clear on whether NL would have
 7   been the one condition ducting the research?
 8        A.    We didn't actually conduct research.  We
 9   funded grantees to do the research.  We provide
10   direction and guidance on the research and oversee
```
Page 105

Pearsal.Camarata Deposition

11  it.
12      Q.      Do you know if NL published anything while
13  serving in this position?
14      A.      I believe she, I believe she may have.
15      Q.      Do you recall what she published?
16      A.      I'm not sure.  Could have been an
17  innovations piece, a COPS innovations piece.
18      Q.      Do you recall what her role was in the
19  publication?
20      A.      I think -- if I'm right, I'd have to go
21  back and look at the publication, she would have been
22  one of the authors.
23      Q.      Did have you any impressions of NL's
24  performance as the supervisory social science
25  analyst?

00256

1       A.      Yes.
2       Q.      What were those impressions?
3       A.      I rated her.  She was outstanding.
4       Q.      What made her an outstanding supervisory
5   social science analyst?
6       A.      My recollection now, of course, this goes
7   back, and it's reflected in her performance
8   appraisals.  I would remember read those.
9       Q.      I would love to give them to you but I
10  don't have them?
11      A.      Well, I'm just saying I've rated her
12  performance and they are reflected in the performance
13  appraisal.
14      Q.      Do you recall anything from her
15  performance appraisals?
16      A.      I recall -- I can't get specific.  I
17  recall her as an outstanding employee.
18      Q.      Do you recall what made her outstanding?
19      A.      All of her elements and her performance
20  appraisal she was able to perform the elements in her
21  performance appraisal.  Overall, Nancy --
22              MS. WU:  Use initials, please.
23              THE WITNESS:  NL is an independent self
24  motivated doer and thinker.  She would run with
25  projects.  She required very, very, very little

00257

1   guidance.  She had the technical expertise.  She had
2   been in the COPS office for a while.  She had been in
3   the grants division for a while.  She knew COPS
4   policies, procedures and grant programs very, very,
5   very well.  She had served as a team leader on a very
6   huge COPS grant program and she was an outstanding
7   team leader and she was very well respected by her
8   team members.  She was able to communicate with all
9   of her team members and keep them apprised of
10  information while she served as the supervisor, the
11  staff very much respected her.  They respected her
12  knowledge, her expertise.  She was able to meet
13  timelines, keep projects on time.  She was concise
14  with me.  Very brief.
15      Q.      What was her knowledge and expertise in?
16  In what area did she have knowledge and expertise?
17      A.      Several areas.  Research.  Evaluation.
18  Grants, COPS, grant programs.  She knew our CMS
19  database inside and out.  She could, she knows
20  access, she could develop queries, run queries, she
21  knew the ins and outs of our CMS database.  She was

Pearsal.Camarata Deposition
22    an excellent problem solver.
23    Q.    Do you know where she got her research
24    skills from?  Or her analysis skills from?
25    A.    No.

00258

1     Q.    Were you familiar at all with her
2     education level?
3     A.    I can't recall.
4     Q.    Do you know whether she had a bachelors?
5     A.    I can't recall.
6     Q.    You can't recall whether she had a
7     Bachelor's Degree?
8     A.    I would assume she would.  I assume she
9     did.
10    Q.    Do you recall whether she had a Masters
11    degree?
12    A.    I can't recall.
13    Q.    Would you assume she had a Masters degree?
14    A.    No.
15    Q.    Why not?
16    A.    Why not?  Because a Masters degree is not
17    required for the position.
18    Q.    Why is a Masters degree not required for
19    the position?
20    A.    It's my understanding that masters and
21    Ph.D. levels are an advantage but on the vacancy
22    announcement, I didn't think it said that you have to
23    have a masters to apply.
24    Q.    And you don't know whether NL had a
25    Masters degree while you sit here today?  Is that

00259

1     right?
2     A.    Correct.  And you know I just want to
3     state the level of education is not a sole
4     requirement for selection.
5     Q.    There is no question pending.  Can I take
6     two minutes.  I just want to make sure there is
7     nothing else and then we will get out of here.
8     (Recess.)
9     BY MS. MEDINA:
10    Q.    Returning to the selection process in 2004
11    for the supervisory social science analyst position,
12    can you describe to me the vision that Mr. Scheider
13    presented to the panel?
14    A.    Just as I recall it, was a vision that
15    included doing more, producing more publications and
16    doing more with publications.  It was doing more
17    analytical work within the division, looking more at
18    databases and doing analytical work.  And the third
19    component was operationalizing community policing.
20    Q.    Did you have any impressions of this
21    vision?  I guess first I'd like to ask you was it the
22    first time that had you heard about this vision?
23    A.    It's the first time I had heard him
24    articulating vision.
25    Q.    And what were your impressions of his

00260

1     vision?
2     A.    Made sense.
3     Q.    Anything else?
4     A.    It was good.  It made sense.  It was --
5     Q.    What made sense about it?
6     A.    We needed to do more with publications.
Page 107

Pearsal.Camarata Deposition

7   We were at a point where we were just producing
8   publications and once they were produced it was done.
9   We didn't have a strategy for what to do with the
10  publications so his idea of we need to do more with
11  publications made sense.  The analytical, work we had
12  always been saying we need to do more internal
13  analysis.  There were needs within the COPS office of
14  conducting internal analysis.  And so his vision
15  included hearing that as a need within the COPS
16  office in trying to address it.
17          And operationalizing community policing, I
18  forgot what the question was.
19      Q.    What was your general impressions of his
20  vision?
21      A.    There is always a need to operationalize
22  community policing, we always want to do more in the
23  field to get the field to understand what community
24  policing is.
25      Q.    And I think you already testified but I'm

00261

1   sorry, Mr. Scheider had not shared this vision with
2   you prior to the interview?
3       A.    No.  Not with me.
4       Q.    Had he shared it with other people?
5       A.    I don't know.
6       Q.    Had anyone else in the COPS office raised
7   similar ideas?
8       A.    I mean like I said all along we had always
9   been talking about we need to do more analysis that
10  there were progress reports that we had piled up that
11  we hadn't been looking at the data, so those kinds of
12  discussions have been happening with staff.
13      Q.    Where were those discussions happening?
14      A.    Within, within the division itself.  Other
15  divisions.
16      Q.    Were they at the weekly PPSE meetings?
17      A.    They could have been.  I, I was not
18  attending weekly PPSE meetings.
19      Q.    So what meetings were you at where these
20  things were discussed?
21      A.    Senior manager's meetings and meetings
22  with staff but not at the weekly.  I didn't attend
23  the weekly division meeting but certainly in
24  discussions with staff for whatever reason the staff
25  had identified the need to do more analysis.

00262

1       Q.    Were these meetings where you discussed
2   these things, was Mr. Scheider at those meetings?
3       A.    Yes.  As well as everyone else in PPSE.
4       Q.    And we spoke earlier about any talk of
5   diversity in relation to COPS retreats and I wanted
6   to broaden that out.  Has there ever been discussions
7   of diversity at COPS generally?
8           MS. WU:  Objection to form.
9           THE WITNESS:  What do you mean?
10          BY MS. MEDINA:
11      Q.    What do I mean by diversity?
12      A.    No.  When you're saying has there been
13  discussion in any form.
14      Q.    Has the issue of diversity ever been
15  raised at any COPS meetings or in any communications
16  between COPS staff?
17          MS. WU:  Objection.  Lack of foundation.
                    Page 108

Pearsal.Camarata Deposition
18        THE WITNESS:  For instance, we have a BIG
19  chapter at the COPS office, our BIG chapter is Blacks
20  in Government, so there has been discussions
21  certainly in forming that and the person in charge of
22  that would give updates at all staff meetings.  So
23  there is discussion in that regard.
24        BY MS. MEDINA:
25        Q.    Do you know when the BIG chapter was

00263

1  formed at COPS?
2        A.    I don't recall.
3        Q.    Do you recall it being formed?
4        A.    Yes.  Yes.
5        Q.    What do you recall about it being formed?
6        A.    That we were forming our own chapter at
7  the COPS office.  Calvin Hodnett was the lead.
8        Q.    Can you spell that?
9        A.    H-O-D-N-E-T-T.  And he was forming the BIG
10  chapter and it was very well received by all of the
11  COPS office executive managers.
12        Q.    Do you know what brought about the
13  formation of the BIG chapter?
14        A.    No.
15        Q.    Did there ever come a time where anyone in
16  the COPS staff, I'm sorry anyone at COPS raised a
17  concern with diversity issues?
18        MS. WU:  Objection.
19        THE WITNESS:  Not that I recall or I don't
20  know.  If you could be more specific.
21        BY MS. MEDINA:
22        Q.    Did there ever come a time when anyone at
23  the COPS office raised a concern for opportunities
24  for African-American men at COPS?
25        MS. WU:  Objection to the form.

00264

1        THE WITNESS:  Can you repeat that.
2        BY MS. MEDINA:
3        Q.    Did there ever come a time when anyone at
4  COPS raised a concern with the lack of opportunities
5  for African-American men at COPS?
6        MS. WU:  Same objection.
7        THE WITNESS:  I remember hearing of that
8  at one point.
9        BY MS. MEDINA:
10        Q.    Do you recall when?
11        A.    No, I don't.
12        Q.    Was it before the formation of the big
13  chapter?
14        A.    I don't know.
15        Q.    What do you remember hearing about it?
16        A.    I just remember hearing that someone had
17  raised it as an issue.
18        Q.    Were you present when the issue was
19  raised?
20        A.    I don't believe so.
21        Q.    You heard about it through someone else?
22        A.    Yes.  I mean, I believe.  I can't recall.
23  I can't recall.  I just know I was aware of somebody
24  raising something of that nature.
25        Q.    Did do you anything in response to

00265

1  somebody raising this issue?
2        A.    No.
                    Page 109

Pearsal.Camarata Deposition
```
 3     Q.      What was your position at that time?
 4     A.      I don't recall.  I don't recall.
 5     Q.      Was it while you were at PPSE?
 6     A.      I don't recall.
 7     Q.      Do you recall whether it was while you
 8  were at the grants administrative division?
 9     A.      I don't recall.
10     Q.      Do you recall anything about what, how you
11  heard about it?
12     A.      No.
13     Q.      Did it make an impression on you?
14     A.      How so?  I mean I remember hearing it.
15  But that's it.
16     Q.      But you don't remember when?
17     A.      No.  No.
18     Q.      You don't remember what position you were
19  in?
20     A.      No.
21     Q.      You don't remember if you responded to the
22  concern at all?
23     A.      I didn't respond to it.  It wasn't
24  directly to me.
25     Q.      Who was it directly to?
```
00266
```
 1     A.      I don't know.  I just remember hearing of
 2  an issue.
 3     Q.      And you didn't think that it was your job
 4  to respond to the issue at all?
 5     A.      Not in the way I heard it or did it -- no.
 6  I didn't think it was my responsibility based on me
 7  being aware of his concern.
 8     Q.      Did you ever follow up with anyone
 9  regarding this issue?
10     A.      Did I ever follow up?  Did I personally --
11  I don't recall ever personally following up with
12  anyone.
13     Q.      Did this issue concern you?
14     A.      I'm sensitive to those kinds of issues.
15     Q.      But you didn't follow up with anyone?
16     A.      I don't know what you mean by follow up or
17  what I could have done.
18     Q.      Did you ever talk to anyone about the
19  issue after someone raised, after you had heard about
20  it?
21     A.      I don't recall.
22                 (Cammarata Exhibit No. 10 was
23                 marked for identification.)
24             BY MS. MEDINA:
25     Q.      I take it that's an I recognize this
```
00267
```
 1  document.  Ms. Cammarata, please review Exhibit 10
 2  and let me know if you recognize the email chain?
 3     A.      I'm ready.
 4     Q.      Do you recognize the email chain?
 5     A.      Yes.
 6     Q.      And what's being discussed in the email
 7  chain?
 8     A.      Why the delay in, or what's being
 9  discussed in trying to come up with an agreement on
10  the position description and performance work plan in
11  getting Al on a position description, getting him on
12  a PWP, and my denial of a course that he requested.
13  Training course.
```
                      Page 110

Pearsal.Camarata Deposition

14    Q.    What -- let's see.  Can you read the first
15  three sentences of the last email in the chain.  Not
16  including hello Pam.
17    A.    I have a concern regarding your denial of
18  the course.  I don't understand the reason.  You said
19  that my attending the course would violate personnel
20  policy regulation or law.
21    Q.    Does that, this -- who is speak engine
22  this email?
23    A.    Mr. Pearsall.
24    Q.    And who is he speaking to?
25    A.    Me.

00268
1    Q.    Is that, is that a fair recollection of a
2  conversation that you had had with Mr. Pearsall?
3    A.    Yes.
4    Q.    Did you tell him that his attending the
5  course he had requested would violate personnel
6  policy regulation or law?
7    A.    Yes.
8    Q.    Did you cite a regulation to him?
9    A.    No.
10    Q.    Did you ever give him the regulation that
11  approving the training course would have been a
12  violation of?
13          MS. WU:  Objection.  Mischaracterizes
14  prior testimony.
15          THE WITNESS:  What was your question?
16          BY MS. MEDINA:
17    Q.    Did you ever give Mr. Pearsall the
18  regulation to which you referred in your conversation
19  with him?
20          MS. WU:  Same objection.
21          THE WITNESS:  I don't know if I did.
22          BY MS. MEDINA:
23    Q.    Do you know if there was any further
24  follow up other than this email between you and
25  Mr. Pearsall regarding his training request?

00269
1    A.    I believe we had a verbal conversation
2  about it.
3    Q.    That was after this last email?
4    A.    I don't know if it was after or before, or
5  right during the same time.
6    Q.    And I'm sorry.  You said you don't recall
7  whether you gave Mr. Pearsall the regulation that you
8  had cited?
9    A.    Correct.
10    Q.    Had you ever cited that regulation to any
11  other employees before?
12    A.    Yes.
13    Q.    Who?
14    A.    Rob Chapman.
15    Q.    Under what circumstances?
16    A.    He requested to go to the same training
17  course.  And as I said, for the same reasons I was
18  going to have to deny it.  I recommended a very
19  similar course for Rob, as I did for Mr. Pearsall.
20    Q.    And did you send Mr. Chapman the
21  regulation as well?
22    A.    I don't know.  I don't recall.
23    Q.    Were you familiar with the regulation that
24  you had cited prior to Mr. Pearsall's request for
Page 111

Pearsal.Camarata Deposition

00270

25  training?

1       A.   Yes.
2       Q.   Did you have to research the regulation at
3  all?
4       A.   No.  I had already denied it in 2001 for
5  Rob Chapman.  Same course.  Same purpose.
6       Q.   And you had cited -- I'm sorry, had you
7  cited to Mr. Chapman the regulation?
8       A.   Not by -- I don't know if I did it by
9  number but I cited that I was not able to approve the
10  training course because he was not an official
11  supervisory position and I recommended another
12  course.
13       MS. MEDINA:  I'm all done so now I turn
14  the witness over.
15       MS. WU:  I only had one statement that I
16  wanted to put on the record and that was just that
17  prior to Miss Cammarata's deposition we had produced
18  to you a few emails and since they are not Bates
19  numbers, at least the three emails, I just wanted to
20  identify them for the record.
21       MS. MEDINA:  Absolutely.  Thank you.
22       MS. WU:  Great.  One of the emails is
23  dated at the top September 29, 2003.  It's an email
24  from Albert Pearsall to Sharon Baker, Pam Cammarata
25  and Nancy Leach and the subject is regarding meeting

00271

1  to discuss PWP.  That's a two-page email chain.
2       The second email which we produced is a
3  document containing two emails.  The top email is
4  another email from Mr. Pearsall.  It's dated
5  September 29th, 2003 directed to Pam Cammarata and
6  Nancy Leach CCing Sharon Baker and the subject again
7  is regarding meeting to discuss PWP.
8       And the third email which we produced this
9  morning is a document containing two emails and the
10  top email appears to be again from Mr. Pearsall.
11  It's dated August 28th, 2003 from -- strike that.  To
12  Pam Cammarata.  The subject is regarding I am sorry I
13  missed your phone call this morning.
14       In addition, I just want to state for the
15  record that we had faxed over to the attorneys here
16  supplemental production yesterday and then this
17  morning because apparently it did not go through in
18  its entirety and that would contain documents that
19  were bates stamped COPS 1627 to COPS 1628.  Great.
20  That's it.
21       (Whereupon, at 4:50 p.m., the taking of
22  the instant deposition ceased.)
23
24                              _____
25                              Signature of the Witness

00272

1
2  SUBSCRIBED AND SWORN to before me this _____ day
3  of _____, 2006.
4
5                              _____
6                              NOTARY PUBLIC
7  My Commission expires:  _____
8
9

Page 112

Pearsal.Camarata Deposition

```
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```